Donna J. McCready
Ashburn & Mason, P.C.
1227 West 9th Avenue, Suite 200
Anchorage, Alaska 99501
(907) 276-4331 / phone
(907) 277-8235 / fax

Attorney for Kimberly Allen

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

KIMBERLY ALLEN, Personal Representative)
of the ESTATE OF TODD ALLEN,                        )
Individually, on Behalf of the ESTATE OF     )
TODD ALLEN, and on Behalf of the Minor   )
Child PRESLEY GRACE ALLEN,                    )   Case No.:   3:04-CV-0131-JKS
                                                                      )
              Plaintiffs,                                       )
                                                                      )
vs.                                                                 )
                                                                      )
UNITED STATES OF AMERICA,                     )
                                                                      )
              Defendants.                                     )
_____)

**MEMORANDUM FOR RULING
REGARDING PROOF OF CAUSATION**

## I.    INTRODUCTION

Kimberly Allen, by and through counsel Ashburn & Mason, P.C., hereby moves this Court for a ruling on the appropriate standard for her burden of proof regarding causation given that the defendant's negligence in this case has made it more difficult for her to prove causation conclusively.

This medical malpractice action involves the wrongful death of 36-year old Todd Allen, who is survived by his wife, Kim Allen, and his minor daughter, Presley. The defendant's agents negligently triaged and subsequently misdiagnosed Todd Allen's subarachnoid hemorrhage when he presented at Alaska Native Medical Center's (ANMC) Emergency Department with 10/10 pain in his head and ears, nausea, vomiting and slow speech. Mr. Allen was triaged to a mid-level practitioner in the clinic side of the Emergency Department. The nurse practitioner failed to adequately assess Mr. Allen or to order a brain CT which, more likely than not, would have revealed that Mr. Allen was suffering from a subarachnoid hemorrhage. Had Mr. Allen's brain bleed been appreciated, he would have been admitted, monitored and med-evaced to the University of Washington in Seattle, which has a state-of-the-art facility for the treatment of aneurysms. Instead, Mr. Allen was not admitted and sent on his way to eat breakfast, to walk around, to lift luggage and to sleep unmonitored. Mr. Allen's brain swelled throughout the morning and afternoon of April 19th before he fell into a coma and died early the following morning from a subarachnoid hemorrhage.

The United States takes the position that Mr. Allen would have died no matter what care and assistance ANMC may have provided had his brain bleed been properly diagnosed the early morning of April 19, 2003. The defendant relies on the lack of evidence regarding the specifics of Mr. Allen's condition the morning and afternoon of April 19th (i.e., the location and size of his aneurysm which caused the subarachnoid bleed and Mr. Allen's vital signs) to assume that his outcome would be unchanged by a

proper diagnosis and treatment.  Indeed, the government relies on the fact that Mr. Allen became comatose some 10 hours after it negligently sent him back into the community from ANMC without monitoring or treatment to argue he would have died no matter what they did.  *However, this lack of evidence regarding the specifics of Mr. Allen's condition and the fact of his deterioration over the many hours following his presentation to the ANMC Emergency Department is the sole result of ANMC's negligent assessment of Mr. Allen and failure to order a brain CT and admit Mr. Allen to the hospital.*  The United States is, in essence, assuming it should be allowed to legally benefit from the consequences of its own negligence.

Thus, the plaintiff asks this Court for a ruling, following well established legal rules, that if Kim Allen establishes that ANMC was negligent in failing to properly assess Mr. Allen and to order appropriate testing (CT scan), the burden of proof shifts to the defendant to demonstrate that Mr. Allen's outcome would have been the same had his true condition been appreciated the morning of April 19th, 2003.  Alternatively, plaintiffs ask for a ruling preventing defendants from relying on the lack of information resulting from its negligent assessment and subsequent decision not to admit, treat, and/or monitor Mr. Allen to defend against liability.

