ALLEN v. USA                                                    DIANE "DEDE" DUNTZE, R.N.
                                                                                2/24/2006

Page 101

1  Q. Have you heard of that text?
2  A. No.
3  Q. Okay. How about Tintinalli, T-i-n --
4  T-i-n-t-i-n-a-l-l-i?
5  A. No.
6  Q. It's an emergency room -- have you ever
7  heard of that text?
8  A. No.
9  Q. All right. I want to go to the third
10 paragraph of your report, and where you state, at
11 the last sentence: "Although Mr. Allen died later
12 in the day, the early morning urgent care visit with
13 Donna Fearey ANP at Alaska Native Medical Center
14 4/19/03 seems to have been generally appropriate."
15 And I just want to ask you: What do you mean
16 by "seems to have been generally appropriate"?
17 A. I think that it was an appropriate visit,
18 that her -- I think that what I was getting at is
19 what I referred to later on is, in hindsight, there
20 may have been some things that, you know, would have
21 helped. Like in hindsight, a neuro exam may or may
22 not have helped. But generally I felt like her --
23 her history and exam was appropriate, with the
24 exceptions of the things that I mentioned in my
25 report, that maybe there could have been a little

Page 102

1  bit more history about his vomiting or --
2  Q. Well, let me ask you about that. Let's
3  just go ahead and mark that as an -- as an exhibit,
4  the emergency room record from 4/19. So I'm
5  marking -- shoot. I always tend to do that.
6       MS. McCREADY: Do you have any blanks, so --
7  so I'm not marking one that's highlighted?
8       You can use that, if you would like.
9       MR. GUARINO: All right.
10      (Exhibit 5 marked.)
11 BY MS. McCREADY:
12 Q. So I have marked as Exhibit 5 -- that's the
13 4/19/03 emergency room visit of Todd Allen. And I'm
14 sure you reviewed this a number of times. Is
15 that -- is that right?
16 A. That's right.
17 Q. Okay. And so some of the information that
18 you had indicated in your report that in hindsight
19 may have been helpful in this case would have been a
20 more careful history. Is that correct?
21 A. Could have been a little bit more in-depth.
22 Q. Okay. And a little bit more in-depth in
23 terms of whether or not this pain was different than
24 the pain he had before?
25 A. Yes.

Page 103

1  Q. Whether or not this was the worst pain this
2  patient had ever had?
3  A. Yes.
4  Q. And the description of the -- the onset,
5  whether or not it was sudden or whether or not it
6  came on over time?
7  A. Yes.
8  Q. Anything else from the history that could
9  have been included by Nurse Fearey?
10 So for instance, do you know how much pain
11 medication this patient had taken before he showed up
12 that morning?
13 A. No, I don't.
14 Q. Do you know how many times he vomited?
15 A. No, I don't.
16 Q. Okay. Would that be information, as an
17 emergency care provider, that you would want to know
18 about this patient, if he presented in your
19 emergency room?
20 A. Could be helpful.
21 Q. Yeah. And how could it be helpful?
22 A. To help you make your diagnosis.
23 Q. Okay. And determine whether or not this is
24 more of an urgent situation as opposed to a not very
25 urgent situation?

Page 104

1  A. Yes.
2  Q. All right. Did you notice that Nurse
3  Fearey documented that this patient had -- that
4  their speech was slow?
5  A. Yes.
6  Q. And what -- what did that indicate to you?
7  A. I didn't know what it meant.
8  Q. Okay.
9  A. I didn't know what she meant by it.
10 Q. All right.
11 A. I have -- I have to say that in her
12 deposition -- can I refer to that?
13 Q. Sure, absolutely.
14 A. She said that -- I think what she said was
15 it wasn't, like, pressured, and so that could mean
16 to me that she was thinking that his speech was
17 normal.
18 Q. Right. Have you ever documented that a
19 patient's speech was slow just to show that it was
20 normal?
21 A. I probably wouldn't use those words but --
22 Q. I mean, if you wanted to document that a
23 patient's speech was normal, would you generally
24 document that it was normal as opposed to slow?
25 A. Probably.

