ALLEN v. USA

DIANE "DEDE" DUNTZE, R.N.
2/24/2006

Page 173

1    Q.  Sure.  Okay.  Would you want to do a
2  neurological exam on a patient if you got the
3  information that they had taken all their drugs, but
4  they still had pain?
5    **A.  Possibly, yes.**
6    Q.  Okay.  And why would that be?
7    **A.  If he has taken his drugs, he has kept his**
8  **drugs down, and his drugs aren't working, then that**
9  **would make me suspect that he had a more severe**
10  **headache than his usual.**
11    MS. McCREADY:  All right.  Let's go off
12  record so I can look at my notes.
13    THE VIDEOGRAPHER:  Off record, 12:12 p.m.
14    (Recess taken.)
15    THE VIDEOGRAPHER:  On record, 12:18 p.m.
16  BY MS. McCREADY:
17    Q.  Going back to Exhibits 7 and 8.  And those
18  are the dictated notes of the emergency room
19  physician and the admitting physician, Dr. --
20  Dr. Lee.
21    If, in fact, the description that Mrs. Allen
22  reports to them of her husband's presentation that day
23  as having a severe headache, a severe headache
24  start- -- starting in his jaw and going up the back of
25  his head to the top of his head, if that, in fact, was

Page 174

1  what was stated that morning at AN- -- the ANMC
2  emergency room to Donna Fearey or to the triage nurse,
3  would your opinions change in this case?
4    **A.  Yes.**
5    Q.  Okay.  And how would they change?  How
6  would that change it?
7    **A.  Well, let's say my thinking would change in**
8  **that I would want to get more history of:  If he**
9  **actually had a severe headache earlier that morning,**
10  **then he should have had a CT scan, possibly a lumbar**
11  **puncture and a bleed ruled out.**
12    Q.  Okay.  Do you have any -- have you been
13  asked to give an opinion on whether or not the -- on
14  the issue of phone advice; that is, are you -- do
15  you have an understanding that Kim Allen actually
16  called ANMC later that day, at about 3:47 p.m.?
17    **A.  Yes.**
18    Q.  "That day" meaning April 19th?
19    **A.  Yes.**
20    Q.  Okay.  And did you understand that that
21  phone call shows up on her cell phone record?
22    **A.  Yes.**
23    Q.  All right.  Do you have an opinion as to
24  whether or not the -- I understand -- have you --
25  let me back up.  Let me start over.

Page 175

1    So you have -- there's an understanding you
2  have that she actually called ANMC.  Is --
3    **A.  Yes.**
4    Q.  -- that right?  Have you seen any notes
5  from ANMC about that phone call?
6    **A.  No.**
7    Q.  All right.  Do you have an opinion about
8  whether or not the advice, as Mrs. Allen describes
9  that she was given on the phone that afternoon on
10  the -- on the 19th, as to whether or not that was
11  proper advice?
12    **A.  I don't think it was proper advice.**
13    Q.  Okay.  And what's that based on?
14    **A.  That's based on -- first of all, I'm not**
15  **sure they should have given that phone advice; but**
16  **second of all -- well, there's not enough**
17  **information to find out what questions a person on**
18  **the phone asks --**
19    Q.  Sure.
20    **A.  -- what information Kim Allen actually**
21  **gave.  But if -- if he was unarousable, then she**
22  **should have called an ambulance.**
23    Q.  Okay.  Say that again.  I'm sorry.
24    **A.  If he was unarousable, she should have been**
25  **told to call an ambulance.**

Page 176

1    Q.  All right.  I'm going to mark as Exhibit 12
2  what's been given to me by the government.  And it's
3  Bates stamped ANMC nine -- 905, 906 and 907.
4    (Exhibit 12 marked.)
5  BY MS. McCREADY:
6    Q.  Do you remember if you got copies of -- of
7  those e-mails?
8    **A.  No, I did not.**
9    Q.  Okay.  Let me just -- I don't want to spend
10  a lot of time on this.  Let me ask you briefly.  At
11  the top, it says, message from (sic) Vogel,
12  Katherine, assistant nurse manager.
13    Do you know who Katherine Vogel is?  I mean,
14  have you seen reference to her in the records?
15    **A.  Yes.**
16    Q.  And do you have an understanding that she's
17  sort of the nurse manager for the emergency
18  department?
19    **A.  Yes.**
20    Q.  All right.  And this was an e-mail I have
21  now discerned dated June 4th, '01.  The next page is
22  an e-mail, June 4th, '02, and then "Telephone Advice
23  in the ED/UCC," with a line through it.  Have you
24  spoken with Katherine Vogel?
25    **A.  No.**

