ALLEN v. USA                                                      MICHAEL LEVY, M.D.
                                                                  2/24/2006

Page 124

1   Q. Sure. And -- and assuming that -- let me
2   just ask you to assume something for a second, that
3   you didn't read her deposition; you're reading this
4   note, "speech slow." What came to mind before you
5   read her explanation?
6   A. Came to mind was that that might represent
7   that the person was somehow obtunded, that there
8   could be some type of neurological event going on.
9   Q. And would that be consistent with somebody
10  who had a subarachnoid bleed?
11  A. Could be.
12  Q. When she says -- is it TMs bilaterally a
13  bit cloudy, but mobile? What does that mean to you?
14  A. It means that she had -- actually, she's a
15  pretty good practitioner. She took the time to
16  actually insufflate the ears and not just jump to
17  the conclusion that the person had ear infections.
18  Q. Okay. And in fact, she -- okay. And what
19  does "a bit cloudy" mean?
20  A. It means that they just don't look
21  absolutely sparkling clear. And so that, on the one
22  hand, could be an inference that perhaps there's an
23  early infection or something like that going on, but
24  that she took the extra step and she insufflated the
25  ears, found them to be mobile. And that is a good

Page 125

1   indication that the person doesn't have an ear
2   infection.
3   Q. Is -- and I'm just trying to understand the
4   "bit cloudy." Does that -- I mean, is that
5   something that you would see when you insufflate?
6   A. No. Just from direct visualization.
7   Q. Okay. And then how about the -- that the
8   neck was supple? What did you take from that?
9   A. I thought that was a -- a good thing to
10  have done and that that meant that she was thinking
11  about things, such as irritative meningeal events,
12  such as infections or even subarachnoid hemorrhage.
13  Q. And does the -- the fact that the neck is
14  supple, does that rule out a subarachnoid bleed?
15  A. No.
16  Q. Okay. Is there anything else that she -- I
17  mean, is that how you would document, actually
18  checking whether or not there was some meningeal
19  irritation, just saying "neck supple"?
20  A. It's a good start. I mean, many people
21  would write down Kernig and Brudzinski's sign as the
22  classic, but I think it is, in my experience, very
23  common for people to simply try to move the neck and
24  see if it's mobile and then write that the neck is
25  supple.

Page 126

1   Q. Okay. And then do you know whether or not
2   this patient had any discomfort when she was
3   checking his neck?
4   A. There's -- I took by inference that having
5   a supple neck meant that there was no pain, but I
6   see nothing here that says that he had no pain.
7   Q. All right. And was -- would that be
8   something that you would be documenting, whether or
9   not the patient had discomfort when you were
10  checking their neck?
11  A. Honestly, I might write it just like that.
12  Q. As neck supple?
13  A. Yes.
14  Q. Okay.
15  A. But I might put non-tender.
16  Q. Do you have an understanding about whether
17  or not this patient was looking for pain medications
18  that morning?
19  A. I don't think he was.
20  Q. All right. You have gone through his -- I
21  can tell from your report, you know, you looked back
22  at -- at his records in terms of when he presented
23  at the ANMC pri- -- previously. Is that correct?
24  A. Yes.
25  Q. All right. And do you have an

Page 127

1   understanding, as you sit here right now: When is
2   the last time this patient actually presented to the
3   emergency room at ANMC complaining of pain?
4   A. He infrequently came to the emergency
5   department with pain.
6   Q. Okay. Well --
7   A. I can't -- I would have to have the record
8   in front of me to actually pull up the -- because I
9   get the clinic notes and the ER notes a little bit
10  mixed up honestly.
11  Q. Okay. Well, is there a distinction to you
12  between a patient presenting to -- to the emergency
13  room and to a family medicine clinic?
14  A. Well, a lot of it's just convenience and
15  timing, in terms of availability of access to the
16  clinic. The -- and then the kind of symptoms
17  they're having. So if now vomiting is the problem,
18  then waiting for a day to get into the clinic may
19  not be acceptable. If it's a "before hours kind of
20  thing," if a person thinks they have something
21  going on -- emergencies are self-defined of course.
22  Q. Sure.
23  A. So he self-defined himself as having an
24  emergency, which is what we have people do.
25  Q. Does it -- does it affect your opinions at

