UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KIMBERLY ALLEN, Personal
Representative of the ESTATE
OF TODD ALLEN, Individually,
on Behalf of the ESTATE OF
TODD ALLEN, and on Behalf of
the Minor Child PRESLEY
GRACE ALLEN,

    Plaintiffs,

vs.

UNITED STATES OF AMERICA,

    Defendant.
_____/
Case No. A04-0131 (JKS)

**DEPOSITION OF LORETTA LEE, M.D.**

Pages 1 - 52, inclusive

Friday, April 29, 2005, 3:06 p.m.

Anchorage, Alaska

## Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Fax 907.276.8016

Exhibit – 10

Page 17

1    Q. Okay. That's fine. I was just curious.
2  But in any event, the dictation and/or the notes that
3  are part of Exhibit 26, those would be taken at least
4  as soon as possible after you met --
5    A. Yes.
6    Q. -- and spoke with whoever is involved in the
7  case. Is that correct?
8    A. Yes.
9      MS. MEYERS: Wait for her to finish the
10 question and then answer.
11     THE WITNESS: Okay.
12 BY MS. McCREADY:
13   Q. So going to that, under the dictated note,
14 "History of Present Illness" -- and I'm back on
15 Exhibit 24, actually, on the dictated note. I'm
16 sorry, Doctor. I wanted to ask you about the "History
17 of Present Illness."
18     It says, "A 36-year-old male brought to the
19 ER status post arrest in the field. The patient's
20 history is obtained from his wife and from Dr. Susan
21 Dietz, emergency room physician. According to the
22 patient's wife, he had been complaining of a headache
23 in his right jaw area radiating to the back of his
24 head and then up to the top of his head, along the
25 back side of his head."

Page 18

1      And did that have any significance to you,
2  this description of his headache?
3    A. Well, the jaw area would be why I think --
4  the location starting from the jaw would be why they
5  were thinking that it was related to his surgery.
6    Q. Okay. And how about the "radiating to the
7  back of his head and then up to the top of his head,
8  along the back side of his head"? Did that have any
9  significance to you?
10   A. That perhaps there might be something else
11 going on.
12   Q. Okay. What else could be -- let me ask you
13 this: Was this description of his headache consistent
14 then with how he presented at Providence; that is,
15 that he had a subarachnoid hemorrhage?
16   A. I'm not -- I guess -- I guess so. I'm not
17 sure, because people present with different types of
18 headaches at different locations, you know, so I don't
19 know if the location itself gives us a hint that it
20 might have been a subarachnoid hemorrhage.
21   Q. Okay. So you don't know if the location
22 itself would have been a hint?
23   A. No.
24   Q. The fact that this gentleman was presenting
25 at the emergency room at ANMC, in the morning,

Page 19

1  complaining of a headache, was that consistent with
2  him having a subarachnoid hemorrhage later that day?
3      MR. GUARINO: Objection. Foundation to that
4  question.
5      MS. MEYERS: Yeah. I'm going to object,
6  too, on the basis of foundation.
7  BY MS. McCREADY:
8    Q. When this gentleman presented at Providence
9  and -- let me just ask this: He was diagnosed with a
10 subarachnoid hemorrhage. Is that correct?
11   A. Yes.
12   Q. With diffuse cerebral edema. Is that
13 correct?
14   A. Yes.
15   Q. And then he subsequently died as a result of
16 that. Is that your understanding?
17   A. Yes.
18   Q. And then was that presentation consistent
19 with a complaint of a headache earlier that day?
20     MR. GUARINO: Same objection. Foundation.
21     THE WITNESS: Can I answer?
22     MS. MEYERS: You can answer.
23     THE WITNESS: Yes.
24 BY MS. McCREADY:
25   Q. Have you spoken with Mr. Guarino about this

Page 20

1  case?
2    A. No.
3    Q. Let me ask you this: Who have you spoken
4  with about this case?
5    A. I have spoken to somebody at my malpractice
6  insurance, and my lawyer.
7    Q. Okay. And you understand that no one is in
8  any way criticizing your care in this case. No one is
9  saying you have done anything wrong. Do you
10 understand that?
11   A. Yes.
12   Q. Okay. So you have talked to your
13 malpractice carrier, and you have spoken with your
14 attorney. Anyone else that you have spoken with about
15 the case?
16   A. No.
17   Q. Did you talk to Dr. Dietz?
18   A. No, I haven't spoken to her at all.
19   Q. Have you spoken with anyone at the Alaska
20 Native Medical Center who works at the Alaska Native
21 Medical Center about the case?
22   A. No.
23   Q. Do you know any of the folks that work over
24 at the ER at ANMC?
25   A. Not personally, no.