Case 3:04-cv-00131-JKS   Document 48-3   Filed 11/13/2006   Page 1 of 3

**A000DE4**
**RICHARD RUBENSTEIN - February 22, 2006**

```
Page 101
 1   to go shopping in Anchorage. But I think in
 2   conjunction with that was that he was going to
 3   stop at ANMC to get his pain medication.
 4       Q. Right. And ANMC being the Alaska
 5   Native Medical Center; is that right?
 6       A. Correct.
 7       Q. Let me just ask you if you had any
 8   experience -- have you worked on other cases where
 9   the care at Alaska Native Medical Center was at
10   issue?
11       A. I don't -- not to my recollection.
12       Q. Have you ever been to the Alaska
13   Native Medical Center?
14       A. No.
15       Q. Aside from working on this case,
16   have you been familiar with how they run the
17   emergency department at ANMC?
18       A. No.
19       MR. GUARINO: I didn't hear that
20   question, Donna. It drifted off.
21       MS. McCREADY: Whether or not he, aside
22   from working on this case, would have any
23   knowledge about how the emergency department at
24   ANMC is operated, and he said no.
25       Q. Is that correct?
```

26 (Pages 98 to 101)

**800-288-3376**

A000DE4
RICHARD RUBENSTEIN - February 22, 2006

```
                                          Page 102
 1       A. Correct.
 2       Q. Do you know any of the physicians
 3   that work at Alaska Native Medical Center?
 4       A. No.
 5       Q. Do you know what their policy is in
 6   terms of when or -- when and whether they would
 7   put one of their patients on a pain management
 8   contract?
 9       A. I don't.
10       Q. Was it your impression that this --
11   that Mr. Allen was addicted to pain medication?
12       A. Yes.
13       Q. How does that relate to your
14   opinions in this case?
15       A. It doesn't.
16       Q. So it doesn't matter one way or the
17   other that he was, that you think he was addicted
18   to pain medication?
19       A. No.
20       Q. Did you form an opinion that he was
21   getting medications outside of his pain management
22   contract?
23       A. I have no knowledge. I don't know.
24   I haven't even thought about it.
25       Q. Page 3 of your report, at the top
```

27 (Pages 102 to 105)

Atkinson-Baker, Inc., Court Reporters          800-288-3376

A000DE4
RICHARD RUBENSTEIN - February 22, 2006

Page 183

1  clear about the -- distinguishing between the
2  ruptured and unruptured.
3       But if I understand your opinion that
4  it's -- because Todd Allen, the logistics of him
5  actually getting worked up and treated because he
6  was in Anchorage, that just would lead you to
7  believe that they just --
8       A.  It wouldn't have happened.
9       Q.  It wouldn't have happened.
10      A.  He would have been dead no matter
11 what had been done.
12      Q.  Who have you -- have you talked to
13 anyone about the logistics of dealing with a
14 patient with an aneurysm or a ruptured aneurysm in
15 Anchorage?
16      A.  I mean, I've reviewed in detail all
17 of the medical records. I have looked at
18 Dr. Levy's report. I have talked to Mr. Guarino
19 about what the logistics were in Anchorage, and,
20 you know, that there are three neurosurgeons in
21 the state. It's not clear to me whatsoever that
22 either Godursky or Craelic or Cohen were doing
23 aneurysm surgery on 4-19-03 in Anchorage.
24      And I think even if they were, under
25 optimum circumstances, they would not have

Page 184

1  operated on him within, you know, six to 12 hours
2  of the presentation of the sentinel hemorrhage at
3  7:10 a.m., if we're presuming that that's what
4  occurred, and that his workup would not have been
5  completed or substantially done by the time that
6  he rebled to have prevented his demise.
7       You know, all of this is total
8  speculation. You don't even, one, know that he
9  had an aneurysm. We know that he had a
10 subarachnoid hemorrhage. You know, the greatest
11 likelihood is certainly it was an aneurysmal
12 subarachnoid hemorrhage. We don't know the
13 location, we don't know the accessibility, we
14 don't know the best method of treatment.
15      Q.  Right. And we've got a lot of
16 things that we don't --
17      A.  Circumstantial evidence.
18      Q.  Well, yeah. We don't know because
19 he wasn't worked up that morning, on April 19th at
20 ANMC, so we don't have a lot of information.
21      A.  As I said, it's my belief -- it's
22 my opinion, let's put it that way, to a reasonable
23 degree of medical probability that -- and
24 certainly, an imaging study that morning I believe
25 would have been normal.

47 (Pages 182 to 185)

Atkinson-Baker, Inc., Court Reporters                    800-288-3376