Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3   _____
                                      )
 4   KIMBERLY ALLEN, Personal         )
     Representative of the ESTATE     )
 5   OF TODD ALLEN, Individually,     )
     on Behalf of the ESTATE OF       )
 6   TODD ALLEN, and on Behalf of     )
     the Minor Child PRESLEY          )
 7   GRACE ALLEN,                     )
                                      )
 8              Plaintiffs,           )
                                      )
 9        vs.                         )
                                      )
10   UNITED STATES OF AMERICA,        )
                                      )
11              Defendant.            )
     _____)
12   Case No. A04-0131 (JKS)
13
14   _____
       VIDEOTAPED DEPOSITION OF MICHAEL LEVY, MD
15   _____
16
17            Pages 1 - 195, inclusive
18            Friday, February 24, 2006
                    2:12 P.M.
19
20        Taken by Counsel for Plaintiffs
                        at
21              ASHBURN & MASON
        1130 West 6th Avenue, Suite 100
22              Anchorage, Alaska
23
24
25
```

Hand Delivered

RECEIVED
MAR 13 2006
ASHBURN & MASON
COPY

Page 31

1   an aneurysmal bleed.
2   Q.  I'm sorry.  Say --
3   A.  From aneurysmal bleeding.
4   Q.  Okay.  And with the one patient presented
5   obtunded that -- were -- were they comatose or --
6   A.  Yes.
7   Q.  All right.  And then the other two, how did
8   they present?  And were these patients that you --
9   you actually had contact with, or were they just
10  patients that you knew about?
11  A.  These were my patients.
12  Q.  Okay.
13  A.  Yes.
14  Q.  All right.
15  A.  They were both very uncomfortable.
16  Something was clearly wrong with them.
17  Q.  Okay.  And when you say they were -- I
18  mean, what sorts of -- I mean, how did you know they
19  ended up with a subarachnoid hemorrhage?
20  A.  Because I scanned them --
21  Q.  Okay.
22  A.  -- and I followed the results and took care
23  of them.
24  Q.  Sure.  And -- and I just want to ask you,
25  since it sounds like you have a memory of those

10 (Pages 28 to 31)

Page 32

1  patients: How did the -- the other two, the other
2  two that weren't comatose, how did they present?
3     A. They presented with intense, severe head
4  pain.
5     Q. Okay. And --
6     A. Sensitivity to light, stiff neck.
7     Q. Did both of them have sensitivity to light?
8     A. Yes.
9     Q. Did both of them have a stiff neck?
10    A. Yes.
11    Q. All right. And did you -- were you able to
12 determine -- if you were, if you knew, when, in
13 fact, they had -- their aneurysms had ruptured?
14    A. Generally I recall that they could tell me
15 pretty specifically that something happened,
16 something changed abruptly. They got bad headaches.
17    Q. Okay. And were either of these two
18 patients chronic pain patients?
19    A. No.
20    Q. All right. And what happened to those
21 patients, if -- if you know?
22    A. One patient was sent to Seattle.
23    Q. On a med-evac?
24    A. Yes. And the other patient was -- later in
25 the year, after the arrival of a new neurosurgeon in

Page 33

1  town, and the patient was operated the next day.
2     Q. Okay. And then do you know -- have any
3  idea what their outcomes were?
4     A. When last I spoke to the neurosurgeon, the
5  outcome with the last patient we talked about was --
6  I believe it was good. I didn't get a lot of
7  specifics, but he was satisfied with the result.
8        And I believe the other patient who had an
9  endovascular procedure performed, did fine. I -- I
10 only know that because I had no further contact with
11 her, but I received a note from Harborview's kind of
12 physician liaison people.
13    Q. Okay. So you've had -- have you sent any
14 other patients; that is, have you been involved in
15 the care of a patient with a subarachnoid
16 hemorrhage, aside from the patients that we just
17 talked about, where you arranged for them to be
18 med-evac'd to Harborview?
19    A. Yes.
20    Q. All right. And then do you usually get
21 some communication from Harborview how about how the
22 patient did?
23    A. Sometimes, not always.
24    Q. All right.
25    A. But they're pretty good about it. It's not

Page 53

1  doubt, in my mind, have made a difference to them,
2  based on my specialty and my knowledge of the
3  natural history of subarachnoid hemorrhage --
4     Q. Yeah. And that's what I'm trying to --
5     A. -- aneurysmal -- yeah. I would say that I
6  cannot render an opinion, as an expert, on the
7  actual outcome of this case and how the initial care
8  would have ultimately impacted that.
9     Q. And is that because of your -- that's
10 outside of your area of expertise?
11    A. Yes.
12    Q. Okay. Do you think that the -- in your
13 opinion, is the -- is a mid-level practitioner an --
14 sorry -- is an advanced nurse practitioner, who is
15 working in an urgent care setting, are they held to
16 the same -- same standard of care as an emergency
17 room physician?
18    A. No.
19    Q. Okay. And why not?
20    A. Because their training is not as extensive
21 as an emergency physician.
22    Q. Okay. And so you think they're held to a
23 different standard of care?
24    A. I do.
25    Q. All right. And is that -- is that just --

Page 54

1  is that opinion based on just what you said, that
2  they're -- you know, you know there's a different
3  level of training between the two, or is that based
4  on anything else?
5     A. That's the only reason.
6     Q. All right. And what is the difference in
7  training?
8     A. I'm not an expert on the training of the
9  nurse practitioners, but they are nurses who get a
10 master's degree and do some clinical time.
11    Q. Okay. And I'm sorry. I'm looking at your
12 report, and I -- I don't want to skip -- I don't
13 want to go over things that we have already
14 discussed, so I'm just going to take a moment.
15       MR. GUARINO: And Donna, just so it's clear,
16 because of -- you -- I mean, you can ask the question
17 any way you want in terms of causation or standard of
18 care. I mean, you should assume that anything that's
19 expressed in his report Dr. Levy could be called on to
20 testify about at trial.
21       How -- how you phrase it, whether you call it
22 standard of care, causation, you know, how -- however
23 you phrase it legally, that's not the way doctors look
24 at it. Doctors look at it in terms of what they're
25 asked to look at. So don't assume you can skip

```
                                                      Page 57
1    A. Yes.
2    Q. Do you ever do brain surgery? Have you
3  ever done brain surgery?
4    A. I have assisted in brain surgery. I have
5  never been the primary operator in brain surgery.
6    Q. Okay. And -- and just so I can ask: Under
7  what circumstances would you be assisting in a brain
8  surgery?
9    A. Most of the time it's elective. Right now
10 I've gone to the operating room with colleagues to
11 see what the outcome was in a case. So I would go
12 in and more look than assist, I guess might be more
13 appropriate.
14       And the place it could happen, which I
15 haven't been called upon, is the placement of a drain
16 or a monitor in the emergency department when a
17 neurosurgeon might place -- when I was in Chinle, when
18 I was in the reservation, I was the only one there, I
19 had the material there to perform burr holes for a
20 subdural hematoma and that kind of thing, but never
21 had to do it.
22   Q. Okay. But you don't consider yourself
23 to -- given that experience, to have some expertise
24 in neurosurgery, or do --
25   A. Absolutely not.
```