UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

KIMBERLY ALLEN, Personal
Representative of the ESTATE
OF TODD ALLEN, Individually,
on Behalf of the ESTATE OF
TODD ALLEN, and on Behalf of
the Minor Child PRESLEY
GRACE ALLEN,

    Plaintiffs,

vs.

UNITED STATES OF AMERICA,

    Defendant.
_____/

Case No. A04-0131 (JKS)

**VIDEOTAPED DEPOSITION OF RICHARD E. BRODSKY, M.D.**

Pages 1 - 147, inclusive

Monday, April 11, 2005, 8:05 a.m.

Anchorage, Alaska

### Alaska Stenotype Reporters
511 West Ninth Avenue
Anchorage AK 99501-3520
*Serving Alaska Since 1953*

Rick D. McWilliams, RPR, Ret.
Fred M. Getty, RPR, Ret.

Telephone 907.276.1680
Email AkSteno@aol.com
Copyright © 2006
Fax 907.276.8016

Richard Brodsky                     Deposition                    April 11, 2005

Page 5

1  Anchorage, Alaska, Monday, April 11, 2005, 8:05 a.m.
2        THE VIDEOGRAPHER: We move on record at
3  approximately five minutes past 8:00 a.m. This is the
4  deposition of Dr. Richard Brodsky, taken by plaintiff,
5  in the matter Allen, et al. versus United States of
6  America, Case A04-0131. We are in the Alaska Native
7  Medical Center, 4315 Diplomacy Drive, Anchorage,
8  Alaska, on Monday April 11th, 2005.
9        The court reporter's name is Gary Brooking
10 with Alaska Stenotype Reporters of Anchorage, Alaska.
11 My name is Eric Baldwin with Professional Business
12 Video of Anchorage.
13       I will now ask counsel to please introduce
14 themselves and state whom they represent.
15       MS. McCREADY: My name is Donna McCready,
16 and I represent Kim Allen.
17       MR. GUARINO: Gary Guarino representing the
18 United States of America.
19       THE VIDEOGRAPHER: Thank you. Would our
20 reporter please swear the doctor.
21          RICHARD E. BRODSKY, M.D.,
22    called as a witness herein on behalf of the
23    Plaintiffs, having been duly sworn upon oath
24    by Gary Brooking, Notary Public, was
25    examined and testified as follows:

Page 6

1              EXAMINATION
2  BY MS. McCREADY:
3     Q. Good morning, Dr. Brodsky.
4     A. Good morning.
5     Q. Have you ever been deposed before?
6     A. Yes.
7     Q. Okay. So you understand there's certain
8  ground rules. If I ask you a question, you have to
9  answer out loud, and even though we have this being
10 videotaped and tape-recorded. And if -- I'm sure
11 you're not going to answer any question that you don't
12 understand for me, so just tell me if you don't
13 understand one of my questions and I will try to
14 rephrase it.
15    A. Sure.
16    Q. All right. What's your current position at
17 ANMC?
18    A. I'm the medical director of the emergency
19 department.
20    Q. Okay. Do you hold any other positions?
21    A. Not currently.
22    Q. Not currently. What was your -- I could
23 see -- let me just show you a copy of your -- this is
24 what I received from --
25    A. Yeah, okay.

Page 7

1     Q. -- counsel, is a copy of -- and could I have
2  an exhibit sticker? I'll just mark it as Exhibit 1.
3     A. Sure. Okay.
4             (Exhibit 1 marked.)
5  BY MS. McCREADY:
6     Q. And is that a copy of your CV?
7     A. Yes, it is, uh-huh.
8     Q. Okay. And it looked like at some -- at some
9  point you were holding the position of acting chief
10 physician executive?
11    A. That's true. I --
12    Q. Go ahead.
13    A. Yeah. I was acting chief physician
14 executive from March of last year until November of
15 this year -- of last year rather. Excuse me.
16    Q. Okay. And what is acting chief physician
17 executive?
18    A. Well, the chief physician executive is the
19 senior physician in the hospital who is in -- a member
20 of the executive team, executive management team in
21 the hospital, is responsible for credentialing
22 oversight for quality care, interaction between the
23 medical staff and the administration.
24       MR. GUARINO: Let's hold on. It sounds like
25 they're drilling. I hope that's not a long-term

