```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
 4   KIMBERLY ALLEN, Personal
     Representative of the ESTATE
 5   OF TODD ALLEN, Individually,
     on Behalf of the ESTATE OF
 6   TODD ALLEN, and on Behalf of
     the Minor Child PRESLEY
 7   GRACE ALLEN,
 8              Plaintiffs,
 9       vs.
10   UNITED STATES OF AMERICA,
11              Defendant.
     _____/
12   Case No. A04-0131 (JKS)
13
14
15          DEPOSITION OF LORETTA LEE, M.D.
16              Pages 1 - 52, inclusive
17         Friday, April 29, 2005, 3:06 p.m.
18                 Anchorage, Alaska
19
20
21
22
23
24
25
```

Page 22

1  Q. All right.
2  A. I don't know the outcome of that case.
3  Q. And what was your role in the case?
4  A. I was the admitting physician.
5  Q. Okay. I'm just curious whether or not in
6  that case you were just a treating physician as a
7  witness or --
8  A. Yes.
9  Q. Okay. Was there anything involving your
10 care that was being criticized in that case?
11 A. Not that I know of.
12 Q. Okay. And how long ago was that?
13 A. That was, I think, 2001. So it was a while
14 back.
15 Q. All right. If you can tell me about the
16 other depositions.
17 A. One was as an expert witness that I did an
18 independent medical evaluation, and another was
19 actually a family -- a patient of mine who had died
20 whose -- who had rewritten his will, and there were
21 issues of whether or not he was competent to have
22 rewritten that will when he did.
23 Q. Okay. Let me ask you about when you
24 testified as an expert after doing an independent
25 medical evaluation. Had you been retained by the

Page 23

1  defense in the -- actually, let me back up. What kind
2  of case was that? Was it just a --
3  A. I think I was being retained by the
4  insurance company. There was a car that had gone
5  through the front side of a home and that the
6  occupants of the home were feeling that their medical
7  problems were related to the slowness of the repairs
8  that occurred on their house.
9  Q. Okay. And so the insurance company then had
10 hired you to do the IME?
11 A. Yes.
12 Q. Okay. And when was that, approximately?
13 A. It was the end of last year.
14 Q. And I'm not sure I understood. In the case
15 where the patient had died and then there was an issue
16 about his competence?
17 A. Yeah.
18 Q. Okay. So were you -- what was the subject
19 of your testimony then in that case?
20 A. Just around the time -- what his mental
21 status was like and what he was like around the time
22 that he rewrote his will.
23 Q. Okay. Any other cases in which you have
24 been deposed?
25 A. No.

Page 24

1  Q. Okay. And I want to go back to Exhibit 24.
2  In the second paragraph, it says, "Because of his
3  headache pains, he went to ANMC today. His wife
4  states he was seen around 10 a.m. He was treated with
5  a shot, some oral Phenergan, and sent home."
6       Is it Phenergan? Am I pronouncing that
7  correctly?
8  A. Yes.
9  Q. And what is that?
10 A. That's an antiemetic, so it's for people who
11 have nausea, vomiting.
12 Q. All right. And "The patient's wife stated
13 that he had some sonorous respirations" -- and what do
14 you mean by "sonorous respirations"?
15 A. Loud snoring type of sounds.
16 Q. -- "and about 3 p.m. she called ANMC, and
17 they told her that as long as he was breathing, she
18 should not worry, that it was likely a side effect of
19 the medications."
20      And that's what you wrote down. Is that
21 what Mrs. Allen told you had happened that day?
22 A. I believe so.
23 Q. Okay. And then did that -- I mean, did that
24 have any significance to you, or did -- I'm just
25 curious why you documented that.

Page 25

1  A. I think that it did probably delay her
2  coming in again.
3  Q. And then had you had -- again, had you
4  talked to anyone at ANMC about this contact with the
5  wife and --
6  A. No.
7  Q. And then it says, "She then went out to shop
8  and came back at about 5 p.m. She saw he was not
9  breathing. She was unable to arouse him, and he spat
10 up some blood. She then called EMS."
11      In the next paragraph that starts out "In
12 the emergency room, initial ABGs" -- I'm actually
13 looking at the third sentence. It says, "He did not
14 have any posturing." And if you could explain to me
15 what that means.
16 A. Posturing is something that happens when --
17 when parts of the brain aren't working and sometimes
18 when people are brain-dead or -- they will have --
19 have, you know, their -- it's different for different
20 parts of the brain.
21 Q. Okay. So is it -- I'm sorry. So it's a
22 movement of the limbs or --
23 A. Yeah. It's the positioning of the limbs.
24 Q. And so what significance was it that he did
25 not have any posturing?

