Review of Alllen v. United States of America

Case No. A04-0131

Michael Levy M.D., FACEP, FACP

Copyright © 2006

Todd Allen was an unfortunate 36-year-old Alaska Native male who on April 19, 2003 suffered a massive intracranial hemorrhage from which he succumbed. My review of the information available finds that there are two very distinct versions of Mr. Allen's presenting symptoms. Donna Fearey, ANP provided competent and appropriate care for this patient as he presented to her by her account of his history and findings. Similarly, I believe that he was appropriately triaged to the assigned level of care and that there were no institutional failings on the part of ANMC in this regard. The practitioner appropriately evaluated a person who for all purposes appeared to be presenting with a "breakthrough" episode of his chronic pain. If one examines the timeline for the course of the patient's disease it is dubious that a workup for a suspected intracranial hemorrhage if begun at the time of his initial visit would have changed his outcome.

**Alaska Native Medical Center**

It is appropriate for midlevel practitioners to see patients with painful conditions, even if severe in intensity, if there is no evidence of a serious underlying problem requiring the special skills of a physician. Although this lawsuit may include the contention that the patient was inappropriately triaged to the urgent care clinic I do not believe that to be the case given this patient's presentation to the triage nurse. His presentation was completely consistent with an exacerbation of his chronic pain and associated inability to keep his pain medication down due to vomiting. This type of presentation would not typically raise an undo level of concern absent other complaints or findings.

There was a documented call placed to ANMC by Mrs. Allen to obtain advice on her husband's apparent somnolence. Mrs. Allen believes that she spoke to the emergency department and was given advice that was clearly inappropriate. It is difficult to resolve this insofar as there is no evidence that she did reach anyone in the emergency and it was the policy of the emergency department to give no advice over the phone. I do not believe that any institution can absolutely certify that all of their employees will always follow a policy. The phone call may have gone to another department within the institution. We cannot confirm what was said to Mrs. Allen and well-intentioned people very often misinterpret information they receive or they take information out of context. Ultimately, even if one accepts the worst-case scenario of an emergency department nurse giving such advice (and without excusing it were it to have occurred) the question that must be answered is would transport to the emergency department at 4:00 p.m. have made a difference? As explained below, I do not think that it would have.

**Chronic head and jaw pain**

On November 22, 1999 Mr. Allen was struck to the face by a moving vehicle. His injuries included bilateral subcondylar mandibular fractures (fractures involving the jaw joint), midline alveolar fracture (fracture involving the bone in which the upper teeth are housed), open midline mandibular fractures (fractures of the jaw bone nearer the front) as well as facial lacerations. Thereafter he required chronic opiate narcotics and occasional Valium for pain relief. He had frequent visits to the ANMC family practice clinic with complaints of jaw and ear pain and was generally treated with narcotic pain relievers. This was not ultimately affected by a surgery with the placement of a prosthetic right

Copyright © 2006

temporomandibular joint in June of 2001. He seemed compliant with the requirements of his pain management contract.

**Mr. Allen had a prior history of headaches**

An important question is that of whether Mr. Allen was presenting on April 19 with a headache. There is at least a semantic issue of whether the pain on the side of his head was a "headache" or face pain. The nurse's triage note on April 19 states "ears and head are hurting" as the patient's chief complaints. Also it is important to establish whether Mr. Allen had a history of headaches. If he did, then a recurrence of a headache would not by itself be a significant departure from his past challenges with his pain. If he had never had headaches, a different conclusion might be reached. We do not know if that meant that he had some new type of pain or whether he was referring to the same type of headache he had in the past on numerous occasions. Although Mrs. Allen's deposition indicates that Mr. Allen did not suffer from headaches, this was not the case. Plaintiff's response to the defense's request attaches significance to the claim that his pain was 10/10 on the day he saw Donna Fearey. The following are some instances when did describe his headaches:

