## RICHARD A. RUBENSTEIN, M.D., INC.

FELLOW OF AMERICAN ACADEMY OF NEUROLOGY
DIPLOMATE OF AMERICAN ASSOCIATION OF NEUROMUSCULAR & ELECTRODIAGNOSTIC MEDICINE

RECEIVED
US PATENT OFFICE

PLAZA ONE OFFICE BUILDING
3220 BLUME DRIVE, SUITE 151
RICHMOND, CA 94806
TELEPHONE (510) 243-2380
FAX NO. (510) 243-2382

November 29, 2005

Gary M. Guarino
Assistant U.S. Attorney
Department of Justice
District of Alaska
Federal Building & U.S. Courthouse
222 West 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567

RE:                    **TODD ALLEN v. USA (ALASKA NATIVE MEDICAL CENTER)**
DATE OF BIRTH:         March 30, 1967

Dear Mr. Guarino:

The following medical records regarding the case of Todd Allen v. USA (Alaska Native Medical Center) were reviewed in their entirety by this examiner.

### REVIEW OF MEDICAL RECORDS:

The medical file, including the following reports, was reviewed:

C. E. Harrell, M.D.
George Ladyman, M.D.
Alexander Baskous, M.D.
Paula J. Colescott, M.D.
Alan R. Deubner, D.D.S.
Susan Clift, M.D.
William C. Heagy, D.D.S.
David M. Edwards, D.D.S.
Paul L. Craig, Ph.D.
Robert J. Kwok, M.D.
Donna Fearey, M.D.

Copyright © 2006

RE:    ALLEN, TODD
TO:    Gary M. Guarino, Assistant U.S. Attorney
PAGE: 2

> Scott E. Luna, PFF
> David A. Moeller, M.D.
> Susan Dietz, M.D.
> Loretta Lee, M.D.
> Mormile Physical Therapy

Also reviewed were the following:

> Certificate of Death
> Pharmacy records
> Plaintiff's Response to Defendant's Second Discovery Request dated June 30, 2005
> Deposition of Richard E. Brodsky, M.D. dated April 11, 2005
> Deposition of Donna A. Fearey dated April 11, 2005
> Deposition of Kimberly Allen dated April 12, 2005
> Deposition of Tim Scheffel, D.O. dated April 12, 2005
> Deposition of Loretta Lee, M.D. dated April 29, 2005
> Deposition of Patricia A. Ambrose dated May 10, 2005
> Deposition of Susan Edwards, LPN dated June 9, 2005

## OPINION:

Based on review of all submitted medical records, the following opinions are expressed to a reasonable degree of medical probability:

Mr. Allen had a complex pain history commencing on November 22, 1999 when he was involved in an automobile/pedestrian accident, striking his face against the side of an advancing car. This resulted in bilateral supracondylar mandibular fractures, midline mandibular fracture and dental alveolar fractures. His condition was operatively stabilized, and he commenced the postoperative course of opioid medication intake for chronic pain. Repeated reference was noted to unusual opiate drug dependency.

David M. Edwards, D.D.S. (in a letter to Alan Deubner, D.D.S., March 30, 2001) commented that, in this doctor's experience, most patients with temporomandibular joint dysfunction did not require high dose narcotics over long periods of time. They only required narcotics for the first few weeks following surgery.

Mr. Allen was transitioned to a chronic pain management program (December 12, 2002) and signed an opioid pain medication contract (January 11, 2003).

Copyright © 2006

RE:    ALLEN, TODD
TO:    Gary M. Guarino, Assistant U.S. Attorney
PAGE: 3

Ongoing complaints of significant temporomandibular joint pain were noted, working upward and causing pain throughout his head with headaches being a problem post injury (notes of Paul L. Craig, Ph.D., August and September 2001).

