Page 1

1              UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF ALASKA
3  _____
                                           )
4  KIMBERLY ALLEN, Personal                )
   Representative of the ESTATE            )
5  OF TODD ALLEN, Individually,            )
   on Behalf of the ESTATE OF              )
6  TODD ALLEN, and on Behalf of            )
   the Minor Child PRESLEY                 )
7  GRACE ALLEN,                            )
                                           )
8              Plaintiffs,                 )
                                           )
9       vs.                                )
                                           )
10 UNITED STATES OF AMERICA,               )
                                           )
11             Defendant.                  )
   _____)
12 Case No. A04-0131 (JKS)
13
14 _____
       VIDEOTAPED DEPOSITION OF MICHAEL LEVY, MD
15 _____
16
              Pages 1 - 195, inclusive
17
              Friday, February 24, 2006
18                    2:12 P.M.
19
           Taken by Counsel for Plaintiffs
20                       at
                   ASHBURN & MASON
21         1130 West 6th Avenue, Suite 100
                  Anchorage, Alaska
22
23
24
25

PACIFIC RIM REPORTING   907-272-4383                Copyright © 2006
      www.courtreportersalaska.com

Page 8

1  more time -- I did all my emergency stuff, but I
2  also spent more time with the internal medicine side
3  of it as well as having my own clinic for -- I
4  forget now. I think it was about three years while
5  I was a resident there.
6     Q.  And when you say your own clinic, what
7  do -- what do you mean?
8     A.  I had a clinic -- when you're an internal
9  medicine resident, you have a clinic and patients
10 you're responsible for a couple times a week during
11 the two or three years of your residency, so you do
12 your regular stuff, your hospital stuff, and then
13 you would come in and see patients that have been
14 assigned to you who would be returning to you on an
15 ongoing basis, that you're treating blood pressure
16 and diabetes and various such things.
17    Q.  Are there subspecialties within emergency
18 medicine, or were -- when you refer to
19 subspecialties, was that within some -- some other
20 group, some other --
21    A.  Well, there actually are. There's --
22 there's gerontology, there's sports medicine,
23 there's critical care or other fellowship boardings
24 that you can get associated --
25    Q.  Okay.

Page 9

1     A.  -- with emergency medicine.
2     Q.  In -- in regards to your board
3  certification in emergency medicine, is it generally
4  in emergency medicine, or is it --
5     A.  Yeah. I'm board certified in both
6  emergency medicine and internal medicine.
7     Q.  All right. And I saw that you're -- you
8  were recertified in emergency medicine in 1998. Is
9  there -- is there a requirement that you be
10 recertified every ten years?
11    A.  With emergency medicine, there is.
12    Q.  With emergency medicine. And how about
13 with internal medicine?
14    A.  There isn't for my year, so I just have to
15 keep up with my CE's and the like. They do have a
16 pathway for that, which I have been doing their
17 CE's, but I haven't gone through the --
18    Q.  Okay.
19    A.  -- recertification because I don't have to.
20    Q.  And then are you -- is your pra- -- current
21 practice now emergency medicine?
22    A.  Yes.
23    Q.  Do you feel like you're practicing internal
24 medicine? I -- I assume that there's some overlap
25 between internal medicine and emergency medicine,

Page 10

1  but is -- is basically your practice comprised of --
2  of working in an emergency room?
3     A.  100 percent emergency medicine, but the
4  training I received in internal medicine is kind of
5  integral to that.
6     Q.  Okay. What's -- what is the difference
7  between the training that a family medicine
8  physician undergoes versus emergency medicine
9  physician? And can you be board certified in family
10 medicine?
11    A.  Yes --
12    Q.  Can you? Okay.
13    A.  -- you can. I guess I can't be real expert
14 in talking about family medicine, what their --
15 their focus, though it just generally has to do more
16 with being the medical home for people, ongoing care
17 from cradle to grave basically, so doing pediatrics
18 and then adolescent and adult care; and mostly
19 focusing on, you know, health promotion, disease
20 prevention, I think.
21       So taking care of chronic illness, doing the
22 usual immunizations, kind of the whole gamut of stuff,
23 but not looking to -- and more intense focus, like
24 emergency medicine would with regard to the acute
25 emergencies we see; and then less like internal

Page 11

1  medicine, in that internists are trained to a more
2  specific level for adult disease and more complex
3  adult disease, which a family practitioner would
4  probably refer many cases to an internist or an
5  internal medicine subspecialist.
6     Q.  Okay. Since -- since completing your
7  residency -- and that was four years?
8     A.  Yes.
9     Q.  And is that in part because you were doing
10 the internal -- I'm sorry -- a residency in internal
11 medicine and emergency medicine together?
12    A.  Yes.
13    Q.  All right. And then you were chief
14 resident, emergenc- -- emergency medicine at McGaw
15 Medical Center. Is -- where is that? Where is
16 McGaw?
17    A.  That's Northwestern University in Chicago
18 and the Gold Coast.
19    Q.  Okay. And that's -- and as chief resident,
20 what generally were your responsibilities?
21    A.  I was a fourth-year resident at the time,
22 and so, in addition, I had a leadership role with
23 regard to the residency, and interface with the
24 attending staff, teaching responsibilities, and
25 scheduling.

Page 12

1  Q. Okay. If you could describe for me right,
2  currently, what is your -- what's your current
3  practice?
4  A. I'm an emergency physician. I'm the
5  chairman of the emergency medicine department at
6  Regional. So my -- I spend a hundred percent of my
7  time doing clinical work, seeing patients with all
8  manner of emergency.
9  Q. Okay. Are you involved in training medical
10 students through the WWAMI program or any sort --
11 other sort of program?
12 A. We occasionally have medical students, but
13 they're not through WWAMI. They come from places
14 like Scotland and the like, through just
15 associations that some of our partners have had with
16 them.
17 Q. Okay. So -- so have you been involved in
18 at least training some -- some medical students who
19 are --
20 A. I have trained medical students, yes.
21 Q. All right. How about working with people
22 in emergency medicine -- let me go back to the first
23 page of your CV. It says National Association of
24 EMS -- oh, that's emergency medicine physicians. Is
25 that correct?

Page 13

1  A. EMS, emergency medical services physicians.
2  Q. Okay. Do you work with training
3  paramedics?
4  A. Yes.
5  Q. Okay. And -- and I guess EMTs, emergency
6  medicine technicians. Is that what that stands for?
7  A. They're all -- yeah. A paramedic is
8  technically an emergency medical technician, hyphen
9  P, so the highest level of EMT is paramedic.
10 Q. Okay. And you're involved in training --
11 A. Yes.
12 Q. -- in paramedics and -- and the like?
13 A. I was head of the -- I was the medical
14 director for the Paramedic Academy here in town for
15 four or five years, and since then I am not doing
16 that right now. And when it's become MTI with a
17 security and that thing over there, I -- I left them
18 then, but up till that point I was with -- Aurora
19 North is what the academy was before, and it became
20 NorthStar Academy.
21 Q. Okay.
22 A. And after NorthStar it became MTI. And at
23 that time I left, but --
24 Q. Okay. But are you familiar with the sort
25 of medical training the paramedics --

Page 14

1  A. Oh, sure.
2  Q. -- have?
3  A. Well, in addition, I'm the medical director
4  for the Anchorage Fire Department. So I'm in charge
5  of areawide EMS, is really my most recent title.
6  And I'm the past chairman of the medical advisory
7  board on EMS for the mayor.
8  Q. Okay. And what year was -- what year were
9  you in that position?
10 A. I've been in it since 1995.
11 Q. Okay. So you're currently in -- so you're
12 currently in that position?
13 A. Yes.
14 Q. Okay. And you've been doing it for the
15 last 11 years?
16 A. Uh-huh.
17 Q. Okay. It looks like you worked at Alaska
18 Native Medical Center from July '89 to June '90. Is
19 that correct?
20 A. Correct.
21 Q. And then why did you end up leaving there?
22 A. I had a commitment to the National Health
23 Service Corps that began after my -- after I
24 finished my residency. It was a three-year
25 commitment.

