```
                UNITED STATES DISTRICT COURT        2006 MAR 13 PM 2: 38
                  FOR THE DISTRICT OF ALASKA
                          ---oOo---                    RECEIVED
                                                    US ATTORNEY OFFICE
```

KIMBERLY ALLEN, Personal
Representative of the ESTATE OF
TODD ALLEN, Individually, on Behalf
of the ESTATE OF TODD ALLEN, and on
Behalf of the Minor Child PRESLEY GRACE
ALLEN,
        Plaintiff,
vs.                 No.  304-CV-0131 (JKS)
UNITED STATES OF AMERICA,
        Defendants.
------------------------------/

DEPOSITION OF RICHARD A. RUBENSTEIN, M.D.
February 22, 2006
RICHMOND, CA


Reported by:
DANUTA KRANTZ
CSR NO. 4782

Atkinson-Baker, Inc.

Court Reporters

www.depo.com

File No.: A000DE4

### Page 6

1    MR. GUARINO: This is Gary Guarino. I
2  represent the United States.
3       THE VIDEOGRAPHER: Thank you.
4       The court reporter will please swear the
5  witness.
6       RICHARD A. RUBENSTEIN, M.D.
7       having been sworn as a witness,
8         testified as follows:
9       THE VIDEOGRAPHER: You're on the record.
10      MS. McCREADY: Thank you.
11      EXAMINATION BY MS. McCREADY
12      MS. McCREADY: Q. Good afternoon,
13 Doctor.
14      A. Good afternoon.
15      Q. Is it Rubenstein?
16      A. Rubenstein, yes.
17      Q. Okay. Dr. Rubenstein, what did you
18 do to prepare for this deposition this afternoon?
19      A. I reviewed extensive documents,
20 reviewed extensive literature, reviewed extensive
21 depositions, I reviewed the expert reports of
22 plaintiff and defense experts.
23      Q. Okay. On the extensive documents,
24 are you talking about Mr. Allen's medical records?
25      A. Yes, And I also reviewed a CD of

### Page 7

1  his MRI scan -- excuse me, of his CT head scan of
2  4-19-03.
3       Q. So you reviewed documents as well
4  as the films that were taken at Providence Alaska
5  Medical Center on 4-19-03; is that correct?
6       A. Yes.
7       Q. Let me just pull out -- in your
8  report you had listed some records that you had
9  reviewed. I will mark that.
10      (Document marked Plaintiff's
11      Exhibit 1 for identification.
12      MS. McCREADY: Q. Doctor, I am marking
13 Exhibit 1, at least what was provided to me as
14 your report that was dated November 29 --
15      A. Correct.
16      Q. 2005. And really, I just wanted to
17 focus on the medical records that you had listed
18 in this report.
19      Did you ever -- is there any listing of
20 medical records by Bates stamping numbers?
21      A. No.
22      Q. Have you gotten any correspondence
23 from Mr. Guarino that sort of sets forth
24 everything that he sent to you?
25      A. Yes.

### Page 8

1       Q. Did you have his correspondence at
2  hand?
3       A. Yes. Right. I do.
4       Q. I would like to mark that as an
5  exhibit, any correspondence you had with
6  Mr. Guarino.
7       A. If you mark on the underside of
8  the -- you know what I'm saying?
9       Q. Okay.
10      (Document marked Plaintiff's
11      Exhibit 2 for identification.)
12      MS. McCREADY: Q. And you've handed me
13 your file, and is it the -- let me just ask.
14 There is a December 20, 2005 letter?
15      A. All of the correspondence is in
16 there.
17      Q. So this is this whole stack; is
18 that correct?
19      A. Correct.
20      Q. What I am going to do is put a
21 Bates stamp -- I'm sorry, an exhibit sticker,
22 Exhibit 2, on the back of the first page of that,
23 but the whole thing will become Exhibit 2.
24      A. Okay.
25      Q. And then we will just copy it after

### Page 9

1  the -- at a break or after the deposition. Okay.
2       A. Or if the records are -- they're
3  probably not that extensive, but the way I
4  generally do this is to have the court reporter
5  send someone back here with their own copying
6  machine to copy it, and then rather than, you
7  know, her take the time after the deposition to do
8  it.
9       Q. Okay. We can talk about that when
10 we go off record.
11      A. Sure.
12      MR. GUARINO: Donna.
13      MS. McCREADY: Yes.
14      MR. GUARINO: Dr. Rubenstein is coming
15 through clearly, but about halfway through or
16 partway through some of your questions you start
17 to fade, and I am wondering whether you are
18 turning away from the microphone or whether it's
19 just the line connection.
20      MS. McCREADY: I don't think it's the
21 line connection. I just think it's the setup. I
22 will try to keep my voice up.
23      MR. GUARINO: That was better. I heard
24 that clearly all the way through.
25      MS. McCREADY: Okay.

Page 10

1  Q. In terms of literature, if you
2 could -- I am curious what literature you have
3 reviewed.
4  A. I have reviewed -- it's right here,
5 if you want to go through it article by article.
6  Q. Okay.
7  A. Okay. Much of it is literature
8 that was memorialized in your expert Susan Shott's
9 bibliography, but there is additional literature,
10 you know, from my own files.
11  Q. Do you have those separated out,
12 like what you got, what literature was cited by
13 Dr. Shott and what literature you sort of looked
14 up on your own?
15  A. I do, by and large. There may be a
16 couple of articles in the Shott file. Let me put
17 it this way. Most of the articles in the Shott
18 file were, you know, I already had in my files.
19 There were some that I didn't, and, you know, they
20 are mixed together really.
21   But I can say these articles here are
22 articles that were -- clearly came from my
23 information, but most of the Shott articles I
24 already had in my bank of knowledge. It's just
25 that they -- there was an overlap.

