Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

```
KIMBERLY ALLEN, Personal        )
Representative of the ESTATE    )
OF TODD ALLEN, Individually,    )
on Behalf of the ESTATE OF      )
TODD ALLEN, and on Behalf of    )
the Minor Child PRESLEY         )
GRACE ALLEN,                    )
                                )
              Plaintiffs,       )
                                )
    vs.                         )
                                )
UNITED STATES OF AMERICA,       )
                                )
              Defendant.        )
_____)
Case No. A04-0131 (JKS)
```

COPY

VIDEOTAPED DEPOSITION OF DIANE "DEDE" DUNTZE, RN, ANP

Pages 1 - 184, inclusive

Friday, February 24, 2006
9:06 A.M.

Taken by Counsel for Plaintiffs
at
ASHBURN & MASON
1130 West 6th Avenue, Suite 100
Anchorage, Alaska

Page 89

1  with a subarachnoid hemorrhage. Would you agree
2  that it's important that emergency care providers be
3  familiar with a presentation of a subarachnoid
4  hemorrhage?
5      A. Yes.
6      Q. Okay. And would you agree that it's
7  important that providers -- emergency room providers
8  have a basic understanding of -- that -- that the
9  presentation of a subarachnoid hemorrhage could
10 vary, that it's not always the same?
11     A. Yes.
12     Q. All right. Going back to patients with --
13 who may have a subarachnoid hemorrhage, where that's
14 part of a differential diagnosis. I just want to
15 make sure I have sort of exhausted everything that
16 you would be concerned about looking at as an
17 emergency room provider in a patient where -- that's
18 part of your differential diagnosis.
19         We have gone over the physical exam, the
20 neurological exam, and a history. Is there anything
21 else that you would want to know as a provider, in
22 terms of trying to figure out whether or not a patient
23 who presents has a subarachnoid hemorrhage?
24     A. And how is this patient presenting?
25     Q. Okay.

Page 90

1      A. No. I'm -- I'm asking you. Is this a
2  person -- like you're asking me, I think: How does
3  a person with a subarachnoid hemorrhage -- I don't
4  know. I -- I think I might be confused on what
5  you're asking me.
6      Q. Okay. Well, I guess I'm trying to
7  understand your -- you have worked as an emergency
8  room provider. Okay? And -- well, let me -- let me
9  just start back at the beginning.
10         MR. GUARINO: No, please don't do that.
11         THE WITNESS: Yeah, let's don't go back that
12 far.
13         MR. GUARINO: We're never getting her out of
14 here anytime if we're going to do that.
15 BY MS. McCREADY:
16     Q. Well, I don't mean back to the beginning,
17 but if you have a patient who presents -- in your --
18 in your experience as an emergency room
19 practitioner, when is it that a subarachnoid
20 hemorrhage would come into your differential
21 diagnosis?
22     A. If the patient had a sudden onset of a
23 really bad headache, often they, you know, refer to
24 that as a thunderclap headache. If the patient had
25 a stiff neck, if the patient had neurologic

Page 91

1  problems, like vision changes, nausea and vomiting,
2  all the things that I mentioned before, trouble with
3  speech, then I would think, hmm, you know, the red
4  flag would go up.
5      Q. Okay. When you say -- have you ever had a
6  patient come to you and say, I had a thunderclap
7  headache?
8      A. No, but patients will say -- you know, if
9  you say, did this come on suddenly or slowly, you
10 know, they will tell you whether it was sudden or
11 slow.
12     Q. And is that generally a question you would
13 ask if a patient came to you with a severe head
14 pain, that you would want to know if it came on
15 suddenly or if it came on slowly?
16     A. A lot of times.
17     Q. Is it important to know whether or not a
18 patient's headache is -- had a sudden onset?
19     A. Yes.
20     Q. Okay. And -- and -- and why would that be,
21 that you would want to know that? As an emergency
22 room provider, why would you want to know whether or
23 not their headache had a sudden onset?
24     A. So that you could work through what your
25 differential diagnosis is.

