ALLEN v. USA                                                          MICHAEL LEVY, M.D.
                                                                           2/24/2006

Page 1

1                   UNITED STATES DISTRICT COURT
2                     FOR THE DISTRICT OF ALASKA

3  ───────────────────────────────────────────

4  KIMBERLY ALLEN, Personal           )
   Representative of the ESTATE       )
5  OF TODD ALLEN, Individually,       )
   on Behalf of the ESTATE OF         )
6  TODD ALLEN, and on Behalf of       )
   the Minor Child PRESLEY            )
7  GRACE ALLEN,                       )
                                      )
8              Plaintiffs,            )
                                      )
9         vs.                         )
                                      )
10 UNITED STATES OF AMERICA,          )
                                      )
11             Defendant.             )
                                      )
12 Case No. A04-0131 (JKS)
13 ───────────────────────────────────────────

14
           VIDEOTAPED DEPOSITION OF MICHAEL LEVY, MD
15 ───────────────────────────────────────────
16
                 Pages 1 - 195, inclusive
17
                 Friday, February 24, 2006
18                       2:12 P.M.
19
              Taken by Counsel for Plaintiffs
20                          at
                       ASHBURN & MASON
21            1130 West 6th Avenue, Suite 100
                    Anchorage, Alaska
22
23
24
25

               PACIFIC RIM REPORTING   907-272-4383        Copyright © 2006
                    www.courtreportersalaska.com

COPY

Exhibit A
Page 1 of 13 Pages

ALLEN v. USA                                                MICHAEL LEVY, M.D.
                                                                   2/24/2006

Page 8

1    more time -- I did all my emergency stuff, but I
2    also spent more time with the internal medicine side
3    of it as well as having my own clinic for -- I
4    forget now. I think it was about three years while
5    I was a resident there.
6        Q.   And when you say your own clinic, what
7    do -- what do you mean?
8        A.   I had a clinic -- when you're an internal
9    medicine resident, you have a clinic and patients
10   you're responsible for a couple times a week during
11   the two or three years of your residency, so you do
12   your regular stuff, your hospital stuff, and then
13   you would come in and see patients that have been
14   assigned to you who would be returning to you on an
15   ongoing basis, that you're treating blood pressure
16   and diabetes and various such things.
17       Q.   Are there subspecialties within emergency
18   medicine, or were -- when you refer to
19   subspecialties, was that within some -- some other
20   group, some other --
21       A.   Well, there actually are. There's --
22   there's gerontology, there's sports medicine,
23   there's critical care or other fellowship boardings
24   that you can get associated --
25       Q.   Okay.

Page 9

1        A.   -- with emergency medicine.
2        Q.   In -- in regards to your board
3    certification in emergency medicine, is it generally
4    in emergency medicine, or is it --
5        A.   Yeah. I'm board certified in both
6    emergency medicine and internal medicine.
7        Q.   All right. And I saw that you're -- you
8    were recertified in emergency medicine in 1998. Is
9    there -- is there a requirement that you be
10   recertified every ten years?
11       A.   With emergency medicine, there is.
12       Q.   With emergency medicine. And how about
13   with internal medicine?
14       A.   There isn't for my year, so I just have to
15   keep up with my CE's and the like. They do have a
16   pathway for that, which I have been doing their
17   CE's, but I haven't gone through the --
18       Q.   Okay.
19       A.   -- recertification because I don't have to.
20       Q.   And then are you -- is your pra- -- current
21   practice now emergency medicine?
22       A.   Yes.
23       Q.   Do you feel like you're practicing internal
24   medicine? I -- I assume that there's some overlap
25   between internal medicine and emergency medicine,

Page 10

1    but is -- is basically your practice comprised of --
2    of working in an emergency room?
3        A.   100 percent emergency medicine, but the
4    training I received in internal medicine is kind of
5    integral to that.
6        Q.   Okay. What's -- what is the difference
7    between the training that a family medicine
8    physician undergoes versus emergency medicine
9    physician? And can you be board certified in family
10   medicine?
11       A.   Yes --
12       Q.   Can you? Okay.
13       A.   -- you can. I guess I can't be real expert
14   in talking about family medicine, what their --
15   their focus, though it just generally has to do more
16   with being the medical home for people, ongoing care
17   from cradle to grave basically, so doing pediatrics
18   and then adolescent and adult care; and mostly
19   focusing on, you know, health promotion, disease
20   prevention, I think.
21            So taking care of chronic illness, doing the
22   usual immunizations, kind of the whole gamut of stuff,
23   but not looking to -- and more intense focus, like
24   emergency medicine would with regard to the acute
25   emergencies we see; and then less like internal

Page 11

1    medicine, in that internists are trained to a more
2    specific level for adult disease and more complex
3    adult disease, which a family practitioner would
4    probably refer many cases to an internist or an
5    internal medicine subspecialist.
6        Q.   Okay. Since -- since completing your
7    residency -- and that was four years?
8        A.   Yes.
9        Q.   And is that in part because you were doing
10   the internal -- I'm sorry -- a residency in internal
11   medicine and emergency medicine together?
12       A.   Yes.
13       Q.   All right. And then you were chief
14   resident, emergenc- -- emergency medicine at McGaw
15   Medical Center. Is -- where is that? Where is
16   McGaw?
17       A.   That's Northwestern University in Chicago
18   and the Gold Coast.
19       Q.   Okay. And that's -- and as chief resident,
20   what generally were your responsibilities?
21       A.   I was a fourth-year resident at the time,
22   and so, in addition, I had a leadership role with
23   regard to the residency, and interface with the
24   attending staff, teaching responsibilities, and
25   scheduling.

