```
                UNITED STATES DISTRICT COURT        2006 MAR 13 PM 2:38
                 FOR THE DISTRICT OF ALASKA
                         ---oOo---                    RECEIVED
                                                  US ATTORNEY OFFICE

KIMBERLY ALLEN, Personal
Representative of the ESTATE OF
TODD ALLEN, Individually, on Behalf
of the ESTATE OF TODD ALLEN, and on
Behalf of the Minor Child PRESLEY GRACE
ALLEN,
              Plaintiff,
vs.                      No.  304-CV-0131 (JKS)
UNITED STATES OF AMERICA,
           Defendants.
-------------------------------/


         DEPOSITION OF RICHARD A. RUBENSTEIN, M.D.
                   February 22, 2006
RICHMOND, CA



   Reported by:
   DANUTA KRANTZ
   CSR NO. 4782


Atkinson-Baker, Inc.

Court Reporters

www.depo.com

File No.:  A000DE4
```

Page 1

A000DE4
# RICHARD RUBENSTEIN - February 22, 2006

### Page 6

1  MR. GUARINO: This is Gary Guarino. I
2  represent the United States.
3  THE VIDEOGRAPHER: Thank you.
4  The court reporter will please swear the
5  witness.
6  RICHARD A. RUBENSTEIN, M.D.
7  having been sworn as a witness,
8  testified as follows:
9  THE VIDEOGRAPHER: You're on the record.
10  MS. McCREADY: Thank you.
11  EXAMINATION BY MS. McCREADY
12  MS. McCREADY: Q. Good afternoon,
13  Doctor.
14  A. Good afternoon.
15  Q. Is it Rubenstein?
16  A. Rubenstein, yes.
17  Q. Okay. Dr. Rubenstein, what did you
18  do to prepare for this deposition this afternoon?
19  A. I reviewed extensive documents,
20  reviewed extensive literature, reviewed extensive
21  depositions, I reviewed the expert reports of
22  plaintiff and defense experts.
23  Q. Okay. On the extensive documents,
24  are you talking about Mr. Allen's medical records?
25  A. Yes. And I also reviewed a CD of

### Page 7

1  his MRI scan -- excuse me, of his CT head scan of
2  4-19-03.
3  Q. So you reviewed documents as well
4  as the films that were taken at Providence Alaska
5  Medical Center on 4-19-03; is that correct?
6  A. Yes.
7  Q. Let me just pull out -- in your
8  report you had listed some records that you had
9  reviewed. I will mark that.
10  (Document marked Plaintiff's
11  Exhibit 1 for identification.
12  MS. McCREADY: Q. Doctor, I am marking
13  Exhibit 1, at least what was provided to me as
14  your report that was dated November 29 --
15  A. Correct.
16  Q. 2005. And really, I just wanted to
17  focus on the medical records that you had listed
18  in this report.
19  Did you ever -- is there any listing of
20  medical records by Bates stamping numbers?
21  A. No.
22  Q. Have you gotten any correspondence
23  from Mr. Guarino that sort of sets forth
24  everything that he sent to you?
25  A. Yes.

### Page 8

1  Q. Did you have his correspondence at
2  hand?
3  A. Yes. Right. I do.
4  Q. I would like to mark that as an
5  exhibit, any correspondence you had with
6  Mr. Guarino.
7  A. If you mark on the underside of
8  the -- you know what I'm saying?
9  Q. Okay.
10  (Document marked Plaintiff's
11  Exhibit 2 for identification.)
12  MS. McCREADY: Q. And you've handed me
13  your file, and is it the -- let me just ask.
14  There is a December 20, 2005 letter?
15  A. All of the correspondence is in
16  there.
17  Q. So this is this whole stack; is
18  that correct?
19  A. Correct.
20  Q. What I am going to do is put a
21  Bates stamp -- I'm sorry, an exhibit sticker,
22  Exhibit 2, on the back of the first page of that,
23  but the whole thing will become Exhibit 2.
24  A. Okay.
25  Q. And then we will just copy it after

### Page 9

1  the -- at a break or after the deposition. Okay.
2  A. Or if the records are -- they're
3  probably not that extensive, but the way I
4  generally do this is to have the court reporter
5  send someone back here with their own copying
6  machine to copy it, and then rather than, you
7  know, her take the time after the deposition to do
8  it.
9  Q. Okay. We can talk about that when
10  we go off record.
11  A. Sure.
12  MR. GUARINO: Donna.
13  MS. McCREADY: Yes.
14  MR. GUARINO: Dr. Rubenstein is coming
15  through clearly, but about halfway through or
16  partway through some of your questions you start
17  to fade, and I am wondering whether you are
18  turning away from the microphone or whether it's
19  just the line connection.
20  MS. McCREADY: I don't think it's the
21  line connection. I just think it's the setup. I
22  will try to keep my voice up.
23  MR. GUARINO: That was better. I heard
24  that clearly all the way through.
25  MS. McCREADY: Okay.

3 (Pages 6 to 9)

A000DE4
RICHARD RUBENSTEIN - February 22, 2006

Page 10

1  Q. In terms of literature, if you
2  could — I am curious what literature you have
3  reviewed.
4  A. I have reviewed — it's right here,
5  if you want to go through it article by article.
6  Q. Okay.
7  A. Okay. Much of it is literature
8  that was memorialized in your expert Susan Shott's
9  bibliography, but there is additional literature,
10 you know, from my own files.
11 Q. Do you have those separated out,
12 like what you got, what literature was cited by
13 Dr. Shott and what literature you sort of looked
14 up on your own?
15 A. I do, by and large. There may be a
16 couple of articles in the Shott file. Let me put
17 it this way. Most of the articles in the Shott
18 file were, you know, I already had in my files.
19 There were some that I didn't, and, you know, they
20 are mixed together really.
21 But I can say these articles here are
22 articles that were — clearly came from my
23 information, but most of the Shott articles I
24 already had in my bank of knowledge. It's just
25 that they — there was an overlap.

