UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

- - -

KIMBERLY ALLEN, Personal )
Representative of the Estate of )
Todd Allen, Individually on Behalf )
of the Estate of Todd Allen and )
on Behalf of the Minor Child, )
PRESLEY GRACE ALLEN, )
                                   )
             Plaintiffs,           )
                                   )
    vs.                            ) NO. 3:04-CV-0131-JKS
                                   )
UNITED STATES OF AMERICA,          )
                                   )
             Defendant.            )
                                   )

VIDEOTAPED DEPOSITION OF

FRANK MANNIX, M.D.

CARDIFF BY THE SEA, CALIFORNIA

FEBRUARY 14, 2006

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376
REPORTED BY:   MICHELLE K. BAILEY, CSR NO. 10713

FILE NO.:  A000F65

1

## Page 22

14:03:39  1    An additional four hours?
14:03:41  2    A. Yes.
14:03:41  3    Q. All right.
14:03:42  4    And since the report was prepared up until now, can
14:03:44  5 you give me an idea, if you spent additional time, how much
14:03:48  6 time you've spent?
14:03:49  7    A. I have. It looks like, as what's been billed,
14:03:53  8 there's just another half hour. But probably in preparation
14:03:58  9 for today's deposition -- I could look upstairs if you want
14:04:04 10 me to, but it's in the area of six to eight hours. And then
14:04:07 11 we met this morning for about three hours. And here we are
14:04:12 12 now. So those are all pretty close.
14:04:14 13    Q. So six to eight hours, was that in reviewing
14:04:18 14 materials?
14:04:19 15    A. Again, and making sure that I was comfortable and
14:04:21 16 could access everything quickly in response to your
14:04:25 17 questions.
14:04:26 18    Q. And would the six, eight hours include reviewing
14:04:30 19 any of the reports from the defense experts?
14:04:33 20    A. I don't believe so. I believe I got those before,
14:04:35 21 but I'm not positive about that.
14:04:37 22    Q. All right.
14:04:38 23    And you said you met for three hours. Was that
14:04:42 24 with Ms. McCready?
14:04:43 25    A. It was, this morning, yes.

## Page 23

14:04:44  1    Q. And other than this morning, other than this
14:04:48  2 research on nuchal rigidity, were you given any additional
14:04:50  3 either information or documents this morning?
14:04:53  4    A. No. I verified that at the hospital in question,
14:04:57  5 there was not a neurosurgeon or neurosurgery available. And
14:05:01  6 she led me to believe that that's her understanding as well.
14:05:05  7    Q. And let me make sure I understand. You mean at the
14:05:08  8 Alaska Native Medical Center?
14:05:09  9    A. Correct.
14:05:10 10    Q. And so what were you verifying? That back in 2003,
14:05:16 11 there was not a neurosurgeon available at that hospital?
14:05:18 12    A. Well, that was my understanding all along. I just
14:05:21 13 wanted to verify that. So I asked her that this morning.
14:05:25 14    Q. And where did you get that understanding?
14:05:26 15    A. Probably in a phone conversation, you know, well a
14:05:30 16 long time ago.
14:05:30 17    Q. From who, of sorts?
14:05:33 18    A. Probably from counsel. But it's pretty clear
14:05:35 19 because of all the transfer, you know, issues involved that
14:05:38 20 they weren't going to deal with it there themselves anyway.
14:05:42 21 But somewhere along the line, I think counsel explained to me
14:05:45 22 what the limitations of the hospital were.
14:05:47 23    Q. And I guess how did you verify that information?
14:05:49 24    A. I took it at face value. I just verified it
14:05:52 25 verbally this morning with counsel.

