NELSON P. COHEN
United States Attorney

GARY M. GUARINO
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: gary.guarino@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KIMBERLY ALLEN, Personal Representative of the Estate of TODD ALLEN, Individually, on Behalf of the Estate of TODD ALLEN, and On Behalf of the Minor Child, PRESLEY GRACE ALLEN<br><br>                Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br><br>                Defendant. | Case No. 3:04-cv-0131-JKS<br><br><br>**UNITED STATES' TRIAL BRIEF** |

## I.     INTRODUCTION

Pursuant to the Court's Order [Docket No. 75], the United States of America

submits its initial Trial Brief in this matter.

Plaintiff filed this malpractice action alleging that the Defendant failed to diagnose Todd Allen with a subarachnoid hemorrhage (bleeding from a cerebral aneurysm) when Allen presented at the Alaska Native Medical Center (ANMC) on the morning of April 19, 2003.  Some of the significant disputed issues include: (1) the nature and extent of Todd Allen's long-term chronic pain (jaw, ear, and head pain) as an ANMC patient from 2000 to 2003,  (2) whether Allen's condition and his description of his symptoms at ANMC on April 19, were similar to his long-term chronic pain symptoms or whether they were markedly different and indicative of a bleeding cerebral aneurysm,  (3) whether ANMC Advanced Nurse Practitioner Donna Fearey made a reasonable assessment that Allen's symptoms were another episode of his chronic jaw, ear, and head pain, and  (4) assuming that Allen had a subarachnoid hemorrhage (SAH) from a cerebral aneurysm on the morning of April 19, whether he could have been admitted for tests at ANMC, then transported to another Anchorage hospital for further diagnostic studies, and then medevaced to Seattle for effective surgical treatment before he suffered his catastrophic SAH and coma, only 6 to 8 hours later in the afternoon of April 19, 2003.

## II.    FACTUAL SUMMARY

In November 1999, Todd Allen suffered severe injuries to his head and jaw when he was hit, as a pedestrian, by a passing vehicle.  He had facial surgery immediately after the accident.  In June 2001, he had a second surgery to repair his "completely broken" jaw with a titanium implant.  Before the tragic events in this case, Allen was planning to have further surgery on his jaw.   As a result of his injuries and surgeries, Allen suffered severe

and ongoing pain in his jaw, ear, and head from 2000 to 2003. He was a patient at ANMC and he used narcotic pain medication on a regular basis during these years.

In December 2002, Allen entered the "ANMC Chronic Pain Program" and an "Agreement for Long-Term Use of Opioid Pain Medications." In January 2003, Allen filled out an ANMC "Patient Initial Assessment" form describing his chronic pain. He listed the areas of his pain as the right and left side of his head, his jaw joint and ear areas, and inside his right ear. He marked a "head diagram" showing that he had chronic pain on both sides of his face and head and in his neck and back of his head. He estimated that he had 16 pain flare-ups in the prior month, which lasted for "1-2 hrs to 2-3 days." He rated his recurring pain as 10 (of 10) at its worst and 6 on average. He described his chronic pain as aching, sharp, throbbing, shooting, and unbearable.

On April 18, 2003, Allen and his wife, Kimberly Allen, drove from Valdez to Anchorage, arriving in late evening, and picked up  refills of his pain medications. The drive through the mountains was one of the activities that had aggravated his chronic pain in the past. The next morning, April 19, Allen presented at ANMC with complaints of "ears & head are hurting - up all night" and pain of 10. There are disputed issues of fact as to Allen's condition, reported symptoms, and statements during this exam. Mrs. Allen has stated that Allen complained of having a severe headache, with pain radiating from his neck up through the back of his head, and that he told the health care providers at ANMC that this pain episode was different from his chronic pain history.

The ANMC intake nurse (Patricia Ambrose, R.N.) noted that Allen was "sitting

with ease," that he did not appear to be in severe pain or distress, that he was an ANMC chronic pain patient, and that he could be seen by an Advanced Nurse Practitioner on the Urgent Care (UCC) side of the clinic as opposed to the Emergency (ER) side. ANMC's UCC and ER were located in the same area with patients assigned to either side of the clinic.

ANP Donna Fearey examined Allen on the morning of April 19. ANP Fearery has stated that Allen's chief complaint was ear and jaw pain, that during his drive from Valdez he started having pain in his right ear, and that he wanted to know if he had an ear infection. He was sitting and talking calmly and he was not in severe distress or holding his head or vomiting. They discussed his prior injuries, jaw surgery, and chronic pain history and he indicated that the pain was in the area of his right ear on the side of his head. Allen did not complain of a severe headache and he did not appear to be in severe or intense pain. Allen's own hand-written note describing his pain complaints at ANMC that morning stated, "pain all night in R. [Right] ear bad."

