Donna J. McCready
Friedman, Rubin & White
1126 Highland Avenue
Bremerton, WA  98337
Telephone:  (360) 782-4300
Facsimile:  (360) 782-4358
E-mail:  dmccready@frwlaw.us

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KIMBERLY ALLEN, Personal Representative of the Estate of TODD ALLEN, Individually, on behalf of the Estate of TODD ALLEN, and on behalf of the Minor Child, PRESLEY GRACE ALLEN,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | ) Case No. 3:04-CV-0131-JKS<br>)<br>) **PLAINTIFF'S TRIAL BRIEF**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## I.    INTRODUCTION

This is a medical malpractice case brought under the Federal Tort Claims Act[1] against the United States for the wrongful death of 36-year old Todd Allen who is survived by his wife, Kim Allen, and his minor daughter, Presley Grace Allen.  Mrs. Allen filed a complaint against the United States on behalf of Mr. Allen's estate, her minor child and herself.

---

[1] 28 U.S.C. §§ 1346, 2401, and 2671 *et seq*.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1    In summary, Mrs. Allen maintains that the Alaska Native Medical Center Emergency

2    Department ["ANMC ED"] and its health care providers, acting within the scope of their employment,

3    provided care to Mr. Allen early on the morning of April 19, 2003 that was below the standard of care

4    applicable to an emergency department in a major hospital and that, as a direct consequence of the

     Government's negligence, Todd Allen died of a subarachnoid hemorrhage.  Mrs. Allen also maintains

5    that due to the Government's negligence, she suffered severe emotional distress in witnessing her

6    husband go into respiratory arrest later that same day as his discharge from the ANMC ED.

7    The issues to be decided at trial which will be discussed more fully below are 1) what is the

     standard of care that applies in this case; 2) was the standard of care breached; 3) did the breach of the

8    standard of care cause Todd Allen's death; and 4) what is the appropriate compensation to be provided

     Mr. Allen's widow, his child and his estate.

9
     ## II.    JURISDICTION

10   As part of the Indian Self-Determination and Education Assistance Act,[2] the Federal

11   Government committed to transitioning from "Federal domination" of programs and services to Native

     people to allowing Native Americans to meaningfully participate in developing and providing

12   programs and services, including healthcare services, to Native people.  Pursuant to the Indian Self-

     Determination Act the Indian Health Service ["IHS"] has entered into compacting agreements with

13   Native Tribes and organizations to provide funding for health care services.   As the Government

14   explained in paragraph 6 of its Answer [docket # 6], "the Alaska Native Medical Center ("ANMC") is

     operated, in part, pursuant to a compact agreement with the United States Indian Health Service under

15   Title I of the Indian Self Determination Act, Pub. L. 93-638, 88 Stat. 2206 (1975)…."   The

     Compacting agreement between IHS and the Alaska Native Tribal Health Consortium[3] recognized that

16   "Congress has declared that it is the policy of the United States, in fulfillment of its special

17   responsibilities and legal obligations to the American Indian and Alaska Native people, to meet the

     national goal of providing the highest possible health status to Indians and Alaska Natives and to

18   provide existing Indian Health services with all resources necessary to effect that policy."

19   _____

     [2] 25 U.S.C. § 450(a)(1975).

20   [3] Called the Compact Between Certain Alaska Native Tribes and the United States.

FRIEDMAN, RUBIN & WHITE
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

The Indian Self Determination Act also essentially provides that any Indian Tribe, tribal organization or Indian contractor providing health care services pursuant to a cooperative agreement under the Act which is claimed to have caused injury or death is considered to be part of the Federal Government, specifically the Department of Health and Human Services ["HHS"].   25 U.S.C. § 450f(d).   Therefore, because the ANMC ED and the health care providers employed there are considered to be a part of HHS and employees of HHS, this is a case properly brought under the Federal Tort Claims Act.

## III.    THE LIABILITY OF THE UNITED STATES

### A.    The Elements of the Malpractice Claim

Under the Federal Tort Claims Act, state substantive law applies.  28 U.S.C. § 2674.  *See Bell Helicopter v. U.S.*, 833 F.2d 1375, 1377 (9th Cir. 1987).  This is a medical malpractice case and under Alaska law, Mrs. Allen has the burden of proving by a preponderance of the evidence the following:

>    1)    The degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

>    2)    That ANMC and/or its employees lacked this degree of knowledge or skill <u>or</u> that ANMC and/or its employees failed to exercise this degree of care.

AS 9.55.540 (1976).

Ordinarily Mrs. Allan would have the burden of proving that ANMC and/or its employees' negligence was the legal cause of harm to Todd Allen, however, as extensively discussed in Mrs. Allen's Memorandum in Support of her Motion for Ruling Regarding Proof of Causation and related pleadings [docket ## 41-45, 55], Mrs. Allen seeks to shift the burden of proof to the Government on the issue of causation.   The facts and legal arguments supporting Mrs. Allen's position regarding shifting the burden of proof on causation are set forth in the above-referenced pleadings.

### B.    Standard of Care for Emergency Room Medicine

According to ANMC ED's mission statement, "the [emergency] department treats adult, pediatric and geriatric patients who present on a non-scheduled basis for emergent and urgent problems.   Comprehensive services are provided to patients of all ages and both sexes across the

PLAINTIFF'S TRIAL BRIEF
*Allen v. USA*, Case No. 3:04-CV-0131-JKS
Page 3 of 23

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1    complete spectrum of *Emergency Medicine* to eligible beneficiaries in the entire state." [Emphasis

2    added.]

3    Emergency medicine is its own medical specialty separate and distinct from other areas of

    medicine. Physicians practicing in this specialty are required to complete a residency in emergency

4    medicine. Emergency medicine is a practice area for which a physician can become board certified.

5    The purpose or function of emergency medicine is to identify patients with conditions that are serious,

    treatable and time urgent. A fundamental principle of emergency medicine is to assume the worst first

6    which means ruling out life threatening events before treating more common less serious diagnoses. It

    is the responsibility of the emergency medicine practitioner to always be vigilant to the possibility of a

7    life threatening diagnosis in a patient.