## II.     FACTUAL BACKGROUND

On the morning of April 19, 2003, at 7:10 a.m., Todd Allen presented at the Emergency Department of ANMC with his wife, Kim Allen, who was pregnant with their first child, complaining of "ears and head are hurting – up all night."  Exhibit 1,

ASHBURN & MASON P.C.
LAWYERS
1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  •  FAX 907.277.8235

Excerpt of Patricia Ambrose's Deposition at 48.  He reported to the triage nurse that he had "10/10" pain.  *Id.*  The triage nurse, Patricia Ambrose, remembered Mrs. Allen saying "he had taken all his pills and he still had pain."  Exhibit 1 at 51-52.[1]

ANMC's Emergency Department is divided into two sections:  the Emergency Room, which is staffed by Emergency Room (ER) physicians, and the Urgent Care Center (UCC), which is staffed by mid-level practitioners such as advanced nurse practitioners (ANP) and physician's assistants (PA).  Exhibit 1 at 31-33; Exhibit 2, Excerpt of Dr. Richard Brodsky's Deposition[2] at 13-15.  Patients are not told they are being triaged to the ER or the UCC.  Exhibit 1 at 76.  The ANMC Emergency Department's triage policy in 2003 was that patients presenting with "pain – severe, any etiology" were assigned an Acuity Level of 2 and seen by an ER physician.  Patients with "pain – significant, any etiology, i.e., headaches, earaches, back pain" were assigned an Acuity Level 3 and could be seen by an ER physician or mid-level practitioner.  Exhibit 3, Excerpt of Diane Duntze's Deposition[3] at 123-133, and Deposition Ex. 6 at ANMC 898, 900, 901.  According to ANMC records, every patient

---

[1]  Mr. Allen had a history of jaw pain as a result of a traumatic jaw fracture which occurred in 1999.  After having surgery on his jaw his pain was well controlled with pain medication.  He had never presented to the Emergency Department or the ANMC Family Clinic complaining of nausea and vomiting in addition to head pain.  He had never presented to the Emergency Department or the ANMC Family Clinic complaining that he could not control pain with pain medication.  In fact, it had been over two years since he had presented in the ANMC Emergency Department for any reason.

[2]  Dr. Brodsky was, at all times relevant to this case, the Chief of the Emergency Department at ANMC.

[3]  Diane Duntze is defendant's expert nurse witness.

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA,* Case No. 3:04-CV-0131-JKS

assigned an Acuity Level 3 on the morning of April 19th, 2003 was seen by an ER physician. Exhibit 4, Excerpt of Dr. Frank Mannix's Deposition[4] at 128-129.

**1.  ANMC's Negligent Misdiagnosis and Mr. Allen's Death.**

Despite the fact that Mr. Allen presented complaining of 10/10 pain with his "ears and head are hurting – up all night," the triage nurse, Patricia Ambrose, assigned Mr. Allen an Acuity Level 4, which meant he would be seen by a mid-level practitioner in the UCC as opposed to an ER physician. Exhibit 1 at 56. The mid-level practitioner who evaluated Mr. Allen, Nurse Fearey, failed to take an adequate history in that she failed to determine the onset of his pain, the location of the pain and whether or not the pain was different than his prior pain complaints; she failed to appreciate the significance of his "slow speech," associated symptoms of nausea and vomiting, and the fact that he had always been able to control his pain with medication in the past. She failed to ascertain how many pain pills he had taken the night before in his effort to control his pain and she failed to conduct a neurologic examination. Exhibit 5, Excerpt of Dr. Richard Rubenstein's Deposition[5] at 132-133; Exhibit 6, Excerpt of Dr. Michael Levy's Deposition[6] at 120-121, 123-124, 145-146; Exhibit 3 at 78-79, 102-104; 170-174. Instead, Ms. Fearey ordered a shot of phenergan (which acts synergistically with narcotics and causes drowsiness) and sent him on his way. Thus, instead of being

---

[4]  Dr. Mannix is plaintiff's expert on emergency medicine.

[5]  Dr. Rubenstein is defendant's expert neurologist.

[6]  Dr. Levy is defendant's expert on emergency medicine.

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA,* Case No. 3:04-CV-0131-JKS

ASHBURN & MASON P.C.

LAWYERS

1227 WEST 9TH AVENUE, SUITE 200

ANCHORAGE, ALASKA 99501

TEL 907.276.4331  •  FAX 907.277.8235

admitted and treated for a life-threatening condition, Mr. Allen was allowed to eat breakfast, walk around, lift luggage and packages and to sleep unmonitored. [7]

Mrs. Allen called ANMC that afternoon at approximately 3:45 p.m. because her husband was "sleeping really hard" and had sonorous respirations. Exhibit 8, Excerpt of Kim Allen Deposition at 123-129, 135. ANMC told Mrs. Allen not to worry if he was breathing. *Id*. at 129. At approximately 5:10 p.m. Mrs. Allen called 911 because she could not rouse her husband and she saw blood coming from his mouth. *Id.* at 132-133, 136.