29 (Pages 101 to 104)

Page 121

1  Ambrose, Patricia Ambrose?
2      A.  No, I don't.
3      Q.  Okay.  And have you ever spoken with her in
4  relation to this case?
5      A.  No.
6      Q.  All right.  Are you going to be offering
7  any opinions on the triage decision that was made by
8  Patricia Ambrose and whether or not that was
9  accept- -- that was below the standard of care or
10 not?
11     A.  I don't know.
12     Q.  Well, let me ask you:  Do you see any
13 problems with how Patricia Ambrose triaged Todd
14 Allen the morning of April 19th, '03?
15     A.  No, I don't.
16     Q.  Okay.  What's that based on?
17     A.  That's based on -- it looks like they just
18 do a little short sentence of how the patient --
19 what the patient's chief complaint is, and she wrote
20 down:  Ears and head are hurting, he's been up all
21 night.  She writes down a ten for what he apparently
22 told her for his pain, and her objective note is
23 that he's sitting at ease.
24         And so I don't have any problem with that.
25 She doesn't say he's vomiting.  She doesn't say, you

Page 122

1  know, anything that makes me wonder how he's doing.
2      Q.  Well, do you remember -- did you read her
3  deposition, Patricia Ambrose?
4      A.  Yes.
5      Q.  Right.  And did you remember her saying
6  that -- that he also gotten information from his
7  wife that he had taken all his pain pills and he
8  threw -- and he couldn't keep them down?  No, that
9  he -- I'm sorry.  Let me go back.  Let me go to that
10 actually.
11         Do you remember -- and I can -- I can show
12 this to you.  I don't have a separate copy of it, but
13 when -- I asked Nurse Ambrose:  "What do you remember
14 about his wife?"
15         "She told me he took all his drugs, that he
16 had taken all his pills and he still had pain."
17         Do you remember that part?
18     A.  No, I don't remember that.
19     Q.  Okay.  Well, if -- does that change any of
20 your -- this is -- this is Patricia Ambrose
21 testifying about what she remembers about that
22 morning.  Would that be something you would think a
23 triage nurse would actually document, that he had
24 taken all of his drugs, taken all of his pills, and
25 he still had pain?

Page 123

1      A.  Yes.
2      Q.  Okay.  Does that affect your opinion at all
3  about whether or not she was reasonable in how she
4  triaged this patient?
5      A.  I don't know.  I would have to think.
6         (Exhibit 6 marked.)
7  BY MS. McCREADY:
8      Q.  Okay.  Let me go over the -- just ask you
9  about the triage policy that I have marked as
10 Exhibit 6.  And taking a look at that, these are
11 Bates stamped ANMC 894 through 904.  And does that
12 look like the -- what you were given in terms of
13 what the triage policy was in place at the time --
14     A.  Yes.
15     Q.  -- at ANMC in 2003?
16     A.  Yes.
17     Q.  Okay.  And we talked a little bit about the
18 triage policy that -- at least before working on
19 this case, you weren't familiar with the five
20 level -- five levels of acuities.  Is that correct?
21     A.  Right.
22     Q.  All right.  But did you review the
23 different levels in -- at least in ANMC's policy, in
24 terms of how patients should be triaged, in terms of
25 who's a one, who's a two, who's a three?

Page 124

1      A.  Yes.
2      Q.  Okay.  And -- and knowing what ANMC's
3  triage policy was, how -- how would you have triaged
4  Mr. Allen, and if you -- if you thought about that?
5      A.  If -- with his ears and head hurting, a
6  pain ten, but he's sitting at ease, I think that I
7  would have put him as a three or a four.
8      Q.  How about if -- if you had the information
9  that he had taken all his drugs, but he still had
10 pain?
11     A.  I might have called it a three.
12     Q.  Okay.  Is it your understanding --
13     A.  But I guess --
14     Q.  Go ahead.  I'm sorry.
15     A.  -- let me just think --
16     Q.  Sure.
17     A.  -- about that, because if I knew that he
18 had taken his drugs but he had been throwing up all
19 night, his drugs might not have been effective.
20     Q.  How would you know?
21     A.  I don't know.
22     Q.  Right.  Well, would you want to ask the
23 patient whether or not he had actually -- how many
24 times he vomited?
25     A.  Yes.