47 (Pages 173 to 176)

Emergency Department/Urgent Care Center

<u>Triage</u>



I.    <u>PURPOSE:</u>

To provide a mechanism of rapid evaluation and prioritization of all patients presenting for care in the Emergency Department/Urgent Care Center.

II.    <u>BACKGROUND:</u>

Due to the volume of patients seen, and the unpredictability of their arrival, it is important to have a triage system to assess patients and assign a triage level based on their acuity. Assigning triages levels assures that those patients with the most emergent needs are seen in a timely manner. Triage is a rapid evaluation and prioritization of the patient's medical needs and should be done by a nurse that is trained and skilled to do this. Patients arriving by ambulance will have received initial triage by the pre-hospital providers. The ED nurse will reassess these patients and an appropriated triage level will be assigned.

III.    <u>POLICY:</u>

Every patient presenting to the Emergency Department/Urgent Care Center will be triaged and assigned an acuity-based triage level by a Registered Nurse.

IV.    <u>PROCEDURE:</u>

A.    Call the patient into the Triage Room.

B.    Determine and document the patient's reason for the visit (chief complaint) and a brief history (subjective).

C.    Obtain and document the vital signs on all patients including temperature, pulse, respiration's, pulse oximetry (as indicated) and BP on patients > 14 years of age.

D.    Document:

1.    Time of arrival.

2.    Time of triage.

3.    Last menstrual period on all females 10-55 years of age.

4.    Medications and allergies if pertinent.

5.    Weights on infants and children recorded in kilograms.

6.    Document a brief objective nursing note pertinent to the patient's presenting complaint.

7.    Assign a level of acuity based on the presenting subjective and objective data:

a)  Level 1: These are the most acutely ill patients requiring immediate evaluation and or emergency interventions.

b)  Level 2: These patients have emergent problems requiring evaluation/intervention in a timely. These are patients with serious injuries or illnesses that might deteriorate or suffer long term problems if they do not receive prompt treatment.

c)  Level 3: These patients need urgent treatment and have severe, but not immediately life threatening injuries or illnesses. They need to be treated fairly urgently.

d)  Level 4: These patients need the skills of our staff, but do not need urgent treatment. Their condition will not deteriorate if they have to wait for treatment.

e)  Level 5: These patients do not need the skills of our staff and/or could seek attention from their own primary provider.

*See:  Triage Acuity Level Guidelines*

E.  Administer appropriate nursing interventions (applying ice, dressing wounds antipyretics, analgesics, etc.) and initiate diagnostic tests if indicated per unit protocols.
(Note:  if the volume of patients requiring triage is substantial, these protocols may be initiated by the UCC or ED nurses so that the triage nurse does not fall behind).

F.  After triage, direct the patient back to the waiting room, as appropriate if the patient is a level 3, 4 or 5. Instruct them to inform the triage nurse if their condition worsens so that they can be re-evaluated if needed.

G.  If the patient needs immediate or emergent evaluation (Level 1 and 2's) take the patient back to the ED and assist (if time allows) with undressing and moving onto a stretcher.

H.  Report all patients triaged to the ED side to the receiving RN or Shift Coordinator before returning to triage.

I.  Remain aware of patients arriving. Evaluate whether a patient can wait to be triaged or if the patient needs immediate attention ahead of others in the waiting area.

J.  Remain aware of patient flow within the department by physically moving from triage area and communicating with nurses assigned to the treatment area. Be aware of the changing status of the patients by periodically reviewing the ED charts and communicating with the Shift Coordinator.

K.  Remain aware of flow in lobby and of patients arriving by ambulance and Community Service Patrol. Maintain crowd control.

L.  Assist family members with questions and concerns about patients. Provide patients waiting in lobby with general explanations regarding waits, activity in ED causing delays in patient flow, and rough estimate of remaining wait if requested

Written 2/97

ANMC0000000895