34 (Pages 124 to 127)

Page 144

1  Q. At the morning that he presents at the
2  Alaska Native Medical Center -- Center on
3  April 19th, 2003, and if he presented with a
4  headache going from the back of his head, going to
5  the top of his head, would that be different than
6  his presentation in the past, these prior visits
7  that you have referred to to the family medical
8  center or the family medical clinic or to the
9  emergency room?
10  A. It seemed to be.
11  Q. Okay. If, in fact, that is how he
12  presented that morning, would that change your
13  opinion in this case?
14  A. No, it wouldn't change my opinion per se
15  unless it -- if he perceived it as a significant
16  change in his headache pattern.
17  Q. Okay. And that would -- that would be how
18  you would -- that would affect your opinion in this
19  case, if he thought it was different than the pain
20  he had experienced in the past?
21  A. That radiation pattern by itself is very
22  common for just myofascial-type pain that a person
23  might have from radicular nerve roots, so there's --
24  that by itself would not raise the huge red flags.
25  Q. Okay.

Page 145

1  A. In the context of the patient describing it
2  as something significant and different, that would
3  definitely be something we would want to look into.
4  Q. Okay. Do you remember Donna Fearey
5  testifying in her deposition that she didn't
6  remember talking to him about whether or not the
7  pain was different than what he had had before?
8  A. No, I don't remember that.
9  Q. Okay. Just one second. This is Donna
10  Fearey's deposition at page 78. And I ask her:
11  "Did you -- do you remember talking to him about
12  whether or not this was pain that was different than
13  what he had experienced before?"
14  "No, I don't remember."
15  And then I asked her: "Do you remember
16  talking to him about whether or not this was the worst
17  pain he had?"
18  "No."
19  Does that refresh your memory, or does that
20  make any difference to you, that she just doesn't --
21  she didn't know whether or not --
22  A. No.
23  Q. She doesn't remember --
24  A. She --
25  Q. -- talking to him about -- that she doesn't

Page 146

1  remember talking to him about whether or not the
2  pain was different than what he had experienced
3  before?
4  A. Well, if she didn't ask those questions,
5  and it sounds like she's not saying she didn't. She
6  just doesn't remember.
7  If she didn't, I would prefer, and I think it
8  would be -- the medical history should have that in
9  it. She should have asked that. Now whether she did
10  or she didn't I can really tell from that, but -- but
11  I prefer she did ask those questions.
12  Q. Right. And that's not documented in the
13  note from --
14  A. Correct.
15  Q. -- April 19th that she asked those
16  questions. Is that correct?
17  A. No, it's not.
18  Q. All right. Would that be below the
19  standard of care if she didn't ask those questions?
20  A. Those are questions that should be asked.
21  Q. And would it be below the standard of care
22  if those questions were not asked?
23  A. Yeah, it would be. You should ask those
24  questions when you're assessing the headache
25  patient.

Page 147

1  Q. Okay. Do you have an opinion about whether
2  or not Mr. Allen suffered a seizure in the afternoon
3  of -- and you're smiling.
4  A. You know, he could have suffered a seizure.
5  Q. Okay. Do you -- are you going to render an
6  opinion that it's more likely than not that he had a
7  seizure or -- or that -- or do you know?
8  A. It's -- I definitely don't know. I can
9  tell you that.
10  Q. Is this a subject that you have discussed
11  with Mr. Guarino --
12  A. Yes.
13  Q. -- since the deposition of Dr. Mannix?
14  A. Yes.
15  Q. Do you know Dr. Mannix?
16  A. No.
17  Q. Okay. So is it possible that after talking
18  to Mr. Guarino about the subject matter of a
19  seizure, did -- did it come to your attention that
20  the pre-hospital care report, paramedics had
21  indicated that Mr. Allen's airway had emesis with
22  blood?
23  A. No. I noticed that.
24  Q. You did notice that. And did -- and did
25  you notice that they remarked that the HEENT was