Page 8

1  maintenance --
2        MS. McCREADY: I don't know. Well, let's --
3        THE WITNESS: If it's a problem, we can ask
4  them --
5  BY MS. McCREADY:
6     Q. Yeah, okay.
7     A. Involved in, you know, administration of the
8  hospital, oversight for ten departments, I believe it
9  is, in the hospital. Also direct-line authority for
10 all the medical services and supervises the
11 physicians.
12    Q. Okay. And then -- so it's -- it's mainly --
13 it's -- to use your words, I think, you're head of the
14 physicians, but it sounds like you're also in -- in
15 charge of administration as well, or is it --
16    A. Just one member of the executive management
17 team. The hospital has an executive management team
18 that has seven or eight people on it, so there's a
19 chief physician executive, chief nurse executive.
20 There's a CEO, a chief financial officer, somebody in
21 risk management, chief information officer, et cetera.
22 So just --
23    Q. And -- and were you holding that position?
24 Were you filling in for someone, or was that
25 something -- how -- how -- how is it that you were

Page 89

```
 1        MS. McCREADY: No.
 2   BY MS. McCREADY:
 3       Q. Any thoughts that you had as the head of the
 4   emergency department in terms of how things could be
 5   improved?
 6        MR. GUARINO: And, Doctor, before you
 7   answer, I -- I guess I have an objection to the extent
 8   that this was reviewed either as part of a formal QA
 9   process, I would object to any of the questions
10   directed --
11        THE WITNESS: Right.
12        MR. GUARINO: -- to the contents of that.
13   If you're asking him separately as to whether, just in
14   terms of his observation what happened, whether he had
15   any concerns, if you can keep those two distinct
16   then --
17        MS. McCREADY: Sure.
18        THE WITNESS: And I can.
19        MS. McCREADY: Yeah.
20        MR. GUARINO: Okay.
21   BY MS. McCREADY:
22       Q. Did you -- what were your concerns, if you
23   had any?
24       A. I did not have any concerns. I mean,
25   looking at this case, a very difficult situation,
```

Page 90

```
 1   difficult case, I wouldn't have changed anything. Any
 2   provider could have been subject to the same outcome.
 3        This is a disease which 50 percent of the
 4   people don't survive, and it's a -- you know, it's an
 5   unfortunate case, and I -- I can't see anything in my
 6   own opinion, looking at the case procedurally, you
 7   know, that we would have done differently based on the
 8   information.
 9       Q. Okay.
10       A. No.
11       Q. And when you say "based on the information,"
12   based on the --
13       A. Based on the information that's there in
14   terms of the record of, you know, the -- the
15   observations of the people who saw the -- I didn't see
16   the patient, so I can't tell you if -- you know, if I
17   would have seen the patient that I might have done
18   something differently or not because --
19       Q. Sure.
20       A. -- I -- I don't have the -- I have no direct
21   observation of what this patient looked like. I can
22   only go by what's in the record. But based what's in
23   the record and talking to, you know, people involved,
24   we wouldn't have changed our procedures or done
25   anything different or -- you know, that I can think
```

Page 91

```
 1   of.
 2       Q. Okay. When -- do you know Todd -- did you
 3   know the patient?
 4       A. I can't tell you that I -- I mean, I don't
 5   recollect that I knew him, you know. And if I
 6   reviewed his record and looked, I might have seen him
 7   sometime in the past. But he's not somebody I'm
 8   familiar with or was familiar with, to be honest with
 9   you.
10       Q. Okay. And are you familiar with his wife at
11   all?
12       A. I have no idea who his wife is.
13       Q. Okay. Just wanted to follow up on one thing
14   you said about 50 percent of these patients don't --
15   don't survive.
16       A. Uh-huh.
17       Q. Why is it that 50 percent -- when you say
18   50 percent of these patients, what --
19       A. People with subarachnoid hemorrhage, I think
20   they -- the published statistics -- and it may be
21   improved in 2005 now from a lot of the literature
22   that's out there, because, you know, when you look at
23   medical literature and you look at statistics like
24   that, oftentimes --
25       Q. Sure.
```

Page 92

```
 1       A. -- it's historical, based on times where we
 2   didn't have as much stuff as we have now and, you
 3   know -- but -- and being a dinosaur like I am, I have
 4   seen a lot of things change in my career so -- but the
 5   published data on -- and when you read about
 6   subarachnoid hemorrhage, it says 50 percent of
 7   patients with subarachnoid hemorrhage -- you know, the
 8   mortality rate is 50 percent. So that's substantially
 9   high. It's a bad disease to have, I mean, when half
10   the people who have it die.
11       Q. Right. And is that just on -- based on
12   what -- what you're talking about in terms of the
13   literature you reviewed? Is that -- why is it that
14   50 percent of them die?
15       A. 50 percent of them die because, first of
16   all, it's -- it's a life-threatening illness, number
17   one. And so, you know, it's something that's rapidly
18   fatal in a certain percentage of patients, number one.
19   Because if you have a substantial amount of bleeding
20   inside your cranium causes increased intercranial
21   pressure and pushes on the brain and kills you. And
22   so it's something that, you know, can rapidly be
23   fatal.
24        But I think also one of the most important
25   things to realize is it's a very difficult diagnosis
```