Page 34

1  Dr. -- it sounds like you had discussions at the time
2  with Dr. Downs about it.
3      A.  Yes.
4      Q.  And what do you remember Dr. Downs telling
5  you about the case?
6      A.  I think he was worried that -- you know,
7  because this was a young patient who -- who died
8  suddenly, that there would -- you know, that the
9  family would want some questions answered.
10     Q.  Did he talk to you that he was worried that
11 there would be some kind of repercussions or a lawsuit
12 involving this or --
13     A.  Yes.
14     Q.  And Dr. Downs expressed that concern to you
15 at the time?
16     A.  Yes.
17     Q.  Okay.  Did any other physicians express that
18 concern to you?
19     A.  I don't recall specifically.
20     Q.  Okay.  When's the last time you talked to
21 Dr. Downs about Todd Allen?
22     A.  Probably around the time that he died.  I
23 have talked to Dr. Downs since then, but not about
24 him.
25     Q.  Okay.  Did you have that concern at the

Page 35

1  time, that there would be some kind of, you know,
2  legal ramifications or a lawsuit involving Mr. Allen?
3      A.  I think we -- whenever somebody young dies
4  unexpectedly, you know, that's always a possibility.
5      Q.  Did Dr. Downs say anything to you about his
6  concern being that the patient had gone to ANMC
7  earlier that day before he came to Providence?
8      A.  Yes.
9      Q.  Okay.  What did he say about that?
10     A.  That she -- the wife was concerned that --
11 that it should have been caught earlier.  And I think
12 that he was unsure because we were not at ANMC.  We
13 don't know what he looked like at that time.  So sort
14 of an unsettling situation for us because we didn't
15 want to mislead the wife, and we didn't want to say
16 anything wrong either, you know.
17     Q.  You didn't want to say anything wrong?  I
18 just want to make sure I understand.
19     A.  Because I don't want to -- we didn't want to
20 make the wife think that, oh, you know, go sue ANMC.
21 They did this wrong.  You know, I don't -- because we
22 were not there, so we don't know.
23     Q.  And did you want to be careful not to say
24 anything to the wife that would in any way criticize
25 ANMC's care?

Page 36

1      A.  Like I said, we weren't there, so we don't
2  know if their care -- what happened with their care.
3  He may -- a lot of people come in with headaches, and
4  it's hard to know which ones are going to be bleeding
5  and which ones are just regular headaches.
6      Q.  Were there any other discussions about
7  whether or not -- were there any discussions at all
8  about whether or not to contact ANMC?
9      A.  No.
10     Q.  Okay.  Do you know whether or not Dr. Downs
11 talked to anyone at ANMC about this case?
12     A.  I don't know.
13     Q.  Okay.  Did you and Dr. Downs then discuss
14 about what, in fact, you would say to the wife about
15 what had happened to Mr. Allen?
16     A.  No.
17     Q.  Looks like she had some questions about an
18 autopsy.  What do you remember about that?
19     A.  I think she was wanting -- she felt that,
20 with an autopsy, she might have some more answers to
21 her questions.
22     Q.  Okay.  And do you know whether or not an
23 autopsy was ordered?
24     A.  I'm not sure.
25     Q.  If a patient wanted an autopsy, who would

Page 37

1  they talk to about that?
2      A.  Usually I believe if they die within 24
3  hours at the hospital, it goes to the medical
4  examiner.  And the medical examiner can either take
5  the case and do an autopsy or they can decline.  And
6  then it's up to the family, I believe, if they want an
7  autopsy, to let the hospital know.
8      Q.  I'm just curious if you know who at
9  Providence would be the person who would know about
10 that.
11     A.  No.
12     Q.  Okay.  Have you ever had any discussions
13 with your colleagues -- and when I say "colleagues,"
14 people in your practice or people at Providence -- any
15 discussions about any concern for the care at ANMC,
16 the care that was provided to Todd Allen at ANMC?
17     A.  I'm not sure what you're asking.
18     Q.  Yeah.  Did you have any -- well, let me
19 break it down.  Did you have any discussions with
20 anyone in your practice about concerns you had
21 about -- well, first of all, did you have any concerns
22 about the care that Mr. Allen had had at ANMC?
23     A.  Yes.  I think whenever somebody dies, we
24 wonder about the care.  I think -- especially in an
25 unexpected death.