1. On his pain management forms (ANMC Chronic Pain Program Patient Initial Assessment 15A; Allen 326) Mr. Allen writes that the location of his pain is "right side head jaw joint area" and "left side head jaw joint area". Mr. Allen illustrates on the schematic where he experiences pain and this demonstrates pain in the back of the head (occiput) and areas extending from the ear towards the back of the head (Allen 333). The intensity of the pain on the same form is described as 10/10 at its worst and averaged 6/10 (he found that an acceptable level of pain) (Allen-327).
2. In his deposition in Allen v Han 3/1/2001 p 74 he testified that he gets headaches at least once a week and he described them as "very excruciating". He also testified that he had headaches AND jaw pain (p 76-77), which is to say that the headache was a painful entity itself separate from the jaw pain.
3. On 4/22/01 he was seen at the ANMC Emergency Department by a midlevel practitioner with a chief complaint of "hurting in jaw, head and ears" and requesting pain medications after having been denied the medications twice in the past two days by the family practice clinic. At that time he was "holding face and jaws", which would seem to indicate discomfort but pain scale was not documented (Allen-201).
4. He received physical therapy from Mormile Physical Therapy and on his intake form of 3/14/02 the practitioner wrote, "Pt has severe bilateral H.A. (headache), beginning in neck-through Tmjoints-lateral (sic) face to lateral and posterior head."(Allen-304D).
5. Dr Paul Craig saw the patient in August and September of 2001 for a neuropsychological evaluation. Dr Craig wrote, "The patient stated that headaches were a problem post-injury. The headache pain starts in the temporomandibular joint area bilaterally and then works upward causing pain through his head" [Allen=285].

Copyright © 2006

6. He was seen on January 23, 2003 by his primary care physician, Dr Freeman, who reported that the patient complained of "HA (headache) and tender scalp in temporal area" (Allen-336). During this time there were phone call exchanges regarding getting an MRI to evaluate why his pain seemed to be increasing.

The conclusion is that Mr. Allen did suffer from pain that he had on many occasions described as headaches of severe intensity. This supports Ms Fearey's recollection of the encounter of a patient with chronic pain who was concerned that he might have an ear infection and once having been reassured that he did not, was satisfied with the relief of his nausea.

### April 19, 2003

On April 19, 2003 Mr. Allen went to the ANMC Emergency Department with complaint "ear and jaw" pain per the practitioner and with a chief complaint of "ears and head are hurting" per the triage nurse [Allen 363]. Mr. Allen was triaged in the ANMC Emergency Department at 7:10am, called to the examining room at 7:35 and seen at 7:40am by nurse practitioner Donna Fearey and was discharged from the Emergency Department shortly after 8am. The next unequivocal time point associated with documented physical assessment is when Anchorage Fire Department was activated at 5:11pm at which time his condition was irretrievable. Was there something that should have alerted the practitioners that morning that Mr. Allen would suffer this fate?

Ms Fearey stated in her deposition that the patient complained of right ear and jaw pain that occurred while crossing the pass coming from Valdez, Alaska on his way to Anchorage the night prior. He explained that it was a common problem for him to experience increased pain with elevation change and that he was concerned that he had an ear infection and wanted an exam to exclude of confirm that concern. There was nothing volunteered by the patient to suggest that he had a new headache, different type or intensity of pain or any other personally alarming symptoms. Her exam logically focused initially on his clinical appearance and he "passed" that since he did not look sick or in significant distress. His vital signs were acceptable. The focus of the exam was his ears and they were found to be normal and the rest of his general exam was normal and unremarkable. There was no specific neurological exam done. In retrospect this is a failing now that we know he subsequently suffered an intracranial hemorrhage but it actually would have been distinctly unusual for a practitioner in a clinic setting to do a detailed, formal neurological exam on a person presenting with what for all purposes appears to be an exacerbation of chronic TMJ pain. Overall her clinic note is sparse but concise and is written in a tone of a clinic visit and not the more expansive documentation that would be expected in a patient identified as having higher suspicion complaints with lists of pertinent positives or negative. Whether that is good or bad is a subjective issue but it certainly represents common practice. It seems to reflect the style of medical record that was encouraged by her supervisor, Dr Scheffel.