Mr. Allen had repeated visits to Alaska Native Medical Center for chronic pain complaints, including headache, (Dr. Craig's note) and was suspected of being habituated to narcotics and a frequent visitor to the clinic (deposition of Patricia A. Ambrose dated May 10, 2005).

At the time Mr. Allen presented to the Alaska Native Medical Center at 7:10 a.m. on Saturday, April 19, 2003, nurse evaluator Donna Fearey noted his chief complaints were nausea and TMJ/ear pain (aftercare instructions dated April 19, 2003). There was no reason to suspect that this pain presentation was any different from the multiple prior pain presentations over the past three years.

The incidence of primary subarachnoid hemorrhage in the United States is about 26,000 cases per year, which cause about 10 percent of all stroke deaths; more than half affect patients under the age of 45. About one case per 10,000 population occurs (Brust, J: *Subarachnoid Hemorrhage* in *Merritt's Textbook of Neurology, Ninth Edition*, Williams and Wilkins, 1995, pg. 276).

Even if this was a sentinel headache (aneurysmal warning leak), it was not sufficiently atypical to warrant further suspicion and physician referral. Nurse Fearey noted that his neck was supple, again atypical for acute subarachnoid hemorrhage. Even if a CT had been performed at this juncture, it remains a matter of speculation to opine that subarachnoid blood, edema or ischemic change would have been demonstrated.

In any event, it would be speculative to conclude that any purported imaging abnormality early that morning would have warranted a spinal fluid evaluation in someone with a known preexisting complex pain disorder and opiate habituation (with a supple neck).

Even if a CT head scan had been performed at Alaska Native Medical Center on the morning of April 19, 2003 and was felt to be consistent with subarachnoid hemorrhage (a matter of speculation), there is no compelling evidence, to a reasonable degree of medical probability, that progression from a "warning leak" to aneurysmal subarachnoid hemorrhage would have been prevented.

The fact that his pain was reportedly accompanied by nausea and vomiting is again a nonspecific symptom since severe head pain of any cause can be associated with nausea and vomiting as well as opioid narcotic side effect.

Within a self-limited period Mr. Allen was discharged from the clinic, went to the hospital cafeteria and subsequently met a friend at Sam's Club. Mr. and Mrs. Allen reportedly stayed at Sam's Club

Copyright © 2006

RUBN0000001182

Exhibit L Page 3 of 6

RE:    ALLEN, TODD
TO:    Gary M. Guarino, Assistant U.S. Attorney
PAGE: 4


for 45 minutes where he lay down on a porch swing. They returned to their hotel in the early afternoon.

Mrs. Allen reportedly placed a call to Alaska Native Medical Center in the mid afternoon (3:47 p.m.) and told the hospital personnel that he received a shot of Phenergan, and experienced some nausea and vomiting. She was reportedly told that "If he were breathing, he was okay." No hospital notes of this telecommunication exist.

Mrs. Allen returned from errands around 3 p.m. and later found Mr. Allen in deep unresponsive coma with blood in his mouth from an apparent seizure.

Noncontrast CT brain scan (April 19, 2003) demonstrated diffuse attenuation between gray and white matter over the cerebral hemispheres consistent with diffuse subarachnoid hemorrhage and slight ventricular compression. A toxicology screen was negative for alcohol, amphetamines and barbiturates but positive for benzodiazepines and opiates (at 6:23 p.m.).

Sometime between 2 and 3:30 p.m. on the afternoon of April 19, 2003, Mr. Allen suffered a massive aneurysmal subarachnoid hemorrhage with sudden death and, under any circumstances, was not resuscitatable. No medical intervention nor imminent neurosurgical procedure could have been performed to have ameliorated the diffuse cerebral edema and ischemic effects of the subarachnoid hemorrhage (i.e., he had no evidence of hydrocephalus in which an external ventricular drain would have been inserted, nor was there any evidence of a focal hematoma capable of surgical evacuation).