Page 15

1  Q. Okay.
2  A. And so it expired. And I was done with it.
3  At that point in time, I didn't really wish to
4  continue in the National Health Service Corps.
5  Q. Okay. And it's called the National Health
6  Service Corps?
7  A. Yes.
8  Q. And what's the -- I'm sorry. What was the
9  commitment? I'm not sure I understand that.
10 A. Well, I expend- -- I attended a very
11 expensive medical school.
12 Q. Okay. And so you committed to work --
13 A. Year for year for tuition.
14 Q. Okay. And -- and what's the -- and you
15 said it's a -- it's a three-year program?
16 A. For me, I signed on for three years. I --
17 because it's just the way the fourth year in my
18 medical school was structured, it wasn't as
19 expensive for me as the first three years. And, you
20 know, I frankly didn't want to have any more time
21 with the National Health Service necessarily than I
22 had to. I didn't want to commit to that. I wanted
23 to volunteer. I thought it was different. But
24 anyway, so I was able to do that for three years,
25 and that was my commitment time. So I had spent two

Page 20

1 with a colleague who is a -- he's a physician, JD.
2  Q. A physician, JD, somebody not in Alaska?
3  A. Not in Alaska.
4  Q. Okay. And what --
5  A. Without mentioning names or places --
6  Q. Sure.
7  A. -- or people or times.
8  Q. And what was your -- what was the -- the
9 purpose of that conversation?
10  A. The purpose was really more or less to fill
11 time. This is a friend who thrives on talking about
12 such things, quite honestly, and he's got his
13 perspectives on things. And so I think it was more
14 just that kind of conversation.
15  Q. This friend of yours, does he practice --
16 I'm just curious if he's practicing law or
17 practicing medicine.
18  A. Medicine.
19  Q. Okay. Is he one of the -- is he somebody
20 who went to -- who was a lawyer and then became a
21 doctor, or was he a doctor and then became a lawyer?
22  A. Doctor, became a lawyer.
23  Q. Okay. I don't ever see it the other way
24 around. All right. Do you actually -- do you work
25 for a group that works at Alaska Regional, or are

Page 21

1 you an actual employee of Alaska Regional?
2  A. We have a corporation, and we're a
3 contractor to Alaska Regional.
4  Q. Okay. And is there -- how many people are
5 in your group?
6  A. There are seven of us.
7  Q. And then are -- is there any particular
8 hierarchy within the group?
9  A. There's -- it's a partnership with a
10 partnership track, and we currently have just
11 matriculated our -- the most recent person as a
12 partner. And we actually have one hired person
13 right now, so that would be the only hierarchy per
14 se. Then we have one person we call our president.
15  Q. Okay. And are -- do you have a position in
16 this --
17  A. I'm a vice president.
18  Q. Vice president, okay. Now, on the second
19 page of your CV, under "Other Professional
20 Positions," it says, "Medical director, AeroMed
21 International." And what is that?
22  A. AeroMed International is a med-evac service
23 owned by YK Delta Corp.
24  Q. Okay. And what's your -- you're the -- are
25 you currently the medical director?

Page 22

1  A. I'm not.
2  Q. Okay.
3  A. I have worked with them since 2001, and I'm
4 not currently the medical director.
5  Q. All right. But is it a group that you work
6 with?
7  A. It's a group I had worked with until about
8 five months ago, on projects prior.
9  Q. And is that what you were referring to
10 before, that you had -- no longer have an
11 association with this group --
12  A. No.
13  Q. -- or was that something else?
14  A. There's also -- MTI is the one I said.
15  Q. MTI. I'm sorry.
16  A. Yeah.
17  Q. What is MTI?
18  A. Medical Training Institute. It's the one
19 you see in the paper these days associated with all
20 the hubbub.
21  Q. With the Security Aviation?
22  A. (Witness nods head.)
23  Q. Got you. Okay. What was your -- I just
24 wanted to get an understanding of what exactly you
25 did. You were a medical director for AeroMed

Page 23

1 International --
2  A. Uh-huh.
3  Q. -- and then what did that -- what -- the
4 medical director, what did that entail?
5  A. Right. Well, I established protocols and
6 standing orders for the service, and reviewed
7 100 percent of the med-evacs, provided on-line medic
8 control, and shared some of those duties with some
9 of my partners at Denali Emergency Medicine
10 Associates, which is my group. And I flew in the
11 aircraft a few times. And then we would have
12 monthly staff meetings, where I provide training and
13 feedback.
14  Q. And the "staff" meaning to the -- were they
15 physicians, or was this -- would be -- this be the
16 paramedics, or who were the staff?
17  A. The crews were paramedics and flight RNs.
18  Q. Okay.
19  A. So that would be the component of those.
20  Q. And what -- what sort of aircraft are we
21 talking about that were used for med-evacs?
22  A. The typical aircraft used when I was with
23 them were Lear 35, Lear 36 -- there's a Lear 25
24 which was used sometimes. They were Citation jets.
25 In the village, they had one Caravan with Grant

Page 24

1  Aviation, and then there was occasional use of, I
2  think, a Conquest.
3      Q.  Ever use helicopters?
4      A.  No.  Well, they could be involved in the
5  village, in a helicopter rescue, insofar as the Army
6  National Guard in Bethel has a Black Hawk that's
7  stationed out there.  And so that was used for some
8  village rescues.
9      Q.  Okay.  And generally what would AeroMed
10 International -- in this med-evac group, where
11 would -- I mean, generally where was it operating?
12 Bringing patients into Anchorage or taking patients
13 outside of Anchorage?
14     A.  Typically it's bringing patients into
15 Anchorage, although it also flew, not uncommonly, to
16 Seattle, in particular.
17     Q.  Okay.
18     A.  It's based here.  There were two bases of
19 operation.  There was a base in Anchorage at
20 Signature East, and then there was a base at Grant
21 Aviation out at Bethel.
22     Q.  Got it.  And was it -- is it un- -- was it
23 uncommon or is it uncommon to med-evac patients out
24 of Anchorage to Seattle?
25     A.  No, it's not uncommon.

Page 25

1      Q.  And would generally patients go to the
2  University of Washington?
3      A.  Most often, I think, although there were
4  other destinations.
5      Q.  Okay.  Would Harborview -- is Harborview
6  part of the University of Washington?
7      A.  Yes.
8      Q.  Okay.  And are you familiar with
9  Harborview?  Have you been down there?
10     A.  I -- you know, I have been down there.  I
11 have spent no time there.
12     Q.  All right.
13     A.  So I'm not familiar with it, I guess is the
14 easiest way to say it.
15     Q.  Have you ever accompanied a patient from
16 Anchorage on a med-evac to Harborview?
17     A.  No.
18     Q.  Have you ever accompanied a patient from --
19 who was being med-evac'd from Anchorage down to
20 Seattle, at all?
21     A.  No.
22     Q.  All right.  So you must be familiar with
23 then how the med-evac planes -- it sounds like
24 they're really airplanes -- are -- are equipped.
25     A.  Yes.

Page 26

1      Q.  Would that be fair to say?  Okay.  And are
2  they equipped to transport critically ill patients?
3      A.  Yes.
4      Q.  And are they equipped to allow the
5  administration of medication intravenously to
6  patients?
7      A.  Yes.
8      Q.  And could you administer anti-convulsants
9  to patients who are being med-evac'd?
10     A.  Yes.
11     Q.  How about monitoring and controlling blood
12 pressure of a patient in a med-evac?
13     A.  Yes.
14     Q.  So they're equipped to do that.  Is that --
15     A.  Yes.
16     Q.  Are they equipped to monitor and control
17 fluids in a patient?
18     A.  Yes.
19     Q.  All right.  In your experience with
20 med-evacking patients from Anchorage down to
21 Seattle, whatever that destination within Seattle
22 would be, are the patients generally accompanied by
23 a medical professional, whether or not it's a
24 paramedic or a physician or a nurse?
25     A.  What type of patient are you talking about?