Page 11

1  Q. Sure. Okay. All right. I want to
2 come back to that.
3   Anything else you did to prepare for
4 deposition, today's deposition?
5  A. No, I don't think so.
6  Q. Did you talk to Mr. Guarino?
7  A. When?
8  Q. In preparation for this deposition.
9  A. Yes, I did talk to Mr. Guarino.
10 Yes.
11  Q. Just for about how long?
12  A. You mean in terms of --
13  Q. Preparation --
14  A. Are you talking about today?
15  Q. I am talking about --
16  A. What are you talking about?
17  Q. I'm talking about in preparation
18 for this deposition.
19  A. I think I talked to him about one
20 hour on Sunday night, and I talked to him today
21 for about maybe ten minutes.
22  Q. Then did you talk about -- I am
23 just curious if you gentlemen discussed the other
24 depositions that have been taking place.
25  A. Yes. I mean, that certainly was

Page 12

1 one of the topics we discussed, yeah. Yes.
2  Q. All right. If you could tell me,
3 what exactly is a neurologist?
4  A. A neurologist, or neurology, the
5 specialty that deals with diseases of the central
6 and peripheral nervous systems, the junction
7 between nerves and muscles and muscles.
8  Q. What is the difference between a
9 neurologist and a neurosurgeon?
10  A. Well, we think and they operate.
11  Q. Okay.
12  A. If you want to know the truth.
13  Q. I am sure you have been asked that
14 question before. So you think and they operate?
15  A. Correct.
16  Q. What is the difference in training?
17  A. A neuro -- a standard neurology
18 training program is one year of internship and
19 three years of residency training and then
20 additional fellowship years after that, if one
21 wants to really subspecialize in any -- an area of
22 neurology.
23   Neurosurgical training, I think pretty
24 much in the good neurosurgical training programs,
25 I think the standard training is about around five

Page 13

1 years or so after medical school.
2  Q. Okay. So are there -- do
3 neurologists go through surgical residencies?
4  A. No.
5  Q. Then do you do surgery?
6  A. No.
7  Q. Are you board certified as a
8 neurologist?
9  A. Yes.
10  Q. All right. Is board certification,
11 is that something that you have to -- you have to
12 be recertified after a particular period of time?
13  A. You know, they did have after many
14 years, after I was board certified, they did have
15 a recertification exam, and I think that has kind
16 of gone by the wayside, you know. There were a
17 few years when that was in vogue, and I have not
18 heard anything more about recertification exams.
19  Q. When were you actually board
20 certified?
21  A. I was board certified in 1976. I
22 was elected to fellowship, which is a higher level
23 of board certification, in 1982.
24  Q. Then have you been recertified
25 since '76?

Page 54

1  familiar with a subarachnoid hemorrhage
2  presentation?
3      A. Yes.
4      Q. Would you agree that emergency room
5  care providers should consider subarachnoid
6  hemorrhage when a patient presents with their head
7  hurting?
8      MR. GUARINO: Donna, that faded out. I
9  heard half of the question.
10     MS. McCREADY: Q. Would you agree that
11 the emergency room care provider -- sorry. Let me
12 start over.
13     Would you agree that emergency room care
14 providers should consider a subarachnoid
15 hemorrhage when the patient presents to the ER
16 with their head hurting?
17     A. I would not agree with that.
18     Q. Why not?
19     A. Because you didn't qualify the
20 question. You need to qualify the question and be
21 very specific. I mean, are you referring
22 generically, are you referring to Mr. Allen
23 specifically in terms of a patient who is a
24 chronic pain, chronic headache -- you know, he had
25 a long history of headache before this.

Page 55

1      In someone who has chronic headaches,
2  who is on narcotic medication, patients who have a
3  preexisting history of headache as opposed to
4  someone who arrives in an emergency setting
5  de novo, you know, without any prior history of
6  headache, and has a severe, excruciating headache,
7  the worst headache they have ever experienced in
8  their life, you've got to be very specific.
9      In the one instance of a patient like
10 Mr. Allen, who was a chronic pain patient, chronic
11 headache patient, on narcotics, on a narcotic
12 contract, or somebody with preexisting migraine,
13 frequent migraines, et cetera, in other words, a
14 chronic headache patient, certainly someone who
15 presents in an emergency room, the diagnosis of
16 subarachnoid hemorrhage would not be high on my
17 differential.
18     Q. And the question is not whether or
19 not it's high on the differential. Should it be
20 considered?
21     A. I don't even think it needs to be
22 considered, you know, unless there is something
23 that is sufficiently atypical about the
24 presentation that would warrant an elevated level
25 of suspicion that there was something new going

Page 56

1  on, as opposed to someone who presented without
2  any prior history of headache, you know, as I
3  said, had a severe excruciating headache,
4  obviously then, the first thing you would think of
5  would be a subarachnoid hemorrhage.
6      Q. Would you agree that once a
7  patient -- assume for a moment there is a high
8  suspicion of a subarachnoid hemorrhage, would you
9  agree that the standard of care is then to order a
10 CAT scan?
11     A. Yes.
12     Q. Would you agree that a CAT scan,
13 generally, the sensitivity is that it will pick up
14 90 to 95 percent of bleeds?
15     A. About 95 percent of subarachnoid
16 hemorrhage, yes.
17     Q. Would you agree if that was -- if a
18 CT was negative, then you would go do a lumbar
19 puncture if you had a high suspicion -- index of
20 suspicion of a subarachnoid bleed?
21     A. If somebody presented with a
22 sentinel headache that was, you know, as I said,
23 arose basically de novo out of nowhere, severe
24 headache, the sequence of events certainly would
25 be a CT. If that was negative, then a spinal