Page 92

1      Q. Okay. When you -- well, do you know -- let
2  me ask you this: Do you know what the standard of
3  care is for a patient, once they're diagnosed with a
4  subarachnoid hemorrhage, once they're actually --
5  it's determined that they have a subarachnoid
6  hemorrhage, do you know what the standard of care is
7  for treating them?
8      A. Well, you would turn them over to a
9  neurologist or a neurosurgeon.
10     Q. Okay. And anything else? I guess I'm just
11 trying to get at: Are you going to be offering any
12 opinions in this case on the standard of care of
13 treating a patient who has got a subarachnoid
14 hemorrhage?
15     A. No.
16         (Exhibit 2 marked.)
17 BY MS. McCREADY:
18     Q. Okay. On your report, which I have just
19 marked as Exhibit 2 -- and is that a copy of the --
20 your report in this case?
21     A. Yes.
22     Q. All right. I am just wondering what --
23 what it is you did review before you drafted that
24 report.
25     A. What it is I did review?

26 (Pages 89 to 92)

Copyright © 2006

Exhibit R Page 2 of 4

Page 93

1  Q. Yes. What did you review?
2  A. I reviewed the -- Mr. Allen's medical
3  records, the plaintiffs' responses to the first and
4  second discovery requests, depositions of Kimberly
5  Allen, Patricia Ambrose, Donna Fearey, Susan
6  Edwards, Dr. Dietz, Dr. Brodsky, Dr. Lee,
7  Dr. Scheffel. And then I did talk to Donna Fearey
8  briefly on the telephone. And then I reviewed those
9  medical texts that are --
10  Q. That you have referred to?
11  A. Do I have to say what they are?
12  Q. No, that's okay. But I want to ask you
13  about the medical records. Do you have a list of
14  what medical records you were provided?
15      MR. GUARINO: Oh, I think I can give you
16  my -- my office -- I asked them -- in fact, I was
17  looking for them before we started, and I don't have
18  it. But I have got the same format, the letters.
19      MS. McCREADY: Okay.
20      MR. GUARINO: I have the listing of Bates
21  numbers of medical records I can get to you.
22      MS. McCREADY: All right.
23  Q. And then did you -- did you review --
24  because it looked like you reviewed the triage
25  policies at ANMC.

Page 94

1  A. Yes, I did.
2  Q. Okay. Did you review any other documents
3  that were related to the ANMC emergency department?
4  A. I believe that I have a copy of the nurse
5  practitioner job description.
6  Q. Okay. Anything else --
7  A. No.
8  Q. -- that you remember?
9  A. No.
10  Q. Were you given a copy of the e-mails and
11  UCC -- I'm sorry -- emergency department policy on
12  giving phone advice?
13  A. No.
14  Q. All right.
15  A. I don't think so.
16  Q. Okay. Anything else --
17  A. No, I didn't get those.
18  Q. Okay. Have you been -- since you wrote
19  this report, have you been provided with anything
20  else, any other documents?
21  A. The triage -- the triage standards.
22  Q. Policies?
23  A. Yeah, policies.
24  Q. Okay. And that came -- and that came --
25  A. That came after the report, and the nurse

Page 95

1  practitioner job description. Those are the only
2  things that came after the report.
3  Q. Okay. And have you received copies of any
4  of the expert reports in the case?
5  A. Oh, yeah, I did.
6  Q. Okay. So the defense experts as well as
7  the plaintiffs' experts?
8  A. Yes.
9  Q. All right. Anything else you can think of
10  right now that you -- did you bring anything with
11  you today that related to this case?
12  A. Yes.
13  Q. Okay. And what do you -- what do you have?
14  A. I have just, like, what Gary called my
15  working files, just notes that I have taken as I
16  reviewed records and depositions and the textbooks.
17      MS. McCREADY: Okay. Let's go off record for
18  a second. We'll pull those out and then mark those as
19  an exhibit.
20      THE VIDEOGRAPHER: Off record, 10:46 a.m.
21      (Off record.)
22      (Exhibit 3 marked.)
23      THE VIDEOGRAPHER: On record, 10:52 a.m.
24      MS. McCREADY: All right. Thank you.
25  Q. I asked you before we went off record if

Page 96

1  you brought anything, and we just sort of took a few
2  minutes to look at what you had brought today. Is
3  that correct?
4  A. Yes.
5  Q. Okay. And I have marked as Exhibit 3 --
6  and I just want to go through it briefly; I don't
7  want to spend a lot of time on it -- certain
8  documents that you brought related to the case, such
9  as your report. Is that right?
10  A. Yes.
11  Q. And your CV. Is that correct?
12  A. Yes.
13  Q. And then the emergency room visit from
14  4/19/03 when Mr. Allen presented at ANMC?
15  A. Yes.
16  Q. And the discharge instructions for him that
17  day?
18  A. Yes.
19  Q. And then this is the notice of privacy
20  practices with handwriting on it. Is that correct?
21  A. Yes.
22  Q. And then the ANMC chronic pain program for
23  the patient -- patient initial assessment. Is that
24  right?
25  A. Yes. There's three pages of that.