ALLEN v. USA                                                                 MICHAEL LEVY, M.D.
                                                                              2/24/2006

### Page 12

1  Q. Okay. If you could describe for me right,
2  currently, what is your -- what's your current
3  practice?
4     A. I'm an emergency physician. I'm the
5  chairman of the emergency medicine department at
6  Regional. So my -- I spend a hundred percent of my
7  time doing clinical work, seeing patients with all
8  manner of emergency.
9     Q. Okay. Are you involved in training medical
10 students through the WWAMI program or any sort --
11 other sort of program?
12    A. We occasionally have medical students, but
13 they're not through WWAMI. They come from places
14 like Scotland and the like, through just
15 associations that some of our partners have had with
16 them.
17    Q. Okay. So -- so have you been involved in
18 at least training some -- some medical students who
19 are --
20    A. I have trained medical students, yes.
21    Q. All right. How about working with people
22 in emergency medicine -- let me go back to the first
23 page of your CV. It says National Association of
24 EMS -- oh, that's emergency medicine physicians. Is
25 that correct?

### Page 13

1     A. EMS, emergency medical services physicians.
2     Q. Okay. Do you work with training
3  paramedics?
4     A. Yes.
5     Q. Okay. And -- and I guess EMTs, emergency
6  medicine technicians. Is that what that stands for?
7     A. They're all -- yeah. A paramedic is
8  technically an emergency medical technician, hyphen
9  P, so the highest level of EMT is paramedic.
10    Q. Okay. And you're involved in training --
11    A. Yes.
12    Q. -- in paramedics and -- and the like?
13    A. I was head of the -- I was the medical
14 director for the Paramedic Academy here in town for
15 four or five years, and since then I am not doing
16 that right now. And when it's become MTI with a
17 security and that thing over there, I -- I left them
18 then, but up till that point I was with -- Aurora
19 North is what the academy was before, and it became
20 NorthStar Academy.
21    Q. Okay.
22    A. And after NorthStar it became MTI. And at
23 that time I left, but --
24    Q. Okay. But are you familiar with the sort
25 of medical training the paramedics --

### Page 14

1     A. Oh, sure.
2     Q. -- have?
3     A. Well, in addition, I'm the medical director
4  for the Anchorage Fire Department. So I'm in charge
5  of areawide EMS, is really my most recent title.
6  And I'm the past chairman of the medical advisory
7  board on EMS for the mayor.
8     Q. Okay. And what year was -- what year were
9  you in that position?
10    A. I've been in it since 1995.
11    Q. Okay. So you're currently in -- so you're
12 currently in that position?
13    A. Yes.
14    Q. Okay. And you've been doing it for the
15 last 11 years?
16    A. Uh-huh.
17    Q. Okay. It looks like you worked at Alaska
18 Native Medical Center from July '89 to June '90. Is
19 that correct?
20    A. Correct.
21    Q. And then why did you end up leaving there?
22    A. I had a commitment to the National Health
23 Service Corps that began after my -- after I
24 finished my residency. It was a three-year
25 commitment.

### Page 15

1     Q. Okay.
2     A. And so it expired. And I was done with it.
3  At that point in time, I didn't really wish to
4  continue in the National Health Service Corps.
5     Q. Okay. And it's called the National Health
6  Service Corps?
7     A. Yes.
8     Q. And what's the -- I'm sorry. What was the
9  commitment? I'm not sure I understand that.
10    A. Well, I expend- -- I attended a very
11 expensive medical school.
12    Q. Okay. And so you committed to work --
13    A. Year for year for tuition.
14    Q. Okay. And -- and what's the -- and you
15 said it's a -- it's a three-year program?
16    A. For me, I signed on for three years. I --
17 because it's just the way the fourth year in my
18 medical school was structured, it wasn't as
19 expensive for me as the first three years. And, you
20 know, I frankly didn't want to have any more time
21 with the National Health Service necessarily than I
22 had to. I didn't want to commit to that. I wanted
23 to volunteer. I thought it was different. But
24 anyway, so I was able to do that for three years,
25 and that was my commitment time. So I had spent two

6 (Pages 12 to 15)

PACIFIC RIM REPORTING  907-272-4383
www.courtreportersalaska.com

Copyright © 2006

Exhibit A
Page 3 of 13 Pages

ALLEN v. USA                                                                    MICHAEL LEVY, M.D.
                                                                                      2/24/2006

Page 20

1  with a colleague who is a -- he's a physician, JD.
2  Q. A physician, JD, somebody not in Alaska?
3  A. Not in Alaska.
4  Q. Okay. And what --
5  A. Without mentioning names or places --
6  Q. Sure.
7  A. -- or people or times.
8  Q. And what was your -- what was the -- the
9  purpose of that conversation?
10 A. The purpose was really more or less to fill
11 time. This is a friend who thrives on talking about
12 such things, quite honestly, and he's got his
13 perspectives on things. And so I think it was more
14 just that kind of conversation.
15 Q. This friend of yours, does he practice --
16 I'm just curious if he's practicing law or
17 practicing medicine.
18 A. Medicine.
19 Q. Okay. Is he one of the -- is he somebody
20 who went to -- who was a lawyer and then became a
21 doctor, or was he a doctor and then became a lawyer?
22 A. Doctor, became a lawyer.
23 Q. Okay. I don't ever see it the other way
24 around. All right. Do you actually -- do you work
25 for a group that works at Alaska Regional, or are

Page 21

1  you an actual employee of Alaska Regional?
2  A. We have a corporation, and we're a
3  contractor to Alaska Regional.
4  Q. Okay. And is there -- how many people are
5  in your group?
6  A. There are seven of us.
7  Q. And then are -- is there any particular
8  hierarchy within the group?
9  A. There's -- it's a partnership with a
10 partnership track, and we currently have just
11 matriculated our -- the most recent person as a
12 partner. And we actually have one hired person
13 right now, so that would be the only hierarchy per
14 se. Then we have one person we call our president.
15 Q. Okay. And are -- do you have a position in
16 this --
17 A. I'm a vice president.
18 Q. Vice president, okay. Now, on the second
19 page of your CV, under "Other Professional
20 Positions," it says, "Medical director, AeroMed
21 International." And what is that?
22 A. AeroMed International is a med-evac service
23 owned by YK Delta Corp.
24 Q. Okay. And what's your -- you're the -- are
25 you currently the medical director?