Page 11

1  Q. Sure. Okay. All right. I want to
2  come back to that.
3  Anything else you did to prepare for
4  deposition, today's deposition?
5  A. No, I don't think so.
6  Q. Did you talk to Mr. Guarino?
7  A. When?
8  Q. In preparation for this deposition.
9  A. Yes, I did talk to Mr. Guarino.
10 Yes.
11 Q. Just for about how long?
12 A. You mean in terms of —
13 Q. Preparation —
14 A. Are you talking about today?
15 Q. I am talking about —
16 A. What are you talking about?
17 Q. I'm talking about in preparation
18 for this deposition.
19 A. I think I talked to him about one
20 hour on Sunday night, and I talked to him today
21 for about maybe ten minutes.
22 Q. Then did you talk about — I am
23 just curious if you gentlemen discussed the other
24 depositions that have been taking place.
25 A. Yes. I mean, that certainly was

Page 12

1  one of the topics we discussed, yeah. Yes.
2  Q. All right. If you could tell me,
3  what exactly is a neurologist?
4  A. A neurologist, or neurology, the
5  specialty that deals with diseases of the central
6  and peripheral nervous systems, the junction
7  between nerves and muscles and muscles.
8  Q. What is the difference between a
9  neurologist and a neurosurgeon?
10 A. Well, we think and they operate.
11 Q. Okay.
12 A. If you want to know the truth.
13 Q. I am sure you have been asked that
14 question before. So you think and they operate?
15 A. Correct.
16 Q. What is the difference in training?
17 A. A neuro — a standard neurology
18 training program is one year of internship and
19 three years of residency training and then
20 additional fellowship years after that, if one
21 wants to really subspecialize in any — an area of
22 neurology.
23 Neurosurgical training, I think pretty
24 much in the good neurosurgical training programs,
25 I think the standard training is about around five

Page 13

1  years or so after medical school.
2  Q. Okay. So are there — do
3  neurologists go through surgical residencies?
4  A. No.
5  Q. Then do you do surgery?
6  A. No.
7  Q. Are you board certified as a
8  neurologist?
9  A. Yes.
10 Q. All right. Is board certification,
11 is that something that you have to — you have to
12 be recertified after a particular period of time?
13 A. You know, they did have after many
14 years, after I was board certified, they did have
15 a recertification exam, and I think that has kind
16 of gone by the wayside, you know. There were a
17 few years when that was in vogue, and I have not
18 heard anything more about recertification exams.
19 Q. When were you actually board
20 certified?
21 A. I was board certified in 1976. I
22 was elected to fellowship, which is a higher level
23 of board certification, in 1982.
24 Q. Then have you been recertified
25 since '76?

4 (Pages 10 to 13)

Page 14

1  A. No.
2  Q. Or since '82?
3  A. No.
4  Q. All right. Are there
5  subspecialties, then, in neurology?
6  A. Yes.
7  Q. And could you give me an example of
8  what those might be?
9  A. I mean, there is cognitive
10 neurology, behavioral neurology, peripheral
11 neurology, peripheral nerve disease, muscle
12 disease, neurointensive specialization in
13 neurology, neurorehabilitation.
14 Q. Do you have any subspecialties?
15 A. Yes, I do.
16 Q. What would those be?
17 A. I am board certified in
18 electrophysiology, EMG and nerve conduction. I
19 am, I think, have a special interest in traumatic
20 brain injuries and behavioral or cognitive
21 neurology.
22 Q. So you are board certified in
23 electrophysiology; is that correct?
24 A. Correct.
25 Q. That has to do with nerve

Page 15

1  conduction studies?
2  A. Correct.
3  Q. Then you have a special interest in
4  traumatic brain injury?
5  A. In cognitive neurology.
6  Q. In cognitive --
7  A. Or behavioral neurology.
8  Q. Do you know how it was that you
9  were selected to be an expert witness in this
10 case?
11 A. No.
12 Q. What were you asked to do in this
13 case?
14 A. I was asked to review all of the
15 records, depositions, et cetera, and formulate an
16 opinion.
17 Q. An opinion about what?
18 A. About causation. In other words,
19 whether Mr. Allen's subarachnoid hemorrhage was
20 representative of a condition that could have
21 reasonably been prevented had it been diagnosed in
22 a timely fashion.
23 Q. All right. And let me ask you
24 this. What, in your training, practice,
25 education, do you think allows you the background

Page 16

1  to give opinions about that in this case?
2  A. Well, I am a neurologist.
3  Subarachnoid hemorrhage is a neurologic disease.
4  I have seen many, many cases of subarachnoid
5  hemorrhage, but it's within the scope of my
6  experience, my training and my expertise.
7  Q. Let me, then, ask you some
8  questions about, what is your practice? If you
9  could describe for me, do you have a clinical
10 practice, and if you do, if you could describe for
11 me what sorts of patients you see.
12 A. I have an outpatient clinical
13 practice, and I don't do any hospital work per se.
14 And in terms of my outpatient practice, the kinds
15 of cases that I see are patients with headaches,
16 patients with seizures, patients with strokes,
17 patients with pinched nerves, patients with
18 neuropathies, problems with their nerves, patients
19 with spinal pain.
20 Those are pretty much the greatest
21 preponderance of cases that I see.
22 Q. Are we at your office where you
23 actually have your clinical practice?
24 A. Yes.
25 Q. All right. So you don't see

Page 17

1  patients in the hospital; is that correct?
2  A. Correct.
3  Q. How many patients do you see a week
4  typically?
5  A. Well, I am in this office about two
6  weeks a month, and I would say on average I see --
7  and I work four days a week. So in those days I
8  would say I would see, you know, anywhere from
9  eight follow-up patients perhaps and one to two
10 new patients.
11 Q. Okay. So you are actually working
12 in a clinical practice two weeks out of the month
13 approximately?
14 A. About. Yeah.
15 Q. And then there are four-day weeks.
16 And how many hours a day are you
17 working -- the days you are actually here working,
18 what would you say?
19 A. Probably six to eight hours a day.
20 You know, with the dictations I do, six to eight
21 hours a day.
22 Q. Okay. Then there are -- I want to
23 make sure I understand -- eight follow-up, could
24 be -- and I realize these are not hard and fast
25 numbers, but this is general ballpark,