## Page 24

14:05:54  1    Q. Oh. Okay. I'm sorry. I thought you called
14:05:56  2 someone or checked on it this morning.
14:05:58  3    A. No. This was in our meeting this morning.
14:06:00  4    Q. Okay.
14:06:01  5    Anything else in the way of additional information
14:06:04  6 or documents that you got this morning?
14:06:05  7    A. Not to my knowledge.
14:06:07  8    Q. All right.
14:06:07  9    I have a copy of your CV that was provided as part
14:06:12 10 of the disclosures in this case. Is that CV -- it's dated
14:06:18 11 July 1, 2004. Is it still accurate at this point?
14:06:22 12    A. I believe so, because I believe it's the one that I
14:06:25 13 furnished with the opinion letter of November of last year.
14:06:29 14 There haven't been any substantive changes in the last couple
14:06:31 15 of years.
14:06:33 16    Q. Okay.
14:06:33 17    And it indicates -- well, let me ask you directly.
14:06:36 18 What area of medicine do you consider yourself to be
14:06:39 19 specialized in?
14:06:40 20    A. In emergency medicine.
14:06:41 21    Q. Any others?
14:06:42 22    A. No.
14:06:42 23    Q. Do you have any particular specialty in the either
14:06:47 24 diagnosis or treatment of patients with subarachnoid
14:06:51 25 hemorrhage or aneurism?

## Page 25

14:06:52  1    A. Well, I have been the co-chair of the stroke
14:06:56  2 committee at our hospital for the last two years and I've
14:06:59  3 been active in developing the stroke team. In fact, I led
14:07:03  4 that development. We've just generated admitting orders and
14:07:08  5 protocols for our stroke patients including intracranial
14:07:13  6 hemorrhage. And I've been active in educating the staff and
14:07:16  7 the nurses on the issue of strokes. I participate in the
14:07:19  8 County stroke meetings. And I suppose at this stage in my
14:07:24  9 career, if you had to say what area am I most involved with,
14:07:27 10 that would be it.
14:07:28 11    Q. In the area of patients with strokes?
14:07:30 12    A. Correct.
14:07:31 13    Q. That -- my understanding includes patients who have
14:07:35 14 strokes for lots of different reasons, not just patients with
14:07:39 15 aneurisms.
14:07:40 16    A. That's correct.
14:07:40 17    Q. Okay.
14:07:41 18    And in terms of your prior experience, I take it
14:07:44 19 you had a general experience as an emergency room physician.
14:07:47 20 You weren't specializing particularly in the care of patients
14:07:50 21 who had aneurisms.
14:07:51 22    A. No. That's partly correct. I began out in
14:07:56 23 internal medicine, switched to emergency medicine, did my
14:08:01 24 residency there. And for the first five or ten years, my
14:08:04 25 area of interest was in trauma and hemorrhage. And I talked

## Page 46

14:34:31  1   Q. In this case, do you know or are you able to render
14:34:34  2   an opinion as to what size Mr. Allen's aneurism was?
14:34:37  3   A. No.
14:34:38  4   Q. I have also seen at least published data that
14:34:50  5   indicates some patients have more than one aneurism. Can you
14:34:53  6   tell whether Mr. Allen might have had more than one aneurism?
14:34:58  7   A. No, sir.
14:34:58  8   Q. Is it part of your area of expertise such that you
14:35:07  9   can render an opinion in this case as to whether -- assuming
14:35:11 10   Mr. Allen had an aneurism, whether it would have been more
14:35:15 11   likely treated by a clipping procedure or by one of these
14:35:20 12   coiling procedures?
14:35:21 13   A. Yes.
14:35:22 14   Q. All right.
14:35:23 15         And can you tell me what your understanding is of
14:35:26 16   that or what your opinion is?
14:35:28 17   A. Yeah. And I base that on the fact that two or
14:35:31 18   three years ago, the coiling procedure was not very common.
14:35:36 19   And even now, in 2006, the clear indications and guidelines
14:35:43 20   are still being worked out and it's not an everyday
14:35:46 21   procedure. So in 2003, if there were going to be a procedure
14:35:49 22   done, it would much more likely be either a screw for
14:35:52 23   intracranial monitoring, a drainage of the hematoma if it
14:35:57 24   existed or clipping of an aneurism.
14:35:59 25   Q. Did Mr. Allen have a hematoma that would have been