After her exam and discussion with Allen, ANP Fearey determined that Allen's pain complaints were consistent with his prior jaw injuries and they were similar in nature and location to his chronic pain history. She ordered some medication (phenergan) for his prior nausea so that he would be able to take his pain medicine. He was not given any pain medication at ANMC that morning. Allen was then discharged with instructions to return if his symptoms worsened or did not improve.

After discharge, Allen and Mrs. Allen went to the ANMC cafeteria for breakfast.

Allen appeared tired but he said he felt better.  They then went to Sam's Club and Mrs. Allen shopped while Allen took a nap.  They returned to their motel in the early afternoon and Allen laid down to nap while Mrs. Allen went out to shop and get lunch.  When Mrs. Allen returned Allen appeared to be snoring abnormally and he did not respond or wake up when Mrs. Allen tried to wake him for lunch.

Later in the afternoon, Mrs. Allen tried to wake Allen a second time but he did not respond.  She claims she called ANMC to report his abnormal snoring and that she was told by a nurse that if he was breathing he was okay.  She laid down next to Allen and watched TV for a time and then tried to forcibly wake Allen.  He did not respond and as she shook him he was "dead weight" and when she rolled him over some blood came out of his mouth.  She called 911 and the emergency paramedics came and tried to resuscitate Allen and then transported him to Providence hospital.

The Providence physicians stated that Allen was "dead in the field" when the paramedics found him, that when he arrived at Providence he met some of the criteria for brain death, and that the consulting neurosurgeon advised that nothing could be done surgically.  Allen did not regain consciousness and he was declared dead on April 20 due to his sudden SAH on April 19.

### III.    SUMMARY OF CLAIMS AND DEFENSES

Plaintiff has asserted various claims of malpractice including that ANMC intake Nurse Ambrose failed to properly assess Allen, that Allen should have been referred to and examined by an ER physician instead of ANP Fearey, and that ANP Fearey breached

the standard of care and negligently failed to assess Allen as having a possible SAH and cerebral aneurysm.  Plaintiff also claims that ANMC's failure to admit Allen for monitoring and treatment in the morning of April 19 and ANMC's alleged failure to respond to Mrs. Allen's telephone call later in the afternoon were a proximate cause of Allen's SAH, coma, and brain injury on April 19 and his eventual death on April 20.

The United States will present testimony from various ANMC witnesses (including ANP Fearey) and from medical experts including: Dr. Michael Levy, a board certified emergency and internal medicine physician, with experience as a medical director for emergency services and med-evac services in Alaska;  Dr. Richard Rubenstein, a board certified neurologist, Dr. Ronald Shallat, a neurosurgeon; and Ms. Dede Duntze, a certified Family Nurse Practitioner with emergency medicine experience as an ANP.

The expected witness testimony and expert reports will present the following defenses for the United States. Allen's symptoms as reported in the records and by Nurse Ambrose and ANP Fearey were consistent with his chronic pain history.  ANP Fearey's assessment of Allen's symptoms was reasonable and she did not breach the standard of care.  Allen had a sudden, catastrophic SAH early in the afternoon of April 19,  after his discharge from ANMC.  Allen would not have had surgery to prevent his SAH in the short time (6-8 hours) between his discharge from ANMC and his acute SAH that afternoon.  He could not have been transported from ANMC and then medevaced to Seattle in that short time period.  Thus, Allen's tragic outcome would have been the same

even if he had been diagnosed with a possible cerebral aneurysm or SAH in the morning at ANMC.

## IV.  LEGAL AUTHORITIES FOR FTCA CLAIMS AND DEFENSES

Plaintiff filed this action under the Federal Tort Claims Act (FTCA), which provides that the United States shall be liable for damages for tort claims to the same extent that a private party would be liable to the claimant "in accordance with the law of the place where the act or omission occurred."[1]  The alleged conduct in this case occurred at ANMC and the Court applies the law of Alaska regarding the elements of proof for a medical malpractice action.  Yako v. United States, 891 F.2d 738, 745 (9th Cir. 1989).

The required elements and burden of proof for medical malpractice claims under Alaska law are set out in AS 09.55.540(a)(1), (2), and (3).  Plaintiff has the burden of proof ("preponderance of the evidence") for all elements of a medical malpractice action including the applicable standard of care, the alleged breach of the standard of care, and the proximate causation for the alleged injury.   AS 09.55.540(a).