8    A subarachnoid hemorrhage ("SAH") is a condition that is serious, treatable and time urgent.

9    It is serious in that it is life threatening. It is treatable medically and surgically and it is time urgent in

    that if the SAH is detected in time, the patient can be monitored and stabilized to avoid rebleeding or

    increased intracranial pressure.

10    The natural history of a SAH is for there to be a "warning leak" (a "sentinel bleed") which

11    causes severe pain in the patient's head. It is the patient with a SAH who presents to the emergency

    room neurologically intact but complaining of severe pain that has the best possible opportunity for a

12    good outcome. The expert testimony at trial will establish that when assessing someone with

    significant head pain in an emergency department, a SAH is always part of the differential diagnosis.

13    An emergency department practitioner must know about the presentation(s) of a SAH and the pitfalls

14    of misdiagnosis. In order to determine if a SAH remains a part of the differential diagnosis, it is

    necessary to take a careful history, which includes ascertaining the onset of the pain, the severity of the

15    pain (*i.e.*, is this the worst pain the patient has experienced), associated symptoms and the

16    differentiation between the pain complained of in the emergency department versus the pain the patient

    may have experienced in the past. This standard of care for assessing patients with head pain applies to

17    chronic pain patients as well. In cases where a SAH is suspected, the standard of care is to order a CT

18    scan of the brain which has a detection rate of approximately 90-95% and if a CT is negative, a lumbar

    puncture is performed which, in all but the rarest cases, would detect a sentinel bleed if there was one.

19    All the experts in this case agree that the standard of care for treating a patient with a SAH is to

20    institute appropriate therapeutic measures as soon as possible and that it would be below the standard

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington 98337
Phone: (360) 782-4300
Facsimile: (360) 782-4358

of care to discharge a patient once a SAH is diagnosed. Preoperative treatment of patients with SAH has improved the outcomes of such patients and the primary goals of treatment for someone diagnosed with a SAH is to prevent rebleeding and vasospasm. Once the diagnosis of a subarachnoid bleed is made, the standard of care would be to secure the airway, admit the patient to an intensive care unit, have his blood pressure monitored, possibly administer a calcium channel blocker and medicine to reduce a stress ulcer and to treat the patient with anti-convulsants. The patient would not be allowed to take anything by mouth and would be hydrated. The patient's level of consciousness and intracranial pressure would be monitored and increased intracranial pressure can be treated medically. The patient would not be allowed to walk around or lift things, as physical exertion can cause a rebleed. Ideally a patient with a subarachnoid bleed would be treated at a state-of-the-art facility for evaluating and treating aneurysms and subarachnoid bleeds, such as the University of Washington in Seattle.

All of the preoperative care required for a patient with a subarachnoid bleed could be provided in Anchorage in 2003 and in any of the med-evac aircraft which traveled from Anchorage to the University of Washington.

### C.    The Essential Facts of the Present Case

#### 1.    The Alaska Native Medical Center Emergency Department

The ANMC ED is divided into two sections: the Emergency Room ["ER"] and the Urgent Care Center ["UCC"].[4] The Emergency Room is staffed by medical doctors trained in emergency medicine. The UCC is staffed by "mid-level practitioners" which means it is staffed by nurse practitioners and physician assistants. According to the Government's expert in emergency medicine, the UCC is "a convenience site … and it exists to bleed off stuff from the emergency department. It functions at a lower level."

The ANMC ED has a triage policy whereby patients are assigned an acuity level and are triaged to the ER or UCC accordingly. Patients triaged as a 1 or 2 are seen by a physician on the ER side of the ED. A patient triaged as a 3 is seen by physician in the ER unless the ER is particularly busy and then the patient may be seen by a mid-level practitioner. A patient triaged as a 4 would see a mid-level practitioner. Someone triaged as a 5 is considered to be someone who is not in need of

---

[4] The ER and UCC have separate funding sources. The ER is funded via the Alaska Native Tribal Health Consortium's budget and the UCC is funded through South Central Foundation's budget.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington 98337
Phone: (360) 782-4300
Facsimile: (360) 782-4358

emergency medical services and could be redirected to their primary care provider. ANMC's triage policy provides that a patient who presents with a severe headache with or without a history of trauma or with just "pain-severe, any etiology" would be assigned an acuity level of 2 and triaged to the ER to be seen by an emergency medicine physician. A patient who presents with "pain – significant, any etiology, *i.e.*, headaches, earaches, back pain" would be assigned an acuity level of 3 and initially triaged to the ER to see an emergency room physician unless the ER was particularly busy.

The morning of April 19, 2003, the ED was not particularly busy and every patient assigned an acuity level 3 was seen by an emergency room physician.

### 2.    Todd Allen's Visit to the ANMC ED April 19, 2003

Early on the morning of April 19, 2003, Mr. Allen woke up his wife who was three months pregnant with their first child, and said "we have to go to the hospital right now" because his head hurt so much. He and Mrs. Allen arrived at the Alaska Native Medical Center ("ANMC") Emergency Department ("ED") at 7:10 a.m. The triage nurse documented that Mr. Allen was complaining of "ears and head are hurting - up all night" with "10/10" pain. Mr. Allen was nauseous and had been vomiting the night before. Although he had taken pain medications, he was still reporting 10/10 pain. The triage nurse, Patricia Ambrose, recalled that "had taken all his pills but he still had pain."[5]

Contrary to ANMC's written protocol, Nurse Ambrose triaged Mr. Allen as an Acuity level 4 which guaranteed he would be seen by a mid-level practitioner as opposed to an emergency room physician. Mr. Allen was not told he was being seen by a mid-level practitioner. The mid-level practitioner, Nurse Fearey, after spending a few minutes with Mr. Allen, ordered a shot of phenergan, an anti-nausea medication. Nurse Fearey discharged Mr. Allen without suspecting a SAH, let alone ruling out a SAH, although she knew Mr. Allen was complaining of "ears and head are hurting – up all

---

[5] Mr. Allen had a history of jaw pain as a result of a traumatic jaw fracture which occurred in 1999 when he was hit by a car. After having a second surgery on his jaw in 2001, his jaw was much better but he still required medication to control the pain on occasion. The evidence will show that Mr. Allen had just picked up his pain medication the night of the 18th and that he had never been unable to control his pain after taking his medication.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1

2
night" with "pain =10/10", knew he had nausea and vomiting, and knew he had been taking pain
medication.  In addition, Nurse Fearey had documented "speech slow."