Paramedics transported Mr. Allen to Providence Alaska Medical Center ("Providence") via ambulance. The emergency room physician at Providence, Dr. Dietz, documented that Mr. Allen "apparently developed a severe headache earlier this morning … per his wife, he had so much headache that he took pain pills he had been given." Exhibit 9, Excerpt of Dr. Susan Deitz's Deposition at 15-16. The Providence admitting physician, Dr. Lee, documented that "according to the patient's wife, he had been complaining of a headache in his right jaw area radiating to the back of his head and then up to the top of his head, along the back side of his head." Exhibit 10, Excerpt of Dr. Loretta Lee's Deposition at 17. A CT of Mr. Allen's brain showed he had a subarachnoid hemorrhage and extensive brain swelling. He died the next day.

---

[7] Every defense expert in this case agreed that it would be below the standard of care to discharge a patient with a brain bleed and you would not allow a patient in such condition to eat, walk around, lift things or sleep unmonitored. Exhibit 6 at 158-160 (Levy); Exhibit 5 at 70 (Rubenstein); Exhibit 7, Excerpt of Dr. Ronald Shallat's Deposition at 52-53, 141-146, 157-160. (Dr. Shallat is defendant's expert neurosurgeon.) *See also*, Exhibit 3 at 92 (Duntze).

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA,* Case No. 3:04-CV-0131-JKS

ASHBURN & MASON P.C.
LAWYERS
1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  ·  FAX 907.277.8235

2.    **The Standard of Care**.

The standard of care for assessing someone with significant head pain in any emergency department is to include a subarachnoid bleed as part of the differential diagnosis because a subarachnoid bleed is life threatening.  Exhibit 3 at 76; Exhibit 6 at 37-38, 118-119.  An emergency department practitioner must know about the presentation(s) of a subarachnoid bleed and the pitfalls of misdiagnosis.  Exhibit 3 at 88-89; Exhibit 6 at 37-38.  In order to rule out a subarachnoid bleed, it is necessary to take an adequate history, which includes ascertaining the onset of the pain, the severity of the pain (i.e., is this the worst pain the patient has experienced), associated symptoms, and the differentiation between the pain complained of in the emergency department versus what the patient may have experienced in the past.  Exhibit 3 at 81-83, 90-91; Exhibit 6 at 38-42.  This standard of care for assessing patients with head pain applies to chronic pain patients as well.  Exhibit 3 at 88; Exhibit 6 at 42-43.  If a subarachnoid bleed is suspected a brain CT is ordered which has an over 90% detection rate.  If the brain CT is negative a lumbar puncture is performed.  Exhibit 3 at 84; Exhibit 5 at 56 -57.

A subarachnoid bleed usually has a sudden onset, is terribly painful and is often associated with nausea and vomiting.[8]  Exhibit 3 at 78-79; Exhibit 6 at 45-46.  A patient with a subarachnoid bleed may have neurological deficits, such as altered speech.

---

[8]    Nurse Fearey, the ANP who did not admit Mr. Allen that morning, acknowledged in her own testimony that "when somebody has a severe headache and – and is vomiting, that can be an indication that they have got increased pressure in their head … and that causes them to vomit. … [l]ike from a bleed ... from a bleed or a tumor."  Exhibit 11, Excerpt of Donna Fearey's Deposition at 53.

ASHBURN & MASON P.C.

LAWYERS

1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  •  FAX 907.277.8235

Exhibit 3 at 80; Exhibit 6 at 124.  However, the more neurologically intact the patient is when they present to an emergency department, the more likely they will have a good outcome if properly diagnosed and treated.  Exhibit 12, Excerpt of Dr. Robert Cantu's Deposition at 140; Exhibit 13, Excerpt of Dr. Susan Shott's Deposition at 63, 82-85.[9]

It is critical to admit a patient diagnosed with a subarachnoid hemorrhage to an intensive care unit and to institute treatment as soon as possible.  Exhibit 7 at 76-77. The standard of care is to monitor a patient's blood pressure and other vital signs and to provide prophylactic treatment, which may include calcium channel blockers and anticonvulsants, to prevent rebleeding and/or vasospasm (constriction of blood vessels in the brain).  Exhibit 5 at 58; Exhibit 6 at 159; Exhibit 7 at 52-63.  Patients diagnosed with a subarachnoid hemorrhage at ANMC are med-evaced to University of Washington which has a state-of-the-art facility for treatment of aneurysms.  Exhibit 2 at 96; Exhibit 5 at 87.  There the patient would undergo an angiogram which would provide further detail regarding the brain bleed.