Page 125

1  Q. Okay. Would you want to know whether or
2  not he knows whether or not he vomited up his
3  medication?
4  A. Yep.
5  Q. Because sometimes patients could actually
6  maybe even tell that, that they could maybe even see
7  the medication. Is that -- is that something that
8  could happen?
9  A. Yes.
10 Q. All right. But we don't know that looking
11 from this record. Is that correct?
12 A. That's correct.
13 Q. And we don't know that from reading Donna
14 Fearey's or Patricia Ambrose's deposition. Is that
15 right?
16 A. Yes.
17 Q. All right. How important would that be,
18 whether or not this patient had been taking pain
19 medication and couldn't keep it down -- or how
20 important would it be for you to know whether or not
21 he had actually been throwing up his pain medication
22 as opposed to not throwing up his pain medication?
23 A. Well, it factors in to what's happening
24 with his head -- or his pain, I should say.
25 Q. Is it your understanding that patients,

Page 126

1  including -- included in the acuity -- acuity level
2  three for ANMC is a patient with "pain -
3  significant, any etiology, i.e., headaches,
4  earaches" and "back pain"?
5  A. Yes.
6  Q. And just taking at face value this
7  emergency visit record from April 19th, would --
8  would you consider that Mr. Allen had significant
9  pain, any etiology, headaches, earaches, back pain?
10 A. He had pain. How significant, I can't tell
11 you.
12 Q. Well, is that something that the triage
13 nurse would -- that would be part of her job, in
14 terms of determining how much pain the patient was
15 in, whether or not it was significant or severe?
16 A. I think there's a contradictory thing here,
17 in that he says his pain is a ten, she says he's
18 sitting at ease, and so it's hard to determine how
19 significant it is.
20 Q. All right. And -- and certainly going back
21 to this issue of hindsight, knowing that this
22 patient presented with a subarachnoid bleed at
23 Providence later that day, do you have an opinion
24 about whether or not he was in significant or severe
25 pain that morning?

Page 127

1  MR. GUARINO: Objection. Foundation.
2  BY MS. McCREADY:
3  Q. Go ahead. You can answer that, if you can.
4  A. My answer is the same. I don't know.
5  Q. Okay. Let me ask you this: Did you review
6  the records of Dr. Dietz and Dr. Lee?
7  A. Yes.
8  Q. Okay. And Dr. Dietz was the emergency room
9  physician at Providence. Is that correct?
10 A. Yes.
11 Q. All right. I'm going to mark as
12 Exhibit 7 -- this is Dr. Dietz' dictated note. It's
13 Allen (Providence) 59, 60, 61 and 62, 62 being her
14 handwritten notes.
15    (Exhibit 7 marked.)
16    MR. GUARINO: This is Exhibit 7?
17    MS. McCREADY: Exhibit 7.
18 Q. And did you note that at least later on
19 this very same day, on April 19th, that Dr. Dietz,
20 the emergency room physician, had taken a history
21 from Mrs. Allen about what had -- what was going on
22 with her husband that day? Was that your
23 understanding?
24 A. Yes.
25 Q. And did you have an understanding about

Page 128

1  whether or not Mrs. Allen was present for
2  Mr. Allen's visit with Nurse Fearey and the triage
3  nurse that morning at ANMC?
4  A. From the notes, you can't tell that, but
5  from the depositions, yes, you could tell that.
6  Q. That Donna Fearey remembered that his wife
7  was there. Is that correct?
8  A. Yes.
9  Q. And certainly the triage nurse remembered
10 that, because she remembered the wife giving her
11 information. Is that correct?
12 A. Yes.
13 Q. All right. And so when the nurse -- I'm
14 sorry -- when Dr. Dietz, the emergency room
15 physician, notes that, at least taking the history
16 from the wife, that he apparently developed a severe
17 headache earlier this morning, would that be
18 consistent with him -- if somebody -- if -- if she
19 says that the wife reported he had a severe headache
20 earlier that morning -- and assume for a moment that
21 that's, in fact, what he had, a severe headache
22 earlier that morning -- would he be properly triaged
23 as a four under the ANMC's triage policy?
24 A. If he had a severe headache?
25 Q. Uh-huh.