Page 156

1  Q. He presents in the -- I'm sorry. He
2  presents where? At the Alaska Native Medical Center
3  emergency room?
4  A. When he -- it's going to be -- what we're
5  going to talk about is his worst or his best by the
6  time he actually is going to be matriculating into
7  the system. His worst, in my opinion, is going to
8  be probably a four.
9  Q. Did you talk to Mr. Guarino about this
10 issue of when you look at a Hunt & Hess grade,
11 whether or not it's when they first present to an
12 emergency room or when it's, you know, later on?
13 A. We didn't discuss it per se, but we talked
14 about that issue around and about. So we didn't
15 have a big discussion about: Is it before or an
16 after kind of thing, but we -- I think we both
17 discovered, through some of our readings in your
18 stuff, that -- that there were controversies about
19 that.
20 Q. Okay. And controversies about when you
21 look at the Hunt & Hess grade?
22 A. Yes.
23 Q. Okay. But is that something that you're
24 qualified to talk about, whether or not -- how
25 Hunt & Hess grades affect outcome?

Page 157

1  A. No.
2  Q. So your opinion -- go ahead.
3  A. No. I mean, that -- that's reasonable,
4  what you say. I will leave it at that. That's
5  fine.
6  Q. When you have somebody -- and you have
7  dealt with patients with subarachnoid bleeds. If
8  you determine that somebody has a subarachnoid bleed
9  through a CT scan, is it below the standard of care
10 then for you to just discharge that patient from the
11 emergency room --
12 A. Yes.
13 Q. -- to go home?
14 A. Well, just to qualify, because I'll help
15 you out here. There's subarachnoid hemorrhages, and
16 there's subarachnoid hemorrhages. We discharge
17 subarachnoid hemorrhages from the emergency
18 department on the advice of the neurosurgeons when
19 they're traumatic.
20 Q. I'm sorry. You discharge them from the
21 emergency room --
22 A. From --
23 Q. -- to -- to the care of another health care
24 provider. Is that right?
25 A. It --

Page 158

1  Q. No.
2  A. It can happen that a small subarachnoid
3  hemorrhage from trauma will be discharged from the
4  hospital, from the emergency department primarily.
5  Q. Okay. But that would be on the advice of a
6  neurosurgeon?
7  A. Yes.
8  Q. Would you do that -- would you make that
9  decision on your own?
10 A. No.
11 Q. Would that be fairly atypical?
12 A. To discharge somebody?
13 Q. To discharge a patient who has been
14 diagnosed with a subarachnoid hemorrhage.
15 A. You know, my only point was that -- was
16 just to focus the discussion on different types of
17 subarachnoid bleeding, and those due to trauma are
18 kind of a different animal than those due to other
19 causes.
20 Q. Okay.
21 A. And so if we're foking -- focusing on the
22 subarachnoid --
23 Q. Nontraumatic.
24 A. -- the nontraumatic subarachnoid
25 hemorrhage, then absolutely it would be rather

Page 159

1  extraordinary for me to discharge somebody who I
2  diagnosed as having a subarachnoid hemorrhage from
3  the emergency department primarily.
4  Q. Is there an assumption, when somebody is
5  diagnosed with a subarachnoid hemorrhage in the
6  emergency room and that -- and they're fairly
7  neurologically intact, is there an assumption
8  that -- that that patient is going to undergo
9  treatment?
10 A. Yes.
11 Q. Okay. And "treatment" meaning that their
12 blood pressure would be monitored?
13 A. Yes.
14 Q. And that they would be -- their fluid
15 intake would be monitored?
16 A. Yes.
17 Q. And that they may be provided medication,
18 depending on what their situation is, that is, you
19 know, whether or not they -- they're experiencing
20 increased intracranial pressure?
21 A. Possibly. More -- more of it would be kind
22 of pain management and different issues like that.
23 Q. Okay. And is that something that you have
24 done in the emergency room setting; that is, you
25 have been with a patient, I think as you described