**Page 93**

1  to make often. And if you look at the literature
2  again, you will find that most people who present with
3  subarachnoid hemorrhage are not diagnosed when they
4  first present, or a substantial portion of them are
5  not. And so it's something that often doesn't present
6  overtly with the obvious signs and symptoms that leads
7  somebody to the diagnosis.
8       So if someone comes in with the worst
9  headache of their life, that suddenly came on, and a
10 stiff neck, you know, you're much more likely to say
11 subarachnoid hemorrhage than somebody who comes in and
12 says, I have a headache, or, you know, I'm nauseous
13 or, you know, I'm -- you know, don't feel right. And
14 so that many patients -- or even most patients who are
15 initially seen are not diagnosed.
16      And the diagnosis requires, you know,
17 imaging techniques or lumbar puncture, and so one has
18 to make the leap to suspicion to do those things, and
19 so probably a lot of people are missed.
20   Q.  Okay. I wanted to ask you about imaging
21 techniques --
22   A.  Uh-huh. Sure.
23   Q.  -- and technology --
24   A.  Sure.
25   Q.  -- in the emergency department.

**Page 94**

1    A.  Sure.
2    Q.  Do you have -- I -- I'm going to take it you
3  have got CT scans.
4    A.  Twenty-four hours a day.
5    Q.  Twenty-four hours a day. And was that the
6  case in 2003?
7    A.  Yes.
8    Q.  All right. And what generation of
9  technology is it?
10   A.  At that time, I don't know the -- I can't
11 tell you which scanner it was at that time. You know,
12 we've upgraded since then to a 16-bit, you know,
13 technology. So it was the previous technology. But
14 certainly the resolution was enough to show
15 subarachnoid hemorrhage and, you know, that's what we
16 used as our --
17   Q.  Oh, sure. Okay.
18   A.  -- technique, you know, at the time.
19   Q.  And then did you have arteriograms?
20   A.  We do not have arteriograms available in the
21 hospital. So if we need to do an arteriogram, we
22 would -- at that time?
23   Q.  Yeah.
24   A.  Of course it's a different era now. With
25 our new scanner, we have CT and geography available,

**Page 95**

1  and so it's a little bit upgraded with this
2  generation. But in that time period, we didn't have
3  CT and geography capability. So if somebody was
4  determined to need an angiogram, we would have made
5  arrangements to transfer them to Alaska Regional
6  Hospital and have the angiogram done there.
7    Q.  And is there a difference between an
8  angiogram and an arteriogram?
9    A.  Same.
10   Q.  Are they the same thing?
11   A.  Same.
12   Q.  Okay. So in 2003 you had CT technology and
13 then -- and if -- and if somebody needed an angiogram,
14 arteriogram, you would send them over --
15   A.  Right.
16   Q.  -- to Alaska Regional?
17   A.  Right, uh-huh.
18   Q.  Okay. Got it. And then now there's been
19 some upgrades in technology and things?
20   A.  There's upgrades in technology, in terms of
21 having CT/angio capability. The resolution is not as
22 good as a full, you know, core angiogram, and, you
23 know, most neurosurgeons, if they're going to operate
24 on somebody with a subarachnoid hemorrhage who might
25 have an aneurysm, they would want to do an angiogram

**Page 96**

1  first. They want --
2    Q.  Sure.
3    A.  -- want to get better verification of the
4  site and determine, you know, what their approach is
5  going to be. And they may even, with some
6  subarachnoid hemorrhages in this day and age,
7  particularly in the posterior circulation, they'll do
8  angiography and coilings so that you can avoid doing a
9  craniotomy. And so -- and that's not done in Alaska
10 right now.
11      So -- and so our policy -- and I knew you
12 were going to get to this. I might as well tell you
13 now. Generally then, and continues to be now for most
14 people with subarachnoid hemorrhage, most of our
15 patients end up going to Seattle --
16   Q.  Okay.
17   A.  -- for subarachnoid hemorrhage definitive
18 diagnosis and treatment. And back at that time, we
19 were still sending many of those patients to Alaska
20 Regional for an angiogram first before we made the
21 decision as to whether they would go to Seattle --
22   Q.  Okay.
23   A.  -- or stay here in Anchorage. Today, even
24 though we have a neurosurgeon on our own staff right
25 now, we're sending all the patients to Seattle, and