Page 38

1   Q.  Okay.  And then did you talk to anyone in
2   your practice about those concerns?
3   A.  Yes.  Other colleagues in my office.
4   Q.  Okay.  And I'm just curious whether or not
5   other colleagues in your office also expressed any
6   concerns to you about care the patients get at ANMC.
7        MR. GUARINO:  I object now to the complete
8   lack of foundation to express any opinions about care
9   rendered in this case by colleagues who weren't even
10  involved in the treatment of the patient and have no
11  knowledge of the facts.
12       MS. McCREADY:  First of all, that's not my
13  question.  And secondly, she can answer the question.
14  Q.  My question is whether or not in those
15  discussions whether or not your colleagues had any
16  concerns about care rendered to patients in general by
17  ANMC.
18  A.  No.
19       MS. MEYERS:  I'm going to --
20       MR. GUARINO:  Same objection.
21       MS. MEYERS:  This is getting really far
22  afield.
23       MS. McCREADY:  She can still answer the
24  question.  There's no reason why this witness can't
25  answer that question.

Page 39

1        MR. GUARINO:  I haven't directed anybody not
2   to answer questions.  I just stated an objection.
3        MS. McCREADY:  Okay.
4        THE WITNESS:  No.
5   BY MS. McCREADY:
6   Q.  Just so that I didn't get it completely
7   lost, your testimony is that no one in your practice
8   that you have discussed this case with has ever
9   expressed any concern to you about the care that
10  patients get at ANMC?
11  A.  No.
12  Q.  Have you cared for any other patients in
13  your practice where there was a concern -- you
14  specifically had a concern about care they had been
15  receiving at ANMC?
16       MS. MEYERS:  I'm going to object.  This is
17  really getting far afield.
18       MS. McCREADY:  You can object.  She can
19  still answer.
20       THE WITNESS:  No.
21       MS. McCREADY:  Let's go off record for a
22  moment.
23            (Off record.)
24       MS. McCREADY:  I don't have anything else.
25  Thank you, Dr. Lee.  Appreciate it.

Page 40

1            EXAMINATION
2   BY MR. GUARINO:
3   Q.  Good afternoon, Dr. Lee.  Are you okay to
4   continue?  Do you --
5   A.  Yes, I'm fine.
6   Q.  -- need a break?  I have got a few
7   questions.  I never like to say how long it's going to
8   take, because we always violate that rule then.  But,
9   hopefully, I don't have more than a few.
10       Let's start -- and I apologize ahead of
11  time.  I'm going to jump around.  I'm not going to
12  follow the same sort of path that Ms. McCready has
13  gone through.  I just have a few kind of follow-up
14  questions to ask.
15       The first has to do with the addendum on
16  your -- I guess the admitting report.  Is that
17  Exhibit 24?
18  A.  Yeah.
19       MS. McCREADY:  Yes.
20  BY MR. GUARINO:
21  Q.  Do you have that?  It's the third page.
22  A.  Yes.
23  Q.  And specifically I wanted to ask you
24  questions about the next-to-the-last paragraph that
25  dealt with the issue of autopsy.  Do you see that?

Page 41

1   A.  Uh-huh.
2   Q.  And I want to make sure I understand this.
3   Mrs. Allen was concerned -- you state:  "She is quite
4   concerned as to what exactly happened with him."
5        I don't want to go through all that
6   testimony again, but Mrs. Allen was concerned about
7   what had happened to her husband?
8   A.  Yes.
9   Q.  And then she had a discussion.  Did she have
10  the discussion with you personally about doing an
11  autopsy?
12  A.  I can't recall if it was me or Dr. Downs or
13  both of us, but I -- I do -- I think she did talk
14  about that.
15  Q.  And then it says, "We discussed that an
16  autopsy would be her right..."
17       Did Mrs. Allen have the right to request an
18  autopsy for her husband?
19  A.  Yes.
20  Q.  Do you know whether she ever requested an
21  autopsy?
22  A.  I don't know.
23  Q.  But she could have, if she wanted to?
24  A.  Yes.
25  Q.  And while we're on that same exhibit, let