Mr. Allen had also been vomiting and there was mention made in deposition questioning as to whether that might have represented a sign of increased intracranial pressure. Certainly vomiting is a symptom of increasing intracranial pressure, however it is also an extremely common sign associated with myriad other conditions. The most common associated condition causing vomiting is pain itself. I personally have observed

Copyright © 2006

this on a daily basis in my emergency practice as being caused by any number of painful conditions that in no way could represent increased intracranial pressure. If the vomiting did represent a manifestation of increased intracranial pressure I am very surprised that a small dose of phenergan would so relieve symptoms as was demonstrated in Mr. Allen's case when he left the urgent care clinic to have a large breakfast. Phenergan does not relieve increased intracranial pressure.

Kimberly Allen's recollection is significantly different and emphasizes neck and head pain and that this was a different type of pain than he had previously suffered. She makes no mention of Mr. Allen stressing his focus of concern being a possible ear infection. The only communication we have from Mr. Allen himself is a handwritten note on the privacy notice that he received at sign-in at the ANMC ED on 4/19/2003 said to be in his own hand per his wife stating "7:00 pain all night in R ear"(Allen-357). It will be impossible at this juncture to know which version is in fact correct. Mrs. Allen was at bedside in the examining room throughout the entire encounter but offered no other history nor did she have any questions of the practitioner. If Ms Fearey had vigorously questioned Mr. Allen would she have found subtle or even overt additional information that would have led to a workup for intracranial hemorrhage? The question is rhetorical and ultimately it comes down to whose recollection you believe to be accurate.

As pointed out above, his presentation was like many others for him in particular and for those who suffer from chronic pain in general. Pain is one of the most, if not the single most, common reasons for which people seek emergency care. Persons with chronic pain are seen disproportionately often in the emergency department compared to those who are not on therapy for chronic pain. Therefore, this is a very frequent complaint encountered by the emergency practitioner and in the vast majority of cases someone with chronic pain who presents with an exacerbation of this pain with no new or extreme features is suffering "breakthrough" pain and can be treated accordingly. A workup for such complaints is unwarranted unless there has been some significant new objective or subjective change. This population of patients represents a significant challenge for practitioners just for the reasons evidenced in this case. Although his wife, Kimberly Allen, contends that he had not complained of headaches before, there is no indication from the practitioners that she pointed that out. It is not at all clear that he complained specifically of a headache to Ms. Fearey. Even though Mr. Allen had specifically described the head pain that he chronically experienced as outlined above, Kimberly Allen appeared unaware that he even suffered from head pain. ("I was not aware of it" Deposition Kimberly Allen p 74, line 9) He had no apparent alterations in vital signs nor was his clinical presentation remarkable. It is noted that after a small intramuscular dose of phenergan (an agent unlikely to mitigate the pain of intracranial hemorrhage) Mrs. Allen stated that he felt better and ate a large breakfast (Deposition Kimberly Allen p112 line 20 and 24). There are reports in the literature that certain agents, particularly those effective for migraine, can relieve the pain of intracranial hemorrhage. Phenergan is not typically viewed as one of those agents. Given the outcome it is likely his presentation that morning was a "sentinel bleed" but it cannot be stated with absolute certainty.

**Time of Events per Mrs. Allen's Recollections:**
4/19/05 early am: increased pain and vomiting

7:07a.m. Mr. and Mrs. Allen present to ANMC Emergency Department
7:10a.m. Nursing triage
7:35a.m. Taken to room
7:45a.m. Examined by nurse practitioner
8:01a.m (?07) Intramuscular injection of phenergan
Departure time? 15min after?
Stopped to eat 30-45 min: Leave Native Hospital at 9am?
Go to Sam's Club and shop for 45 minutes: now 11a.m?
Back to hotel: no complaint of pain, just tired.
Stayed there 15-20 minutes then left him to go to REI
Drive time plus REI shopping of 45 minutes= 1h 15min
Stop at McDonalds=15minutes?
Return time 12:45? It seems likely that this was more like 3:47 p.m. by Mrs. Allen's phone record since she stated that she had called ANMC for advice on his being sleepy.
Snoring loudly, but nothing else unusual was noted
Ate lunch: 15 minutes?
Layed down with him and watched TV 60-90 minutes
Tried to wake him for a 3pm departure for Palmer. Breathing seemed irregular. Tried to wake him or lift him. Rolled over, blood from mouth. Called 911.