Mr. Allen's progression from a grade I (headache and/or slight meningismus) to a grade IV (profoundly depressed level of consciousness) or grade V (comatose with flaccidity or abnormal posturing) was, unfortunately, not preventable.

Patients with grade IV or V subarachnoid hemorrhage tend to do badly whatever treatment they receive and are surgically inoperable.

It would be erroneous to speculate that, for some unclear reason, Mr. Allen's preexisting complex pain problem, narcotic addition and chronic opioid contract (with a long preexisting history of temporomandibular joint and diffuse head pain) (Dr. Craig's notes of August and September 2001) was sufficiently different to have warranted a brain CT scan at Alaska Native Medical Center on the morning of April 19, 2003 (or physician emergency room referral).

The presumption that the CT head scan would have demonstrated diffuse subarachnoid hemorrhage at 7 or 8 a.m. on the morning of April 19, 2003 is, again, a matter of speculation (CT scans at the time of warning leaks are frequently negative), and there was no indication of a stiff neck (his neck was supple) (note of Donna Fearey, April 19, 2003). Complaints were not at all atypical of prior

Copyright © 2006

RE:    ALLEN, TODD
TO:    Gary M. Guarino, Assistant U.S. Attorney
PAGE: 5

symptoms (at 7:10 a.m. Nurse Fearey noted complaints of ear and jaw pain, and his head hurting). The symptom of nausea noted by Nurse Fearey was nonspecific.

Even under optimum circumstances, had the correct diagnosis been surmised, transfer from Alaska Native Medical Center to local hospitals (Alaska Regional or Providence) would have taken time. Once arrival at the hospital occurred, radiologic setup, preliminary blood work, EKG and stabilization would have further encompassed several hours.

Four vessel angiography may not have demonstrated the source of bleeding (7 to 10 percent of initial angiograms are negative). Even if an aneurysm had been identified, to a reasonable degree of medical probability, there is no assurance that the aneurysm would be operable and situated in an accessible location.

Without knowledge of the exact location of the aneurysm (or presence of a surgical neck) or the presence of multiple aneurysms, it would again be a matter of speculation to presume that sufficient neurosurgical expertise was available in Anchorage to warrant emergent surgery or that neuro-surgeons would have performed same day surgery.

The aneurysm may well have merited an endovascular approach instead of a surgical approach, unavailable in Anchorage at the time of Mr. Allen's subarachnoid hemorrhage.

The likelihood that emergency surgery would have been performed by 3:30 p.m. that afternoon, thus preventing Mr. Allen's catastrophic aneurysmal subarachnoid hemorrhage, would be highly improb-able.

Just the logistics of presurgical testing, ongoing medical stabilization and angiography would have segued Mr. Allen into the afternoon, and the unpredictability period encompassing his fatal hemorrhage.

It would be not only impractical but also erroneous to presume that the surgical team would jump into the fray in a timely manner to prevent a condition that is inherently unpredictable.

Under any circumstances he would never have been a candidate for transfer to Seattle. Mr. Allen was medically unstable and would have died en route.

Without knowing the character and location of Mr. Allen's aneurysm, the treatment of his condition and his rapid deterioration from a grade I to grade IV or V would neither have been preventable nor reasonably foreseen.

Copyright © 2006

RE:    ALLEN, TODD
TO:    Gary M. Guarino, Assistant U.S. Attorney
PAGE: 6

The overarching issue in this case is that a substantial percentage of aneurysmal ruptures in this age group (Mr. Allen was 36 years of age at the time of his subarachnoid hemorrhage) results in out-of-hospital sudden death irrespective of treatment or whether treatment is rendered at all.

To a reasonable degree of medical probability, no intervention, diagnostic study or hospital transfer would have, in any way, affected the eventual outcome of Mr. Allen's demise.

Please feel free to contact me should you have any further questions regarding this case.

Sincerely,

*Richard A. Rubenstein, M.D.*

Richard A. Rubenstein, M.D.

RAR:jc

Copyright © 2006