Page 27

1      Q.  You tell me.  Does it depend on the
2  patient, depend -- is that the issue?  Does it
3  depend on how the patient is and what's going on
4  with the patient?  Does that determine who goes down
5  with them?
6      A.  Yes, because you could have a stable
7  transport of a patient who is going for rehab that
8  could be wheelchair-bound and could have just an
9  escort in a commercial aircraft.  You can have
10 somebody who couldn't go commercial aircraft but
11 still was not a sick patient per se, but just
12 because of logistics, having to be in a stretcher,
13 the like -- and they might go just with some sort of
14 medical escort.
15         But for the missions that we flew, by and
16 large, they would be people who were acutely ill and
17 needed a higher level of care, et cetera, and they
18 would be typically flown with a crew complement of a
19 para- -- a flight paramedic and a flight RN.
20     Q.  Okay.  A flight paramedic and a flight RN.
21 And how -- in your experience, how common is it that
22 patients are med-evac'd; that is, in this last
23 scenario that you were describing with a flight
24 paramedic or flight RN, a critically ill patient,
25 how often does that come about where a patient's

9 (Pages 24 to 27)

Page 48

1  medicine?
2  A. Yes.
3  Q. But they're not something that you go to on
4  a regular basis?
5  A. Correct.
6  Q. But do you consider them to be
7  authoritative texts on emergency medicine?
8  A. The problem with emergency medicine is it's
9  so all-encompassing, that if one wants specific
10 information, it's really better to go to source
11 information as opposed to Tintinalli or to Peter's
12 book. I mean, it can be helpful, but it's not -- I
13 don't think it's really definitive.
14 Q. Okay. And I'm not sure I understood what
15 you said. You would go to some other source?
16 That's what I'm not sure I --
17 A. Well, so if I want to find out about
18 subarachnoid hemorrhage and I want to know more
19 about it than what I know, then I won't go read what
20 Judith Tintinalli has to say about it necessarily.
21 I would go to the medical literature and -- and try
22 to find review articles from sources just to kind of
23 focus in on that typically.
24 Q. Okay. And have you done that --
25 A. I have --

Page 49

1  Q. -- in this case?
2  A. Yeah. I got a whole bunch of them from
3  your expert.
4  Q. Oh. Gary's been sending them around to
5  everybody. Okay.
6     So you have reviewed articles that were sent
7  to you by Mr. Guarino that apparently were cited by --
8  that were cited by one of my experts. Is that right?
9  A. Yes.
10 Q. Okay. And have you reviewed those
11 articles?
12 A. Yes.
13 Q. Okay. And did they in any way -- I assume
14 you were sent those articles after you had drafted
15 your report in this case.
16 A. I don't remember, to tell you the truth.
17 Q. Let's just assume then -- never mind. I
18 know the answer to that question. I shouldn't have
19 asked it.
20 A. I'm glad you do, because I really don't.
21 Q. Well, is there anything that you read in
22 those articles that changed your opinions in this
23 case? Let's put it that way.
24 A. No, I don't think so. It was great to get
25 to read them, though, quite honestly. I mean, this

Page 50

1  is something that you just don't get the opportunity
2  to go back and do that often when you're busy with
3  lots of other things.
4  Q. Sure.
5  A. So I enjoyed going through most of them.
6  Q. And did you learn something that you didn't
7  know before, in going through those articles?
8  A. I always learn stuff, absolutely.
9  Q. Well, anything stand out in your mind
10 about -- something you were like: Gee, I didn't
11 know that before, involving subarachnoid hemorrhage?
12 A. I'm sure there was, and it will come to me
13 when I need it. But I can't tell you right now.
14 Q. All right. We'll revisit the topic.
15 A. Okay.
16    MS. McCREADY: Going to your report. You
17 were looking my way. I just wanted to make sure you
18 weren't trying to signal me about the tape.
19    THE VIDEOGRAPHER: No, I'm not.
20    MS. McCREADY: I thought, we haven't been
21 going that long.
22    (Exhibit 2 marked.)
23    MR. GUARINO: No. She just wanted to tell
24 you that the tape hadn't been running for the past
25 hour so...

Page 51

1     MS. McCREADY: Actually, can I see that for a
2  second, just because I want to make sure -- oh, okay.
3  Q. Okay. I have marked as Exhibit 2 -- this
4  is your report, and then also attached is some --
5  the records that -- it looks like the records that
6  you reviewed, you know, as well as your -- your
7  billing in this case up until the time you wrote
8  your report. And I just want to focus on your
9  report for now.
10    First of all, let me ask you what you were
11 asked to do in this case.
12 A. Well, I think I was asked to render an
13 opinion on the care given to Mr. Allen.
14 Q. By?
15 A. By the providers in this case, Ms. Fearey,
16 in particular.
17 Q. And also by the triage nurse, Ms. Ambrose?
18 A. I really -- I'm sure we have a contract
19 somewhere that's spelled out. Since I looked at
20 every piece of material, every piece of paper that
21 was associated with this thing -- I kind of looked
22 at the big sweep of things, so I don't remember if I
23 specifically asked by Ms. Ambrose or not.
24 Q. Okay. And then were you -- do you remember
25 whether or not you were asked to give an opinion

15 (Pages 48 to 51)

Page 56

1  have been going about an hour, so let's just take a
2  five-minute break.
3       THE WITNESS: Okay.
4       THE VIDEOGRAPHER: Off record, 3:00 p.m.
5       (Recess taken.)
6       THE VIDEOGRAPHER: On record, 3:11 p.m.
7       MS. McCREADY: Thanks.
8    Q. Dr. Levy, when we were talking about your
9  area of expertise and whether or not you could
10 render an opinion about causation in this case, do
11 you have any training as a neurosurgeon?
12   A. No.
13   Q. All right. Have you ever -- did you ever
14 do a rotation in neurosurgery?
15   A. I didn't do the full rotation in
16 neurosurgery, no. I spent some time with the
17 neurosurgery service, but that wasn't an elective I
18 took.
19   Q. Okay. Was that back in the '70s or --
20   A. That was back in the '80s.
21   Q. In the '80s, okay. Have you ever done -- I
22 assume you performed surgery --
23   A. Yes.
24   Q. -- in -- in your capacity as an emergency
25 room physician. Is that correct?

Page 57

1    A. Yes.
2    Q. Do you ever do brain surgery? Have you
3  ever done brain surgery?
4    A. I have assisted in brain surgery. I have
5  never been the primary operator in brain surgery.
6    Q. Okay. And -- and just so I can ask: Under
7  what circumstances would you be assisting in a brain
8  surgery?
9    A. Most of the time it's elective. Right now
10 I've gone to the operating room with colleagues to
11 see what the outcome was in a case. So I would go
12 in and more look than assist, I guess might be more
13 appropriate.
14      And the place it could happen, which I
15 haven't been called upon, is the placement of a drain
16 or a monitor in the emergency department when a
17 neurosurgeon might place -- when I was in Chinle, when
18 I was in the reservation, I was the only one there, I
19 had the material there to perform burr holes for a
20 subdural hematoma and that kind of thing, but never
21 had to do it.
22   Q. Okay. But you don't consider yourself
23 to -- given that experience, to have some expertise
24 in neurosurgery, or do --
25   A. Absolutely not.

Page 58

1    Q. Okay.
2    A. For the surgical side of it, neurosurgery.
3    Q. Okay. And what's the other side of
4  neurosurgery?
5    A. Well, neurosurgery involves a lot of
6  things, like people with ruptured disks and all
7  kinds of things that I see, that I diagnose and then
8  hand to the neurosurgeons for definitive care.
9    Q. Okay. But that's something where you would
10 diagnosis it and then refer the patient on.
11   A. Correct.
12   Q. Is that correct?
13   A. Yes.
14   Q. Do you -- are you ever in a position as an
15 emergency room physician to provide long-term
16 care --
17   A. No.
18   Q. -- to the patients that you see? And --
19 and that's no?
20   A. That's "no."
21   Q. Looking at page two of your report -- and
22 it sounds like you are rendering an opinion about
23 the appropriateness of the triage decision in this
24 case. Is -- is that true?
25   A. Yes.

Page 59

1    Q. All right. And in your opinion, as you
2  have expressed in your report, that you thought that
3  this patient was triaged appropriately. Is that
4  right?
5    A. Yes.
6    Q. And what is that based on?
7    A. Just my reading of the report, that it's a
8  person that presented with what he described, at
9  least, as ear and head pain, as I recall.
10   Q. And when you say "the report," are you
11 talking about the emergency room visit record?
12   A. The -- the entire thing that I have come to
13 call the report, which is all available information
14 that I had.
15   Q. Okay. So when you say "the report," you're
16 talking about all his medical records and --
17   A. No. His presentation that day, his
18 handwritten note on the sign-in sheets, the things
19 that would allow me to make some conclusion about
20 what it was he was presenting with.
21   Q. Okay. And let me go ahead and mark this as
22 an exhibit, because I want to be sure that we're
23 talking about the same thing. And I'm marking as
24 Exhibit 3 -- this is the emergency visit record from
25 April 19th, 2003.