Page 57

1  fluid evaluation.
2      Q. At least in your experience and
3  your review of the literature, CTs pick up most, I
4  mean, 95 percent of bleeds?
5      A. Correct.
6      Q. Would you agree that, just in
7  general, talking about the --
8      A. Let's say, CTs pick up about 95
9  percent of acute subarachnoid hemorrhage if done,
10 you know, within the first 12 to 24 hours after
11 the bleed. You know, by, let's say, five days
12 after the bleed, the sensitivity of the CT is
13 about 50 percent.
14     Q. Sure. But in at least that first,
15 did you say 24 hours?
16     A. 24 hours.
17     Q. Right. It's going to have a 95
18 percent sensitivity rate?
19     A. Correct.
20     Q. I just want to ask some general
21 questions about treatment of patients who are
22 diagnosed with subarachnoid hemorrhage.
23     It sounds like that is at least where
24 your area of expertise is. You worked in terms of
25 treating patients with subarachnoid hemorrhage?

15 (Pages 54 to 57)

Page 118

1  lean forward just a second.
2      A. Sure.
3      Q. Is there a set of boxes at the top?
4      A. Yes. Pain 7 to 8. I am sorry.
5  Yes. 7 to 8. You are right.
6      Q. He is complaining of pain?
7      A. Yes.
8      Q. In that visit he is looking for
9  medication; is that right?
10     A. Correct.
11     Q. And they give him medication?
12     A. Yes.
13     Q. And there is a description of
14 headache and tender scalp in the temporal area.
15 Is that how that description reads?
16     A. Yes.
17     Q. Was he complaining of nausea and
18 vomiting at that visit?
19     A. I don't see it.
20     Q. Are there any visits that
21 Mr. Allen -- in your review, extensive review of
22 these records, did you see any visits that
23 Mr. Allen made to the ANMC Family Medicine Clinic
24 complaining of pain and nausea and vomiting?
25     A. He made plenty of visits for pain,

Page 119

1  but in terms of nausea or vomiting, I did not see
2  any until 4-19-03.
3      Q. Until 4-19-03.
4      Did you see any visits to -- by
5  Mr. Allen to the Alaska Native Medical Center
6  Family Medicine Clinic complaining of pain where
7  he had been taking his pain medication and
8  couldn't control his pain with his pain
9  medication?
10     A. Well, I mean, just by virtue of the
11 fact that he was coming back for frequent pain
12 refills and was on the pain contract starting
13 12-12-02, I think that signifies that he was a
14 chronic pain patient. He had certainly had
15 episodes of breakthrough pain, and requested pain
16 medication until they got him on this contract.
17     Q. On the morning of April 19, 2003,
18 is it your understanding that Mr. Allen was
19 looking for pain medication?
20     MR. GUARINO: I am sorry, Donna, I
21 didn't hear that question.
22     MS. McCREADY: Q. On the morning of
23 April 19, 2003, was it your understanding that
24 Mr. Allen was looking for pain medication?
25     A. I think that a collateral reason he

Page 120

1  was coming to Anchorage from Valdez was to pick up
2  his refills. I mean, he called on the 18th to
3  pick them up. So he was coming to pick up pain
4  medicine there.
5      Q. Is that your understanding?
6      A. Well, I mean, he was symptomatic,
7  you know, with what he described as ear, head and
8  jaw pain, which was not really any different than
9  his chronic symptoms.
10     Q. Is it your understanding that he --
11 was part of the reason why he went to the ER that
12 morning, that is, the emergency department at ANMC
13 on the morning of April 19, was to pick up his
14 pain medications?
15     A. I don't know.
16     Q. Do you know whether or not he
17 picked up his pain medications the night before
18 and started taking them?
19     A. Well, there is some note, I think
20 it was in his wife's deposition, that she didn't
21 know, you know, if he had taken his -- he had
22 medication, and she didn't know if he had taken
23 the medication. Let me find that for you.
24     I can't find it exactly, but she was --
25 she acknowledged in her depo that he had pain

Page 121

1  medicine the day before, or the night before, and
2  that she was not aware if he had taken it. That's
3  what I recollect.
4      Q. Let's go to the note of the --
5  let's go to the emergency room visit from
6  April 19, 2003. I am going to mark that sheet,
7  the emergency room visit, Exhibit 9.
8      (Document marked Plaintiff's
9      Exhibit 9 for identification.)
10     THE WITNESS: Hang on. Yes.
11     MS. McCREADY: Q. Can you tell -- go
12 ahead.
13     A. I had my copy of it, but I am
14 just -- hang on.
15     Q. Sure. Take your time.
16     MR. GUARINO: Which record are you
17 talking about, Donna?
18     MS. McCREADY: I am talking about the
19 emergency room visit from April 19, 2003.
20     MR. GUARINO: But there were several
21 records that day. Which doctor or which -- can
22 you describe it better than that?
23     MS. McCREADY: Oh, I'm sorry. I am
24 talking about the morning of the emergency visit
25 at ANMC.

31 (Pages 118 to 121)

Page 134

1  with reporting 10 out of 10 pain, at least pain --
2  and they mention their head, that it would be
3  important to take a history, that is, a detailed
4  history, to distinguish whether or not this pain
5  was different than pain this patient had had
6  before?
7       A.  Where do you see 10 out of 10 pain?
8       Q.  I'm sorry, on Exhibit 9 at the top,
9  under "7-10, Ears and head are hurting. Up all
10 night. P equals 10."
11      A.  I don't -- you want to show that to
12 me?
13      Q.  Sure.  Can you see that?  Right
14 there.  "P equals 10."  Had you noticed that
15 before?
16      A.  I didn't really take note of it,
17 no.
18      Q.  But you see now that, at least the
19 nurse or somebody had written down that this
20 patient was reporting pain equals 10?
21      A.  Correct.
22      Q.  So my question was, if you have a
23 patient reporting to the emergency room -- and
24 this was an emergency room visit -- reporting,
25 "Pain 10 out of 10.  Ears and head are hurting.