27 (Pages 93 to 96)

Page 101

1  Q. Have you heard of that text?
2  A. No.
3  Q. Okay. How about Tintinalli, T-i-n --
4  T-i-n-t-i-n-a-l-l-i?
5  A. No.
6  Q. It's an emergency room -- have you ever
7  heard of that text?
8  A. No.
9  Q. All right. I want to go to the third
10 paragraph of your report, and where you state, at
11 the last sentence: "Although Mr. Allen died later
12 in the day, the early morning urgent care visit with
13 Donna Fearey ANP at Alaska Native Medical Center
14 4/19/03 seems to have been generally appropriate."
15     And I just want to ask you: What do you mean
16 by "seems to have been generally appropriate"?
17 A. I think that it was an appropriate visit,
18 that her -- I think that what I was getting at is
19 what I referred to later on is, in hindsight, there
20 may have been some things that, you know, would have
21 helped. Like in hindsight, a neuro exam may or may
22 not have helped. But generally I felt like her --
23 her history and exam was appropriate, with the
24 exceptions of the things that I mentioned in my
25 report, that maybe there could have been a little

Page 102

1  bit more history about his vomiting or --
2  Q. Well, let me ask you about that. Let's
3  just go ahead and mark that as an -- as an exhibit,
4  the emergency room record from 4/19. So I'm
5  marking -- shoot. I always tend to do that.
6      MS. McCREADY: Do you have any blanks, so --
7  so I'm not marking one that's highlighted?
8      You can use that, if you would like.
9      MR. GUARINO: All right.
10     (Exhibit 5 marked.)
11 BY MS. McCREADY:
12 Q. So I have marked as Exhibit 5 -- that's the
13 4/19/03 emergency room visit of Todd Allen. And I'm
14 sure you reviewed this a number of times. Is
15 that -- is that right?
16 A. That's right.
17 Q. Okay. And so some of the information that
18 you had indicated in your report that in hindsight
19 may have been helpful in this case would have been a
20 more careful history. Is that correct?
21 A. Could have been a little bit more in-depth.
22 Q. Okay. And a little bit more in-depth in
23 terms of whether or not this pain was different than
24 the pain he had before?
25 A. Yes.

Page 103

1  Q. Whether or not this was the worst pain this
2  patient had ever had?
3  A. Yes.
4  Q. And the description of the -- the onset,
5  whether or not it was sudden or whether or not it
6  came on over time?
7  A. Yes.
8  Q. Anything else from the history that could
9  have been included by Nurse Fearey?
10     So for instance, do you know how much pain
11 medication this patient had taken before he showed up
12 that morning?
13 A. No, I don't.
14 Q. Do you know how many times he vomited?
15 A. No, I don't.
16 Q. Okay. Would that be information, as an
17 emergency care provider, that you would want to know
18 about this patient, if he presented in your
19 emergency room?
20 A. Could be helpful.
21 Q. Yeah. And how could it be helpful?
22 A. To help you make your diagnosis.
23 Q. Okay. And determine whether or not this is
24 more of an urgent situation as opposed to a not very
25 urgent situation?

Page 104

1  A. Yes.
2  Q. All right. Did you notice that Nurse
3  Fearey documented that this patient had -- that
4  their speech was slow?
5  A. Yes.
6  Q. And what -- what did that indicate to you?
7  A. I didn't know what it meant.
8  Q. Okay.
9  A. I didn't know what she meant by it.
10 Q. All right.
11 A. I have -- I have to say that in her
12 deposition -- can I refer to that?
13 Q. Sure, absolutely.
14 A. She said that -- I think what she said was
15 it wasn't, like, pressured, and so that could mean
16 to me that she was thinking that his speech was
17 normal.
18 Q. Right. Have you ever documented that a
19 patient's speech was slow just to show that it was
20 normal?
21 A. I probably wouldn't use those words but --
22 Q. I mean, if you wanted to document that a
23 patient's speech was normal, would you generally
24 document that it was normal as opposed to slow?
25 A. Probably.

29 (Pages 101 to 104)