Page 22

1  A. I'm not.
2  Q. Okay.
3  A. I have worked with them since 2001, and I'm
4  not currently the medical director.
5  Q. All right. But is it a group that you work
6  with?
7  A. It's a group I had worked with until about
8  five months ago, on projects prior.
9  Q. And is that what you were referring to
10 before, that you had -- no longer have an
11 association with this group --
12 A. No.
13 Q. -- or was that something else?
14 A. There's also -- MTI is the one I said.
15 Q. MTI. I'm sorry.
16 A. Yeah.
17 Q. What is MTI?
18 A. Medical Training Institute. It's the one
19 you see in the paper these days associated with all
20 the hubbub.
21 Q. With the Security Aviation?
22 A. (Witness nods head.)
23 Q. Got you. Okay. What was your -- I just
24 wanted to get an understanding of what exactly you
25 did. You were a medical director for AeroMed

Page 23

1  International --
2  A. Uh-huh.
3  Q. -- and then what did that -- what -- the
4  medical director, what did that entail?
5  A. Right. Well, I established protocols and
6  standing orders for the service, and reviewed
7  100 percent of the med-evacs, provided on-line medic
8  control, and shared some of those duties with some
9  of my partners at Denali Emergency Medicine
10 Associates, which is my group. And I flew in the
11 aircraft a few times. And then we would have
12 monthly staff meetings, where I provide training and
13 feedback.
14 Q. And the "staff" meaning to the -- were they
15 physicians, or was this -- would be -- this be the
16 paramedics, or who were the staff?
17 A. The crews were paramedics and flight RNs.
18 Q. Okay.
19 A. So that would be the component of those.
20 Q. And what -- what sort of aircraft are we
21 talking about that were used for med-evacs?
22 A. The typical aircraft used when I was with
23 them were Lear 35, Lear 36 -- there's a Lear 25
24 which was used sometimes. They were Citation jets.
25 In the village, they had one Caravan with Grant

8 (Pages 20 to 23)

ALLEN v. USA

MICHAEL LEVY, M.D.
2/24/2006

Page 24
1  Aviation, and then there was occasional use of, I
2  think, a Conquest.
3     Q. Ever use helicopters?
4     A. No. Well, they could be involved in the
5  village; in a helicopter rescue, insofar as the Army
6  National Guard in Bethel has a Black Hawk that's
7  stationed out there. And so that was used for some
8  village rescues.
9     Q. Okay. And generally what would AeroMed
10 International -- in this med-evac group, where
11 would -- I mean, generally where was it operating?
12 Bringing patients into Anchorage or taking patients
13 outside of Anchorage?
14    A. Typically it's bringing patients into
15 Anchorage, although it also flew, not uncommonly, to
16 Seattle, in particular.
17    Q. Okay.
18    A. It's based here. There were two bases of
19 operation. There was a base in Anchorage at
20 Signature East, and then there was a base at Grant
21 Aviation out at Bethel.
22    Q. Got it. And was it -- is it un- -- was it
23 uncommon or is it uncommon to med-evac patients out
24 of Anchorage to Seattle?
25    A. No, it's not uncommon.

Page 25
1     Q. And would generally patients go to the
2  University of Washington?
3     A. Most often, I think, although there were
4  other destinations.
5     Q. Okay. Would Harborview -- Is Harborview
6  part of the University of Washington?
7     A. Yes.
8     Q. Okay. And are you familiar with
9  Harborview? Have you been down there?
10    A. I -- you know, I have been down there. I
11 have spent no time there.
12    Q. All right.
13    A. So I'm not familiar with it, I guess is the
14 easiest way to say it.
15    Q. Have you ever accompanied a patient from
16 Anchorage on a med-evac to Harborview?
17    A. No.
18    Q. Have you ever accompanied a patient from --
19 who was being med-evac'd from Anchorage down to
20 Seattle, at all?
21    A. No.
22    Q. All right. So you must be familiar with
23 then how the med-evac planes -- it sounds like
24 they're really airplanes -- are -- are equipped.
25    A. Yes.

Page 26
1     Q. Would that be fair to say? Okay. And are
2  they equipped to transport critically ill patients?
3     A. Yes.
4     Q. And are they equipped to allow the
5  administration of medication intravenously to
6  patients?
7     A. Yes.
8     Q. And could you administer anti-convulsants
9  to patients who are being med-evac'd?
10    A. Yes.
11    Q. How about monitoring and controlling blood
12 pressure of a patient in a med-evac?
13    A. Yes.
14    Q. So they're equipped to do that. Is that --
15    A. Yes.
16    Q. Are they equipped to monitor and control
17 fluids in a patient?
18    A. Yes.
19    Q. All right. In your experience with
20 med-evacking patients from Anchorage down to
21 Seattle, whatever that destination within Seattle
22 would be, are the patients generally accompanied by
23 a medical professional, whether or not it's a
24 paramedic or a physician or a nurse?
25    A. What type of patient are you talking about?

Page 27
1     Q. You tell me. Does it depend on the
2  patient, depend -- Is that the issue? Does it
3  depend on how the patient is and what's going on
4  with the patient? Does that determine who goes down
5  with them?
6     A. Yes, because you could have a stable
7  transport of a patient who is going for rehab that
8  could be wheelchair-bound and could have just an
9  escort in a commercial aircraft. You can have
10 somebody who couldn't go commercial aircraft but
11 still was not a sick patient per se, but just
12 because of logistics, having to be in a stretcher,
13 the like -- and they might go just with some sort of
14 medical escort.
15        But for the missions that we flew, by and
16 large, they would be people who were acutely ill and
17 needed a higher level of care, et cetera, and they
18 would be typically flown with a crew complement of a
19 para- -- a flight paramedic and a flight RN.
20    Q. Okay. A flight paramedic and a flight RN.
21 And how -- in your experience, how common is it that
22 patients are med-evac'd; that is, in this last
23 scenario that you were describing with a flight
24 paramedic or flight RN, a critically ill patient,
25 how often does that come about where a patient's

9 (Pages 24 to 27)