5 (Pages 14 to 17)

Page 18

1  approximately like eight follow-up patients during
2  the week?
3      A. During the week, yes.
4      Q. And then one to two new patients a
5  week?
6      A. Correct.
7      Q. Is that right? Okay. Any other --
8      A. No. Probably one new patient --
9  one to two new patients a day.
10     Q. A day?
11     A. You know, a day.
12     Q. Okay. But the eight follow-up
13 patients per week or per day, that's what I wanted
14 to make sure I understood.
15     A. Somewhere around there.
16     Q. I am sorry. I didn't ask that very
17 well.
18     Eight -- you would generally see
19 follow-up patients during a week?
20     A. No. Per day.
21     Q. Per day. That's what I didn't
22 understand.
23     A. That includes, you know, at least
24 on some of them, performing electrophysiologic
25 studies.

Page 19

1      Q. I don't want to spend a lot of time
2  on that, but I do want to sort of understand that.
3      If you could describe that to me, what
4  are these electrophysiological studies?
5      A. Well, let's say somebody has a
6  pinched nerve, like carpal tunnel syndrome, or
7  somebody has a pinched nerve in the neck. I would
8  do, you know, an electromyogram to see if they
9  have evidence of nerve injury, or I would do a
10 nerve conduction velocity study to see if they
11 have evidence of focal compression.
12     Q. Okay. The other two weeks out of
13 the month, are you working in other clinics?
14     A. I am working in another office.
15     Q. Where is that?
16     A. Marin County, California.
17     Q. And if you could describe for me
18 your practice at the other office.
19     A. That is my forensic office.
20     Q. When you say forensic office, what
21 do you mean?
22     A. Cases that I am involved in that
23 are litigated cases.
24     Q. Just so I understand, that is just
25 a separate office in a different location that you

Page 20

1  would generally do the work, this medical/legal
2  work; is that correct?
3      A. Correct.
4      Q. Approximately how many cases -- if
5  you break down your time in terms of working,
6  would it be half time in the clinic and then half
7  time doing medical/legal cases?
8      A. I would say that is about correct.
9      Q. Do you do any teaching?
10     A. No.
11     Q. Okay.
12     A. I did, but I don't do it anymore.
13     Q. All right. How long ago was that?
14     A. Well, I was assistant professor of
15 neurology at UC Davis from about '76 to '78, then
16 I was assistant clinical professor of neurology at
17 UCSF from about '79 to '94.
18     Q. Have you done any sort of teaching,
19 that is, formal teaching in the university since
20 '94?
21     A. No.
22     Q. About how many cases, that is,
23 legal cases, are you consulting on at any one time
24 roughly?
25     A. You know, it really varies. I

Page 21

1  would say, you know, maybe sometimes none. It
2  could be -- vary from none to maybe two to three.
3      Q. At any given time?
4      A. Correct.
5      Q. How many in a year do you think?
6      A. No way of knowing. I don't keep
7  track.
8      Q. You don't keep a list of cases?
9      A. Well, if you figure, I take about
10 three months' vacation a year. So I am in this
11 office, you know, maybe two weeks a month, four
12 days. So the litigated cases, or my litigation
13 work is very variable. Sometimes it's none, and
14 you know, sometimes it could be two to three. So
15 I mean, I don't have any way of really
16 characterizing how many cases I do per year or per
17 month or, you know, that kind of thing.
18     Q. How many cases are you working on
19 right now aside from Mr. Allen?
20     A. Aside from this one, I think about
21 one or two others.
22     Q. When I am asking you about working
23 on -- I am just curious, do sometimes people send
24 you records and then you review them that you
25 never hear from them again or -- and would you

Page 34

1 the country or are there particular areas that --
2 where you mainly are doing expert work?
3    A. Well, most, I would say, of the
4 cases that I have worked on pretty much have been
5 west of the Mississippi.
6    Q. Have you ever had any training in
7 emergency medicine?
8    A. Well, not emergency medicine. You
9 mean like treating heart attacks and pulmonary
10 emboli and --
11    Q. Like doing ER work?
12    A. Well, I mean, I did ER work as an
13 intern, and I'm thoroughly familiar with
14 neurologic emergencies, but in terms of any
15 ongoing work as an emergency room physician, let's
16 say, no, I have not done that.
17    Q. Let me ask this. Is emergency
18 medicine a specialty within medicine?
19    A. Yes.
20    Q. Do doctors or medical students that
21 want to become doctors actually do residencies in
22 emergency medicine?
23    A. Yes.
24    Q. Have you done a residency in
25 emergency medicine?

Page 35

1    A. No.
2    Q. When you talk about neurological
3 emergencies, if you could just give me an example
4 what that would be.
5    A. Yeah. Like subarachnoid
6 hemorrhage, intracerebral hemorrhage, myasthenic
7 crises, traumatic brain injury.
8    Q. Have you ever worked in an
9 emergency room setting, I mean, aside from being
10 in medical school?
11    A. Well, I have -- maybe what you are
12 confused about is, I have been in emergency rooms
13 hundreds and hundreds of times consulting on my
14 patients, you know, when I was doing hospital
15 work.
16    But in terms of working in an emergency
17 room and treating colds and sniffles looking in
18 eardrums and that kind of thing, I have never done
19 that.
20    Q. Actually, that's what I do want to
21 understand, the hospital work, the work you have
22 done in emergency rooms.
23    Is that something where you would be
24 called to an emergency room because one of your
25 patients has presented in the emergency room?