## Page 47

14:36:03  1   drained.
14:36:03  2   A. No. Well, you know, I'd have to say I need to look
14:36:07  3   back at the CT, which I could do if you'd like.
14:36:10  4   Q. Sure.
14:36:12  5   A. Let's see here.
14:36:13  6         MS. MC CREADY: And actually, can we just go off
14:36:16  7   the record for a moment so I can take a bathroom break?
14:36:19  8         MR. GUARINO: Why don't we do that. I'm going to
14:36:23  9   stay on the line rather that call again. Why don't we take a
14:36:27 10   ten minute break.
14:36:27 11         MS. MC CREADY: Okay.
14:36:27 12         THE VIDEOGRAPHER: Going off the record at
14:36:30 13   3:36 p.m.
14:40:59 14         (off the record)
14:40:59 15         THE VIDEOGRAPHER: We're on record at 2:41.
14:41:05 16         MS. MC CREADY: And, Gary, this is Donna McCready.
14:41:07 17   I just wanted to -- this might shorten the deposition some.
14:41:12 18   I want to be really clear. You know, Dr. Mannix is just --
14:41:16 19   I'm offering him as an expert on the standard of care. He's
14:41:19 20   not going to be rendering any opinions on causation. And I
14:41:23 21   probably could have saved you some time had I thought to say
14:41:27 22   that earlier. But consistent with his report, he's really
14:41:30 23   only -- he's an expert in emergency medicine and, therefore,
14:41:34 24   testifying about the standard of care.
14:41:37 25         MR. GUARINO: Yeah. That will shorten it up. So

## Page 48

14:41:40  1   it will probably affect some of the questions I was going to
14:41:42  2   ask down the road. But let's see how it goes. If I get to
14:41:46  3   that point and he says he's not going to offer opinions in an
14:41:50  4   area, then we'll move on.
14:41:52  5         MS. MC CREADY: Okay.
14:41:56  6   BY MR. GUARINO:
14:41:57  7   Q. Are we ready?
14:41:57  8   A. We are. And I did locate the document about the CT
14:42:02  9   scan.
14:42:02 10   Q. Let me ask you a question on that, Doctor, just so
14:42:06 11   I can be clear. Is this the report of the CT scan that was
14:42:09 12   done at Providence Hospital when Mr. Allen was brought in?
14:42:13 13   A. That's correct.
14:42:14 14   Q. Have you ever seen the actual film of that CT scan?
14:42:16 15   A. No, sir.
14:42:17 16   Q. But you're looking at the report. And I think you
14:42:19 17   said you wanted to look at it to tell whether he had a
14:42:22 18   hematoma.
14:42:23 19   A. Yeah. My recall was that he did not and the report
14:42:25 20   is consistent with that.
14:42:27 21   Q. So he would not -- at least in that report, he
14:42:30 22   would not have had on of the surgical procedures to drain a
14:42:33 23   hematoma?
14:42:34 24   A. Certainly not at the time this CT was done.
14:42:37 25   Q. All right.

## Page 49

14:42:37  1         And is there any reason to think that at an earlier
14:42:40  2   time that day, he would have had a hematoma?
14:42:43  3   A. No. Sometimes later if there's recurrent bleeding,
14:42:45  4   there could be one.
14:42:46  5   Q. And I think we may be able to end this fairly
14:42:46  6   quickly. But since I started, I'd like to fully close it
14:42:49  7   off. And I think you indicated that you thought back in 2003
14:42:52  8   the more likely procedure would have been the clipping type
14:42:56  9   procedure as opposed to the coiling procedure.
14:42:58 10   A. That's correct.
14:42:58 11   Q. Was that -- just so I can -- for my own mind, is
14:43:05 12   that anywhere? For example, if Mr. Allen had been here at
14:43:08 13   Anchorage or if he had been at a teaching hospital in
14:43:11 14   Los Angeles or in San Francisco, would that sort of general
14:43:14 15   rule, you think, still apply, that they would more likely do
14:43:17 16   a clipping procedure than a coiling procedure?
14:43:19 17   A. No. That's -- I'm glad you asked the question.
14:43:22 18   When I say more likely, I mean statistically more likely
14:43:26 19   across the board, because the coiling was not done. If he
14:43:30 20   ended up at a center where there happened to be somebody that
14:43:34 21   was very interested and expert at it, then they may have
14:43:38 22   developed their own internal protocols and he might well have
14:43:41 23   had it done. Those protocols are still being developed and
14:43:43 24   there's not a consensus even now across the nation about the
14:43:47 25   clear advantages of one versus the other in every instance.