The Alaska Supreme Court has held that the terms of this statute are so clear and unambiguous that the courts are foreclosed from revising the standards through judicial construction.  Crosby v. United States, 48 F.Supp.2d 924, 930 (D. Ak. 1999); Poulin v Zartman, 542 P.2d 251, 270 (Alaska 1975).  Alaska law does not recognize the lesser standards of proof and causation that have been argued under the rejected  "loss of chance

---

[1]  28 U.S.C. §§1346(b) and 2674.

doctrine." Crosby, 48 F.Supp2d at 930-32.

The standards and limits ("caps") for any claims for non-economic damages under Alaska law are set out in AS 09.17.010(b), including claims for personal injury or wrongful death (AS 09.55.580) and damages for pain and suffering, loss of consortium, or "other non-pecuniary damage."

Alaska has rejected the collateral source rule for medical malpractice actions. Plaintiff's claims and any damages are subject to AS 09.55.548(b), which abrogates the collateral source bar in AS 09.17.070. Reid v. Williams, 964 P.2d 453, 455 (Alaska 1998). AS 09.55.548(b) was enacted as part of malpractice reform legislation, which was intended to reduce malpractice damages awards and to prevent the double payment of damages. Id., at 456-58. The Alaska Legislature rejected the collateral source rule that previously allowed the plaintiff a double recovery if the alternative would be to benefit the defendant. Reid, 964 P.2d at 457-58 (the statute will reduce damages awards and shift tort costs away from defendants). This change in the law is consistent with the Alaska tort law principle that a plaintiff should recover no more than the loss actually incurred. Luth v. Rogers & Babler Construction Co., 507 P.2d 761, 766 (Alaska 1973).

Under AS 09.55.548(b), any damages should be reduced by any amounts that Plaintiff has received as compensation from any collateral sources, whether private, group, or governmental. This would include any benefit payments that Plaintiff (Mrs. Allen or Presley Allen) received or will receive from Social Security.

Further, Plaintiff is not entitled to recover prejudgment interest or attorney's fees

against the United States under 28 U.S.C. §§ 2674 and 2678; <u>Anderson v. United States</u>,
127 F.3d 1190, 1191 (9th Cir. 1997).

### V.     PRE-TRIAL EVIDENTIARY MOTIONS

Plaintiff filed a Motion for Ruling Regarding Proof of Causation [Docket No. 42]
and a Motion in Limine to Limit Defendant's Expert's Testimony [Docket No. 48] The
United States has filed its Oppositions to these motions and incorporates the legal
authorities and arguments cited in those pleadings. [Docket Nos. 53 and 63]

### VI.     DEFENDANT'S OBJECTIONS TO PLAINTIFF'S TRIAL EXHIBITS

Exhibits P-1 and P-2: Defendant does not object to these exhibits on foundation or
hearsay grounds.  Defendant does reserve its right to object to the use of these exhibits if
Plaintiff seeks to use them to try to impose a different or higher medical "standard of
care" for the ANMC health providers in their treatment of Allen.  Such a use of the
generalized "Mission Statement" or "Corporate Goals" would conflict with the standards
and requirements for malpractice actions under Alaska law.  09.55.540.

Exhibits P-3 to P-9: Defendant reserves the right to offer as exhibits the additional
pages or portions of the ANMC and Providence medical records that are not included in
the portions marked as exhibits by Plaintiff in order to provide a more complete and
comprehensive version of the records for the Court's review.

Exhibits P-14 to P-16: Defendant objects to the admission of these documents on
relevancy grounds depending on the purpose for which Plaintiff attempts to use them at
trial.

Exhibits P-30 to P-34: Defendant's position is that the respective experts' reports, notes, and work files, and witness depositions are available for use during the direct testimony and cross-examination of expert witnesses for impeachment or for illustrative purposes.  However, Defendant objects that the respective expert reports, notes, work files, and witness depositions should not be admitted in their entirety as they may include irrelevant, hearsay, duplicative, or objectionable statements.

Exhibits P-36 to P-40: See objections to Exhibits P-14 to P-16 and P-30 to P-34.

Exhibit P-41: See objections to Exhibits P-30 to P-34.

Exhibit P-42 and P-43: See objections to Exhibits P-30 to P-34 with regard to the use and admission of deposition testimony.

RESPECTFULLY SUBMITTED this 9th day of May, 2007.

NELSON P. COHEN
United States Attorney

s/Gary M. Guarino
GARY M. GUARINO
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: gary.guarino@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2007,
a copy of the foregoing **United States' Trial
Brief** was served electronically on Donna McCready.


s/ Gary M. Guarino