3
After being discharged from the ANMC ED, Mr. Allen ate breakfast with his wife, walked
around Sam's Club, unloaded the Allen's truck and laid down to sleep in the couple's motel room. [6]

4
Later that day, at around 3:47 p.m., Mrs. Allen called ANMC because of her husband's unusual
sonorous breathing.  She was told that this was likely a side effect of the medication and not to worry.

5

6
At around 5:00 p.m., Mrs. Allen noticed her husband's breathing had changed; she physically
tried to wake him and was unable to.  She saw blood coming from his mouth and she immediately

7
called 911.  Mrs. Allen was giving Mr. Allen CPR under instructions from the 911 operator when the
paramedics arrived and took over as Mrs. Allen watched.  The paramedics transported Mr. Allen via
ambulance to Providence Alaska Medical Center where he arrived at 5:53 p.m.

8

9
Dr. Dietz, the emergency room physician at Providence, took a history from Mrs. Allen
documenting that Mr. Allen had "developed a severe headache earlier this morning" and "today, when

10
he had a severe headache he apparently presented at ANS emergency department and was diagnosed
with it being facial pain … per his wife he had so much headache that he took pain pills he had been

11
given[7] … she states she called for advice to ANS [regarding his sonorous breathing] and was instructed
that it was most likely a medication reaction."  Dr. Dietz gathered the history from Mrs. Allen before

12
Mr. Allen's condition was actually diagnosed in the Providence Emergency Department.

13
Dr. Lee, the physician who admitted Mr. Allen to Providence the evening of April 19th,
documented that "according to the patient's wife, he had been complaining of a headache in his right

14
jaw area radiating to the back of his head and then up to the top of his head, along the backside of his

15
head … because of his headache pain, he went to ANMC today … the patient's wife states that he had

16

_____

17

18
[6] In April 2003, the Allens were in the process of moving from Anchorage to Valdez where Mr. Allen
was employed full time as an oil spill responder with TCC.  The Allens were staying at a Microtel in
Anchorage at the time of the events that give rise to this case.

19

20
[7] We know that Mr. Allen took 10 percocet between the evening of April 18th and the afternoon of the
19th when he was admitted to Providence only because Dr. Dietz did a pill count.  No one at the
ANMC ED bothered to ask Mr. Allen how much pain medication he had taken in his attempt to control
his pain when he presented that morning.

FRIEDMAN, RUBIN & WHITE
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

some sonorous respirations and about 3:00 p.m. she called ANMC, and they told her that as long as he was breathing, she should not worry, that it was likely a side effect of the medications."

CTs of Mr. Allen's brain were taken at Providence at 6:47 p.m. and showed that he had a subarachnoid hemorrhage and diffuse cerebral edema.

Mr. Allen died on April 20th of a subarachnoid hemorrhage.

**D.      Summary of The Plaintiff's Claims Against the Government**

Mrs. Allen's claims of negligence are:

1)      Nurse Ambrose's triage decision, which was a marked departure from ANMC's own triage policy, was below the standard of care. The standard of care for a patient presenting to an emergency department complaining of 10/10 pain in their head and ears such that they were up all night with nausea and vomiting and unable to control the pain with narcotics is to triage that person to see a emergency room physician, not a mid-level practitioner. That was in fact ANMC's policy but it was not followed. The proper level of acuity would have been 2. Even if Mr. Allen had been triaged as an acuity level of 3, he would have been seen by an emergency room physician. Notable is the fact that Nurse Ambrose decided herself that Mr. Allen was not experiencing 10/10 pain. Had Mr. Allen been triaged to see an emergency room physician, more likely than not, his true condition would have been diagnosed and his outcome would have been very different.

2)      Nurse Fearey did not ever suspect that Mr. Allen had an intracranial bleed, a condition we know that he had that morning. Given what we know about patients with SAH, the pain with which Mr. Allen presented the morning of April 19th must have been profoundly different in nature, character, and severity from his previous jaw pain. Nurse Fearey either lacked the knowledge and skill to appreciate the significance of Mr. Allen's documented symptoms or had the knowledge and skill but simply failed to exercise the degree of care ordinarily exercised under the circumstances. Despite the fact that Mr. Allen was unable to control his pain with narcotics and despite the fact that he had never presented with nausea and vomiting in concert with head pain, Nurse Fearey failed to inquire into the onset of his pain; nor did she inquire into the location, severity and difference in his pain patterns. Had Nurse Fearey performed an evaluation meeting the minimum standards applicable in an emergency room setting, Mr. Allen's true condition would have been at least suspected and a CT scan ordered, in which case his outcome would have been very different; and

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

3)      ANMC was negligent in providing Mrs. Allen with advice on the phone at 3:47 p.m. on April 19th that was anything other than that she needed to bring her husband in to the hospital or to call 911. Although Mr. Allen's condition may have worsened by that time, it is more likely than not that medical intervention could have prevented his death. As a direct result of the negligence on the part of the triage nurse, the mid-level practitioner and/or ANMC, Mr. Allen died at the age of 36 years.

## E.      The Government's Theories on Liability

The Government will likely argue that Mr. Allen was properly triaged because Nurse Ambrose could use her own judgment to determine whether or not she thought Mr. Allen was experiencing 10/10 pain; the Government contends that it was reasonable for her to determine that Mr. Allen was not in significant or severe pain the morning of April 19, 2003. The difficulty with the Government's position is that under ANMC's written triage policy the lowest acuity level that could reasonably be assigned to Mr. Allen was a 3 and if he had been assigned an acuity level of 3, he would have been seen by an emergency room physician that morning. Also, given what we know to be Mr. Allen's condition on April 19th, Nurse Ambrose's assumption regarding Mr. Allen's level of pain was patently unreasonable.