**3.    Defendant's Causation Defense.**

The defendant's misdiagnosis of Mr. Allen was a result of both the negligent triage decision (which was in violation of ANMC's triage policy) resulting in Mr. Allen's being seen by a mid-level practitioner as opposed to an ER physician[10] and the

---

[9]   Dr. Cantu is plaintiff's expert neurosurgeon; Dr. Shott is plaintiff's expert medical statistician.

[10]   The government's nurse expert (Diane Duntze) admitted that she was not sure whether or not the triage decision by Ambrose breached the standard of care.  Exhibit 3 at 122-123.  The problem with the triage decision is highlighted by the government's

ASHBURN & MASON P.C.
LAWYERS
1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331 · FAX 907.277.8235

fact that the mid-level practitioner either did not possess the requisite diagnostic skills to appreciate that Mr. Allen had a subarachnoid bleed – Mr. Allen's true condition the morning he sought treatment at ANMC[11] – or failed to exercise the degree of knowledge or skill required under the circumstances to make the proper diagnosis. Mr. Allen was owed a certain duty of care by ANMC to be provided with adequate emergency room care whether he was seen by a mid-level practitioner or a physician and the failure of the ANMC care provider to appreciate the significance of his symptoms, her failure to order a brain CT and her decision to send the patient away without further work up breached this duty. Indeed, plaintiff's and defendant's experts agree that it would be a violation of the standard of care to release a patient with a subarachnoid bleed from the hospital and allow the patient to eat breakfast, run errands, lift luggage and sleep without being properly monitored.[12]

Remarkably, the United States claims that it would not have mattered if Mr. Allen's brain bleed had been diagnosed and Mr. Allen had been admitted to the hospital, monitored, treated and med-evaced to the University of Washington. The government,

_____

emergency medicine expert (Dr. Levy) who described the ANMC Urgent Care Center as "a convenience site … the reason it exists is to bleed off stuff from the emergency department. It functions at a lower level" with "mid-level care providers" who are held to a "lower standard of care." Exhibit 6 at 114-115. Dr. Levy also explained that another difference between the ER and the UCC is that if you are a physician on the ER side you assume the patients are "sicker." Exhibit 6 at 116-117. By the same token the UCC practitioner does not expect to see very sick patients.

[11]    Defendant's own expert neurosurgeon (Dr. Shallat) testified that Mr. Allen more likely than not had a sentinel bleed the morning he sought treatment at ANMC. Exhibit 7 at 135-136, 171-172.

[12]    *See supra* note 4.

ASHBURN & MASON P.C.
LAWYERS
1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  •  FAX 907.277.8235

relies in large part on the lack of information in the case, *e.g.* location and nature of Mr. Allen's aneurysm, Mr. Allen's blood pressure, level of consciousness, intracranial pressure, etc., throughout the morning and afternoon of April 19th. Exhibit 5 at 184.[13] Exhibit 7 at 139-14. See Exhibit 13 at 75-80.[14] *However, as previously stated, this lack of data is the direct consequence of the negligence of the triage nurse and the mid-level practitioner* which resulted in no CT being ordered and Mr. Allen being sent away from the clinic without any further work-up, monitoring or care.  The United States is attempting to hide behind the consequences of its own negligence to avoid liability. While, as discussed below, the plaintiff has evidence in support of causation, the lack of precise information regarding Mr. Allen's subarachnoid hemorrhage the morning and afternoon of April 19th makes it challenging to rebut conclusively defendant's worst-case scenario argument that Mr. Allen was not treatable and that he was going to die anyway.

Under these circumstances, it is appropriate to shift the burden of proof to defendant regarding whether Mr. Allen's condition was treatable the morning he sought care at ANMC and to prohibit the defendant from arguing that the plaintiff can not prove causation due to a lack of evidence which results directly from the defendant's negligence.

---

[13]    The government's expert neurologist opined, "all of this is total speculation. You don't even, one, know that he had an aneurysm… We don't know the location, we don't know the accessibility, we don't know the best method of treatment."