Page 46

1  Ms. McCready asked you, and I wasn't sure I understood
2  your answer. Is that the time that you saw the
3  patient, or is that the time that you wrote this note?
4      A.  Usually, I write -- it's the time that I
5  actually sit down and write the note. And even though
6  I write -- I usually start it writing "full H&P
7  dictated," even though it's not, because that's -- you
8  know, so they know that this is not the H&P. This is
9  not the final H&P.
10      Q.  And I just want to make sure I understand.
11  If we go down to -- let's go down -- actually, let me
12  start right underneath, I guess, the second line of
13  this. It says "36-year-old male." Is that correct?
14      A.  Uh-huh.
15      Q.  "Brought to ER post arrest in field"?
16      A.  Yes.
17      Q.  And I apologize. I just want to make sure
18  I'm interpreting this correctly so we don't have to
19  later call you back and say, "Hey, what did this note
20  mean?" And is that CT? Does that refer to CT scan?
21      A.  Yes.
22      Q.  "CT brain with subarachnoid hemorrhage and
23  diffuse cerebral edema"?
24      A.  Yes.
25      Q.  And then "Admitted. Family agree with" --

Page 47

1  and is that "DNR status"?
2      A.  Yeah. Do not resuscitate.
3      Q.  All right. And then the next line begins:
4  "Per wife." Does that mean information from the wife?
5      A.  Yes.
6      Q.  "Patient complained of headache, right jaw"?
7      A.  Yes.
8      Q.  Is that what that means?
9      A.  Uh-huh.
10      Q.  And then you have an arrow.
11      A.  So radiating.
12      Q.  So this is sort of a shorthand version of
13  the dictation?
14      A.  Yes.
15      Q.  "Radiate back of head, radiate up to top of
16  head since last p.m."?
17      A.  Yes.
18      Q.  All right. And then you have -- I don't
19  want to go through all of this, but then you have
20  "history of titanium plate in jaw one year ago." What
21  is that next --
22      A.  Status post, S, slash, P.
23      Q.  "Motor vehicle accident"?
24      A.  Uh-huh.
25      Q.  And then if we can go down below that, I

Page 48

1  think I understand the next notes. But then you have
2  a note -- it begins -- I think it's "sonorous
3  respiration." Is that what that word is?
4      A.  Yeah.
5      Q.  "Sonorous respiration per wife about
6  3 p.m."? And if I'm doing this incorrectly, please
7  correct me. I'm trying to interpret your notes, but
8  you're the author. So you tell me if I'm reading it
9  incorrectly. "Sonorous respiration per wife about
10  3 p.m." Is that correct?
11      A.  Yes.
12      Q.  And then it says "5 p.m. with" -- and I
13  don't understand what that next note is.
14      A.  Oh, it's a question, Kussmaul respiration.
15      Q.  What does that mean?
16      A.  That's when -- it's sort of what happens at
17  the -- near death, when they sort of have a -- take a
18  breath, and then they don't breathe for a while and
19  then have a big --
20      Q.  Okay. And so that was your shorthand
21  reference to that?
22      A.  Yes.
23      Q.  All right. And then the next word,
24  "unarousable"?
25      A.  Yes.

Page 49

1      Q.  Okay. And then "spit up some blood." Did I
2  read that correctly?
3      A.  Yes.
4      Q.  All right. And I'm assuming again all of
5  this information would have been -- well, can you tell
6  whether any of this information came from anyone other
7  than Mrs. Allen; in other words, Dr. Dietz or one of
8  the --
9      A.  Yes. I think in the -- in the dictated
10  report, it says information -- or history is obtained
11  from his wife and from Dr. Susan Dietz.
12      Q.  So you might have gotten some information
13  from Dr. Dietz as well?
14      A.  Yes.
15          MR. GUARINO: Let's go off record for a
16  second.
17              (Off record.)
18          MR. GUARINO: Thank you, Doctor. I don't
19  have any other questions.
20              FURTHER EXAMINATION
21  BY MS. McCREADY:
22      Q.  Just really quickly, just to clarify
23  something. The dictated note, which is Exhibit 24,
24  that's the admission note. And that looks like it was
25  dictated at 10:12 p.m. Is that correct?