The time course of events that day has only two objective points after the departure from the emergency department. One is the call to ANMC at 3:47 p.m. that is documented by phone records. The other is the time of EMS response at 5:11 p.m. Mrs. Allen's estimations do not jive well with the fixed time points that we have which is understandable. In general, she clearly underestimated the times.

**What if Mr. Allen had an Intracranial Hemorrhage and a Workup for Diagnosis Had Begun at 8:00 a.m. on April 19, 2003?**

I will begin by emphasizing two important points:
1. We do not know that Mr. Allen's initial presentation on this date actually represented an intracranial hemorrhage.
2. We do not know what kind of hemorrhage he suffered. There is no way from the available evidence to know whether his hemorrhage could have been treated under the best of circumstances.

Additional important points are emphasized regarding medical practice in Anchorage, Alaska in April 2003:
1. ANMC had no ability to perform angiograms. The patient would have been transferred to Alaska Regional Hospital (ARH) for the diagnostic cerebral angiogram. Scheduling the test would have required the ready availability of the angiography suite and an ambulance transfer to the receiving facility.
2. ANMC had no neurosurgeon at that time.
3. The state of Alaska at that time had three practicing neurosurgeons. If he had been found to have a cerebral aneurysm, it is very unlikely that it would have been performed in Alaska.

Copyright © 2006

It is likely that he was deeply obtunded from his intracranial hemorrhage at the time of the phone call and quite possible was becoming symptomatic during their trip to Sam's Club. If that was the case then he was not a candidate for emergency surgery at least at 3:47p.m. It is very unlikely that a small dose of phenergan caused him to be so unarousable more than seven hours later. He had not slept the night prior so he was conceivably very tired. Conjecture is required as to the cause of his somnolence: was it really just severe fatigue or was it his medical condition? An additional, possible time point is suggested by the blood that issued from his mouth when she rolled him over prior to activating EMS. The most likely source of blood in his mouth in this setting would be from tongue maceration from a seizure. If this were the case, if he did have a seizure, it is unlikely that he would have done this in a small hotel room without his wife hearing something unusual going on. This would then mean that his condition became critical while his wife was out running errands and prior to her return when she dined in the room.

Proposed "real-world" time line for the diagnosis and treatment of an intracranial hemorrhage in Anchorage, Alaska 4/19/2003 that I believe to be a very conservative estimate based upon my years of practice:

8:00 a.m.: workup for possible intracranial hemorrhage begins. Call placed and CT scan of head ordered.
8:30 a.m.: CT scan done
8:40 a.m.: CT results reported
If positive for bleeding, begin decision-making...
[If negative for bleeding but concern for CT failure to diagnose (up to 2-5% of bleeds) Then perform diagnostic lumbar puncture: add 60-90 minutes to overall time.]
8:45 a.m.: page neurosurgery
9:00 a.m. Neurosurgeon returns call. Recommends angiogram to define the type of bleed. If it is an aneurysm, he will ask that patient be transferred to Seattle, Washington. If it is non-aneurismal such as that due to an arterio-venous malformation, tumor or other undetermined cause the patient may remain in Anchorage. Neurosurgeon will examine the patient at ARH.
9:10 a.m.: Begin making contact with ARH regarding availability of angiography suite, page invasive radiologist.
9:20 a.m.: Speak with invasive radiologist.
9:30 a.m.: Begin transfer process. Contact ambulance for transfer, copy all paperwork, write an interim transfer note, copy all labs and CT scans.
10:00 a.m.: Ambulance arrives. Ambulance crew reviews patient history, packages patient for transfer.
10:30 a.m.: Leaves for ARH
10:45 a.m.: Arrives ARH (code yellow transport, obeys all traffic laws)
10:50 a.m.: Arrives at cath lab. Begin registration, preparation for procedure.
11:00 a.m.: Radiologist arrives and begins procedure
11:45 p.m.: Full 4-vessel angiogram done. Information is now available. Decision now would be made regarding patient's disposition. If one assumes that an aneurysm was found and that it had bled, the neurosurgeon would probably see the patient at ARH.
12:15 p.m. Neurosurgeon evaluates patient