17 (Pages 56 to 59)

Page 76

1  I do not believe you can say that with a medical
2  certainty.
3      Q.  You don't think you can?
4      A.  No.
5      Q.  So do you think it was just then a
6  coincidence that he presented that morning at ANMC,
7  to the emergency room, and then later on had a
8  bleed?
9      A.  No.
10     Q.  Okay. So what is your opinion within a
11 reasonable degree of medical certainty about what
12 exactly his condition -- actual condition was when
13 he presented at ANMC that morning?
14     A.  In terms of him having a bleed as opposed
15 to having a bleed later, he could have had a
16 pre-aneurysmal bleed -- or if he had an aneurysm at
17 all. Certainly we don't know that. But he could
18 have had a premonitory pain unrelated to any free
19 blood in the subarachnoid space.
20     Q.  And explain that: Premonitory pain.
21     A.  He could have had, for the sake of
22 argument -- and I -- I wouldn't concede, because
23 there's no way for me to know. But for the sake of
24 argument, to say that he had a subarach- -- that he
25 had a -- an aneurysm, for example, as a cause of

Page 77

1  subarachnoid bleeding.
2      Q.  An aneurysm or ruptured aneurysm?
3      A.  Just an aneurysm.
4      Q.  Okay. Go ahead.
5      A.  And so the aneurysm could have changed in
6  size. It could have stretched. It could have had a
7  little bit of bleeding within the layers of the
8  aneurysm which could have caused a change in -- or
9  could have caused some kind of notice to him
10 certainly of discomfort, without any blood, without
11 any observable blood in any way you wanted to look
12 at it.
13     Q.  Okay. So one scenario is he could have had
14 a -- an aneurysm that changed in some sense but
15 didn't bleed but that could have caused pain. Is
16 that correct?
17     A.  Yes.
18     Q.  Okay. And another scenario is he could
19 have a sentinel bleed. Is that right?
20     A.  Yes.
21     Q.  And what's the -- what's a sentinel bleed?
22     A.  It's a release of blood into the
23 subarachnoid space. And the "sentinel" is that it
24 is a thing that alerts the person that -- that
25 they -- of pain of a different nature has occurred

Page 78

1  and that that's their blood. And so it's a sentinel
2  event, because it allows a person to know that
3  something's going on.
4      Q.  Okay. And then another scenario --
5      A.  Sorry.
6      Q.  That's okay. And then do you think it's
7  within the realm of possibilities that he actually
8  had a -- a -- a bleed, you know, not just a sentinel
9  bleed, but a bleed?
10         MR. GUARINO: I don't understand the
11 distinction between those two. Are you talking volume
12 of blood now or time, amount of blood? Otherwise, I
13 don't understand the difference between a sentinel
14 bleed and bleed.
15 BY MS. McCREADY:
16     Q.  Well, do you understand what I mean between
17 a sentinel bleed and a bleed?
18     A.  No.
19     Q.  Okay. Well, a sentinel bleed is where
20 there's just a small release of blood. Is that
21 correct?
22     A.  Probably so, yes.
23     Q.  Okay. And what is that -- is that your
24 understanding of what a sentinel bleed is?
25     A.  Well, I would say that most probably it's a

Page 79

1  little different for each event in terms of what's a
2  little blood. But I think, in general, I agree with
3  that.
4      Q.  Okay. Do you think that he could have
5  shown up at the emergency room at ANMC the morning
6  of April 19th with the amount of blood that was seen
7  on the CAT scan later at Providence?
8      A.  No.
9      Q.  Okay. Did -- and did you review the films?
10     A.  I did.
11     Q.  All right. Okay. So you don't think that
12 that's within the realm of possibilities?
13     A.  That he had that same picture at 6:00
14 o'clock at night, that he had -- had at 8:00 a.m.,
15 is what you're saying?
16     Q.  Sure.
17     A.  Absolutely not.
18     Q.  Okay. And --
19     A.  But let me --
20     Q.  Go ahead.
21     A.  -- say that if you go back to something
22 like maybe January 23rd or something like that, in
23 his medical record, he has a presentation that's
24 very, very similar to the presentation he had when
25 he showed up on the morning of the day of the big

22 (Pages 76 to 79)

Copyright © 2006

Exhibit O Page 8 of 18

Page 80

1  event.
2  Q. Okay. And I --
3  A. And to say that that was somehow different
4  than what happened here, in retrospect, is a little
5  hard to say and so --
6  Q. That's what I want to ask -- I want to ask
7  you about that as well.
8  A. Okay.
9  Q. But let me just say on this issue of --
10  A. Sure.
11  Q. -- of what the possibilities were in terms
12  of the morning of April 19th, 2003 --
13  A. Sure.
14  Q. -- and what he's suffering from. So -- so
15  one -- one scenario is he could have had, you know,
16  something change in his aneurysm with no bleeding.
17  That's one possibility. Is that right?
18  A. Yes.
19  Q. And then one possibility is he could have a
20  sentinel bleed. And then are you saying that
21  there's a -- is that true, that he could have had a
22  sentinel bleed that morning?
23  A. I think that's possible.
24  Q. Okay. And then are you saying -- go ahead.
25  I don't mean to cut you off.

Page 81

1  A. But I will tell you the reasons why I think
2  it's --
3  Q. Sure.
4  A. -- less likely.
5  Q. Okay.
6  A. He presented with -- by his account, ear
7  pain, possibly with extension to the head. I mean,
8  that's a little bit vague. Certainly the nurse's
9  triage note says ear and head pain similar to what
10  he's had many times described to other people, and
11  that his main focus seemed to be that he had
12  possibly an ear infection.
13  Q. And that's based on Nurse Fearey's record.
14  Is that correct?
15  A. Right.
16  Q. So that's -- you're assuming that she's
17  documented accurately --
18  A. Yes.
19  Q. -- her visit with him. Is that right?
20  A. I am.
21  Q. Okay. Go ahead.
22  A. Now he received a very innocuous and pretty
23  infective treatment certainly for subarachnoid pain,
24  Phenergan, intramuscularly, 25 milligrams. And
25  within a very short period of time he's up and eats

Page 82

1  a large meal. That, in my experience, is
2  extraordinary for someone that has subarachnoid
3  bleeding.
4  And based on that, it makes me wonder whether
5  the event that occurred was not bleeding at that point
6  in time but something besides bleeding that perhaps
7  ultimately did lead to bleeding.
8  Q. Okay. And I want to make sure I understand
9  that. Was -- what was extraordinary to you? Was it
10  that he ate a meal, or was it that he had some
11  relief of pain?
12  A. He received no analgesics, he received no
13  pain medication, he received a shot that was -- for
14  a full-grown man, would be pretty small. 50
15  milligram- -- 25 milligrams of Phenergan is on the
16  low side for trying to treat even somebody's nausea
17  who was a full-sized adult.
18  But really, within a very short period of
19  time, he responded to that, seems to me. He's in a
20  well-lit room, he ate a meal, he's no longer
21  nauseated. His pain is not causing so much pain as to
22  make him nauseated.
23  And then he goes off to Sam's Club. He goes
24  about kind of a busy day, at least, to start with, and
25  he starts feeling drowsy. That would not be my

Page 83

1  experience with people with subarachnoid bleeding.
2  Q. Okay. And let me -- let me ask you about
3  that. Well, usually, your experience with people
4  with subarachnoid bleeding is you would usually
5  admit them to the hospital if you knew they had a
6  subarachnoid bleed. Is that right?
7  A. Yeah, but I practice in Anchorage, Alaska,
8  so I don't just get to admit them to the hospital.
9  I'm there with them typically for hours --
10  Q. Right. And --
11  A. -- because -- so I get to see what they're
12  like during that entire period of time. It's -- we
13  do all the diagnostics. The neurosurgeons only come
14  in, if they come in at all to Anchorage, if they are
15  summoned by the results of testing. And so I have
16  had a lot of opportunity to watch at least the
17  near-term course of these patients' progress.
18  Q. Okay. But I -- I guess what -- the point I
19  was trying to make is not that you wouldn't have a
20  chance to observe them, but certainly you're
21  observing them in a -- in -- in a hospital setting;
22  that is, you don't -- when you determine that a
23  patient is -- may have a subarachnoid bleed, you
24  don't discharge them to go walk around, do you?
25  A. No.

23 (Pages 80 to 83)

Page 92

1  effect of narcotics.
2     A.  You hear that.
3     Q.  Is that -- is that true?  Is that your
4  understanding?
5     A.  It's written that that can happen.  And by
6  "potentiate," it just means that maybe a dose -- if
7  you call it five, works like a six.  I mean, they
8  say potentiate.  But in terms of quantitating, it's
9  kind of hard to say.
10       Additionally, they're both sedatives.  They
11 will -- can cause some sedation, so it can potentiate
12 the sedation as well.  That is one of the other
13 potentiations it has.
14       Having said that, again, just in terms of
15 common practice with people who are experienced with
16 medications, we give significant doses of medications,
17 narcotic medications conjointly with anti-emetics,
18 both of them significantly sedating, in people who
19 have been taking their medications and have had
20 break-through pain.  They're not getting any better.
21       And to date, I personally have never had to
22 intervene with these people in terms of -- in my own
23 personal practice, in terms of doing something to
24 support breathing or to reverse the effects of the
25 drug or anything like that.