Page 135

1  Up all night," wouldn't it be important to take a
2  history and determine whether or not this was pain
3  that was different than what this patient had had
4  before?
5       A.  Well, you know, I don't think that
6  this was sufficiently atypical to warrant a higher
7  index of suspicion in a chronic pain patient on
8  narcotics.  Let me just say, that, because the,
9  you know, the severity, or the symptom of severe
10 headache, let's say, sentinel headache,
11 thunderclap headache, et cetera, in the greatest
12 preponderance of patients is benign, that is
13 No. 1; that the only real distinguishing features
14 clinically by history that would warrant an
15 increased index of suspicion of there being a
16 subarachnoid hemorrhage or other intracranial
17 process going on, would be, 1, if there was loss
18 of consciousness associated with this; No. 2, and
19 even more importantly, if there had been a seizure
20 associated with this increased pain.
21      Other than that, there is no higher
22 index of suspicion just because he reports a 10
23 and he is a chronic pain patient on narcotics that
24 would warrant a higher index of suspicion.
25      Q.  But here is my question, Doctor.

Page 136

1       In this scenario, and we are talking
2  about Todd Allen, where he is coming in, and he is
3  a chronic pain patient, and he is reporting 10 out
4  of 10 pain, and he is at the emergency room at
5  ANMC at 7:10 in the morning, wouldn't it be
6  important for an emergency room provider to take a
7  history such that to distinguish whether or not
8  this was pain that was different than the pain he
9  had had in the past?  Wouldn't that be important?
10      A.  So what?  You know.  The issue
11 is --
12      Q.  So what?
13      A.  Yes.  But I am saying -- I am
14 saying that, you know, he does report increased
15 pain, but he has reported many episodes of
16 breakthrough pain.  You know --
17      Q.  The question is -- I am sorry.
18      A.  But the issue is that just because
19 he reports increased pain and he is a chronic pain
20 patient on narcotics does not necessarily at all
21 indicate a higher index of suspicion unless there
22 are ancillary neurologic symptoms going on with
23 this.
24      If you had told me, well, you know,
25 there was a loss of consciousness, if you had told

Page 137

1  me that he had had a seizure, if you told me that
2  he had double vision, you know, those would -- and
3  especially if he had had a seizure, those would be
4  alarming symptoms.
5       And if this were a patient who came in
6  to ANMC de novo, no history of prior headache, no
7  history of narcotic administration, et cetera, in
8  the past, and complained of 10 out of 10 headache,
9  then, of course.  But in this setting, there is no
10 higher index of suspicion that there is a
11 potential sentinel hemorrhage or subarachnoid
12 hemorrhage going on.
13      Q.  So if this -- so if you are a
14 chronic pain patient, then the emergency room
15 provider really doesn't need to take a detailed
16 history when you show up with 10 out of 10 pain.
17      A.  Well, I think --
18      Q.  No, is that your opinion?
19      A.  What do you mean by detailed
20 history?  Define "a detailed history."
21      Q.  One part of it would be to
22 determine whether or not the patient's pain is
23 different from what they have been experiencing in
24 the past.  Would that be important to find out?
25      A.  Well, I presume that, you know, he

35 (Pages 134 to 137)

Page 146

1  I would say, you know, in the absence of any other
2  symptoms that would indicate an acute cranial
3  process, I would say he doesn't need an imaging
4  study, you know, send him home, and I don't think
5  he needs any other workup.
6      Q.  If the emergency room physician --
7  I understand that the fact this was a chronic pain
8  patient is really central to your opinion; is that
9  correct?
10     A.  Correct, and that these symptoms
11 were not sufficiently atypical and did not occur
12 within the context of more alarming neurologic
13 symptoms, such as a seizure, diploplia, focal
14 neurologic deficit, that would have been highly
15 alerting.  In other words, in -- I think a very
16 relevant study of this is Linn's study of sentinel
17 headache, because that is really an issue we are
18 dealing with in this case.
19     In that study where he compared sentinel
20 headache to perimescencephalic hemorrhage, which
21 is a benign form of subarachnoid hemorrhage, with
22 benign thunderclap headache.  All of the symptoms
23 overlapped of everything in terms of headache
24 intensity, headache onset, et cetera; and that the
25 only distinguishing feature between a subarachnoid

Page 147

1  hemorrhage, an aneurysmal subarachnoid hemorrhage
2  headache, and that of benign thunderclap headache
3  was really seizure and double vision, but most
4  prominently seizure.
5      So, the fact that he presented in this
6  fashion is not sufficiently alarming in view of
7  his long history of chronic pain to warrant a
8  further suspicion that there was an intracranial
9  process going on.
10     Q.  Going back to that example you just
11 gave.
12     If an emergency room physician called
13 you and said, Look, I have got this chronic pain
14 patient in here.  They have always been able to
15 control their pain with their pain medications in
16 the past, but now they are here in the emergency
17 room complaining of 10 out of 10 pain.  They have
18 been taking their pain medication.  They can't
19 control it.  And by the way, they have got nausea
20 and vomiting.
21     MR. GUARINO:  Objection to foundation.
22 That question misstates the record.
23     MS. McREADY:  Q.  Go ahead.  Would that
24 cause you some concern to want to work up that
25 patient?