Copyright © 2006

Exhibit A
Page 5 of 13 Pages

Page 28

1  med-evac'd from Anchorage down to Seattle?
2  MR. GUARINO: I guess it --
3  MS. McCREADY: Let's talk about --
4  MR. GUARINO: -- what time per- -- what time
5  are we talking now?
6  BY MS. McCREADY:
7  Q. Sure. Let's talk about in just the last
8  five years.
9  A. Well, you know, honestly, it would be
10  easier to actually get the data as opposed to guess.
11  Q. Well, I don't know if you have a sense of
12  it, and I certainly don't expect you to remember
13  exact numbers but --
14  A. Sure. Let's say in a given month, it
15  completely -- roughly. And it could change
16  depending on diversion status. Hospitals, there's a
17  lot of variables, but I certainly don't think it was
18  unusual to fly ten missions, out of a total of 1200
19  a year to Seattle, let's say, a month.
20  Q. Okay. And I understand it could fluctuate
21  down or up from that. And I want to get your
22  experience dealing with -- I mean, obviously we're
23  talking about a case that involves a -- a patient
24  with a subarachnoid who ultimately was diagnosed
25  with a subarachnoid hemorrhage and a suspected

Page 29

1  ruptured aneurysm. And I just wanted to ask about
2  your experience dealing with patients with a
3  subarachnoid hemorrhage.
4       Let's first confine it to when you were in
5  medical school and -- and your residency. Did you
6  have any experience dealing with patients with
7  subarachnoid hemorrhages at least --
8  A. Yes.
9  Q. -- at that point? Okay. If you could
10  describe that to me, what you remember.
11  A. A long time ago.
12  Q. Well, if you don't remember, that's fine.
13  A. We had -- at Northwestern, we had a neuro
14  intensive care unit, we had a brand-new sparkling,
15  beautiful sort of facility down there. And we had a
16  lot of neuro intensive care patients. And so I'm
17  sure I saw and took care of subarachnoid hemorrhage
18  during that time, but I can't put a face or a time
19  on any of the ones I took care of at that time.
20  Q. Okay. You can't remember any of the
21  specifics? Nothing stands out, at least at this
22  point?
23  A. Right.
24  Q. Is that fair? Okay. And how about since
25  then? If you could -- and maybe we should work from

Page 30

1  the current time backwards.
2  A. Okay.
3  Q. So in the last five years, have you dealt
4  with any patients that, at least -- at least to your
5  knowledge, ended up with a diagnosis of a
6  subarachnoid hemorrhage?
7  A. And I thought maybe that would be asked,
8  and I was trying to reflect back on how many I might
9  have seen. I believe I have seen three this year so
10  far.
11  Q. Three this year, just in 2006?
12  A. Yes.
13  Q. Okay.
14  A. One of them -- and again, this could be --
15  it's at least that, because I can specifically
16  remember these, and I think I got the right year, in
17  terms of not -- not -- I'm sorry. Not 2006. That's
18  wrong. 2005 is what I'm referring to.
19  Q. Okay.
20  A. I think 2006 would be zero so far.
21  Q. All right.
22  A. So it's 2005. I think I saw three,
23  which -- one, which was completely obtunded, but
24  turned out to have a subarachnoid hemorrhage; and
25  two others that had a subarachnoid hemorrhage from

Page 31

1  an aneurysmal bleed.
2  Q. I'm sorry. Say --
3  A. From aneurysmal bleeding.
4  Q. Okay. And with the one patient presented
5  obtunded that -- were -- were they comatose or --
6  A. Yes.
7  Q. All right. And then the other two, how did
8  they present? And were these patients that you --
9  you actually had contact with, or were they just
10  patients that you knew about?
11  A. These were my patients.
12  Q. Okay.
13  A. Yes.
14  Q. All right.
15  A. They were both very uncomfortable.
16  Something was clearly wrong with them.
17  Q. Okay. And when you say they were -- I
18  mean, what sorts of -- I mean, how did you know they
19  ended up with a subarachnoid hemorrhage?
20  A. Because I scanned them --
21  Q. Okay.
22  A. -- and I followed the results and took care
23  of them.
24  Q. Sure. And -- and I just want to ask you,
25  since it sounds like you have a memory of those

Page 36

1 Q. Okay. And is that something that's written
2 about in the literature, that is, subarachnoid
3 hemorrhages being sort of misdiagnosed?
4 A. We've all -- it's -- it's a point of great
5 concern for all emergency physicians that we might
6 miss that.
7 Q. Okay. And why is that a point of great
8 concern?
9 A. Because it's an easy diagnosis to miss.
10 Q. Okay. And why do you say that?
11 A. Headaches are very common.
12 Q. Okay. So headaches are very common and --
13 well, subarachnoid hemorrhage, is -- is that
14 something that could be potentially fatal?
15 A. Sure. Yes, it is.
16 Q. And be fair to say that a small number of
17 people who present with headaches actually have a
18 subar- -- subarachnoid hemorrhage. Is that right?
19 A. Yes.
20 Q. Okay. But is it -- is there a
21 statistically significant number of patients who
22 present with headache that actually do have a
23 subarachnoid hemorrhage?
24 A. Yes.
25    MR. GUARINO: I guess I'm not sure what you

Page 37

1 mean by "statistically significant." That -- that has
2 no -- has no legal meaning. It's not defined. I
3 mean --
4    MS. McCREADY: Well, did you under- --
5    MR. GUARINO: -- does that mean one percent
6 is enough? Is -- is a half of one percent enough?
7 Is --
8    MS. McCREADY: Well, that's not my question.
9 Q. Did you understand my question?
10 A. I guess I didn't. I thought -- well, you
11 asked me whether some people have that, and I don't
12 think that's what you were asking me about.
13 Q. Okay. Well, is it -- is it -- are there
14 enough people who present with headaches who have a
15 subarachnoid hemorrhage -- is that -- is that number
16 great enough that it's of concern to emergency room
17 physicians?
18 A. Any potential disease process that we would
19 have the opportunity to diagnose and the opportunity
20 to miss is a concern to us.
21 Q. Okay. But specifically with subarachnoid
22 hemorrhages, I mean, is that something that's been a
23 concern within the emergency medical profession
24 for -- is it fair to say a few decades: They might
25 miss that diagnosis?