Page 36

1    A. Or I was on the emergency room
2 panel and I would be called in to see, you know, a
3 new acute patient that was just presenting himself
4 in the emergency room.
5    Q. Are you doing that sort of work
6 now?
7    A. No.
8    Q. When were you doing that?
9    A. The last emergency room work, per
10 se, that I did was about 1997. So it was -- I
11 stopped doing that essentially nine years ago.
12    Q. When you were doing it, if you
13 could describe for me what that practice was like
14 then before 1997.
15    A. Well, in -- I had two associates,
16 one of whom I still have. And we covered an area
17 of a half a million people in this area. And we
18 were the only neurologists for half a million
19 people. So, bigger than Anchorage.
20    And so we were extremely busy. And we
21 covered two hospital emergency rooms in this area
22 for neurology -- neurologic issues.
23    Q. For neurologic consults?
24    A. Yes.
25    Q. So the emergency doctor would maybe

Page 37

1 call you in for a consult; is that right?
2    A. Yes.
3    Q. Have you done any of that work
4 since 1997?
5    A. No.
6    Q. Would that be a situation where you
7 would be called in after the emergency room doctor
8 or care provider had evaluated a patient,
9 determined, you know, that they needed a
10 neurological consult or some other sort of
11 consult?
12    A. Well, you hit on a core issue here,
13 you know, because it took a lot of education of
14 emergency room physicians to not panic when
15 somebody came in with neurological symptoms, and
16 pick up the phone and call us and tell us to come
17 right in and evaluate this patient, as opposed to
18 a good emergency room physician doing a complete
19 evaluation before he picked up the phone to call
20 us, and then presenting the case to us on the
21 phone and going through his neurologic examination
22 and the differential, et cetera.
23    So it took a lot of years of
24 self-education of emergency room physicians around
25 this area before we got to the point where we

**Page 38**

1 would get calls with a very thorough evaluation,
2 with a good, you know, physical and neurologic
3 examination, to give us an idea of whether it
4 really was an emergency or not.
5    Q. How did you go about doing that,
6 the -- in terms of educating emergency room --
7    A. Lot of in-service talks, addressing
8 it with emergency room physicians, when we
9 directly saw them, you know, when we physically
10 saw them in the emergency rooms, and gradually
11 over time, I think with the emergency room
12 specialty training programs, emergency room
13 physicians became better and better trained. When
14 I started in clinical practice in about, you know,
15 11-78 we had general practitioners who worked as
16 emergency room physicians.
17    And the extent of emergency room
18 physician training and specialty training programs
19 just improved over time. They developed a board
20 certification, et cetera. So they became better
21 and better trained. And we are lucky to live
22 around a top medical school here, you know,
23 actually two top medical schools that really train
24 very bright people, and some of them want to go
25 into emergency room medicine.

**Page 39**

1    Q. Okay. So it sounds like that --
2 over the course of -- I mean, were you doing that,
3 then, between, let's say, '78 and '97, this sort
4 of practice?
5    A. Yes. 20 years essentially.
6    Q. I do want to understand your
7 experience, then, during that period of time
8 dealing with patients with subarachnoid
9 hemorrhages and/or aneurysms.
10    A. You know, I saw many, many
11 subarachnoid hemorrhages due to ruptured aneurysms
12 and, you know, monitored their care, often in
13 conjunction with a neurosurgeon. But certainly in
14 the earlier years, we were neurointensivists. So
15 we would admit them to the intensive care unit, be
16 totally responsible for their care, you know,
17 until the angiogram was done and the location of
18 the aneurysm, if located, was discerned, and then
19 the neurosurgeon by and large would take over.
20    Q. Right. When you say many, many
21 patients with subarachnoid hemorrhages, and I just
22 do want to get some sort of sense of that. Over
23 the course of a year, would it be, you know, ten
24 or more like 100?
25    A. No. You know, the incidence of

**Page 40**

1 subarachnoid hemorrhage, you know, is about, you
2 know, 10 per 100,000 population or so. So in any
3 given year in North America there are 30,000 cases
4 of subarachnoid hemorrhage. That is in North
5 America, perhaps worldwide.
6    And so I would say in any given year,
7 you know, I might see three to five cases, three
8 to six cases, of -- three to five cases, I would
9 say, being conservative, of subarachnoid
10 hemorrhage.
11    Q. So in any given year three to five
12 cases of --
13    A. New subarachnoid hemorrhage from a
14 ruptured saccular aneurysm.
15    Q. Got it. And do you consider it to
16 be, you know, 10 out of 100,000, or 30,000 people
17 a year who actually have a subarachnoid
18 hemorrhage, is that statistically significant to
19 you? I mean, is that like, that is a statistic?
20    A. That is just a statistic. Out of
21 that 30,000 population, let's say there are 3,000
22 or so that really never make it to a hospital
23 emergency room and die out of hospital.
24    Q. Right. The ones that actually show
25 up at the emergency room, do you have an opinion

**Page 41**

1 about the statistics on the numbers of those that
2 are misdiagnosed?
3    A. Misdiagnosed?
4    MR. GUARINO: The question broke up.
5 Are you --
6    MS. McCREADY: I am asking about the
7 number of the folks that actually, with
8 subarachnoid hemorrhages that actually make it to
9 a medical facility. I'm looking for -- if the
10 doctor has an opinion or knows the number in terms
11 of how many of those are misdiagnosed.
12    THE WITNESS: I think a small percentage
13 are misdiagnosed.
14    MS. McCREADY: Q. Would you agree that
15 at least the discussion of the misdiagnosis of
16 subarachnoid hemorrhage is pretty widely discussed
17 in the literature over the last few decades?
18    A. I wouldn't say that it's widely
19 discussed. I mean, there certainly have been a
20 number of papers about the misdiagnosis of
21 subarachnoid hemorrhage, but I don't think that
22 it's a topic of discussion that pops up every
23 month in neurologic or neurosurgical journals.
24    Q. Fair enough. But there are a
25 number of papers that certainly have been

11 (Pages 38 to 41)