**Page 126**

who's triaged at a level 2; is that correct?
A. As a general statement, that's probably accurate.
Q. And someone triaged at a level two, would, again, all things being equal, would be expected to be seen sooner than a level 3?
A. Well, that's partly true. But the triage decision also has to do with the level of illness and the level of evaluation required. So when you triage somebody — when we do this in our emergency department, when you triage somebody to the emergent side, you're saying this person had something serious enough they needed to see a doctor. If they need to see a doctor now, then that becomes — you move them up in that range to a 1 or whatever that says they need to see the doctor now. But the real triage decision is do they need to see a doctor in the main ER and how soon.
   If you triage somebody to the urgent care side, you're saying, generally, they don't need to see a doctor necessarily and they don't need to be seen now. So you're pretty much ruling out life threatening problems with that triage decision.
Q. And I'm just focusing for the moment, I'll get to the second part, on the question of how soon they're seen. And maybe I can simplify this. Do you think there's any causal connection as to indicate in terms of the time when Mr. Allen was seen and his injuries in this case?

**Page 127**

A. Well, let me refresh my memory about the times. I think he was triaged at 7:10 and seen at 7:35. And honestly, Counselor, that's good in any ER.
Q. So the fact that it took 25 or 30 minutes to see him, that's not a problem that you're critical in the case?
A. It's not.
Q. Okay.
   And I take it what you are critical of is the fact that he was seen by a nurse practitioner as opposed to by an emergency room physician?
A. Well, let me backtrack. What I'm really critical of is the triage assessment itself which focuses again on his recurrent pain problem and doesn't ask any of the key question about differentiating — I mean, by her own admission, it's a ten out of ten pain in the head and in the ears. That in any emergency department is going to be triaged in a fairly emergent way. But she asks none of those questions, and it's very clear that she made some decisions about him when she saw him based on the previous history. She initially said, "He's in all the time. I see him all the time." When she's pushed on that, the best she could come up with was, "Well, I think I saw him when he came in with the initial injury." And then she says, "I didn't really believe that he was having as much pain as he said." Well, you make those kind of assumptions at your own jeopardy. And none of

**Page 128**

the other critical questions — what was the onset of his headaches. Subarachnoids usually start right now. The patient can tell you. That's not the way jaw pain starts. Is this just like the pain you've had before? And we're back into the same conversation. So there was a misevaluation and triage. And a result of that was that he was triaged in a way that he went to the nurse practitioner.
Q. And that part I understood. I guess I'm trying to explore — I understand you're critical of that. But in terms of practical results, I guess is what I'm looking at, you're not critical of how long it took them to see him. So I can set that aside.
A. That's correct.
Q. Now, in terms of who saw him, you're critical in that you think he should have been seen by an emergency physician, not by a nurse practitioner.
A. Well, what I'm saying is that their own internal guidelines say that they should have been triaged to the main emergency department. Now, category 3 makes — and he's very clearly a category 2 in their guidelines. Category 3 makes room for the possibility that if the triage is busy, a midlevel practitioner would see that patient. But my review of the log that day indicates that all the level 3 patients were seen by doctors. So had the patient been triaged 2 or 3, a doctor would have seen the patient. And in my judgment,

**Page 129**

although I think the standard of care still applies to the nurse practitioner, I think the likelihood that this diagnosis would have been or at least suspected was higher.
Q. And that's what I was trying to get to. Your critique ultimately is that if a triage at 2 or 3 had been seen by an emergency room physician as opposed to a nurse practitioner, that it's more likely that he would have — there would have ben a diagnosis of this subarachnoid hemorrhage?
A. I believe so.
Q. Okay.
   Now, before we get to that, is it — do you agree that at any time if Nurse Feary had thought that he was more seriously ill or that he should have been triaged at a higher level of 3 or 2 or 1, she could have referred him or consulted with emergent room physicians?
A. Absolutely.
Q. So it's not like you get triaged once and the game is over, you never get a chance to see an ER doctor, shut in to another facility for that initial term at all. It indicates Ms. Nurse Feary assessed him. In her own testimony, she said if she thought he was more seriously ill, she could have consulted with a doctor; correct?
A. Correct.
Q. And you would expect a nurse practitioner, I take