It is the Government's position that Mr. Allen was not complaining of pain in his head the morning of April 19th and that he is a chronic pain patient who was complaining of nothing more than pain in his ear and jaw and therefore it was reasonable for the mid-level practitioner to assume that he was just experiencing a flare-up of his jaw pain. The first problem with the Government's position is that the triage nurse documented that Mr. Allen complained of "ears *and head* are hurting – up all night." The second problem is that the Government ignores the fact that what little is documented regarding Mr. Allen's condition on April 19, it is remarkably different than any other time he had presented to ANMC in pain. Mr. Allen had never before presented to the ANMC emergency department or family medicine clinic complaining of nausea and vomiting in concert with head pain. Nor had he ever presented to ANMC with his speech documented as "slow." Mr. Allen had never presented unable to control his pain with his medication. And Mr. Allen had not presented to the ANMC Emergency Department for over two years prior to April 19, 2003 for any reason. The Government also overlooks what was documented by the Providence physicians later that day before Mr. Allen's SAH was diagnosed: that he had gone to ANMC because of a severe headache.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1

2

3

4

5

6

7

8

With respect to the phone advice given to Mrs. Allen at 3:47 p.m. on April 19th, the Government may argue that Mrs. Allen never actually spoke with anyone in the emergency department that day and that even if she had and even if the advice for her not to worry was given (such advice being indefensible), it would not have made any difference in Mr. Allen's outcome.   Mrs. Allen's cell phone bill shows that she called ANMC at 3:47 p.m.  It is documented in the Providence physician's dictated notes that Mrs. Allen discussed with them calling ANMC that afternoon and that she was told her husband's sonorous breathing was likely related to the medication and not to worry.  The theme of the Government's case is that Mr. Allen was destined to die and whether or not it provided appropriate care or behaved negligently and/or recklessly would not have made any difference.  The fact of the matter is that Mr. Allen did not go into respiratory arrest until approximately 5:00 p.m. that day and medical intervention up until that time may have prevented his death.

9

10

11

12

13

14

15

### F.     Contested Issues of Law Regarding Liability

The Government is expected to argue that Nurse Fearey was held to a lower standard of care than an emergency room physician.[8]  While ordinarily nurses are not held to the same standard of care as physicians, the Government's contention misses the mark in this case.  The issue in this case is what is the minimum level of care to which a patient is entitled in the emergency department of a major hospital when he or she presents as Mr. Allen presented on April 19, 2003.  Mrs. Allen contends that there is one standard of care owed by a major hospital such as ANMC in evaluating and diagnosing patients in the emergency department and that this standard of care was not met by ANMC's ED the morning of April 19, 2003.  That standard of care applies whether or not the patient is being seen by an ER physician or a mid-level practitioner.  *See Alef v. Alta Bates Hospital*, 6 Cal.Rtpr.2d 900 (Cal.App.1992).

16

17

18

In *Alef*, a medical malpractice case involving a birth injury, there was much disagreement at trial regarding what standard of care applied to the nurse who was performing the "Doppler monitoring" used to assess the fetal heart rate.  The appellate court, reversing the trial court's granting of defendant's motion for a "nonsuit," opined that

19

20

---

[8] Notably, one of the Government's standard of care experts, Nurse Duntze, is of the opinion that Nurse Fearey should be held to the same standard of care as an emergency room physician.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

> [s]omewhere in the process the parties overlooked the fact that the standard of care determines, inter alia, the minimum level of care to which the patient is entitled. It is undisputed in this record that the purpose of fetal heart monitoring is to detect changes in the normal fetal heart rate indicative of fetal distress ….. Dr. Neff testified that the standard of care in 1981 for Doppler monitoring was to listen and measure through the contraction and for at least 30 to 40 seconds thereafter. Since this was the standard of care to which the patient was entitled, the hospital was required to provide it, and whether the monitoring was performed by a physician or a nurse is irrelevant, as either were qualified to perform that function.

*Id*. at 904. *See also Planned Parenthood v. Vines*, 543 N.E.2d 654, 660 (Indiana App. 1989)(upholding jury verdict in favor of patient who was injured by negligent insertion of intrauterine device [IUD], appellate court discussed that there was one minimum standard of care that applied to insertion of IUD whether or not nurse or physician was performing insertion).

In *Knuth v. Emergency Care Consultants, P.A.,* 644 N.W.2d 106 (Minn.App. 2002), the plaintiff's deceased mother, subsequent to being in a car accident, had visited a particular hospital emergency room nine different times in the course of five months, and on at least five of those visits she complained of pain/spasms in her neck, chest and left arm. The physicians and nurse practitioner evaluating 44-year old Ms. Knuth never ruled out cardiac disease and Ms. Knuth died of a heart attack shortly after a visit to the emergency room. An autopsy revealed she had a 95% blockage of her left main artery to her heart. The appellate court reinstated the jury's verdict in favor of the plaintiff, reversing the trial court's grant of the defendant's motion notwithstanding the verdict. Although the appellate court did not explicitly discuss whether or not there was a different standard of care applying to the emergency room physicians versus the nurse practitioner, implicit in the Court's decision was approval of the plaintiff's expert in emergency medicine testifying regarding a single standard of care that applies in an emergency room under the circumstances of that case. 644 N.W.2d at 108-111.