[14]    The government's counsel questioning plaintiff's expert whether or not she took into consideration the location, shape and number of aneurysms.

ASHBURN & MASON P.C.
LAWYERS
1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  •  FAX 907.277.8235

4.    **Defendants Should Not Be Permitted to Benefit From the Consequences of Their Own Negligence.**

The California courts have addressed instances where a defendants' negligence hinders plaintiffs' ability to demonstrate causation and have adopted a rule shifting the burden of proof to defendants in certain circumstances on public policy grounds.  The first case to address this issue was *Haft v. Lone Palm Hotel*.[15]  There, a father and son drowned at a motel pool where there were no witnesses, and more importantly, no lifeguard, in direct violation of California law.  The California Supreme Court held that under these circumstances the burden of proof on causation should shift to the defendant because its negligent failure to provide a lifeguard deprived plaintiffs of a means to establish the facts leading to the drowning (a witness).  The Court stated:

> [T]he shift of the burden of proof in the instant case may be said to rest on a policy judgment that when there is a substantial probability that a defendant's negligence was a cause of an accident, and when the defendant's negligence makes it impossible, as a practical matter, for plaintiff to prove 'proximate causation' conclusively, it is more appropriate to hold the defendant liable than to deny an innocent plaintiff recovery, unless the defendant can prove that his negligence was not a cause of the injury.[16]

*Haft* thus stands for the principle that the burden of proof regarding causation may be shifted to defendant on the threshold showing that: (1) there is a substantial probability that defendants' negligence harmed plaintiff; and (2) defendants' negligence has rendered it nearly impossible for plaintiff to prove causation conclusively.

---

[15]  478 P.2d 465 (Cal. 1970).

[16]  478 P.2d at 476.

Subsequent decisions applying *Haft* affirm the principle that public policy supports shifting the burden of proof where a defendant's negligence has significantly impaired a plaintiff's ability to prove causation. For instance, in *Galanek v. Wismar*,[17] a client sued her former attorney for malpractice because, while the attorney was representing her in a products liability action based on negligent design of the driver's seat in her car, the attorney failed to obtain and preserve the vehicle in question, leading to dismissal of plaintiff's claim. The attorney argued in the malpractice case that plaintiff could not prove his negligent failure to preserve her vehicle caused plaintiff to lose her action against the carmaker because plaintiff had no evidence that the seat in her car was improperly designed. *But this lack of evidence was the direct result of the attorney's negligent failure to obtain and preserve the car.* Plaintiff thus asked the Court to shift the burden of proof on causation to her former attorney. The Court of appeals agreed and applied *Haft*, stating "[b]ecause Wismar's negligence in failing to preserve the car is what made it impossible for [plaintiff] to prove causation, as a matter of public policy it is more appropriate to hold Wismar liable than to deny [plaintiff] recovery, unless Wismar can prove his negligence did not damage [plaintiff]."[18] The Court concluded that "to require [plaintiff] to establish causation in the instant action would permit Wismar *to take advantage of the lack of proof resulting from his own*

---

[17] 68 Cal.App.4th 1417, 1426 (Cal. App. 1999).

[18] *Id.* at 1426.

*negligence.* Wismar cannot be insulated from personal liability by the very act of professional negligence that subjects him to liability."[19]

In the present case, the factual circumstances of Mr. Allen's death are sufficient to trigger the burden shifting provided for in *Haft* and its progeny. *First*, there is a substantial probability that ANMC's negligent triage decision and subsequent failure to properly diagnose Mr. Allen's condition caused Mr. Allen's death. Mr. Allen came to ANMC early in the morning of April 19th neurologically intact[20] but complaining of severe head pain that could not be controlled with pain medication; his severe head pain was associated nausea and vomiting and slow speech. Late that *same afternoon*, after his wife called 911, Mr. Allen was taken to Providence and diagnosed with a subarachnoid hemorrhage. Defendant's expert neurosurgeon agrees that Mr. Allen, more likely than not, was suffering from a sentinel bleed when he presented to the ANMC Emergency Department. Exhibit 7 at 135-136, 171-172.