Copyright © 2006

LEVY000000117
Attch V, US A04-0131                    7              Expert review of Michael Levy M.D.

Exhibit K Page 7 of 9

12:30p.m: call placed to contract health department at ANMC and to sending practitioner requesting that the patient be transferred to Seattle, Washington for definitive care. If the patient were still stable at this time, he most likely would have been transferred to Seattle, Washington. Call placed to find accepting physician and facility. If he were unstable, he would be admitted to the ICU and monitored. Emergency surgery for ruptured aneurysms was not being performed in Anchorage.
12:40 p.m.: Transfer approved, call placed to medevac service.
1:00 p.m.: Medevac crew arrives at hospital and begins to acquaint themselves with patient and history.
1:30 p.m.: Patient loaded in ambulance and departs ARH for Stevens International Airport. Assuming patient is still stable (otherwise he would not merit transfer) he is taken "code yellow" to the airport.
1:50 p.m.: Arrive at hanger. Load patient connect all monitoring equipment and secure the patient.
2:05 p.m.: Aircraft off the ground and "wheels up" en route to Seattle. Expected flight time about 3.5 hours (Leer jet) to Boeing field. Often there was no Lear jet and the alternative aircraft (CitationJet or Conquest Turboprop) would take up to an additional 1.5 to 2 hours due to flight time and a refueling stop. There would be another 45 minutes of ground time to arrive at hospital.
6:00p.m is best case expected arrival time however, given the known sequence of events, this patient likely suffered a nonsurvivable intracranial bleed no later than 3:47p.m, the time that Mrs. Allen noted that he was unarousable and that by no later than 5:10 p.m. he was in cardiopulmonary arrest. Therefore, there is no reason to believe that even under the "best of circumstances" he would have survived this catastrophic event.

**What about life preserving interventions in Anchorage?**

The skull represents an immovable casing in which the brain, blood and cerebrospinal fluid reside. If one of the three components in the cranial vault begins to increase in volume there ultimately is no place for the contents to shift except downward through the opening known as the foramen magnum, an event known as herniation and essentially the precursor to death. Other consequences of increased intracranial pressure include decreased blood flow to the brain, breakdown of cellular barriers causing brain swelling (cerebral edema) and cardiovascular instability, among others. There are a limited number of non-surgical options in these cases. One method is to administer an agent that has the ability to draw fluid out of the brain and to temporarily decrease intracranial pressure in some instances. The agent typically used for this purpose is mannitol. While there is some debate as to the effectiveness of mannitol, evidence exists that it can lower intracranial pressure and as such can serve to allow additional time for the problem to resolve or to employ a surgical remedy when that is an option. Hyperventilation is another method for decreasing intracranial pressure that is falling from favor but may be able to provide a brief improvement in intracranial pressure (however it may decrease cerebral perfusion, i.e. blood flow to the brain tissue) In the case of ongoing intracranial bleeding for which a surgical solution is not available it unclear that these interventions would affect the patient's outcome. The conclusion therefore is that this unfortunate man suffered a condition with very high lethality and that given his location, time of presentation, time that his condition became for all intents

Copyright © 2006

and purposes irreversible even using a very conservative timeline and that he would have succumbed to it regardless of diagnostics or other supporting interventions.