Page 93

1     Q.  Okay.
2     A.  So I feel like there's a pretty significant
3  therapeutic window in these things once you have
4  experienced it a while.
5     Q.  Okay.  Is it your opinion then that because
6  Mr. Allen experienced some reported relief of his
7  pain the morning of April 19, 2003, that that would
8  rule out the fact that he had a sentinel bleed?
9     A.  Absolutely not.
10    Q.  Okay.  Are you saying that -- or is it your
11 opinion that because he ate a meal that morning --
12 or according to his wife and -- and her deposition
13 testimony, that that would rule out him having a --
14 a sentinel bleed that morning?
15    A.  No, it doesn't rule it out.  It's just that
16 if he were having ongoing bleeding, if he were
17 showing a progressive march of ongoing arterial
18 bleeding from a ruptured aneurysm, for example -- I
19 just, from a commonsense standpoint, wouldn't expect
20 him to be just quite as chipper as he appears.
21       He seems to be a person whose symptoms have
22 extremely stabilized -- it's poorly put -- but who
23 seems to have substantially stabilized.  And he really
24 seems to be doing pretty grand at that point in time.
25    Q.  Well, let me ask about the third -- we have

Page 94

1  gone over that he could have had -- his aneurysm
2  could have changed but not bled, that he could have
3  had a sentinel bleed.
4        And then are you including in the
5  possibilities that it was just a coincidence that he
6  happened to present at the ANMC emergency room on the
7  morning of April 19th and then just by coincidence had
8  a bleed that afternoon, that they're completely
9  unrelated?
10    A.  Nothing's impossible.  I think just -- that
11 seems unlikely to me as well.
12    Q.  Okay.  So that seems -- and I guess I want
13 to understand what -- what your, then, opinion is
14 going to be or what it is in terms of -- and to a
15 reasonable degree of medical certainly exactly what
16 was going on with him that morning.  Is it -- do you
17 think it's more likely than not that he had a
18 sentinel bleed?
19    A.  I think it's more likely than not he had a
20 sentinel event.
21    Q.  And what do you mean by that?
22    A.  Well, in that sense, I mean, I don't know
23 if he actually bled at that time --
24    Q.  I understand --
25    A.  -- when he was seen.

Page 95

1     Q.  And I understand that we don't -- I
2  understand that you don't know for -- you know,
3  beyond a reasonable doubt.  What I want to know is,
4  because you're an expert in this case and you're
5  rendering opinions in this case, what you think is
6  more likely than not.  And --
7     A.  I think what's more likely than not is that
8  he had, statistically, an aneurysm.
9     Q.  Okay.
10    A.  And the aneurysm stretched or dissected
11 slightly or did something which caused him to have
12 discomfort.
13    Q.  Okay.  And so you think he was
14 experiencing -- do you think it's -- it sounds to me
15 like you're saying:  I think it's more likely than
16 not that the morning he presented to ANMC, that is,
17 on April 19th, that he had some sentinel event.  And
18 you're defining that as something going on with his
19 aneurysm, whether bleeding or not?
20    A.  Yes.
21    Q.  Okay.  And why do you say that?
22    A.  I only say it because he ultimately has a
23 bleed.  Everything else about the way he presented
24 was, it seems, largely consistent with his prior
25 history.

26 (Pages 92 to 95)

Copyright © 2006

Exhibit O Page 10 of 18

Page 104

1  what, when, and what did they hear.
2      Q.  Sure.  And I guess my question to you is:
3  Given that the -- the admitting physician and the ER
4  physician at Providence Alaska documented that they
5  had taken a history from the wife the very same day
6  that he had presented at ANMC, and that the report
7  was that he had a severe headache, I'm just trying
8  to understand -- and it seemed like you were saying,
9  well, sure, that's consistent with what he had.  And
10 then when I asked you, did he have a severe headache
11 that morning, you're saying, no, that's not what he
12 said.  That's what I'm trying to understand.
13     A.  Well, I guess I'm concerned about being --
14     Q.  Sure.
15     A.  -- put in a position of saying things that
16 I don't want to say.  The patient himself, when he
17 was talking with Nurse Fearey, as far as I can tell,
18 only by what he's written down, said he had ear
19 pain.
20      She says that what she heard him say was he
21 was most concerned about the possibility of an ear
22 infection.  That's really the only near-term things
23 that I can go from.  In a bigger sense -- does that
24 make sense, or do you want to ask me a question about
25 it?

Page 105

1      Q.  No.  Go ahead.
2      A.  So I believe his presentation was that.
3  He's complained all along, throughout his entire
4  history of having the same pain pattern you just
5  described, of pain at his occiput, sometimes
6  radiating up to the top, felt bilaterally -- I mean,
7  that's -- you know, that's -- any number of places
8  have been documented in my report that he has said
9  that.  She is in a very stressful difficult
10 situation.  In my experience --
11     (Videographer coughing.)
12     MR. GUARINO:  Excuse me.  Let's -- can you
13 hear over that?
14     THE REPORTER:  Yes.
15     MR. GUARINO:  Okay.
16 BY MS. McCREADY:
17     Q.  Go ahead.
18     A.  Well, I think it's certainly worthwhile,
19 and Dr. Dietz and Dr. Lee are -- are very good
20 doctors and know -- this shouldn't be
21 misinterpreted, but the setting in which we do this
22 is stressful, it's noisy, there's always a lot of
23 stuff going on.  And while I think that these
24 histories convey the general gist of it, I don't put
25 as much credence in that, particularly in

Page 106

1  retrospect, and how things are flavored in
2  retrospect.  A person has a subarachnoid hemorrhage;
3  the doctor writes down headache.  It's absolutely
4  what you're going to do.
5      Q.  Okay.  Well, here's what I -- here's, I
6  guess, my next question.
7      A.  Go ahead.
8      Q.  The fact that -- okay.  If somebody has a
9  subarachnoid bleed, certainly you would expect them
10 to have a severe headache.  Is that right?
11     A.  You know what, I had pain, something going
12 on, yes.
13     Q.  So if somebody's got a subarachnoid
14 hemorrhage, you would expect them to have head pain?
15     A.  It's just sometimes people differentiate
16 between what they have had before and what they have
17 now, which didn't happen in this case.  But that is,
18 again, something that I would have been very
19 intrigued by when I have seen people like this.
20 They are explicit with me, in telling me:  This is
21 something different.
22     Q.  Do you know Donna Fearey?
23     A.  I do not.
24     Q.  Okay.  Have you ever worked her?
25     A.  No.

Page 107

1      Q.  All right.  And so your -- basically your
2  opinions in this case are based on the accur- -- the
3  accuracy of her note.  Is that right?
4      A.  Well, I guess that, and I can't -- it seems
5  to me that when you look at it going forward as
6  opposed to looking back, it seems like she saw what
7  she saw, she heard what she heard, and that seemed
8  consistent with this gentleman, what he was telling
9  her -- it -- it seemed to me to be a reasonable sort
10 of thing that happened --
11     Q.  Okay.
12     A.  -- regarding him.
13     Q.  When you're -- going to your report on page
14 two, at that top paragraph where it says, "Donna
15 Fearey, ANP provided competent and appropriate care
16 for this patient as he presented to her by her
17 account of his history and findings," what do you
18 mean by that, as presented -- "as he presented to
19 her by her account of his history and findings"?
20     A.  Well, there are two distinct accounts of
21 the history, and one of them is hers and one of them
22 Mrs. Allen's.  Mrs. Allen paints a completely
23 different picture.
24     Q.  Right.  And not just at her deposition,
25 would you say that she paints a different picture

Page 160

1  before, a patient who has been diagnosed with a
2  subarachnoid bleed, they might be in the emergency
3  department for -- for some period of time while
4  you're transferring their care. Is that correct?
5      A. Yes.
6      Q. Okay. And so you would -- you wouldn't --
7  let me ask this: Would it be below the standard of
8  care for you to say, to a patient who's been
9  diagnosed with a subarachnoid bleed who's under your
10 care, that it's okay to lift heavy objects?
11     A. Right. I wouldn't tell them that.
12     Q. And why would that be?
13     A. It would be because it would be my
14 suspicion that it wouldn't be a good idea. I'm not
15 sure there's a medical study that's ever been done,
16 is why I say it that way, but it -- it wouldn't pass
17 the commonsense test to tell people to do that.
18     Q. Okay. And you wouldn't actually send them
19 out to go walking around the street and go shopping?
20     A. I would not do that.
21     Q. Okay. And that would be below the standard
22 of care, wouldn't it?
23     A. In that setting, where one had been
24 diagnosed, it definitely would.
25     Q. Okay. Now, I'm sorry. It's getting so --