Page 148

1      A.  The first thought that I would have
2  is that they are having breakthrough pain, and
3  that they may need to have an alteration in their
4  pain medication schedule, and that I would not be
5  alarmed in the setting of a chronic pain patient
6  on a narcotic contract, that this was sufficiently
7  different and atypical to warrant a big workup or
8  get a CT scan, et cetera, or do an LP.
9      But, you know, obviously, as I have, you
10 know, gone over and over again, if this was a
11 chronic pain patient and came in with this
12 breakthrough pain and reported that they lost
13 consciousness, they had a seizure, they were
14 having double vision, they couldn't move the right
15 side of their body, then I would say there is
16 something else going on here.
17     Q.  So let me just be clear.
18     In the circumstances I just gave, which
19 are similar to the circumstances in this case, a
20 gentleman presents to the ER, he is a chronic pain
21 patient reporting 10 out of 10 pain, he's got
22 nausea and vomiting, he's been taking his pain
23 medications, and he has not presented in that way
24 before; that is, he has not presented with nausea
25 and vomiting, and he has not presented with having

Page 149

1  taken his pain medications and not being able to
2  control the pain.
3      My only question is, then, it sounds
4  like your opinion is that that doesn't matter, you
5  don't need to rule out a subarachnoid hemorrhage
6  under those circumstances?
7      MR. GUARINO:  I have an objection before
8  the question is answered.  Are you presenting that
9  as a hypothetical?
10     MS. McREADY:  Yes, it's a hypothetical.
11     MR. GUARINO:  As a hypothetical?
12 Because if you are intending to represent that he
13 was taking pain medication and then it was not
14 working, as opposed to taking it and throwing it
15 up, my objection is it's not representative of the
16 record.
17     MS. McREADY:  I understand your
18 objection.
19     Q.  Go ahead.
20     A.  My answer is that it's not
21 sufficiently atypical from his long-standing
22 preexisting presentation to warrant --
23     Q.  Suspicion?
24     A.  -- suspicion that there is a
25 sentinel headache going on, because I don't

38 (Pages 146 to 149)

Page 158

1  A. I am trying to find -- she told
2  somebody in the ER that he had no prior history of
3  headache. I am trying to find that.
4  Q. If you want to look at the bottom
5  of Exhibit 10 on Allen Providence 59, under Review
6  of Systems CNS. I don't know if that is what
7  you're referring to.
8  A. Hang on for a second.
9  Yes. I do not believe he had any
10 history of headaches, correct. That's what I was
11 referring to.
12 Q. She probably would have gotten that
13 from the wife as well?
14 A. Right. I guess it was clear that
15 he never related to his wife that he had
16 headaches, per se, but he clearly related it to
17 physicians that had followed him, you know, over
18 the -- since 11-22-99.
19 Q. Have you drawn any inferences from
20 that?
21 A. Only that there is a, what I think
22 is a significant inconsistency. That's all.
23 Q. Well, do you think there is a -- I
24 guess I want to ask you whether or not there are
25 some people who feel that they only want to talk

Page 159

1  about their medical problems with providers as
2  opposed to talking to their loved ones or friends
3  about it.
4  A. You know, I am not drawing any
5  conclusions. All I am saying is there is a major
6  inconsistency.
7  (Document marked Plaintiff's
8  Exhibit 11 for identification.)
9  MS. McREADY: Q. I have marked as
10 Exhibit 11 Dr. Lee's note from the admission date
11 4-19-2003, and it's Bates stamped Allen Providence
12 21, 22, 23.
13 And is it your understanding that
14 Dr. Lee is the admitting --
15 MR. GUARINO: How many -- it's not clear
16 to me which ones you are marking, Donna. I have
17 got two records.
18 MS. McREADY: Sure. That's why I said
19 Bates stamp Nos. Allen Providence 21, 22, and 23.
20 MR. GUARINO: My copies don't have those
21 numbers on them. If you could tell me -- identify
22 what the first page looks like.
23 MS. McREADY: Yes. At the top it says
24 "Admission date, April 19, 2003." Then it says,
25 "Admitting diagnosis."

Page 160

1  MR. GUARINO: All right. How many pages
2  have you marked?
3  MS. McCREADY: Exhibit 11 is three
4  pages.
5  MR. GUARINO: All right. I think I have
6  got that. Thanks.
7  MS. McCREADY: Q. Dr. Lee was the
8  admitting doctor at Alaska Providence?
9  A. Right.
10 Q. Okay. Providence Alaska, I meant
11 to say.
12 A. She was the internist who admitted
13 him.
14 Q. Exactly. Internist.
15 She noted under History of Present
16 Illness, "The patient's history is obtained from
17 his wife and Dr. Susan Dietz, emergency room
18 physician."
19 According to the patient's wife, he had
20 been complaining of a headache in his right jaw
21 area radiating to the back of his head and then up
22 to the top of his head along the backside of his
23 head. Symptoms began last night."
24 Do you understand -- I mean, do you have
25 any explanation as to why the wife would tell the

Page 161

1  internist at Alaska -- at Providence Alaska later
2  that day this description of her husband's
3  headache if that is not, in fact, what he had?
4  A. No.
5  Q. You don't know why?
6  A. No.
7  Q. You don't know how that happened?
8  A. No.
9  Q. Is this description, the headache
10 in his right jaw area radiating to the back of his
11 head and then up to the top of his head, could
12 that be consistent with a subarachnoid hemorrhage?
13 A. Yes.
14 Q. When you -- turning to that next
15 page of Dr. Lee's note, this is Exhibit 11, where
16 she -- under Assessment, and she says,
17 "Subarachnoid hemorrhage with diffuse cerebral
18 edema and impending herniation and brain death."
19 When you had reviewed the films in this
20 case, had you noted the diffuse cerebral edema?
21 A. Yes.
22 Q. Did you develop any opinions about
23 how long it would take to develop that extent of
24 the edema that was there?
25 A. Yes.