Page 38

1 A. Yes.
2 Q. All right. And is that -- is that
3 something that you have seen written about in the
4 literature?
5 A. Yes.
6 Q. Is that something that you actually
7 train -- when you're actually training your
8 emergency room physicians or -- or personnel, is
9 that -- is that something that you have actually
10 discussed with them, that is, the diagnosis of
11 subarachnoid hemorrhage?
12 A. Yes.
13 Q. Okay. And what do you generally -- in --
14 in your training of other physicians or care
15 providers who are working in the emergency room,
16 what -- what, in fact, do you train them -- or how
17 do you train them in terms of making the diagnosis
18 or suspect the diagnosis of a subarachnoid
19 hemorrhage?
20 A. Well, the first thing is to always be
21 vigilant, that it could be something different. It
22 could be a subarachnoid hemorrhage, if they have a
23 headache.
24 Q. Okay.
25 A. So we want to look for a change in the

Page 39

1 quality or nature of pain, pain that's more severe
2 than what may have been experienced by the person in
3 the past, the classic worst headache of one's life.
4 Q. And to do that, would you need to take a
5 care- -- careful history of the patient?
6 A. Yes.
7 Q. And do you consider that to be the standard
8 of care, that is, that you would take a careful
9 history of a patient who presented with a headache?
10 A. The -- well, with any patient, we want to
11 have sufficient information from them so we can make
12 a diagnosis.
13 Q. Okay. So for any patient, would you agree
14 that the standard of care is to take a care- --
15 careful history so that you can make a diagnosis of
16 the patient?
17 A. Yes. We always wants to be careful. I
18 mean, that's -- and I guess it just depends. One --
19 start splitting hairs in terms of how much one has
20 to dress something up to call it a careful history,
21 perhaps --
22 Q. Sure.
23 A. -- because in any given situation, a
24 careful history could be a couple words.
25 Q. Okay. But -- but a -- fair enough. But at

12 (Pages 36 to 39)

Page 40

1  least with a patient presenting with a headache, you
2  would want to understand the -- the quality of the
3  pain?
4      A. Yes.
5      Q. And the -- the quality and nature of the
6  pain, I think you said. Is that correct?
7      A. Yes.
8      Q. And whether or not the pain was more severe
9  than pain they've had before?
10     A. Yes.
11     Q. All right. And whether or not, as you
12 said, it could be the worst headache of their life.
13 Is that right?
14     A. Yes.
15     Q. And how about the -- would the location of
16 the pain make any difference?
17     A. The location of the pain I don't believe
18 makes a difference per se.
19     Q. Okay.
20     A. Although if it has changed from their
21 typical pain, I'll say, then that would be something
22 a person might want to note.
23     Q. Okay. And how about the onset of pain?
24 Would that be important?
25     A. Yes.

Page 41

1      Q. All right. And why would that be
2  important?
3      A. The -- a more abrupt onset of pain may mean
4  something a little different than pain that starts
5  more gradually.
6      Q. Okay.
7      A. There are exertional headaches, for
8  example, thunderclap headaches associated with
9  sexual activity, those kind of things.
10     Q. Would you want to know what the patient was
11 doing when the pain began, in addition to the --
12 whether or not it was abrupt?
13     A. If the patient stated that they had an
14 abrupt onset of headache, then you might ask what
15 they were doing when it started.
16     Q. Okay. But would that be something if -- if
17 a patient -- in your practice, if the patient
18 presents with a headache, do you ask them what the
19 onset was and whether or not it was abrupt?
20     A. Yes.
21     Q. Okay.
22     A. What I might say more typically was: Is
23 this one of your typical headaches? Was there
24 anything unusual about the headache?
25     Q. Sure.

Page 42

1      A. So I might not say, was it abrupt, was it
2  sudden in onset. It'd be sufficient for me if they
3  said, "This is what I've had before."
4      Q. Okay. And -- and let me ask you if you --
5  you've dealt with patients who have chronic pain, I
6  assume --
7      A. Oh, yes.
8      Q. -- working in the emergency room?
9      A. Yes.
10     Q. Okay. And would the -- is the standard of
11 care different for a patient who has got chronic
12 pain, in terms of taking a history, whether or not
13 that's important?
14     A. The -- is the standard of care different?
15 The approach to the patient is similar, but it's
16 usually more focused, because typically the patient
17 has had many prior experiences with the emergency
18 department, with the health care system. And so
19 quite honestly one can pretty much move forward and
20 ask if anything has changed or if we're just dealing
21 with the same thing. If they have other concerns,
22 what -- what their main concern for being in the
23 emergency department is on that day.
24     Q. Sure. If you've got a patient that
25 presents at the emergency room with chronic pain, is

Page 43

1  one of the first things that you want to know
2  whether or not they're there to get pain medication?
3      A. Well, that's always in there somewhere,
4  isn't it? But the issue really is: What is it
5  today that makes you want to come to the emergency
6  department? If the issue is pain medication, sure,
7  be upfront and say it. If it's something else, let
8  me know, so I can figure out what it is.
9      Q. Okay. But you would want to know, with a
10 chronic pain patient, whether or not -- if they're
11 presenting with pain, whether or not that pain is
12 different than what they've before?
13     A. Yes.
14     Q. All right. Well, let me ask this: If
15 someone said, you know what, it's really not that
16 important to take a history of the patient who
17 presents in the emergency department with chronic
18 pain, would you agree with that?
19     A. No.
20     Q. Would you agree that one of the primary
21 functions of the emergency department in a hospital
22 is to determine if a patient has a condition that's
23 serious, treatable and urgent?
24     A. Yes.
25     Q. Okay. And would you agree that one of the

13 (Pages 40 to 43)