### Page 42

1  published, say, over the last even 40 years about
2  the problem with misdiagnosis of subarachnoid
3  hemorrhage in an emergency room setting?
4      A. Yes.
5      Q. Okay.
6      MR. GUARINO: Is there a question or is
7  this a break?
8      MS. McCREADY: Oh, I'm sorry. I am
9  looking at any notes.
10     MR. GUARINO: Okay. I didn't know if we
11 faded out.
12     MS. McCREADY: No, I am just looking at
13 my notes.
14     MR. GUARINO: Okay.
15     MS. McCREADY: Q. Would you agree that
16 the classic symptom of a subarachnoid hemorrhage
17 is head pain?
18     A. Yes. Headache.
19     Q. Headache?
20     A. Severe, excruciating headache.
21     Q. How would you differentiate head
22 pain versus headache?
23     A. Well, pain in the head can be due
24 to a number of causes. There is a broad
25 differential of head pain, but severe excruciating

### Page 43

1  headache, the worst headache I have ever
2  experienced in my life, is a generalized headache,
3  is rather pathopneumonic or should be alerting to
4  the possibility of subarachnoid hemorrhage.
5      Q. When you say pathopneumonic, what
6  do you mean?
7      A. In other words, if someone comes in
8  de novo, in other words, there is no prior history
9  of headache, and they say, I just experienced the
10 worst headache, you know, a severe headache, came
11 on within seconds, you know, I mean, just the peak
12 headache intensity, evolved over seconds, maybe a
13 few minutes, you know, certainly, any neurologist
14 would say, you know, state that the primary
15 diagnosis to rule out is a subarachnoid
16 hemorrhage.
17     Q. Going back to your experience
18 working in the ER, I am curious whether or not you
19 had ever been in the situation where you had a
20 patient come to you first as opposed to going and
21 being screened by an emergency room care provider,
22 where they came to you first with a complaint of
23 acute headache.
24     A. I have seen thousands and thousands
25 of patients with headaches. And the

### Page 44

1  characteristic of a subarachnoid hemorrhage
2  headache is alarming, acute in onset, with peak
3  headache intensity arising within a second or
4  within a few seconds of onset, perhaps a few
5  minutes. At least in one paper it said it can
6  evolve over a few minutes. But most of the papers
7  say the characteristic onset is within seconds.
8      And that is generally confluent with my
9  experience as well. And, you know, most of the
10 patients that I can recollect that hit a hospital
11 emergency room with a subarachnoid hemorrhage not
12 only had severe headache which arises de novo, you
13 know, from someone without really a previous
14 background of headaches, but is also accompanied
15 by neurologic signs, focal neurologic deficits,
16 stiff neck, diploplia, seizure, et cetera.
17     So there is every indication that there
18 is something pretty ominous going on.
19     Q. But what I am trying to understand
20 is, I understand you have seen thousands of
21 patients with headaches. And is that generally --
22 is that mostly in the clinical setting -- sorry,
23 in the clinic setting where patients are coming to
24 your office and seeing you on an out-patient
25 basis?

### Page 45

1      A. Well, I have seen patients with
2  headaches in the emergency room. I should say
3  that, you know, by far and away the greatest
4  preponderance of headaches in general and
5  headaches that are severe and excruciating in
6  onset are benign.
7      So that the -- by far and away, although
8  headache visits to the emergency room are very
9  common. I mean, that is one of the more common
10 symptoms that emergency room visits occur. I
11 think the statistics are something like one
12 percent of all emergency room visits worldwide are
13 for headache.
14     And by far and away, the greatest
15 preponderance of those visits, including
16 excruciating, explosive headache, are for benign
17 conditions.
18     So I think that it takes ancillary signs
19 and symptoms to warrant an enhanced index of
20 suspicion that there is an intracranial process
21 going on.
22     Q. Would you agree that one of the
23 most common associated symptoms of a subarachnoid
24 hemorrhage is vomiting and nausea?
25     A. No, I wouldn't.

Page 54

1  familiar with a subarachnoid hemorrhage
2  presentation?
3       A. Yes.
4       Q. Would you agree that emergency room
5  care providers should consider subarachnoid
6  hemorrhage when a patient presents with their head
7  hurting?
8       MR. GUARINO: Donna, that faded out. I
9  heard half of the question.
10      MS. McCREADY: Q. Would you agree that
11 the emergency room care provider — sorry. Let me
12 start over.
13      Would you agree that emergency room care
14 providers should consider a subarachnoid
15 hemorrhage when the patient presents to the ER
16 with their head hurting?
17      A. I would not agree with that.
18      Q. Why not?
19      A. Because you didn't qualify the
20 question. You need to qualify the question and be
21 very specific. I mean, are you referring
22 generically, are you referring to Mr. Allen
23 specifically in terms of a patient who is a
24 chronic pain, chronic headache — you know, he had
25 a long history of headache before this.

Page 55

1       In someone who has chronic headaches,
2  who is on narcotic medication, patients who have a
3  preexisting history of headache as opposed to
4  someone who arrives in an emergency setting
5  de novo, you know, without any prior history of
6  headache, and has a severe, excruciating headache,
7  the worst headache they have ever experienced in
8  their life, you've got to be very specific.
9       In the one instance of a patient like
10 Mr. Allen, who was a chronic pain patient, chronic
11 headache patient, on narcotics, on a narcotic
12 contract, or somebody with preexisting migraine,
13 frequent migraines, et cetera, in other words, a
14 chronic headache patient, certainly someone who
15 presents in an emergency room, the diagnosis of
16 subarachnoid hemorrhage would not be high on my
17 differential.
18      Q. And the question is not whether or
19 not it's high on the differential. Should it be
20 considered?
21      A. I don't even think it needs to be
22 considered, you know, unless there is something
23 that is sufficiently atypical about the
24 presentation that would warrant an elevated level
25 of suspicion that there was something new going