Another way of framing the issue in this case is to look at the function being performed by the mid-level practitioner, Nurse Fearey. As a nurse practitioner working in the emergency department of ANMC, Nurse Fearey was performing the functions of an emergency department physician; she was independently evaluating and diagnosing patients which requires regularly working through differential diagnoses, ordering tests and medications. Taking the Government's anticipated argument that Nurse Fearey should be held to a lower standard of care than an emergency room physician to its logical conclusion would mean that had Mr. Allen been evaluated by an orderly or a nursing student, that care provider would only be held to the standard of care of an orderly or nursing student. Applying a lower

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington 98337
Phone: (360) 782-4300
Facsimile: (360) 782-4358

standard of care in that situation would obviously be inappropriate.  *See Central Anesthesia Assoc. v. Worthy*, 333 S.E.2d 829, 834 (Ga. 1985)(in medical malpractice case where student nurse anesthetist provided anesthesia care to patient without supervision, contrary to state statute, and where patient suffered cardiac arrest and brain damage, Supreme Court rejected argument by student nurse that she should not be held to standard of care of skilled certified nurse anesthetist, but only to the standard of care and skill of second year student nurse anesthetist).

Finally, the Government's position that Nurse Fearey is held to a standard of care different than that of an emergency room physician underscores the importance of the triage decision in this case.

### G.     Mrs. Allen's Claim for Negligent Infliction of Emotional Distress

Mrs. Allen moved this Court to allow her to amend her complaint to allege negligent infliction of emotional distress [docket 17] and this Court Granted her motion stating, "in so granting, the Court is expressly declining to determine whether the amended claim is barred by the applicable statute of limitations.  The United States may conduct discovery regarding the amended claim."  [Docket 27]. Mrs. Allen notes that the Government conducted additional discovery and has not moved to dismiss the claim as being barred by the statute of limitations.

### 1.     Mrs. Allen's Claim is Not Barred By the Statute of Limitations

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues …" 28 U.S.C. § 2401(a). *See, e.g., Goodman v. United States*, 298 F.3d 1048 (9th Cir. 2002).  Mrs. Allen presented her administrative claim to the appropriate federal agency within two years of her husband's death. Although she did not explicitly state a claim for negligent infliction of emotional distress, her narrative description of the events and circumstances giving rise to her claims against the United States were more than adequate to allow the United States to conduct a full investigation into the circumstances surrounding Mr. Allen's death, including any claims that Mrs. Allen might have from witnessing her husband go into respiratory arrest and die.  In *Goodman*, the Ninth Circuit held that it was appropriate to allow the husband of deceased in a medical malpractice case to amend his complaint brought against the United States pursuant to the FTCA to allege lack of informed consent even though his administrative claim did not explicitly state such a claim.  298 F.3d at 1055-1056.  The Court explained that "the prerequisite administrative claim need not be extensive.  The person injured, or his

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1  or her personal representative, need only file a brief notice or statement with the relevant federal

2  agency containing a general nature of the injury and the amount of compensation demanded.

3  [Citations omitted.]  Furthermore, the notice requirement under § 2675 is minimal, and a plaintiff's

   administrative claims are sufficient even if a separate basis of liability arising out of the same incident

4  is pled in federal court." *Id.  See also Rooney v. United States*, 634 F.2d 1238, 1242 (9th Cir. 1980).

5          Furthermore, the amendment to the complaint itself properly relates back to the date of the

   filing of the original complaint in federal district court which undisputedly was timely filed.

6  Fed. R. Civ. P. 15(c)(2).  The added claim is therefore not time barred.  Rule 15(c)(2) provides that an

7  amendment relates back to the date of the original pleading if the claim asserted in the amended

   pleading "arose out of the conduct, transaction, or occurrence set forth in the original pleading."  In

8  this case, Mrs. Allen was not seeking to add a new party, but simply seeking to add a claim based on

9  the facts already alleged in the administrative claim and original complaint.  *See, e.g., Martel v.

   Trilogy*, 872 F.2d 322, 323-325 (9th Cir. 1989) (plaintiff's second amended complaint filed outside the

10 statute of limitations stating new causes of action against existing party to case related back to the

   original complaint where it was based on the same operative facts as stated in the original complaint).

11         Mrs. Allen alleged in the original complaint, *inter alia*, that:

12         11.    On or about April 19, 2003, Todd Allen was evaluated at the ANMC
           emergency room.

13         12.    Todd Allen told ANMC personnel that he had a very severe headache,
           which was located in the back of his head and radiated up to the top of his head, nausea,
14         and vomiting.

15         13.    Mr. Allen was examined and discharged from the ANMC emergency
           room.

16         14.    Later the same day, Mr. Allen's wife called the ANMC emergency room
           and reported her husband's symptoms to ANMC employees/agents.  Mrs. Allen was not
           instructed to bring her husband to ANMC nor was she instructed to call 911.

17         15.    Soon thereafter, Mrs. Allen noted that her husband was having periods of
18         apnea.  She tried to rouse her him [sic] and was unable to do so.  At that time, she noted
           that her husband had spit out blood.

19         16.    Mrs. Allen called 911.  Paramedics arrived and attempted to resuscitate
           Mr. Allen.  He was then transported by ambulance to Providence Hospital.

           17.    At Providence Hospital, a CT scan of Mr. Allen's head showed an
20         extensive subarachnoid hemorrhage.  Mr. Allen died shortly thereafter.  Mr. Allen died

PLAINTIFF'S TRIAL BRIEF
*Allen v. USA*, Case No. 3:04-CV-0131-JKS
Page 13 of 23

FRIEDMAN, RUBIN & WHITE
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1    as a result of the negligent conduct and care of the ANMC and its employees and/or
     agents.

2    [*See* docket # 1].

3        Mrs. Allen's amended complaint makes the same factual allegations as in the original

     complaint and alleges that "as a direct and proximate result of Defendant's negligence Mrs. Allen saw

4    her husband, Todd Allen, suffer, go into respiratory arrest and eventually die."  Clearly Mrs. Allen's

5    NIED claim is based on the same set of facts that underlie the wrongful death and survival actions:  the

     negligence of ANMC and its employees and/or agents evaluating Mr. Allen at the emergency

6    department.  Therefore, the NIED claim arises directly "out of the conduct, transaction and occurrence

7    set forth in the original pleading."  Fed. R. Civ. P. 15(c)(2).  *See Martel*, 872 F.2d at 323-325.  *See also*

     *Miller v. Fairchild Industries, Inc.*, 668 F.Supp. 461, 463-464 (D.Maryland 1987) (former employees'

8    amended complaint against employer adding new causes of action was not time-barred where the new

9    claims were based on the same conduct alleged in the original complaint).