---

[19] *Id.* at 1427 (emphasis added). S*ee also Saffro v. Elite Racing, Inc.*, 98 Cal.App.4[th] 173, 180 (Cal. App. 2002)(where marathon race organizer did not supply adequate hydration/electrolytes for competing runners, court suggested case may be appropriate for shifting burden of proof on causation to defendant where plaintiff, a runner who suffered an epileptic seizure after race, had neurological deficits, including memory loss); *Dimond v. Caterpillar Tractor Trailer Co.*, 65 Cal.App.3d 173, 184 (Cal. App. 1976) ("In other instances the law has stood ready to come to the aid of a hapless plaintiff who, through no fault of his own, is unable to provide direct evidence that defendant's breach of duty was a proximate cause of his injuries. . . .The solution in those cases was to shift the burden of proof on the issue of causation to defendant").

[20] According to the defendant's expert neurosurgeon, Mr. Allen had a Hunt and Hess score of 1. Exhibit 7 at 187. The Hunt and Hess score is a grading system for cerebral aneurysms which goes from 0 – 5; the lower the number the more neurologically intact the patient. Exhibit 5 at 82-83.

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA,* Case No. 3:04-CV-0131-JKS

Plaintiff's experts will testify that because Mr. Allen was neurologically intact when he first presented for ED services, he likely would have had a good outcome had his condition been appreciated.[21]    Second, because of the defendant's negligence, the plaintiff does not have precise information regarding the location and size of Mr. Allen's aneurysm or information regarding his blood pressure and intracranial pressures on the 19th, all of which could have assisted plaintiff in proving causation conclusively. Therefore, the burden of proof on causation should shift to the United States.

### 5.    Spoliation Principles Support Shifting the Burden of Proof to Defendant.

In Alaska, spoliation of evidence can shift the burden of proof on causation.  In *Sweet v. Sisters of Providence in Washington*,[22] a medical malpractice plaintiff alleged that the hospital had negligently lost medical records that were critical to plaintiff's claim.  The Court held that the jury should have been instructed that the loss of the medical records raised a rebuttable presumption of negligence on the part of the hospital, but only if there is a threshold finding that the missing evidence "sufficiently hinders plaintiffs' ability to proceed", and was missing through the negligence or fault of the defendant.[23]  In reaching this conclusion, the Court recognized that the absence of

---

[21]    Plaintiff's expert neurosurgeon testified that with, "either one of those grades [Hunt and Hess score of 1 or 2] statistically much more than 50 percent do well following a subarachnoid hemorrhage [sic].  So most probably, he would have done well had the hemorrhage been recognized at that point …".  Exhibit 12 at 140; Exhibit 13 at 63, 82-85.

[22]    895 P.2d 484 (Alaska 1995).

[23]    *Id.* at 491-92.

ASHBURN & MASON P.C.

LAWYERS

1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  •  FAX 907.277.8235

these records impaired plaintiff's ability to prove a connection between negligence and injury and cited to numerous jurisdictions that had held that burden shifting was appropriate where a health care provider negligently alters or loses medical records relevant to a malpractice claim. *Sweet* is consistent with the conclusion of many courts that spoliation of evidence can lead to a shift in the burden of proof, or at the least, a negative inference against the party who failed to preserve the evidence.[24]

Here, plaintiff is not alleging that defendants lost or destroyed existing evidence. Rather, plaintiff is arguing that defendants' negligence in failing to provide Mr. Allen proper care on the morning he sought treatment from ANMC resulted in the loss of evidence of Mr. Allen's medical condition that morning through the lost opportunity to create proper medical records. The failure to create evidence, as a general matter, does not constitute spoliation per se,[25] although some courts have held that failure to create records can constitute spoliation in certain circumstances.[26] Nonetheless, the Court need not address this issue because the principles behind *Sweet* apply whether or not defendants' actions constitute spoliation as a technical matter.

In *Sweet*, the Court adopted the following principles, following the Florida Supreme Court's decision in *Public Health Trust v. Valcin*[27]: (1) that the lack of

---

[24] *See id.* at 491 (listing cases).

[25] *See, e.g., Capitol One Bank v. Rollins*, 106 S.W.3d 286, 298 (Tex. App. 2003) ("[S]poliation is defined as the destruction of evidence, not the failure to create evidence.").

[26] *See Mead v. Papa Razzi Restaurant*, 899 A.2d 437 (R.I. 2006).

[27] 507 So.2d 596 (Fla. 1987).

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA,* Case No. 3:04-CV-0131-JKS

ASHBURN & MASON P.C.