Page 161

1  it's getting sort of late, so I want to try to wrap
2  this up. But I do want to ask you about your time
3  line. And -- and quickly, here -- here's what
4  I'm -- here's what my question is about your time
5  line. I don't -- I don't have -- I certainly don't
6  have a reason to question your conservative time
7  line in terms of how soon this patient would be
8  transported to Seattle if, in fact, that was -- if
9  there was a decision to transport the -- the patient
10 to Seattle.
11     What I'm trying to understand is your
12 qualifications for -- for saying that this patient
13 wouldn't be a candidate to be transferred to Seattle,
14 that, in fact, there's no way this patient could have
15 survived the subarachnoid bleed, that there would be
16 no way, had he been diagnosed the morning of April 19,
17 2003, that he would have survived. I don't understand
18 that.
19     A. Okay. Based on the outcome, for one,
20 because his outcome was that he didn't survive.
21     Number two, I don't think there's anything
22 that would have -- I look at it from the standpoint:
23 What would have been done that would have changed the
24 outcome?
25     So there's mention made of such things as

Page 162

1  Mannitol. I mean, is there a study somewhere in the
2  medical literature that shows that Mannitol improves
3  outcome from a ruptured subarachnoid hemorrhage? I'm
4  not sure there is.
5      Subarach- -- and in terms of temporizing, it
6  may temporize briefly, which may allow more room for
7  arterial bleeding to occur, but it doesn't
8  fundamentally change anything.
9      In fact, repeated doses of Mannitol actually
10 make intracranial pressure higher. So you have only
11 got the small window of time to give Mannitol. And
12 then all the other things that are mentioned.
13     Well, head of bed elevated. Neurolit- --
14 neurosurgical literature shows that really doesn't
15 make a difference in terms of intracranial pressure.
16 The use of blood pressure control. Well, there's a
17 huge variation on how you treat that. Some people
18 would induce hypertension with hemodilution. Other
19 people might lower the blood pressure.
20     Again, what -- what is the effect on outcome
21 of those things? I mean, those have never been shown
22 to improve outcome in this setting.
23     So what's to say when a person has a huge
24 bleed in Anchorage that he's going to do well? Who's
25 going to take care of him? Are we going to transfer

Page 163

1  this patient in that setting or not? I mean, to get
2  a -- to get an accepting physician -- Anchorage
3  neurosurgeons are not going to operate on this person
4  at this setting.
5      Q. No. And in fact, if you had a loved one
6  who had a bleed, a brain bleed, would you -- would
7  your preference be that they be treated at a place
8  like Harborview as opposed to a facility here in
9  Anchorage?
10     A. Next question?
11     Q. No. I -- I'm serious. If -- if you knew
12 someone who had brain bleed, someone you knew --
13     A. Yeah.
14     Q. -- wouldn't you -- wouldn't your preference
15 be that they be treated at a -- and I'm not -- I'm
16 not criticizing the care here. Let me -- let me be
17 clear about my question.
18     Would it be fair to say that the University
19 Washington, Harborview, has a more -- well, compared
20 to what we have here, a state-of-art facility, in
21 terms of dealing with people with aneurysm and brain
22 bleeds?
23     A. I guess it's getting late, Donna, but you
24 know, on the one hand, you won't let me be an expert
25 on the neurosurgical side, but you want me to make

43 (Pages 160 to 163)

Page 164

1 comments about how good they are.
2    Q.  All right. Well, I can assume what your
3 answer is going to be, and maybe you won't like my
4 assumption on what your answer would be.
5        Certainly -- certainly the expectation would
6 be that a patient such as Todd Allen -- would it be a
7 fair assumption that they would be transferred to --
8 to Seattle if, in fact, his subarachnoid bleed had
9 been diagnosed?
10       MR. GUARINO:  Objection.  Foundation.
11 BY MS. McCREADY:
12   Q.  Well, on the one hand, he's giving -- he's
13 going to give opinions about -- hold on. Let me --
14       MR. GUARINO:  Sure.  Go -- go ahead.
15       MS. McCREADY:  I mean --
16       MR. GUARINO:  No, I just want to --
17       MS. McCREADY:  Let's be -- let's be clear.
18 Either this patient -- you know, this person -- this
19 expert is going to give opinions about the outcome of
20 patients in Anchorage who have aneurysms, or -- or
21 he's not.
22       MR. GUARINO:  Well, no.  I -- I don't have a
23 problem with asking the question and have him answer
24 it, but -- but it makes a difference.  If Todd Allen
25 is -- is suffering from a major bleed at 3:00 o'clock

Page 165

1 in the afternoon that day, saying, would you rather
2 transfer him to Washington may be a moot question.
3 Who's going to transfer him?  Who's ever going to take
4 a patient like that?
5        MS. McCREADY:  Sure.
6        MR. GUARINO:  You need to provide more detail
7 as to where Todd Allen is in this process to say,
8 wouldn't you rather transfer him to -- to Washington?
9 Sure.  Maybe anybody would want to transfer him, but
10 you need to define under what condition, who's going
11 to transfer --
12       MS. McCREADY:  I understand.
13       MR. GUARINO:  Okay.
14       MS. McCREADY:  I understand what you're
15 saying.
16    Q.  Well, let me ask:  Do you have an
17 opinion -- do you have an opinion, again, to a
18 reasonable degree of medical certainty, what time
19 Todd Allen or around what time Todd Allen suffered a
20 subarachnoid bleed?
21    A.  I would say "no later than." Is that a
22 fair way to approach this?
23    Q.  Sure.
24    A.  No later than when his wife found him with
25 sonorous respirations, when she was shaking him and

Page 166

1 trying to wake him up.
2    Q.  Okay.
3    A.  And the fact that he was becoming really
4 more somnolent, probably in the absence of
5 additional medications and out of the window when
6 you would expect the medications to still have an
7 effect.  So that was about the McDonald's lunchtime,
8 when he was pretty much unarousable, and loud
9 snoring.
10   Q.  That's your opinion, that that -- I mean,
11 based on your review of the record, that's sort of
12 the opinion you have come to, that around that time
13 he would have suffered a bleed, or no later than --
14   A.  Yeah.  My -- my opinion at that point is
15 that his neurological status was significantly
16 changed at that point in time, and the reason for
17 the change is that -- is because he suffered the
18 subarachnoid bleed.
19   Q.  Okay.  And I'm sorry.  Where did you place
20 the McDonald's visit?  Did you have a time for that?
21   A.  I'm not sure I mentioned about McDonald's,
22 but she had gone out for lunch and then came back.
23 And she dined behind the partition while he -- and
24 there's a little TV back there with a light.
25   Q.  Okay.  And is that before or after her

Page 167

1 phone call to Alaska Native Medical Center?
2    A.  That was before.
3    Q.  Okay.  And how does that -- what
4 significance does that -- that opinion about when he
5 may have suffered a bleed, how is that significant
6 to your opinions in this case?
7    A.  I felt that by the time -- I mean, just in
8 terms of what we knew later by the results of the CT
9 scan, that when he's actively bleeding, when his
10 neurological status has significantly declined, he
11 is no longer a candidate for -- he is no longer that
12 person that you can admit to the hospital, give him
13 pain medication and operate on the next day, if
14 that's going to happen here or elsewhere.  Now he's
15 a person who has a critical, in retrospect,
16 life-ending bleed, and so that the whole -- the
17 whole game has changed.
18   Q.  Okay.  But how about in the morning, when
19 he's presenting at the Alaska Native Medical Center
20 emergency room when he's --
21   A.  Okay.
22   Q.  Would you agree that he was neurologically
23 intact at that point?
24   A.  Seemed to be.
25   Q.  Okay.  And do you know whether or not the

Page 172

1  section that says, "What about life preserving
2  interventions..."
3      It says, "Therefore, there is no reason to
4  believe that even under the 'best of circumstances' he
5  would have survived this catastrophic event."
6      And in fairness, isn't that outside of your
7  area of expertise?
8     A.  Only insofar as my own experience. But in
9  terms of being able to look at a broad scope of
10 patients that I treat on a daily basis, perhaps.
11 But people that I have seen with subarachnoid
12 hemorrhage, such as what he presented with,
13 ultimately we know that he had a surreal -- severe
14 edema, which was ultimately life ending, that that
15 is where I come to that conclusion.
16     Q.  Right. And in -- but in terms of the
17 course of -- and what I'm trying to understand is --
18 is linking this in the morning visit, where he's
19 neurologically intact at ANMC and then -- well, you
20 would agree with me that he didn't have any
21 treatment, aside from a shot of Phenergan, the
22 morning of April 19, 2003. Is that right?
23     A.  Sure.
24     Q.  So I mean, not only did he not get medical
25 treatment, he -- I mean, he was given a shot of