Page 162

1  Q. What is your opinion?
2  A. Pretty immediately from the time
3  the aneurysmal subarachnoid hemorrhage occurred.
4  Q. So the edema you saw on the CAT
5  scans from Providence Alaska, you think that that
6  edema could develop immediately?
7  A. Yes.
8  Q. And immediately meaning within
9  minutes?
10  A. Yes. By the way, I should say
11  that -- and, you know, this should be on the
12  record as well, that the reason that it's more
13  likely than not that Mr. Allen, you know, that his
14  significant breakthrough pain, you know, occurred
15  at 7:10 a.m. and that a CT scan would have been
16  normal had it been obtained, you know, to a
17  reasonable degree of probability that morning,
18  would be the fact that if he had a hemorrhage and
19  brain edema that was clearly evident, done -- the
20  scan that was done around, you know, 5:30 or 6:00,
21  he wouldn't be walking around at 7:10 -- at 8:07
22  a.m. when he was discharged. He would have been
23  comatose at 8:07 a.m. in the ANMC clinic.
24  In other words, he would not have walked
25  out of the clinic, he wouldn't have gone to have

Page 163

1  breakfast, he ate at Sam's Club, et cetera, with
2  that CT appearance. That is incompatible with him
3  walking around and being conscious.
4  Q. Was his neurological presentation
5  that morning at 7:10 at the Alaska Native Medical
6  Center emergency room, was that consistent with a
7  patient who could have a warning leak?
8  A. Well, you know, it's very difficult
9  for me to say. If he had had no history of
10  chronic pain and this whole narcotic history, and
11  he was a de novo patient, I would say certainly it
12  could be a warning leak.
13  But I think the picture is so confusing,
14  and there is not anything sufficiently atypical,
15  as we have gone over, and pardon the pun,
16  ad nauseam, that -- to warrant a higher index of
17  suspicion. Yeah, could this severe pain in a
18  headache-free patient presenting for the first
19  time? Absolutely.
20  Q. I think you read more into my
21  question. I really just want to know whether or
22  not a patient could appear that neurologically
23  intact, as Mr. Allen did that morning, that is,
24  you know, they're walking, they're talking; could
25  a patient be that neurologically intact and have a

Page 164

1  warning leak?
2  A. Now, you -- let's be very specific.
3  You are talking in Mr. Allen, and by
4  definition, when you state "Mr. Allen," you are
5  talking about a chronic pain patient with a long
6  preexisting history of headache, on narcotics for
7  chronic head pain, who presents with, you know, an
8  increase in his head pain; you are asking me
9  whether in that specific instance, his increase in
10  pain could be a demonstration of a warning leak,
11  correct? That is your question?
12  Q. That is my question, but I --
13  A. It has to be very specific.
14  Q. Well, let me put it in context,
15  because you just said that there is no way this
16  gentleman with the CT -- if his CT looked like at
17  7:00 in the morning what it did at 5:30 at
18  Providence, there is no way -- I mean, the guy
19  would have been in a coma; is that correct?
20  A. Correct.
21  Q. So my only -- my question is
22  whether or not patients -- let's not talk about
23  Mr. Allen -- whether or not patients --
24  A. This is a hypothetical question.
25  Q. This is a hypothetical -- whether

Page 165

1  or not patients who are walking and talking and
2  seem to be neurologically intact, whether or not
3  those patients, hypothetically speaking, could
4  have a warning leak.
5  A. Yes, of course. Sure.
6  Q. Is that sort of the -- is that the
7  common presentation, that is, that patients who
8  have warning leaks may present to a medical
9  provider and yet be neurologically intact?
10  A. Yes.
11  Q. I am taking a moment to look,
12  because I don't want to go over old ground. We
13  have actually covered a lot.
14  A. Sure.
15  Q. Going back to your report, and I am
16  on page 3, and I am on that third paragraph. And
17  where you say, "There is no reason to suspect that
18  this pain presentation was any different from
19  multiple prior pain presentations over the past
20  three years."
21  A. Where are you reading?
22  Q. I'm on page 3.
23  A. Which paragraph?
24  Q. Third paragraph.
25  A. From the top?

**Page 166**

1  Q. I'm on the last sentence.
2  A. Okay. Okay.
3  Q. "There is no reason to suspect that
4  this pain presentation was any different from the
5  multiple prior pain presentations over the past
6  three years."
7  And I actually think that we have gone
8  over that.
9  A. Correct, we have.
10  Q. I want to ask you about the
11  paragraph that's 1, 2, 3, 4, 5, 6 down, that
12  starts with, "In any event."
13  A. Okay.
14  Q. It says, "In any event, it would be
15  speculative to conclude that any purported imaging
16  abnormality early that morning would have
17  warranted a spinal fluid evaluation in someone
18  with a known preexisting complex pain disorder and
19  opiate habituation with a supple neck."
20  And I am not sure I understand that. I
21  think the part I don't understand is, conclude —
22  "speculative to conclude that any purported
23  imaging abnormality early that morning would have
24  warranted a spinal fluid evaluation."
25  What do you mean there?