Page 64

1  here in Anchorage?
2     A. Yes.
3     Q. Okay. If a patient presents to an
4  emergency room in a major medical facility
5  complaining of pain of ten out of ten and -- and the
6  information is given that he's taken pain -- pain
7  medication --
8     A. Yes.
9     Q. -- and he still has pain, would that be
10 significant to you as a provider?
11    A. I guess it depends what you mean by
12 "significant."
13    Q. Well, would it be clinically significant in
14 terms of how you might actually either question that
15 patient or -- or deal with that patient?
16    A. I'm sure it would be significant, but it
17 would not -- the prevalence of that complaint in
18 this community and the magnitude of the complaint
19 would put them in -- it was -- it was a very common,
20 common thing.
21    Q. And when you say "this community," what do
22 you mean?
23    A. It seems, just from my own observation,
24 that Anchorage has a high prevalence of chronic
25 pain, more so -- and in talking to physicians that

Page 65

1  we have as locums up here, they're all kind of
2  shocked by how much chronic pain we -- and how many
3  people are on chronic narcotics up here.
4     Q. Okay. And given that a patient such as
5  Mr. Allen, who is a chronic pain patient, who would
6  be presenting at the emergency room -- and actually
7  let me back up for a second.
8        So that wouldn't -- let me just be clear. So
9  if -- if the -- if you know -- If, as Nurse Ambrose
10 testified, that she got information that he was
11 reporting ten out of ten pain and that he had been
12 taking his drugs -- taking all his drugs but still had
13 pain, that wouldn't -- you don't think that that would
14 necessarily go into the triage decision?
15    A. That he had taken all of his drugs?
16    Q. Yeah, and that he still had pain.
17    A. Oh, absolutely not.
18    Q. That wouldn't go into the triage decision?
19    A. No.
20    Q. All right. And so what would go -- well,
21 first of all, did you get the triage policies from
22 ANMC?
23    A. I did.
24    Q. Did you get them prior to writing your
25 report, or do you know if you got them afterwards?

Page 66

1     A. Again, that's sort of that same thing. I
2  was -- I'm -- I'm sure -- pretty sure I did, because
3  I think I had basically the entire packet before I
4  wrote my report.
5     Q. Okay. Well, did you get records after you
6  wrote your report?
7     A. I don't remember when your expert's
8  bibliography came through. There might have --
9  beyond that, I don't think there was any other
10 records after my report.
11    Q. Okay. Is this triage policy at ANMC, is
12 that -- is that something that's sort of familiar to
13 you? I mean, is that similar to the triage policy
14 that's at Alaska Regional emergency department?
15    A. Now we're transitioning to a new model,
16 which is similar to this, which I'm not a
17 hundred percent involved in right now. It hasn't
18 been implemented.
19    Q. Okay. How -- what do you mean? How
20 different -- I'm sorry. Is the --
21    A. It's -- it's very similar to this, but I
22 can't go through it point by point and tell you
23 whether or not they're the same or not.
24    Q. Sure.
25    A. The five-level thing seems to be the

Page 67

1  current approach nationwide, something like it or a
2  variation on it.
3     Q. And what -- has -- has the approach been at
4  Alaska Regional a three-level or a five-level or --
5     A. Regional is small enough that, honestly, we
6  don't get too hung up on these levels. We are able
7  to move people through in a timely fashion, so
8  they're either brought back -- we try to do no
9  triage out at the window. We try to bring everybody
10 back to a room as soon as possible and higher-acuity
11 people are taken back immediately.
12    Q. Sure. And let me ask you about that. At
13 Alaska Regional -- and I understood that you work
14 with a -- a group of other emergency room
15 physicians. Is that right?
16    A. Yes.
17    Q. And then is there -- are there other also
18 mid-level practitioners that work in the emergency
19 department at Alaska Regional?
20    A. No.
21    Q. Okay. Is it staffed only by emergency room
22 physicians?
23    A. Yes.
24    Q. And so you don't work with physician's
25 assistants. Is that correct?

Page 72

1  Q. Okay. And what's that based on?
2  A. The fact that the triage nurse didn't think
3  he looked like he was in severe pain.
4  Q. Okay. And do you know what the triage
5  nurse -- you read her deposition. Do you know what
6  she based that on?
7  A. I read it. And I haven't read it in a
8  while, but she just based it on her past experience,
9  was my recollection.
10 Q. Her past experience with Mr. Allen. Is
11 that right?
12 A. No, I don't know whether it was him per se.
13 Q. Oh, okay.
14 A. We should review that, if that's the point.
15 But I don't.
16 Q. Sure.
17 A. It was just she's been doing that a long
18 time and she's seen a lot of patients, was my
19 understanding on it.
20 Q. And I'm just curious. With your experience
21 with triage nurses -- because I assume that you work
22 with them. Is that correct?
23 A. Yes.
24 Q. And do you ever -- do you actually
25 supervise the triage nurses at Alaska Regional?

Page 73

1  A. I'm not in their direct chain of command
2  there. They have their own hospital command.
3  Q. Got it. But you certainly work with them
4  and --
5  A. And I would feedback to them if I had
6  concerns about triage.
7  Q. Okay. And do you -- I'm just curious: In
8  your experience, would it concern you if a triage
9  nurse -- if a patient came in and reported a certain
10 level of pain, and the triage nurse just decided on
11 her own that that patient didn't have that level of
12 pain?
13 A. No, it wouldn't concern me at all.
14 Q. Okay.
15 A. In a given setting, it did. So I can't
16 make a broad sweep there.
17 Q. Sure.
18 A. If a gentleman was sitting out there, a
19 lady was sitting out there with a fracture,
20 dislocation of the ankle, that was untreated and the
21 person was in extreme pain, then I would be very
22 concerned about that, and we would have to reassess
23 how that was arrived at.
24     But when we get into the extremely subjective
25 notion of the pain scale, which has, for whatever

Page 74

1  reason, been given an objectivity assigned to it, only
2  because it's a number, a self-assigned number, then I
3  have much less problem with that, of allowing somebody
4  to make a subjective decision to allow the emergency
5  department to run more smoothly.
6  Q. Do -- have you come to an opinion in this
7  case as to whether or not Mr. Allen was in severe
8  pain the morning of April 19, 2003, when he
9  presented at the ANMC emergency room?
10 A. I have no doubt he was in pain.
11 Q. Okay. Do -- do you have an opinion about
12 whether or not he was in severe pain?
13 A. That's very subjective. He was in pain. I
14 mean -- and he suffered with pain a long time, and
15 he seemed like a stoic individual. He had ten out
16 of ten pain many times in his life which he didn't
17 come to the emergency department, as far as I could
18 tell from his past records.
19 Q. Right.
20 A. So did he have severe pain? He had pain of
21 a level he had experienced before. And so was that
22 the most severe pain or not? I'm not sure where
23 you're going with that, but I think he had pain that
24 was significant to him, though I'm not sure that was
25 the main reason he came to the emergency department.