Page 56

1  on, as opposed to someone who presented without
2  any prior history of headache, you know, as I
3  said, had a severe excruciating headache,
4  obviously then, the first thing you would think of
5  would be a subarachnoid hemorrhage.
6       Q. Would you agree that once a
7  patient — assume for a moment there is a high
8  suspicion of a subarachnoid hemorrhage, would you
9  agree that the standard of care is then to order a
10 CAT scan?
11      A. Yes.
12      Q. Would you agree that a CAT scan,
13 generally, the sensitivity is that it will pick up
14 90 to 95 percent of bleeds?
15      A. About 95 percent of subarachnoid
16 hemorrhage, yes.
17      Q. Would you agree if that was — if a
18 CT was negative, then you would go do a lumbar
19 puncture if you had a high suspicion — index of
20 suspicion of a subarachnoid bleed?
21      A. If somebody presented with a
22 sentinel headache that was, you know, as I said,
23 arose basically de novo out of nowhere, severe
24 headache, the sequence of events certainly would
25 be a CT. If that was negative, then a spinal

Page 57

1  fluid evaluation.
2       Q. At least in your experience and
3  your review of the literature, CTs pick up most, I
4  mean, 95 percent of bleeds?
5       A. Correct.
6       Q. Would you agree that, just in
7  general, talking about the —
8       A. Let's say, CTs pick up about 95
9  percent of acute subarachnoid hemorrhage if done,
10 you know, within the first 12 to 24 hours after
11 the bleed. You know, by, let's say, five days
12 after the bleed, the sensitivity of the CT is
13 about 50 percent.
14      Q. Sure. But in at least that first,
15 did you say 24 hours?
16      A. 24 hours.
17      Q. Right. It's going to have a 95
18 percent sensitivity rate?
19      A. Correct.
20      Q. I just want to ask some general
21 questions about treatment of patients who are
22 diagnosed with subarachnoid hemorrhage.
23      It sounds like that is at least where
24 your area of expertise is. You worked in terms of
25 treating patients with subarachnoid hemorrhage?

Page 62

1  ischemia or vasospasm.
2      Q. The triple H's, hydration --
3      A. Hydration, hemodilution and
4  hypervolemia.
5      Q. Okay. But why would you measure --
6  I mean, why would you monitor blood pressure?
7      A. Because you want to make sure the
8  blood pressure is not too low, you know, and it is
9  staying within a range, within a very specific
10 range that has been shown at least to be
11 beneficial in helping to prevent vasospasm. And
12 you would monitor blood pressure very closely just
13 in general, because, you know, as I said, there
14 are cardiac complications of subarachnoid
15 hemorrhage, et cetera.
16     Q. What if the blood pressure gets
17 above 220?
18     A. Then it probably would be treated.
19     Q. What is the risk of it getting too
20 high?
21     A. I don't know. It's very -- each
22 case is different.
23     Q. What are some of the downstream
24 consequences --
25     A. Of blood pressure getting --

Page 63

1      Q. -- getting too high?
2      A. Well, if is there a hypertensive
3  crisis, they could have an intracerebral rebleed
4  again. The aneurysm could rebleed. The biggest
5  issue is rebleeding is most common in the first 24
6  hours after -- it's said to be about a 20 percent
7  incidence of rebleeding within the first 24 hours
8  after the initial hemorrhage. So the rebleeding
9  is the big worry.
10     Q. Have you seen any literature to
11 counter that, that most patients actually rebleed
12 after the first 24 hours?
13     A. After the first 24 hours?
14     Q. Yes.
15     A. Well, there is some literature that
16 takes issue with the fact that the incidence is
17 highest within the first 24 hours, but I think
18 most modern-day studies or most recent studies
19 believe that rebleeding is highest in the first 24
20 hours, albeit that is the whole theory behind
21 emergency surgery.
22     Q. Are those the studies -- are
23 those --
24     A. Yes, there are a couple of studies
25 in here --

Page 64

1      Q. -- in your stack that you have here
2  today?
3      A. Yes.
4      Q. That discuss rebleeding within the
5  first 24 hours?
6      A. Yes. As a matter of fact -- I
7  probably can locate it. This is the good one.
8  Nadich's study says most studies show the highest
9  risk of rerupture to be within the first 24 hours,
10 often within the first six or 12 hours, where
11 others have shown the highest risk to be between
12 days four and nine or after day ten or found no
13 period of higher risk.
14     But they found in their study that early
15 aneurysm repair was performed whenever feasible,
16 because there -- and this is a 2005 paper from
17 Columbia -- that the highest incidence or risk of
18 rebleeding was in the first 24 hours.
19     Q. When you say early intervention,
20 that is the term you used, you might have said
21 early intervention?
22     A. Right. Early intervention.
23     Q. Does that mean early surgical
24 intervention?
25     A. Endovascular or surgery. Usually

Page 65

1  in these cases endovascular coiling is done at the
2  time of the angiogram.
3      Q. In what percentage of cases?
4      A. I think most cases of endovascular
5  coiling are done, if the patient is stable, of
6  course, at the time that the angiogram is done and
7  the aneurysm is diagnosed.
8      Q. Do these studies -- and these
9  studies meaning, do you have any studies on your
10 desk in the stack of papers that you have on your
11 desk that discuss when usually the angiogram is
12 done, that is, in terms of time after presentation
13 or diagnosis of the subarachnoid hemorrhage?
14     A. It's done as soon as possible.
15     Q. Right, but I am just curious, do
16 you know generally when that occurs?
17     A. Well, the only thing I can say,
18 which I thought was actually quite interesting,
19 was that, again, in this Nadich paper, I think
20 this is an important statement. He notes that,
21 "The more liberal application of endovascular
22 therapy at the time of initial angiography" -- so
23 that means angiography is done right away if the
24 patient is stable -- "may also reduce the risk of
25 early rebleeding, since surgery after angiography

Page 66

1  is often delayed by six to 12 hours."
2  So there is a delay, characteristically,
3  in getting mobilized to do surgery as opposed to
4  endovascular coiling, which could be done right at
5  the time of the angiogram.
6      Q. And surgery meaning clipping versus
7  endovascular surgery?
8      A. Correct.
9      Q. What would be the importance of
10 giving a patient a calcium blocker?
11     A. Yes.
12     Q. What would be the reason for doing
13 that?
14     A. That is to reduce the DCI, delayed
15 cerebral ischemia. That has been shown to reduce
16 the incidence of vasospasm.
17     Q. How about the stress -- medication
18 for stress --
19     A. Anti-ulcer medicine.
20     Q. Why would you do that?
21     A. Just to prevent a stress ulcer and
22 bleeding out from an ulcer, dropping the blood
23 pressure.
24     Q. Is that sort of a common risk of
25 people with subarachnoid hemorrhage bleeds?