10               **2.     The Elements of Mrs. Allen's NIED Claim**

         "A resolution of the question of whether a plaintiff can assert a claim for NIED is essentially an

11   inquiry into whether the defendant should reasonably foresee the injury to the plaintiff and thus owes

12   the plaintiff a duty of care.  *See Dillon v. Legg,* 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968).

13   The existence and extent of a duty of care are questions of law for the court to determine.  *Estate of*

     *Breitenfeld v. Air-Tek, Inc.,* 755 P.2d 1099, 1102 (Alaska 1988); *Armstrong v. United States,* 756 F.2d

14   1407, 1409 (9th Cir.1985)."  *Beck v. State Dep't. of Trans.*, 837 P.2d 105, 109 (1992).

15       Whether or not the defendant owes the plaintiff a duty of care is based on 1) whether the

16   plaintiff was present at or close to the accident or tragic occurrence; 2) whether the plaintiff

17   experienced shock from the "sensory and contemporaneous observance" of the accident or tragic

18   occurrence and 3) whether the plaintiff is closely related to the person perceived to be injured.  *Id.  See*

     *also Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038, 1041 (Alaska 1986).

19       In this case, as a matter of law, the United States owed Mrs. Allen a duty of care.  It was utterly

20   foreseeable that she would suffer emotional harm as a direct result of the defendant's negligence.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

Mrs. Allen was at the ANMC ED with her husband the morning of April 19, 2003 when he was triaged by Nurse Ambrose and examined by Nurse Fearey. Mrs. Allen drove her husband from the hospital and it was foreseeable that she would be with him as the consequences of ANMC's negligence unfolded. Mrs. Allen saw what she believed to be blood coming from her husband's mouth and she witnessed him going into respiratory arrest. After trying to perform CPR on her husband under instructions given by the 911 operator, she watched paramedics trying to "jump start his heart." She witnessed his death later at the hospital. It cannot be disputed that their relationship was a close one: they were married and Mrs. Allen was three months pregnant with their child.

The Government's position appears to be that Mrs. Allen's claim for NIED was filed too late.

## IV.    COMPENSATION

This case involves claims for wrongful death, survival and negligent infliction of emotional distress. Alaska's wrongful death statute, AS 9.55.580, provides in pertinent part that

> (a) ….. the damages therein shall be the damages the court or jury may consider fair and just. The amount recovered, if any, shall be exclusively for the benefit of the decedent's spouse and children when the decedent is survived by a spouse or children, or other dependents. … When the plaintiff prevails, the trial court shall determine the allowable costs and expenses of the action and may, in its discretion, require notice and hearing thereon. The amount recovered shall be distributed only after payment of all costs and expenses of suit and debts and expenses of administration.

> (b) The damages recoverable under this section shall be limited to those which are the natural and proximate consequence of the negligent or wrongful act or omission of another.

> (c) In fixing the amount of damages to be awarded under this section, the court or jury shall consider all the facts and circumstances and from them fix the award at a sum which will fairly compensate for the injury resulting from the death. In determining the amount of the award, the court or jury shall consider but is not limited to the following:

> (1) deprivation of the expectation of pecuniary benefits to the beneficiary or beneficiaries, without regard to age thereof, that would have resulted from the continued life of the deceased and without regard to probable accumulations or what the deceased may have saved during the lifetime of the deceased;

FRIEDMAN, RUBIN & WHITE
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1

     (2)  loss of contributions for support;

2

     (3)  loss of assistance or services irrespective of age or relationship of decedent to the beneficiary or beneficiaries;

3

     (4)  loss of consortium;

4

     (5)  loss of prospective training and education;

5

     (6)  medical and funeral expenses.

6

**A.    Economic Losses – Deprivation of Pecuniary Benefits to Beneficiaries**

7

     Mrs. Allen and Presley Allen are statutory beneficiaries of Mr. Allen's estate.  Mr. Allen was

8

employed full time for TCC[9] as an oil spill response technician/laborer.  He had an excellent work ethic

9

and was thought highly of by those with whom he worked.  He had been working at TCC since 2000

10

until his untimely death in 2003.  He worked in Valdez one week on/one week off and lived in

11

Anchorage on his weeks off.  At the time he died, he and Mrs. Allen were in the process of moving to

12

Valdez so that he would not have to travel back and forth to Anchorage.  Mr. Allen was a member of

13

the Laborer's International Union of North America, Local 341 for the Trans Alaska Pipeline

14

Maintenance and Construction Agreement.  In 2002, he earned $59,026.00.  Had Mr. Allen's SAH

15

been properly diagnosed on the morning of April 19, 2003, and had he been appropriately monitored

16

and treated, Mr. Allen more likely than not would have had a good outcome and would have been able

17

to return to his job.

18

     Dr. John Finch, the plaintiff's economist, has calculated the plaintiffs' total past and future

19

economic losses due to Mr. Allen's death as $1,563,147.  The Government's economist, Dr. Paul

20

Taylor, calculates the total economic losses as $1,016,000.

---

[9] TCC is an LLC which is responsible for, among other things, operating, maintaining and tracking all SERVS (ship escort response vessel system) oil spill response equipment and oil spill response and tanker line handling/booming operations in the Valdez Marine Terminal.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1

**B.    Non-Economic Losses**

2

Mrs. Allen's and Presley Grace's non-economic losses are truly incalculable.  Because of the

3

Government's negligence, Mrs. Allen witnessed her husband go into respiratory arrest with what she

4

perceived to be blood coming from his mouth in their hotel room.  While pregnant with their first child,

5

she pulled her husband to the floor of the hotel room to give him CPR.  While giving him CPR, the

6

paramedics arrived and she watched as they took over trying to resuscitate her husband.  In the next 36

7

hours, she made the decision to end life support and to donate her husband's organs.  She watched her

8

Mr. Allen die.  Mrs. Allen lost her husband, best friend and the father of her child.