LAWYERS
1227 WEST 9TH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
TEL 907.276.4331  •  FAX 907.277.8235

evidence must be important and must "hinder[] plaintiff's ability to proceed";  and (2) "burden shifting should only occur when the essential medical records are missing through the negligence or fault of the adverse party."[28]  These principles mirror both the foundation for burden shifting under *Haft* (defendant's negligence results in missing information critical to plaintiff's ability to prove causation), and the circumstances here (defendant's negligent misdiagnosis and failure to treat Mr. Allen resulting in lack of medical records, significantly hindering plaintiff's ability to establish causation).  Thus, the Alaska Supreme Court's decision in *Sweet*, while not directly applicable, provides a solid foundation for adoption of the burden shifting regime of *Haft*.

> **6.     Alternatively, Defendants Should Be Prohibited From Relying on the Lack of Medical Evidence Resulting from ANMC's Negligent Misdiagnosis of Mr. Allen.**

If the Court declines to apply *Haft* and shift the burden of proof to defendants to demonstrate that Mr. Allen's condition was not treatable the morning he sought treatment at ANMC, plaintiff asks in the alternative that defendant be prevented from relying on the lack of detailed information regarding Mr. Allen's aneurysm the morning he sought treatment at ANMC as a defense to liability.

Defendants are essentially arguing that the lack of evidence regarding Mr. Allen's aneurysm the morning he sought care at the ANMC Emergency Department renders it pure speculation that any treatment Mr. Allen may have received if properly diagnosed would have prevented his death.  The Fourth Circuit rejected this precise

---

[28]  *See Sweet*, 895 P.2d at 491.

argument in *Hicks v. United States.*[29]  There, the plaintiff alleged that defendants failed to properly diagnose and operate on plaintiff's decedent, thus leading to the wrongful death.   Defendants argued that it was "mere speculation" to argue that plaintiff's suggested diagnosis and treatment would have been successful.  The Court rejected this argument stating:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. *If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable.*  Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass.  The law does not in the existing circumstances require the plaintiff to show to a certainty that the patient would have lived had she been hospitalized and operated on promptly.[30]

The court analogized to an admiralty case involving a man overboard where the court stated that because the ship's master had a duty to attempt a rescue if a reasonable possibility of success existed, liability is established if the master's omission destroyed the reasonable possibility of rescue.[31]  The *Hicks* court concluded that since expert testimony indicated prompt surgery would have saved the patient, the "doctor's negligence nullified whatever chance of recovery [the deceased] might have had and was the proximate cause of the death."[32]

---

[29]  368 F.2d 626 (4th Cir. 1966).

[30]  *Id.* at 632 (emphasis added).

[31]  *Id.* at 632-633 (citing *Gardner v. National Bulk Carriers, Inc.*, 310 F.2d 284 (4th Cir. 1962)).

[32]  *Id.* at 633.

Here, there is ample evidence that had Mr. Allen been properly diagnosed and received prompt treatment when he first presented to ANMC, he would have likely survived.

Thus, legal and equitable principles support an order preventing defendant from relying on the lack of medical evidence regarding Mr. Allen's condition the morning he sought treatment at ANMC as a defense to liability.

**7.    Conclusion.**

For the reasons stated above, plaintiff respectfully requests this Court order that if plaintiff establishes that defendant negligently misdiagnosed Mr. Allen the morning he sought treatment at ANMC, the burden of proof should shift to defendant to demonstrate that Mr. Allen's condition was not treatable at that time because the lack of evidence regarding Mr. Allen's precise condition that morning is a direct consequence of defendant's negligent misdiagnosis.  Alternatively, plaintiff respectfully requests that the Court order that defendant may not rely on the lack of medical evidence regarding Mr. Allen's condition the morning he sought treatment at ANMC as a defense to liability.

ASHBURN & MASON, P.C.
Attorneys for Plaintiff

DATED:   10/31/06          /s/  Donna J. McCready
1227 West Ninth Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 276-4331
Fax: (907) 277-8235
E-mail: djm@anchorlaw.com
Alaska Bar No. 9101003

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA,* Case No. 3:04-CV-0131-JKS

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of October, 2006, a copy of the foregoing Memorandum for Ruling Regarding Proof of Causation was served electronically on:

   Gary Guarino

 /s/ Donna J. McCready

P:\Clients\10194\Pleadings\Memo re Burden Shifting 061031.doc

MEMORANDUM FOR RULING REGARDING PROOF OF CAUSATION
*Allen v. USA*, Case No. 3:04-CV-0131-JKS