Page 173

1  Phenergan. Would you give a shot of Phenergan to a
2  patient who had a subarachnoid hemorrhage?
3     A.  No.
4     Q.  And did you say no?
5     A.  "No." I might in addition to other things,
6  and that might be all I did for him, actually, if
7  all the problem was was vomiting and -- but that
8  wouldn't be the only therapy I might think of, if
9  that's what you're asking.
10    Q.  Right. Well, you wouldn't give him a shot
11 of Phenergan and send him home. Is that correct?
12    A.  If I knew that they had a subarachnoid
13 hemorrhage, I would not give him a shot of Phenergan
14 and send him home.
15    Q.  Okay. And so Mr. Allen was given a shot of
16 Phenergan and essentially discharged. And -- and
17 from there, you know from his wife's testimony that
18 he walked around Sam's. Is that correct?
19    A.  Yes.
20    Q.  And that then -- then did you note that he
21 had unloaded the truck --
22    A.  Yes. He helped in unloading.
23    Q.  -- at the hotel where they were staying?
24    A.  Yes.
25    Q.  All right. And that then he just laid down

Page 174

1  and went to -- went to sleep. Is that your
2  understanding?
3     A.  Yes.
4     Q.  Okay. And certainly he didn't -- he didn't
5  get any sort of medical intervention, is that right,
6  except for the Phenergan?
7     A.  Right.
8     Q.  Okay. So are you really in a position to
9  testify -- is this within your area of expertise,
10 that a patient who has got a subarachnoid bleed who
11 didn't undergo medical treatment, that there would
12 be really no chance of their surviving?
13    A.  I say this in context of what happened with
14 him. He didn't survive. His ultimate end point was
15 where it ended up, which was of having massive
16 ongoing subarachnoid hemorrhage with cerebral edema.
17    Q.  Okay. When you say "massive ongoing,"
18 that -- I think I don't understand that. What was
19 the ongoing part?
20    A.  Well, enough to fill up his entire brain
21 pan with blood, so "massive" may be sort of an
22 exaggeration. I don't know how you say massive.
23 That's a bad choice.
24    Q.  Okay.
25    A.  But enough blood to end his life. That's

Page 175

1  massive enough, I guess.
2     Q.  Right. And then when you said ongoing,
3  that's what I'm not sure I understand, the word
4  "ongoing."
5     A.  Well, something had to happen to cause it
6  to bleed and basically fill the -- it wasn't just a
7  little bleed. He had a significant subarachnoid
8  hemorrhage.
9     Q.  Right. But are you saying that that was
10 just bleeding all day long or did --
11    A.  I --
12    Q.  -- that happen as --
13    A.  I clearly wouldn't be qualified to say one
14 way or the other --
15    Q.  Okay. And you're --
16    A.  -- whether it was one huge spurt or whether
17 it was ongoing bleeding.
18    Q.  Okay. And you're not qualified to say how
19 long it would take to develop the edema that was
20 seen on the scans --
21    A.  That's correct.
22    Q.  -- at Providence that day. Is that
23 correct?
24    A.  Yes.
25    Q.  So do you -- so do you really think you're

46 (Pages 172 to 175)

Page 180

1  look at the pain assessment that Mr. Allen filled
2  out, because there were a lot of questions about
3  what was presented in there.
4      A. Okay.
5      Q. It's exhibit -- well, I don't know what
6  exhibit --
7      A. I have 8.
8      Q. Eight, okay. I -- I have it from the prior
9  deposition, but I think we're using the same form.
10 And there were questions about the effectiveness of
11 Mr. Allen's medication. I'm not going to go back
12 through those, but I do want look at what he
13 described his pain as when he filled this form out.
14 Do you see that, page two, 16a?
15     A. Correct.
16     Q. So when he was actually filling out this --
17 this form, whether he was on medication or how much
18 medication he had taken, we don't know, but -- but
19 he was at the clinic. What did he describe his pain
20 as right then when he was filling out the form?
21     A. Five.
22     Q. Five out of ten --
23     A. Right.
24     Q. -- correct? Okay. And then he was asked:
25 What's your pain at its worst? And what -- what did

Page 181

1  he say?
2      A. Ten.
3      Q. Okay. And what he did he say his average
4  pain that month was when he was taking all of his
5  pain medication to control his pain? What was his
6  average pain?
7      A. Six.
8      Q. So even with the pain medication that he
9  was taking, his average pain was a six?
10     A. Yes.
11     Q. And how many flare-ups of pain did he
12 indicate he had had in the past months?
13     A. Sixteen.
14     Q. Okay. Would that indicate to you that his
15 pain medication was controlling his pain, or not?
16     A. No.
17     Q. If it was controlling it, would you expect
18 him to have frequent flare-ups of pain?
19     A. No.
20     Q. And then let me -- I'm not going to go
21 back -- God, help me, I'm not going to go back
22 through all the questions about -- about treatment
23 and what treatment was provided, but let me start --
24 and I'm not going to go back to testimony. But you
25 testified about the time period in the afternoon

Page 182

1  when you believed that he had this -- 1 won't use
2  the word "massive" bleed -- large bleed, and you
3  said the latest -- no later than when he was
4  having -- his wife was trying to wake him up and she
5  couldn't physically get him to -- to respond.
6          And then you talked about: But it could have
7  been as early as when the McDonald's lunch -- and
8  I'm -- I'm not going to go through the time, but
9  that's the -- the time window.
10         And so my question: Let's assume that
11 sometime in that period he had this large bleed that
12 led him to have this neurological sort of
13 deterioration in his condition.
14         In your report, you address the question of
15 whether the phone call that was made to ANMC at 3:47
16 would have changed his outcome. And I don't want to
17 go through all that, but we've had all the testimony
18 about Mrs. Allen saying she called ANMC; the record in
19 the hotel indicates it was sometime about 3:47. I may
20 state that inaccurately. But it was approximately
21 that time. And she called them. There was the
22 discussion. And she was not told to bring Mr. Allen
23 down to -- to ANMC or to call 911 at that point.
24         Was -- is it your opinion as expressed in the
25 report that that would not have made a difference in

Page 183

1  his outcome at that point?
2      A. I don't think it would.
3      Q. And is that because, without going into all
4  the testimony, because he was already actively
5  bleeding?
6      A. Yes.
7      Q. All right. And the other questions about
8  the time line, in terms of whether Mr. Allen was
9  diagnosed or -- that morning, and given his
10 condition later, would -- if he had been actively
11 bleeding that afternoon, do you have an opinion as
12 to whether he would have been med-evac'd to Seattle
13 for whatever specialized treatment they could
14 provide there?
15         MS. McCREADY: Objection. Foundation.
16         MR. GUARINO: And could you explain to me
17 what the question -- what the foundational objection
18 is?
19         MS. McCREADY: Well, it's what I've been
20 trying to make the point about whether or not Dr. Levy
21 is really the appropriate expert to testify about, you
22 know, what -- whether or not -- I mean, what -- what
23 treatment would be rendered to a patient who has been
24 diagnosed with a subarachnoid hemorrhage.
25         MR. GUARINO: No, no. I'm not talking about

48 (Pages 180 to 183)

Page 184

1  what treatment he would get once he got down there or
2  how specialized it was. I'm talking about the
3  physical action of -- of med-evac- -- he's -- he's
4  probably the best expert in the state on med-evacking
5  of patients.
6       So that's my question, is whether a
7  patient -- assuming Mr. Allen was in the state where
8  he was actively bleeding and was in the neurological
9  state that he appeared to be that afternoon, would he
10 be med-evac'd out to another state for medical
11 treatment at that point?
12      THE WITNESS: And again, that would be my
13 opinion from that standpoint, that if he were an
14 extremist, as he seemed to be here, we would not
15 transport him to another state.
16 BY MR. GUARINO:
17   Q. And the time line as you presented it, in
18 terms of his initial presentation in the morning and
19 the -- the sort of estimates of time it would take
20 to work him up for the day, would he have arrived --
21 had -- had a decision been made to med-evac him,
22 would he have arrived in Washington, the state of
23 Washington, whether it was Seattle or Harborview,
24 whatever facility he might have gone to, would he
25 have arrived in time -- before he began to bleed

Page 185

1  from that subarachnoid hemorrhage?
2    A. The estimation I can make from this: He
3  would not have.
4       MR. GUARINO: Okay. It's too late to go
5  through any other parts of your report, but I just
6  want to make a note for the record that I'm not going
7  to go through his report today. You've had the
8  opportunity to look at it and question him about it.
9       But I will state again: To the extent there
10 are opinions expressed in there to which Dr. Levy is
11 qualified by training or experience to render opinions
12 on in terms of medical care or in terms of practical
13 experience, in terms of time line or med-evac
14 procedures, you can expect that we'll -- we can offer
15 him -- we will offer him or we -- we may offer him to
16 testify on those. Nothing further.
17           FURTHER EXAMINATION
18 BY MS. McCREADY:
19   Q. Okay. Let me just follow up very briefly.
20 On the pain assessment, on the patient initial
21 assessment, which is Exhibit 8, what -- that page
22 that Mr. Guarino was asking you about.
23   A. Yes.
24   Q. And it says, pain as it is now, pain at its
25 worst, pain at its best.