**Page 167**

1  A. I mean that more likely than not if
2  we assume, let's say hypothetically, that this was
3  a sentinel bleed, that the CT would have
4  demonstrated a hemorrhage. In other words, I am
5  saying that the CT in -- the greater likelihood is
6  the CT would have been normal, and that in this
7  setting, as I have opined over and over again,
8  someone presenting in this context with a complex
9  pain disorder, opiate habituation, supple neck,
10  without other symptoms that I have already gone
11  over, would have warranted a higher degree of
12  suspicion prompting an imaging study that was
13  available at ANMC on 4-19-03.
14  Q. Because if he had -- if there had
15  been an imaging abnormality, that is, had there
16  been an abnormal image, you wouldn't need to look
17  at his spinal fluid; isn't that correct?
18  A. It really depends. The importance
19  in someone who has a bona fide history consistent
20  with subarachnoid hemorrhage, let's say somebody
21  who presents without a prior headache history,
22  severe worst headache, immediately going to a CT
23  scan is that you would never do an LP as the first
24  test because they could have a hem — you know,
25  they could have a hematoma in their brain, and you

**Page 168**

1  could precipitate their death by herniation. So
2  you always do a CT first.
3  Q. Right. When I read that paragraph,
4  it sounded like even if there had been something,
5  they had seen something on his CT, you know, it
6  wouldn't have warranted doing a lumbar puncture.
7  A. Well, if they — it had been done
8  and there was a clear subarachnoid hemorrhage, you
9  would not need to do a — but in somebody with a
10  sentinel headache in which the CT was negative,
11  which it is in, you know, a great preponderance of
12  cases, the way you make the diagnosis --
13  Q. Is through a lumbar puncture?
14  A. -- is through a lumbar puncture.
15  But there are those cases in which CT and LP are
16  negative. As a matter of fact, at least in, you
17  know, Widget's study -- he is a -- of sentinel
18  headache cases, the importance of the benign
19  nature of sentinel headache is that when the CT
20  and the LP are normal, that you don't need to go
21  on to angiography.
22  In other words, that the natural history
23  in the greatest preponderance of cases that
24  present with severe explosive headache is not
25  subarachnoid hemorrhage, it's a benign condition

**Page 169**

1  that eventually goes on, let's say, to be
2  migraine, tension headaches, et cetera, and that
3  you don't need to go on and do an angiogram in
4  spinal fluid-negative and CT-negative cases.
5  This all stems, let me just say, by a
6  paper from a very good colleague and friend of
7  mine, Neil Raskin, who reported in 1985 in a paper
8  with Day, that thunderclap headache with normal CT
9  and normal spinal fluid imaging, that they
10  reported a case that they went on to angiogram and
11  had an internal carotid aneurysm with spasm around
12  it, and that in thunderclap headache presentations
13  with normal CT and normal spinal fluid that one
14  should go on and do an angiogram, you know, to
15  rule out an aneurysm.
16  But subsequent bigger prospective
17  studies showed that the natural history of
18  explosive headache in the greatest preponderance
19  of cases was benign when you had normal CT and
20  normal spinal fluid. So in other words, you
21  didn't need to go on and do an angiogram.
22  Q. What is the percentage of cases
23  where somebody really does have a subarachnoid
24  bleed and the CT and the lumbar puncture are
25  normal? I mean, is that a very small percentage

43 (Pages 166 to 169)

**Page 178**

1 my notes so we can finish up.
2     THE VIDEOGRAPHER: The time is 5:15, and
3 this is the end of tape No. 2 in the deposition of
4 Dr. Richard Rubenstein. We are off the record.
5     (Short recess.)
6     THE VIDEOGRAPHER: This is the beginning
7 of tape No. 3 of the deposition of Dr. Richard
8 Rubenstein. The time is 5:22. We are back on the
9 record.
10     MS. McCREADY: Q. And, Dr. Rubenstein,
11 just a couple of other questions about your
12 report. I just want to understand.
13     It's your opinion it's more likely than
14 not that Todd Allen did not have a sentinel bleed
15 or any aneurysm the morning of April 19; is that
16 right?
17     A. Well, he obviously had an aneurysm
18 in the morning --
19     Q. In the morning -- I am sorry.
20     A. Well, I mean, he had an unruptured
21 aneurysm, obviously, in the morning of, you know,
22 so to qualify your statement --
23     Q. Thank you. Let me make sure.
24     It's your opinion that he didn't have a
25 bleed or a ruptured aneurysm the morning of

**Page 179**

1 April 19?
2     A. Yes. I think it's more likely than
3 not that this represented an episode of real
4 breakthrough pain that he had from his chronic
5 preexisting condition. And, you know, is it
6 possible that he had a sentinel headache?
7 Anything is possible, but I don't think that he
8 ruptured the aneurysm until 2:00 that afternoon.
9     Q. Then in your opinion, then, because
10 part of your report is, okay, even assuming he had
11 a sentinel bleed or some sort of a bleed that
12 morning, there's really nothing that could have
13 been done for him; is that your opinion?
14     A. Well, I am -- you know, if he had a
15 sentinel hemorrhage, a sentinel bleed, a warning
16 leak, let's say, which I don't believe he had, I
17 don't believe there was sufficient accompanying
18 symptoms to warrant a higher index of suspicion
19 that he get a CT scan or an LP.
20     But let's say, under ideal
21 circumstances, let's say, hypothetically, that,
22 you know, a sentinel headache had been suspected,
23 he had obtained a CT, which I think in the
24 greatest likelihood, or would be more likely than
25 not to have been negative, and that he had had an

**Page 180**

1 LP, and that he then had -- and it had been
2 diagnosed, let's say he had xanthochromic spinal
3 fluid, and then he went on to be transferred, have
4 angiog -- you know, transferred to either
5 Providence or Alaska Regional, have the
6 angiography, et cetera, we don't know where the
7 aneurysm was, we don't know if it was in an
8 accessible versus inaccessible location, we don't
9 know if it would have been a candidate for
10 endovascular treatment versus surgical treatment.
11     There are a lot of unknowns. But I
12 think what is certain, that is even under optimum
13 circumstances, had it been diagnosed, that he
14 would have rebled that afternoon and died no
15 matter what had been done.
16     Q. What is that based on, this
17 assumption that he would have just rebled and
18 nothing could have been done for him?
19     A. Well, because, one, just in terms
20 of the -- I believe that he rebled sometime right
21 around 2:00 p.m., you know, when he laid down to
22 take a nap. I believe he bled, you know, at the
23 time he went to sleep, to take a nap.
24     Q. My understanding is that it's your
25 opinion that it's more likely than not that that