Page 75

1  Q. What do you think the main reason was that
2  he came to the emergency department?
3  A. I think he came there because his ear hurt,
4  and he wanted to know why he had ear pain and
5  whether he had an infection.
6  Q. Knowing what we know about Mr. Allen and
7  what happened to him later that day, that is, that
8  he was rushed to Providence in essentially a
9  comatose state, do -- do you -- does that make
10 sense? I mean, do you agree with that, that he was
11 rushed to Providence Hospital later that day
12 essentially in a comatose state?
13 A. It's a fact.
14 Q. Okay. And then a fact that he suffered a
15 subarachnoid bleed. Do you agree with that?
16 A. Yes.
17 Q. Okay. Knowing what we know about him, do
18 you have an opinion about whether or not -- let me
19 break this down into two piece- -- two places.
20     Within a reasonable degree of medical
21 certainty, do you have an opinion about whether or not
22 Mr. Allen had a subara- -- subarachnoid bleed the
23 morning of April 19th, 2003, when he presented at
24 ANMC?
25 A. No, I don't think you can believe -- you --

ALLEN v. USA                                                                MICHAEL LEVY, M.D.
                                                                                     2/24/2006

Page 184
1  what treatment he would get once he got down there or
2  how specialized it was. I'm talking about the
3  physical action of -- of med-evac- -- he's -- he's
4  probably the best expert in the state on med-evacking
5  of patients.
6       So that's my question, is whether a
7  patient -- assuming Mr. Allen was in the state where
8  he was actively bleeding and was in the neurological
9  state that he appeared to be that afternoon, would he
10 be med-evac'd out to another state for medical
11 treatment at that point?
12      THE WITNESS: And again, that would be my
13 opinion from that standpoint, that if he were an
14 extremist, as he seemed to be here, we would not
15 transport him to another state.
16 BY MR. GUARINO:
17   Q. And the time line as you presented it, in
18 terms of his initial presentation in the morning and
19 the -- the sort of estimates of time it would take
20 to work him up for the day, would he have arrived --
21 had -- had a decision been made to med-evac him,
22 would he have arrived in Washington, the state of
23 Washington, whether it was Seattle or Harborview,
24 whatever facility he might have gone to, would he
25 have arrived in time -- before he began to bleed

Page 185
1  from that subarachnoid hemorrhage?
2    A. The estimation I can make from this: He
3  would not have.
4       MR. GUARINO: Okay. It's too late to go
5  through any other parts of your report, but I just
6  want to make a note for the record that I'm not going
7  to go through his report today. You've had the
8  opportunity to look at it and question him about it.
9       But I will state again: To the extent there
10 are opinions expressed in there to which Dr. Levy is
11 qualified by training or experience to render opinions
12 on in terms of medical care or in terms of practical
13 experience, in terms of time line or med-evac
14 procedures, you can expect that we'll -- we can offer
15 him -- we will offer him or we -- we may offer him to
16 testify on those. Nothing further.
17         FURTHER EXAMINATION
18 BY MS. McCREADY:
19   Q. Okay. Let me just follow up very briefly.
20 On the pain assessment, on the patient initial
21 assessment, which is Exhibit 8, what -- that page
22 that Mr. Guarino was asking you about.
23   A. Yes.
24   Q. And it says, pain as it is now, pain at its
25 worst, pain at its best.

Page 186
1       First of all, did -- did you ever receive
2  Mr. Allen's work records? Do you have an
3  understanding about whether or not he was employed?
4    A. I knew that he -- or I think I knew that he
5  worked in a capacity for oil spill cleanup in
6  Valdez, and he was off his meds for a period of
7  time, on his meds for a period of time.
8    Q. Okay. And do you have any idea, before you
9  filled this document out, whether or not he had been
10 working in Valdez and not taking his pain
11 medications?
12   A. I assume he was.
13   Q. You assumed he was --
14   A. Right.
15   Q. -- working? Is that what you -- is that
16 what you meant? Okay.
17   A. I thought he was.
18   Q. And then with this -- where it says,
19 "Frequency of pain flares during the last month,"
20 and it says "estimated 16," had you seen any visits
21 that Mr. Allen had made in the past month to the ER
22 complaining of pain?
23   A. In the month of January?
24   Q. Uh-huh.
25   A. I don't believe -- well, he was there on

Page 187
1  the 23rd, wasn't he, with -- and he's complaining of
2  pain at that time. It wasn't the ER. It was the
3  clinic.
4    Q. It was the clinic that he went to?
5    A. Yes.
6    Q. Was he at the emergency room complaining of
7  pain --
8    A. No.
9    Q. -- in that past month?
10   A. No.
11   Q. Okay. When it says, "Pain at its worst," a
12 ten out of ten, do we know whether or not his pain
13 on April 19, 2003 was the worst pain he had ever
14 had?
15   A. No.
16   Q. Well, do you know whether or not it was
17 worse than when he -- it was worse than the pain he
18 described when he filled this document out?
19   A. I don't know. I -- I routinely have people
20 tell me they have 12 out of 10 pain and 13 out of 10
21 pain. So I don't know if he would exaggerate that
22 way -- you know, if your -- if he needed more volume
23 on the thing, but as far as I can tell, from the
24 information I have, I have no way to say.
25   Q. Okay. You -- you can't say whether or not,

49 (Pages 184 to 187)

ALLEN v. USA

MICHAEL LEVY, M.D.
2/24/2006

Page 188

1  when he -- when he presented at April 19, 2003, that
2  was the worst pain he had ever had, and in fact,
3  worse than what he described in his pain initial
4  assessment form?
5     A. No.
6     Q. All right. When Mr. Guarino was asking you
7  about would Mr. Allen have been a candidate to be
8  med-evac'd down to Seattle if, in fact, he had had
9  the -- as -- as he presented that afternoon at
10 Providence, that is, with significant blood in his
11 brain, and you said no, he wouldn't have been
12 transported, would that be your call or would that
13 be the call of a neurosurgeon?
14    A. Well, ultimately I would engage someone to
15 share that with me.
16    Q. Okay. And who --
17    A. Now, I don't know it would be a
18 neurosurgeon -- in this situation, quite honestly,
19 it would probably be Dr. Kohler, if he was in town
20 back then. I think he was.
21    Q. And is Dr. Kohler the neurosurgeon at ANMC?
22    A. Right, who did not perform this kind of
23 surgery. But I believe -- and I -- I have to -- I
24 would have to confirm this, but I believe he was in
25 town.