Page 67

1      A. Yes.
2      Q. How about the anticonvulsants? Why
3  would you give a patient --
4      A. So they don't have a seizure. And
5  then, you know, a seizure would increase their
6  risk of rebleeding.
7      Q. Are patients with subarachnoid
8  hemorrhages at risk of vomiting? Would you ever
9  give a subarachnoid hemorrhage patient an
10 anti-emetic?
11     A. You mean after they present to
12 the --
13     Q. Yes, after they present -- after
14 they are diagnosed.
15     A. They are in the ICU and in coma,
16 you mean?
17     Q. No, I am sorry. After a patient
18 who has been diagnosed with a subarachnoid
19 hemorrhage.
20     A. Yeah.
21     Q. We were talking -- the subject is
22 the standard of care in terms of how you would
23 treat them and where you would put them. And I am
24 curious whether or not is it typical to give a
25 patient who has been diagnosed with a subarachnoid

Page 68

1  hemorrhage an anti-emetic, something that --
2      A. Well, I mean, it would really
3  depend on what was the cause of his -- was the
4  cause raised intracranial pressure? You know, if
5  the cause was raised intracranial pressure, we
6  would start him on Mannitol, an anti-osmotic
7  agent, and that would probably take care of the
8  nausea and vomiting. So it really depends on what
9  the cause of the nausea and the vomiting is.
10     Q. Would you monitor a patient who has
11 been diagnosed with a subarachnoid hemorrhage?
12 Would you monitor them for increased ICP?
13     A. Yes, sure.
14     Q. ICP meaning increased intracranial
15 pressure?
16     A. Yes.
17     Q. How would you do that?
18     A. Certainly by the initial imaging
19 study, that would be done if it showed any
20 evidence of brain swelling or brain edema.
21     And if there was any evidence, let's
22 say, of any impending catastrophe, such as an
23 intraparenchymal hematoma, a herniation syndrome,
24 et cetera, whether -- you know, probably not an
25 intracranial pressure monitor -- you know, an

Page 69

1  intracranial monitor may be inserted, but I think
2  that is variable and up to the neurosurgeon.
3      Q. Can you also measure it by just
4  evaluating the patient's level of consciousness?
5      A. Sure. Yes.
6      Q. Not necessarily doing some sort of
7  invasive procedure, but at least monitoring what
8  the patient's --
9      A. Yeah.
10     Q. -- neurosigns are?
11     A. Sure.
12     Q. Would that be a way of doing that?
13     A. Yes.
14     Q. Would it be important to monitor
15 the fluid intake of a patient if a patient has
16 been diagnosed with a subarachnoid hemorrhage?
17     A. Yes.
18     Q. Why would that -- why would you
19 want to monitor that?
20     A. Because you want to make sure that
21 they are adequately hydrated, and maybe increase,
22 you know, increase their hydration to prevent the
23 development of the vasospasm. You don't want to
24 hydrate them to the extent that you are going to
25 put them in congestive heart failure, but you want

A000DE4
RICHARD RUBENSTEIN - February 22, 2006

Page 178

1  my notes so we can finish up.
2     THE VIDEOGRAPHER: The time is 5:15, and
3  this is the end of tape No. 2 in the deposition of
4  Dr. Richard Rubenstein. We are off the record.
5     (Short recess.)
6     THE VIDEOGRAPHER: This is the beginning
7  of tape No. 3 of the deposition of Dr. Richard
8  Rubenstein. The time is 5:22. We are back on the
9  record.
10    MS. McCREADY: Q. And, Dr. Rubenstein,
11 just a couple of other questions about your
12 report. I just want to understand.
13    It's your opinion it's more likely than
14 not that Todd Allen did not have a sentinel bleed
15 or any aneurysm the morning of April 19; is that
16 right?
17    A. Well, he obviously had an aneurysm
18 in the morning --
19    Q. In the morning -- I am sorry.
20    A. Well, I mean, he had an unruptured
21 aneurysm, obviously, in the morning of, you know,
22 so to qualify your statement --
23    Q. Thank you. Let me make sure.
24    It's your opinion that he didn't have a
25 bleed or a ruptured aneurysm the morning of

Page 179

1  April 19?
2     A. Yes. I think it's more likely than
3  not that this represented an episode of real
4  breakthrough pain that he had from his chronic
5  preexisting condition. And, you know, is it
6  possible that he had a sentinel headache?
7  Anything is possible, but I don't think that he
8  ruptured the aneurysm until 2:00 that afternoon.
9     Q. Then in your opinion, then, because
10 part of your report is, okay, even assuming he had
11 a sentinel bleed or some sort of a bleed that
12 morning, there's really nothing that could have
13 been done for him; is that your opinion?
14    A. Well, I am -- you know, if he had a
15 sentinel hemorrhage, a sentinel bleed, a warning
16 leak, let's say, which I don't believe he had, I
17 don't believe there was sufficient accompanying
18 symptoms to warrant a higher index of suspicion
19 that he get a CT scan or an LP.
20    But let's say, under ideal
21 circumstances, let's say, hypothetically, that,
22 you know, a sentinel headache had been suspected,
23 he had obtained a CT, which I think in the
24 greatest likelihood, or would be more likely than
25 not to have been negative, and that he had had an