Presley Grace has no father and will never have the benefit of the special bond that is known to

9

exist between a father and daughter.  Mr. Allen loved kids and was a mentor to his friend's children in

10

addition to being a Native Youth Olympics Coach and chaperone for many years.  He would have been

a wonderful father.

11

Mr. Allen undoubtedly suffered between the time he was discharged from the ANMC ED and

12

his death.   His true condition, a subarachnoid hemorrhage, which is extremely painful, went

13

undiagnosed and untreated.  As the minutes ticked by on April 19th, Mr. Allen's brain, as can be

gleaned from the 6:47 p.m. CT, progressively swelled within its finite cranial space resulting

14

ultimately in the herniation of his brainstem.

15

There is no dispute that in 2003 non-economic damages for death or physical injury were

16

capped at $400,000.  AS 9.17.010.  The issue in this case is how many separate non-economic damage

caps apply.

17

**1.    Three Separate Non-Economic Damage Caps Apply to The Wrongful
Death, Survivorship and NIED Claims.**

18

**(a)    The wrongful death claim is a separate claim from the survivorship
claim.**

19

At the time of Todd Allen's death Alaska law provided that:

20

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

    (a)  In an action to recover damages for personal injury or wrongful death, all damage claims for noneconomic losses shall be limited to compensation for pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life, loss of consortium, and other nonpecuniary damage.

    (b)  Except as provided under (c) of this section, the damages awarded by a court or a jury under (a) of this section for all claims, including a loss of consortium claim, arising out of a single injury or death may not exceed $400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater.

AS 09.17.010.

By the very language of the statute limiting non-economic damages, the Alaska legislature recognized that personal injury claims are distinct from death claims when it included language limiting damages using the disjunctive "*or*" ("arising out of a single injury *or* death"). If the legislature meant to include personal injuries *and* death, it could have done so. *See, e.g., Sander v. Geib, Elston, Frost Professional Ass'n*, 506 N.W.2d 107, 127 (S.D. 1993).[10]

This reading of AS 09.17.010 comports with the separate legal distinction between survivorship and wrongful death claims. In 2005, the Alaska Supreme Court clarified this distinction when it explained that although a wrongful death action "is based on the injury caused to the decedent, a wrongful death action brought by surviving beneficiaries *should not be viewed as a derivative action; rather, it is an 'independent and distinct' cause of action.* [Citations omitted.] *The independent nature of wrongful death claims contrasts with survivorship claims, which under AS 09.55.570 are brought by a personal representative on behalf of the decedent and are plainly derivative.*" *In re Estate of Maldonado*, 117 P.3d 720, 725 n.28 (Alaska 2005) (emphasis added). In other words, the Alaska Supreme Court has made it clear that in cases involving survivorship claims and wrongful death claims, there are necessarily two distinct and independent actions with two separate and distinct

---

[10] In *Sander*, the South Dakota Supreme Court, in holding that the state's statutory damages cap, which applied to "any action for damages for personal injury *or* death alleging malpractice…", applied separately to a wrongful death claim and survivorship claim, explained that "[w]e read 'or' to mean the legislature intended to recognize the differences in the two causes of action and to apply the cap separately to each." 506 N.W. at 127. The Court further explained that "[w]e are further persuaded to this interpretation because to do so gives effect to all of the provisions of wrongful death actions, common law personal injury actions and [the statute capping damages], and makes them 'harmonious and workable.'" *Id.*

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington 98337
Phone: (360) 782-4300
Facsimile: (360) 782-4358

1  injuries, the injury to the decedent prior to his death and the injury to the statutory beneficiaries as a

2  result of his death.

In *Maldonado*, the Alaska Supreme Court addressed whether proceeds from a wrongful death

3  action were property of the estate of the decedent (who died of asbestosis) or his surviving spouse for

4  purposes of Alaska's elective share law.  The Court concluded that because the cause of action for

wrongful death did not arise until after the decedent died, the widow's proceeds from the wrongful

5  death action claim were NOT property of the estate.  In contrast, the court held that any damages for

6  the survivorship claim would pass through the estate and be subject to probate.

7  As the Court further explained:

8  Alaska Statute 09.55.570 permits all causes of action held by a person to survive that
person's death, and allows the action to be pursued by the personal representatives of the

9  estate.  The survival action comes into existence at the time of injury and may
compensate the victim only for the period between the time of injury and the time of

10  death.  Unlike wrongful death claims, survivorship claims are wholly derivative of the
decedent's pre-existing causes of action and compensate the estate only for those

11  injuries suffered by the decedent prior to the death; the claims do not compensate the
survivors for their own harms.

12  117 P.3d at 729.  *See also Sander*, 506 N.W.2d at 127 (holding that South Dakota's statute limiting

13  damages "in any action for damages … alleging malpractice" applied separately to survivorship claims

and wrongful death claims).

14  Therefore, a separate damages cap applies to the wrongful death claim and to the survivorship

claim.

15  **(b)     A separate damage cap applies to Mrs. Allen's claim for negligent
infliction of emotional distress.**

16  Because Mrs. Allen's claim for negligent infliction of emotional distress involves a separate

17  injury from the wrongful death and survivorship causes of action, a separate damages cap applies to

her claim.  *Cf. Lawrence v. State Farm*, 26 P.3d 1074, 1079 (Alaska 2001).  In *Lawrence*, the Alaska

18  Supreme Court held that parents of a child seriously injured in car accident were entitled to separate

19  policy limits for their claims of negligent infliction of emotional distress, explaining that these claims

20  "concern injuries that the claimants have suffered directly, rather than derivative injuries that resulted

1  from an injury to another."  Because Mrs. Allen suffered a direct and separate injury from the death of

2  her husband, a separate damage cap applies.

## V.     OBJECTIONS TO THE GOVERNMENT'S TRIAL EXHIBITS

3           The Government has marked as Exhibit D-1 a compilation of medical records.  Mrs. Allen

4  objects to this exhibit as it is presently comprised.  This objection is <u>not</u> based on authenticity.  Mrs.