Page 186

1       First of all, did -- did you ever receive
2  Mr. Allen's work records? Do you have an
3  understanding about whether or not he was employed?
4    A. I knew that he -- or I think I knew that he
5  worked in a capacity for oil spill cleanup in
6  Valdez, and he was off his meds for a period of
7  time, on his meds for a period of time.
8    Q. Okay. And do you have any idea, before you
9  filled this document out, whether or not he had been
10 working in Valdez and not taking his pain
11 medications?
12   A. I assume he was.
13   Q. You assumed he was --
14   A. Right.
15   Q. -- working? Is that what you -- is that
16 what you meant? Okay.
17   A. I thought he was.
18   Q. And then with this -- where it says,
19 "Frequency of pain flares during the last month,"
20 and it says "estimated 16," had you seen any visits
21 that Mr. Allen had made in the past month to the ER
22 complaining of pain?
23   A. In the month of January?
24   Q. Uh-huh.
25   A. I don't believe -- well, he was there on

Page 187

1  the 23rd, wasn't he, with -- and he's complaining of
2  pain at that time. It wasn't the ER. It was the
3  clinic.
4    Q. It was the clinic that he went to?
5    A. Yes.
6    Q. Was he at the emergency room complaining of
7  pain --
8    A. No.
9    Q. -- in that past month?
10   A. No.
11   Q. Okay. When it says, "Pain at its worst," a
12 ten out of ten, do we know whether or not his pain
13 on April 19, 2003 was the worst pain he had ever
14 had?
15   A. No.
16   Q. Well, do you know whether or not it was
17 worse than when he -- it was worse than the pain he
18 described when he filled this document out?
19   A. I don't know. I -- I routinely have people
20 tell me they have 12 out of 10 pain and 13 out of 10
21 pain. So I don't know if he would exaggerate that
22 way -- you know, if your -- if he needed more volume
23 on the thing, but as far as I can tell, from the
24 information I have, I have no way to say.
25   Q. Okay. You -- you can't say whether or not,

49 (Pages 184 to 187)

Page 188
1  when he -- when he presented at April 19, 2003, that
2  was the worst pain he had ever had, and in fact,
3  worse than what he described in his pain initial
4  assessment form?
5      A. No.
6      Q. All right. When Mr. Guarino was asking you
7  about would Mr. Allen have been a candidate to be
8  med-evac'd down to Seattle if, in fact, he had had
9  the -- as -- as he presented that afternoon at
10 Providence, that is, with significant blood in his
11 brain, and you said no, he wouldn't have been
12 transported, would that be your call or would that
13 be the call of a neurosurgeon?
14     A. Well, ultimately I would engage someone to
15 share that with me.
16     Q. Okay. And who --
17     A. Now, I don't know it would be a
18 neurosurgeon -- in this situation, quite honestly,
19 it would probably be Dr. Kohler, if he was in town
20 back then. I think he was.
21     Q. And is Dr. Kohler the neurosurgeon at ANMC?
22     A. Right, who did not perform this kind of
23 surgery. But I believe -- and I -- I have to -- I
24 would have to confirm this, but I believe he was in
25 town.

Page 189
1  As a consequence, ANMC would want to have the
2  final say, particularly if someone wanted to transfer
3  their patient, Mr. Allen, to Seattle. And in the
4  past, they have been very conservative.
5      I can tell you, for example, with burns, if
6  we have burns that are over a certain percentage body
7  area, that even if the person's alive and talking to
8  you but has very low probability of survival, it's
9  preferred that they stay here in Anchorage and die
10 here.
11     Q. Does that end up then being your call or --
12 again, your call in terms of your decision about
13 whether or not the patient is transported, or does
14 it end up being -- does -- would ANMC, in that
15 situation, then rely on the emergency room physician
16 to make that decision about whether or not it makes
17 sense to transport that person to Seattle?
18     A. In this specific case, I mean I would play
19 out the scenario, too, that I would eval- -- If the
20 person were in my care, then I would evaluate him.
21 If I had the same findings, for example, over at
22 Providence, then I would probably contact the
23 neurosurgeon at ANMC, if there were such a person,
24 and talk with them, get their opinion.
25     Q. And was Dr. Kohler the neurosurgeon -- was

Page 190
1  he at ANMC at the time that Todd Allen presented to
2  ANMC?
3      A. That's that I'm saying. I don't really
4  know.
5      Q. Okay.
6      A. I would have -- you know, go back and look
7  at records and things, see when he came to town.
8      Q. Okay. If Mr. Allen had been stable, that
9  is, neuro- -- neurologically intact and stable,
10 would there be any question that he would be
11 transported to Seattle?
12     A. The only question would be whether or not
13 the local neurosurgeons would get involved in his
14 care.
15     Q. Okay. And can you say whether or not the
16 local neurosurgeons would get involved in his care?
17     A. There was a period of time when they
18 wouldn't. And I don't know if this particular time,
19 when he presented, was that time. There was a
20 period of time when they were doing basically no
21 aneurysm surgery up here.
22     Q. Okay. And do you have any -- do you know
23 when they started doing that?
24     A. No. I was -- actually tried to find that
25 out, and I wasn't very successful yet.

Page 191
1      Q. How --
2      A. And I still --
3      Q. How did you try to find that out?
4      A. I tried to see if I could get the
5  neurosurgeons to look at their billing records for
6  me to see if they were billing any aneurysm
7  surgeries.
8      Q. And let me guess that you couldn't get them
9  to do that.
10     A. (No response.)
11     Q. Okay. Were you -- did you talk to any of
12 the neurosurgeons in town about this case?
13     A. Not this case per se. I talked to them in
14 generalities without any reference to anything, just
15 about, you know, would you operate on such a person
16 as this or that?
17     Q. And what did you learn?
18     A. That unless -- that no one does emergency
19 surgery in this town for aneurysms.
20     Q. That no one does emergency surgery in this
21 town for aneurysms. That's what you learned?
22     A. For subarachnoid -- for -- for cerebral
23 aneurysms.
24     Q. Sure. And was that the case in 2003?
25     A. And in terms of -- by "emergency surgery,"

50 (Pages 188 to 191)

Page 192

1  I mean, you know, 5:00 o'clock in the afternoon with
2  a diagnosed subarachnoid hemorrhage in a person who
3  is -- pick your Hunt & Hess. They are not going to
4  go to the operating room in this town, as far as I
5  can deduce, and in my own personal experience. It's
6  always: Get your A team on the job, schedule it for
7  8:00 a.m. tomorrow morning, and then we will do it.
8     Q. All right. And was that the case in 2003,
9  as far as you know?
10    A. The problem in 2003 again is that there was
11 this -- this time in our medical history when
12 neurosurgeons were not routinely taking call at the
13 hospitals and were not doing aneurysm surgery in
14 this town.
15    Q. And the neurosurgeons being Dr. Kralick,
16 Dr. Godersky, and Dr. Cohen?
17    A. Correct. But even if Dr. Kohler were in
18 town at that time, he didn't have privileges at the
19 other hospitals to perform such surgeries, nor did
20 he have backup to perform them. So effectively no
21 one who had the skill would do those surgeries up
22 here during a period of time which may have
23 encompassed the time when Mr. Allen had his problem.
24    Q. Right. And you -- you're not comfortable
25 rendering an opinion about whether or not it would

Page 193

1  be more desirable for a patient with a ruptured
2  aneurysm to have care down in Harborview versus up
3  here?
4     A. I can tell you that I know of many patients
5  who have very good outcomes for aneurysm surgery
6  done in Anchorage, Alaska.
7         MS. McCREADY: Okay. I don't have anything
8  else. Thank you.
9         MR. GUARINO: Nothing else.
10        MS. McCREADY: Only because I'm so tired.
11        THE VIDEOGRAPHER: The deposition is
12 concluded. We are off record at 5:36 p.m.
13       (Proceedings concluded at 5:36 P.M.)
14       (Signature reserved.)
15
16
17
18
19
20
21
22
23
24
25