**Page 181**

1 is when he actually bled, not that he rebled?
2     A. Yes.
3     Q. But then assuming, you know, for
4 just the purposes of -- I want to understand the
5 rest of your opinions that, even assuming he had
6 some sort of a sentinel bleed that morning, it's
7 your opinion that he would have rebled that
8 afternoon and nothing could have been done for him
9 to change his outcome? That's my understanding.
10     A. Correct.
11     Q. Okay. That's what I wanted to
12 understand, what that is based on.
13     A. It's based on, from what I know to
14 be the mechanics of treating an aneurysm in
15 Anchorage; in other words, I don't believe that,
16 you know, treatment with Mannitol or treatment
17 with anti-osmotic agents or keeping his head up,
18 you know, as Dr. Cantu -- would have had any
19 impact on his outcome. And I will go into why
20 not.
21     But that aside, I just think that the
22 mechanics of working this up in a timely fashion
23 and not knowing where the aneurysm was, whether it
24 was accessible, inaccessible, et cetera, whether
25 he was a candidate for endovascular surgery or

46 (Pages 178 to 181)

Page 182

1  even if he was a candidate for acute operative
2  intervention, it does not appear to me that it
3  would have happened in a timely enough fashion in
4  Anchorage at Providence or Alaska Regional
5  Hospital to have prevented his hemorrhage.
6      Q.  So —
7      A.  By the way, as I said, irrespective
8  of treatment anywhere, the mortality of
9  subarachnoid hemorrhage is about 50 percent of all
10 cases.
11     Q.  Right. But in this case, if I
12 understand what you said, it sort of boils down to
13 the logistics of the fact that he had this
14 aneurysm when he was in Anchorage?
15     A.  Yes. Let's put it this way. He
16 had this aneurysm probably for a long time.
17     Q.  I'm sorry, the rupture.
18     A.  Probably for many years, but it was
19 an asymptomatic aneurysm.
20     Q.  Sure.
21     A.  You know, it's said, by the way,
22 that about 9 percent of all autopsied patients are
23 discovered, incidentally, to have incidental
24 asymptomatic aneurysms.
25     Q.  Right. I am sorry that I wasn't

Page 183

1  clear about the — distinguishing between the
2  ruptured and unruptured.
3      But if I understand your opinion that
4  it's — because Todd Allen, the logistics of him
5  actually getting worked up and treated because he
6  was in Anchorage, that just would lead you to
7  believe that they just —
8      A.  It wouldn't have happened.
9      Q.  It wouldn't have happened.
10     A.  He would have been dead no matter
11 what had been done.
12     Q.  Who have you — have you talked to
13 anyone about the logistics of dealing with a
14 patient with an aneurysm or a ruptured aneurysm in
15 Anchorage?
16     A.  I mean, I've reviewed in detail all
17 of the medical records. I have looked at
18 Dr. Levy's report. I have talked to Mr. Guarino
19 about what the logistics were in Anchorage, and,
20 you know, that there are three neurosurgeons in
21 the state. It's not clear to me whatsoever that
22 either Godursky or Craelic or Cohen were doing
23 aneurysm surgery on 4-19-03 in Anchorage.
24     And I think even if they were, under
25 optimum circumstances, they would not have

Page 184

1  operated on him within, you know, six to 12 hours
2  of the presentation of the sentinel hemorrhage at
3  7:10 a.m., if we're presuming that that's what
4  occurred, and that his workup would not have been
5  completed or substantially done by the time that
6  he rebled to have prevented his demise.
7      You know, all of this is total
8  speculation. You don't even, one, know that he
9  had an aneurysm. We know that he had a
10 subarachnoid hemorrhage. You know, the greatest
11 likelihood is certainly it was an aneurysmal
12 subarachnoid hemorrhage. We don't know the
13 location, we don't know the accessibility, we
14 don't know the best method of treatment.
15     Q.  Right. And we've got a lot of
16 things that we don't —
17     A.  Circumstantial evidence.
18     Q.  Well, yeah. We don't know because
19 he wasn't worked up that morning, on April 19th at
20 ANMC, so we don't have a lot of information.
21     A.  As I said, it's my belief — it's
22 my opinion, let's put it that way, to a reasonable
23 degree of medical probability that — and
24 certainly, an imaging study that morning I believe
25 would have been normal.

Page 185

1      Q.  And it wouldn't have told you
2  anything?
3      A.  It wouldn't have told you anything.
4      Q.  Did you talk to Dr. Levy?
5      A.  No.
6      Q.  Have you talked to any of the
7  neurosurgeons in Anchorage?
8      A.  No.
9      Q.  Do you know Dr. Cohen or
10 Dr. Godursky or Dr. Craelic?
11     A.  No. I don't know any of them.
12     Q.  Really? Okay.
13     A.  I have seen their names plenty of
14 times, but I don't know them.
15     Q.  Sure.
16     Aside from talking to Mr. Guarino and
17 reviewing the records and the reports in this
18 case, is there anything else that you are — you
19 are relying on or you looked at in terms of the
20 coming to the conclusion that the logistics of
21 Mr. Allen having this ruptured aneurysm in
22 Anchorage created problems with him getting timely
23 treatment that would have changed his outcome?
24     A.  Right. I don't believe there was
25 anything that would have been done that would have