Page 189

1     As a consequence, ANMC would want to have the
2  final say, particularly if someone wanted to transfer
3  their patient, Mr. Allen, to Seattle. And in the
4  past, they have been very conservative.
5     I can tell you, for example, with burns, if
6  we have burns that are over a certain percentage body
7  area, that even if the person's alive and talking to
8  you but has very low probability of survival, it's
9  preferred that they stay here in Anchorage and die
10 here.
11    Q. Does that end up then being your call or --
12 again, your call in terms of your decision about
13 whether or not the patient is transported, or does
14 it end up being -- does -- would ANMC, in that
15 situation, then rely on the emergency room physician
16 to make that decision about whether or not it makes
17 sense to transport that person to Seattle?
18    A. In this specific case, I mean I would play
19 out the scenario, too, that I would eval- -- if the
20 person were in my care, then I would evaluate him.
21 If I had the same findings, for example, over at
22 Providence, then I would probably contact the
23 neurosurgeon at ANMC, if there were such a person,
24 and talk with them, get their opinion.
25    Q. And was Dr. Kohler the neurosurgeon -- was

Page 190

1  he at ANMC at the time that Todd Allen presented to
2  ANMC?
3     A. That's that I'm saying. I don't really
4  know.
5     Q. Okay.
6     A. I would have -- you know, go back and look
7  at records and things, see when he came to town.
8     Q. Okay. If Mr. Allen had been stable, that
9  is, neuro- -- neurologically intact and stable,
10 would there be any question that he would be
11 transported to Seattle?
12    A. The only question would be whether or not
13 the local neurosurgeons would get involved in his
14 care.
15    Q. Okay. And can you say whether or not the
16 local neurosurgeons would get involved in his care?
17    A. There was a period of time when they
18 wouldn't. And I don't know if this particular time,
19 when he presented, was that time. There was a
20 period of time when they were doing basically no
21 aneurysm surgery up here.
22    Q. Okay. And do you have any -- do you know
23 when they started doing that?
24    A. No. I was -- actually tried to find that
25 out, and I wasn't very successful yet.

Page 191

1     Q. How --
2     A. And I still --
3     Q. How did you try to find that out?
4     A. I tried to see if I could get the
5  neurosurgeons to look at their billing records for
6  me to see if they were billing any aneurysm
7  surgeries.
8     Q. And let me guess that you couldn't get them
9  to do that.
10    A. (No response.)
11    Q. Okay. Were you -- did you talk to any of
12 the neurosurgeons in town about this case?
13    A. Not this case per se. I talked to them in
14 generalities without any reference to anything, just
15 about, you know, would you operate on such a person
16 as this or that?
17    Q. And what did you learn?
18    A. That unless -- that no one does emergency
19 surgery in this town for aneurysms.
20    Q. That no one does emergency surgery in this
21 town for aneurysms. That's what you learned?
22    A. For subarachnoid -- for -- for cerebral
23 aneurysms.
24    Q. Sure. And was that the case in 2003?
25    A. And in terms of -- by "emergency surgery,"

50 (Pages 188 to 191)

Copyright © 2006

Exhibit A
Page 12 of 13 Pages

ALLEN v. USA                                                    MICHAEL LEVY, M.D.
                                                                      2/24/2006

Page 192

1  I mean, you know, 5:00 o'clock in the afternoon with
2  a diagnosed subarachnoid hemorrhage in a person who
3  is -- pick your Hunt & Hess. They are not going to
4  go to the operating room in this town, as far as I
5  can deduce, and in my own personal experience. It's
6  always: Get your A team on the job, schedule it for
7  8:00 a.m. tomorrow morning, and then we will do it.
8     Q. All right. And was that the case in 2003,
9  as far as you know?
10    A. The problem in 2003 again is that there was
11 this -- this time in our medical history when
12 neurosurgeons were not routinely taking call at the
13 hospitals and were not doing aneurysm surgery in
14 this town.
15    Q. And the neurosurgeons being Dr. Kralick,
16 Dr. Godersky, and Dr. Cohen?
17    A. Correct. But even if Dr. Kohler were in
18 town at that time, he didn't have privileges at the
19 other hospitals to perform such surgeries, nor did
20 he have backup to perform them. So effectively no
21 one who had the skill would do those surgeries up
22 here during a period of time which may have
23 encompassed the time when Mr. Allen had his problem.
24    Q. Right. And you -- you're not comfortable
25 rendering an opinion about whether or not it would

Page 193

1  be more desirable for a patient with a ruptured
2  aneurysm to have care down in Harborview versus up
3  here?
4     A. I can tell you that I know of many patients
5  who have very good outcomes for aneurysm surgery
6  done in Anchorage, Alaska.
7        MS. McCREADY: Okay. I don't have anything
8  else. Thank you.
9        MR. GUARINO: Nothing else.
10       MS. McCREADY: Only because I'm so tired.
11       THE VIDEOGRAPHER: The deposition is
12 concluded. We are off record at 5:36 p.m.
13       (Proceedings concluded at 5:36 P.M.)
14       (Signature reserved.)
15
16
17
18
19
20
21
22
23
24
25

                                                      51 (Pages 192 to 193)

Exhibit A
Page 13 of 13 Pages