Page 180

1  LP, and that he then had -- and it had been
2  diagnosed, let's say he had xanthochromic spinal
3  fluid, and then he went on to be transferred, have
4  angiog -- you know, transferred to either
5  Providence or Alaska Regional, have the
6  angiography, et cetera, we don't know where the
7  aneurysm was, we don't know if it was in an
8  accessible versus inaccessible location, we don't
9  know if it would have been a candidate for
10 endovascular treatment versus surgical treatment.
11    There are a lot of unknowns. But I
12 think what is certain, that is even under optimum
13 circumstances, had it been diagnosed, that he
14 would have rebled that afternoon and died no
15 matter what had been done.
16    Q. What is that based on, this
17 assumption that he would have just rebled and
18 nothing could have been done for him?
19    A. Well, because, one, just in terms
20 of the -- I believe that he rebled sometime right
21 around 2:00 p.m., you know, when he laid down to
22 take a nap. I believe he bled, you know, at the
23 time he went to sleep, to take a nap.
24    Q. My understanding is that it's your
25 opinion that it's more likely than not that that

Page 181

1  is when he actually bled, not that he rebled?
2     A. Yes.
3     Q. But then assuming, you know, for
4  just the purposes of -- I want to understand the
5  rest of your opinions that, even assuming he had
6  some sort of a sentinel bleed that morning, it's
7  your opinion that he would have rebled that
8  afternoon and nothing could have been done for him
9  to change his outcome? That's my understanding.
10    A. Correct.
11    Q. Okay. That's what I wanted to
12 understand, what that is based on.
13    A. It's based on, from what I know to
14 be the mechanics of treating an aneurysm in
15 Anchorage; in other words, I don't believe that,
16 you know, treatment with Mannitol or treatment
17 with anti-osmotic agents or keeping his head up,
18 you know, as Dr. Cantu -- would have had any
19 impact on his outcome. And I will go into why
20 not.
21    But that aside, I just think that the
22 mechanics of working this up in a timely fashion
23 and not knowing where the aneurysm was, whether it
24 was accessible, inaccessible, et cetera, whether
25 he was a candidate for endovascular surgery or

46 (Pages 178 to 181)

A000DE4
**RICHARD RUBENSTEIN - February 22, 2006**

Page 182

1  even if he was a candidate for acute operative
2  intervention, it does not appear to me that it
3  would have happened in a timely enough fashion in
4  Anchorage at Providence or Alaska Regional
5  Hospital to have prevented his hemorrhage.
6      Q. So —
7      A. By the way, as I said, irrespective
8  of treatment anywhere, the mortality of
9  subarachnoid hemorrhage is about 50 percent of all
10 cases.
11     Q. Right. But in this case, if I
12 understand what you said, it sort of boils down to
13 the logistics of the fact that he had this
14 aneurysm when he was in Anchorage?
15     A. Yes. Let's put it this way. He
16 had this aneurysm probably for a long time.
17     Q. I'm sorry, the rupture.
18     A. Probably for many years, but it was
19 an asymptomatic aneurysm.
20     Q. Sure.
21     A. You know, it's said, by the way,
22 that about 9 percent of all autopsied patients are
23 discovered, incidentally, to have incidental
24 asymptomatic aneurysms.
25     Q. Right. I am sorry that I wasn't

Page 183

1  clear about the — distinguishing between the
2  ruptured and unruptured. .
3      But if I understand your opinion that
4  it's — because Todd Allen, the logistics of him
5  actually getting worked up and treated because he
6  was in Anchorage, that just would lead you to
7  believe that they just —
8      A. It wouldn't have happened.
9      Q. It wouldn't have happened.
10     A. He would have been dead no matter
11 what had been done.
12     Q. Who have you — have you talked to
13 anyone about the logistics of dealing with a
14 patient with an aneurysm or a ruptured aneurysm in
15 Anchorage?
16     A. I mean, I've reviewed in detail all
17 of the medical records. I have looked at
18 Dr. Levy's report. I have talked to Mr. Guarino
19 about what the logistics were in Anchorage, and,
20 you know, that there are three neurosurgeons in
21 the state. It's not clear to me whatsoever that
22 either Godursky or Craelic or Cohen were doing
23 aneurysm surgery on 4-19-03 in Anchorage.
24     And I think even if they were, under
25 optimum circumstances, they would not have

Page 184

1  operated on him within, you know, six to 12 hours
2  of the presentation of the sentinel hemorrhage at
3  7:10 a.m., if we're presuming that that's what
4  occurred, and that his workup would not have been
5  completed or substantially done by the time that
6  he rebled to have prevented his demise.
7      You know, all of this is total
8  speculation. You don't even, one, know that he
9  had an aneurysm. We know that he had a
10 subarachnoid hemorrhage. You know, the greatest
11 likelihood is certainly it was an aneurysmal
12 subarachnoid hemorrhage. We don't know the
13 location, we don't know the accessibility, we
14 don't know the best method of treatment.
15     Q. Right. And we've got a lot of
16 things that we don't —
17     A. Circumstantial evidence.
18     Q. Well, yeah. We don't know because
19 he wasn't worked up that morning, on April 19th at
20 ANMC, so we don't have a lot of information.
21     A. As I said, it's my belief — it's
22 my opinion, let's put it that way, to a reasonable
23 degree of medical probability that — and
24 certainly, an imaging study that morning I believe
25 would have been normal.

Page 185

1      Q. And it wouldn't have told you
2  anything?
3      A. It wouldn't have told you anything.
4      Q. Did you talk to Dr. Levy?
5      A. No.
6      Q. Have you talked to any of the
7  neurosurgeons in Anchorage?
8      A. No.
9      Q. Do you know Dr. Cohen or
10 Dr. Godursky or Dr. Craelic?
11     A. No. I don't know any of them.
12     Q. Really? Okay.
13     A. I have seen their names plenty of
14 times, but I don't know them.
15     Q. Sure.
16     Aside from talking to Mr. Guarino and
17 reviewing the records and the reports in this
18 case, is there anything else that you are — you
19 are relying on or you looked at in terms of the
20 coming to the conclusion that the logistics of
21 Mr. Allen having this ruptured aneurysm in
22 Anchorage created problems with him getting timely
23 treatment that would have changed his outcome?
24     A. Right. I don't believe there was
25 anything that would have been done that would have

47 (Pages 182 to 185)