5  Allen's objection is based on Evidence Rules 401 and 403.  Many, if not most, of the records in D-1

6  were not in Mr. Allan's ANMC chart the morning of April 19, 2003.  Many, if not most, of the records

7  in Exhibit D-1 relate to Mr. Allen's jaw fracture in 1999 and are not relevant to the issues in this case.

8  One of the primary issues in the case is whether or not the standard of care was breached by ANMC

9  Emergency Department employees the morning of April 19, 2003.  Many, if not most, of the records in

10 D-1 do not have a "tendency to make the existence of any fact that is of consequence to the

11 determination of the action more probable or less probable than it would be without the evidence."[11]

   Admitting records of which the care providers were not aware the morning of April 19th is confusing at

12 best and misleading at worst.[12]

13          Exhibit D-3 is what is labeled the "tracking history for Todd Allen."  As long as a proper

14 foundation is laid, there may be no objection to this record.  The issue is that it contains data that is not

15 self-explanatory and no witness with knowledge to date has explained what the data provided in D-3

   actually means.

16

17 _____

18 [11] Fed. R. Evid. 401.  The records relating to Mr. Allen's jaw fracture that were not in his chart the
   morning of April 19th are also not relevant to the issue of causation.

19 [12] Fed. R. Evid. 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value
   is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the
   jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative
20 evidence."

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1

2    Exhibit D-7 is Nurse Fearey's personnel file and annual evaluations.  Mrs. Allen objects to the

3    admission of Exhibit D-7 because it is not relevant to any issue before this Court[13] and its introduction

4    would amount to impermissible character evidence.[14]  Evidence Rule 401 and 608.  Again, one of the

5    primary issues in this case is whether or not ANMC and its employees failed to provide the minimum

6    level of care required under the circumstances the morning of April 19, 2003.  It is not about whether

7    or not Nurse Fearey is a bad or good person, or whether or not she is generally a good or bad nurse; it

8    is whether or not the care she provided met the standard of care required of an emergency department

9    of a major hospital under the circumstances of Mr. Allen's presentation.

10    Exhibits D-37 and D-40 are depositions of oral surgeons, Dr. Deubner and Dr. Edwards, that

11    were taken in a different case involving Mr. Allen's jaw being broken in 1999 when he was hit by a

12    car.  Drs. Deubner and Edwards had performed surgery on Mr. Allen's jaw in 1999 and 2001

13    respectively.  Mrs. Allen can see no reason for the admission or use of these depositions at trial.  They

---

[13] Fed. R. Evid. 401.

[14] Fed R. Evid. 608 governs the introduction of character evidence and provides in pertinent part:

   (a) Opinion and reputation evidence of character.  The credibility of a witness may be
   attacked or supported by evidence in the form of opinion or reputation, but subject to
   these limitations:   (1) the evidence may refer only to character for truthfulness or
   untruthfulness, and (2) evidence of truthful character is admissible only after the
   character of the witness for truthfulness has been attacked by opinion or reputation
   evidence or otherwise.

   (b) Specific instances of conduct.  Specific instances of the conduct of a witness, for the
   purpose of attacking or supporting the witness' character for truthfulness, other than
   conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence.
   They may, however, in the discretion of the court, if probative of truthfulness or
   untruthfulness, be inquired into on cross-examination of the witness (1) concerning the
   witness' character for truthfulness or untruthfulness, or (2) concerning the character for
   truthfulness or untruthfulness of another witness as to which character the witness being
   cross-examined has testified.

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1    are not relevant to any issues before this court and their probative value would be outweighed by other

2    considerations such as the value of the court's time.[15]

       Mrs. Allen does not have a specific objection to the use of other exhibits on the defendant's list,

3    as long as they are used in accordance with the Rules of Evidence.

4

**VI.    CONCLUSION**

5

       Mrs. Allen will prove at trial that the Government breached its duty to Mr. and Mrs. Allen and

6    such breach caused 1) Mr. Allen to suffer unnecessarily; 2) Mr. Allen's death; and 3) Mrs. Allen to

7    suffer severe emotional distress.   Therefore, Mrs. Allen is seeking appropriate compensation for

     herself, her minor daughter, and Mr. Allen's Estate.

8

                                                    FRIEDMAN RUBIN & WHITE
9                                                   Counsel for Plaintiffs

10

11   DATED:_____May 9, 2007_____        By: _/s/_ Donna J. McCready_____

12                                                  1126 Highland Avenue
                                                    Bremerton, Washington 98337
13                                                  Telephone: (360) 782-4300
                                                    Facsimile: (360) 782-4358
                                                    E-mail: dmccready@frwlaw.us
14                                                  Alaska Bar No. 9101003

15

16

17

18   _____

19   [15] Fed. R. Evid. 401 and 403.   Furthermore, Mrs. Allan objects to the use of these depositions under
     Fed. R. Civ. P. 32(a) as she was not a party to the former litigation involving Mr. Allan's injury from
20   being hit by a car and so was not present or represented at the taking of the depositions of Drs.
     Deubner and Edwards.

PLAINTIFF'S TRIAL BRIEF
*Allen v. USA*, Case No. 3:04-CV-0131-JKS
Page 22 of 23

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358

1

2

**CERTIFICATE OF SERVICE**

3   I certify that on the 9 May 2007, a copy of the foregoing Plaintiff's Trial Brief was served electronically on:

4   Gary M. Guarino
Assistant U.S. Attorney
Office of the U. S. Attorney
5   222 W. 7th Ave., #9
Anchorage, AK  99513-7567

6

7   /s/   Donna J. McCready

8   W:\Allen v. USA\PLED\Trial Brief (070509).doc

9

10

11

12

13

14

15

16

17

18

19

20

**FRIEDMAN, RUBIN & WHITE**
1126 Highland Avenue
Bremerton, Washington  98337
Phone:  (360) 782-4300
Facsimile:  (360) 782-4358